**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MALLINCKRODT PLC, *et al.*, | : | Case No. 20-12522 (JTD) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |
| OPIOID MASTER DISBURSEMENT TRUST II, | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | No. 22-50435 (JTD) |
| | : | |
| v. | : | |
| | : | |
| ARGOS CAPITAL APPRECIATION MASTER | : | |
| FUND LP, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MOTION TO DISMISS THE AMENDED COMPLAINT AS TO**
**DEFENDANTS CITADEL SECURITIES LLC AND**
**SUSQUEHANNA SECURITIES, LLC**
**PURSUANT TO THE PROTOCOL ORDER RELATING TO**
**CONDUITS, NON-TRANSFEREES, "STOCKBROKERS,"**
**"FINANCIAL INSTITUTIONS," "FINANCIAL PARTICIPANTS,"**
**AND DISSOLVED ENTITIES**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A.  The Moving Defendants ................................................................................ 4

    B.  The Mallinckrodt Share Repurchases ......................................................... 4

    C.  The Protocol Order ....................................................................................... 4

    D.  Moving Defendants' Protocol Submissions................................................. 7

        1.  Citadel Securities' Submission .........................................................7

        2.  Susquehanna Securities' Submission................................................10

ARGUMENT ....................................................................................................................... 12

  I.  The Share Repurchases Are Qualifying Transactions ...................................... 13

    A.  The Share Repurchases Fall Squarely Within The Code's Definition of "Settlement Payment"................................................................................................. 13

    B.  The Share Repurchases Were Transfers Made In Connection With A Securities Contract...................................................................................................... 21

    C.  The Trust Waived The Argument That The Share Repurchases Are Not Qualifying Transactions ................................................................................................. 23

  II.  Each Of The Moving Defendants Is A Qualifying Participant........................ 25

    A.  Citadel Securities Is A Financial Participant ............................................. 25

    B.  Susquehanna Securities Is A Financial Participant.................................... 29

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Al Maya Trading Estab. v. Glob. Exp. Mktg. Co.*,
2014 WL 3507427 (S.D.N.Y. July 15, 2014) ..................................................24

*Ankele v. Hambrick*,
286 F. Supp. 2d 485 (E.D. Pa. 2003), *aff'd* 136 F. App'x 551 (3d Cir. 2005) .................24

*Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*,
878 F.2d 742 (3d Cir. 1989) ..................................................16, 20

*Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*,
590 F.3d 252 (3d Cir. 2009) ..................................................13

*Brown v. Chinen*,
2010 WL 1783573 (D. Haw. Feb. 26, 2010) ..................................................30

*Bryant v. Avado Brands, Inc.*,
187 F.3d 1271 (11th Cir. 1999) ..................................................28

*Cohen v. Cohen*,
2022 WL 952842 (D. Del. Mar. 30, 2022) ..................................................24

*Cooper v. Centar Inv. Asia Ltd. (In re TriGem Am. Corp.)*,
431 B.R. 855 (Bankr. C.D. Cal. 2010) ..................................................15, 16, 19

*Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Trib. Co. Fraudulent Conv. Litig.)*,
946 F.3d 66 (2d Cir. 2019) ..................................................15, 20, 22

*Doe v. Keane*,
117 F.R.D. 103 (W.D. Mich. 1987) ..................................................30

*Doe v. Princeton Univ.*,
30 F.4th 335 (3d Cir. 2022) ..................................................28

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.) ("Enron I")*,
323 B.R. 857 (Bankr. S.D.N.Y. 2005) ..................................................16, 17, 18

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. ("Enron II")*,
651 F.3d 329 (2d Cir. 2011) ..................................................13, 17, 18, 20

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019) ..................................................28

*G and G Prods. LLC v. Rusic*,
902 F.3d 940 (9th Cir. 2018) .........................................................................24

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*,
2023 WL 2552399 (Bank. D. Del. Mar. 16, 2023) ...............................13, 14, 27

*Halperin v. All Am. Poly Corp. (In re FBI Wind Down, Inc.)*,
581 B.R. 116 (Bankr. D. Del. 2018) ...............................................................15

*Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*,
646 B.R. 617 (Bankr. S.D.N.Y. 2022) .............................................................29

*Hennessy v. Penril Datacomm Networks, Inc.*,
69 F.3d 1344 (7th Cir. 1995) ........................................................................28

*Hill v. Full 360 Inc.*,
2019 WL 1280050 (N.Y. Sup. Ct. Mar. 19, 2019) ...........................................15

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) .............................................................21

*In re Chemours Co. Sec. Litig.*,
587 F. Supp. 3d 143 (D. Del. 2022) ...............................................................21

*In re Columbia Gas Sys.*,
997 F.2d 1039 (3d Cir. 1993) ........................................................................20

*In re Envision Healthcare Corp.*,
2019 WL 3494407 (D. Del. Aug. 1, 2019) ......................................................28

*In re Lehman Bros. Holdings Inc.*,
469 B.R. 415 (Bankr. S.D.N.Y. 2012) ............................................................14

*In re Madoff Sec.*,
2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...................................................22

*In re Nine West LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020) .............................................................27

*In re Nine West LBO Sec. Litig.*,
2023 WL 8180356 (2d Cir. Nov. 27, 2023)............................ 13, 14-15, 17, 22

*In re Nuvelo, Inc., Sec. Litig.*,
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008).....................................................28

*In re Pilgrim's Pride Corp.*,
421 B.R. 231 (Bankr. N.D. Tex. 2009)............................................................20

*Jonas v. Resol. Tr. Corp. (In re Comark)*,
    971 F.2d 322 (9th Cir. 1992) ........................................................19

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991)........................................................................20

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)................................................... 28-29

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ........................................................28

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*,
    181 F.3d 505 (3d Cir. 1999), *abrogated in part on other grounds by Merit
    Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018) ......................13-14, 16-17

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004)..........................................................29

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's LLC)*,
    426 B.R. 488 (Bankr. D. Del. 2010) ............................................28

*O'Neal v. Middletown Twp.*,
    2019 WL 77066 (D.N.J. Jan. 2, 2019) ..........................................24

*Off. Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor
    World (USA), Inc.)*,
    453 B.R.201 (Bankr. S.D.N.Y. 2011) ..........................................18

*Off. Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*,
    326 B.R. 301 (Bankr. D. Del. 2005) ....................................... 23-24

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)..................................................... 27-28

*Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Invs. Fund, L.P.)*,
    467 B.R. 643 (Bankr. N.D. Ill. 2012) ..........................................18

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    773 F.3d 411 (2d Cir. 2014)................................... 14, 18-19, 21, 22

*Quarles v. United States*,
    139 S. Ct. 1872 (2019) .................................................................21

*United States v. McKie*,
    112 F.3d 626 (3d Cir. 1997)..................................................... 20-21

*Whyte v. Barclays Bank PLC,*
    494 B.R. 196 (S.D.N.Y. 2013).......................................................................21

*Youngman v. Yucaipa Am. All. Fund I, L.P. (In re Ashinc Corp.),*
    629 B.R. 154 (Bankr. D. Del. 2021), *rev'd in part by* 2022 WL 2666888
    (D. Del. July 11, 2022)...............................................................................15

## STATUTES

11 U.S.C. § 101...........................................................................................14, 25

11 U.S.C. § 544.................................................................................................12

11 U.S.C. § 546........................................................................................... *passim*

11 U.S.C. § 548...........................................................................................12, 17

11 U.S.C. § 741.......................................................................................14, 15, 21

## RULES

Fed. R. Bankr. P. 7001.......................................................................................3

Fed. R. Bankr. P. 9017.....................................................................................24

Fed. R. Civ. P. 1..................................................................................................3

Fed. R. Civ. P. 12............................................................................................28

Fed. R. Civ. P. 44.1.........................................................................................24

Fed. R. Evid. 201............................................................................................29

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977)...........................................................................20

H.R. Rep. No. 97-420 (1982)...........................................................................20

Pursuant to the Protocol Order Relating To Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities entered on May 15, 2023, D.I. 185-1 (the "Protocol Order"), Citadel Securities LLC ("Citadel Securities") and Susquehanna Securities, LLC ("Susquehanna Securities"; collectively, "Moving Defendants") move to dismiss the claims brought against them by the Trust[1] in this Adversary Proceeding.

## PRELIMINARY STATEMENT

1.     This is a straightforward motion for dismissal under the Protocol Order and the Bankruptcy Code's "safe harbor," Section 546(e), which Congress enacted to minimize disruptions and uncertainty in the nation's securities markets by precluding precisely what the Trust seeks to do here—to unwind long settled transactions that are "settlement payments," or transfers "in connection with a securities contract," made by or to "financial participants."

2.     The transactions at issue in this case—totaling over $1.6 billion paid by Mallinckrodt to repurchase on the open market approximately 35 million shares of its publicly traded common stock between 2015 and 2018 from public shareholders, including investment banks, broker-dealers, and other major market participants—are quintessential "settlement payments" and transfers made "in connection with a securities contract."  And Moving Defendants, which are among the largest securities firms and market makers in the country, are paradigmatic "financial participants," that is, entities with securities agreements or transactions totaling at least $1 billion in notional or actual principal amount outstanding, or mark-to-market positions of at least $100 million.

3.     None of this is complicated.  The Third Circuit has instructed that the Bankruptcy

---

[1]  Unless otherwise defined, terms have the meanings provided in the Protocol Order. "Share Repurchases" means "Share Repurchase Transactions" as defined in the Protocol Order.

Code's definition of "settlement payment" is "extremely broad," and "includes almost all securities transactions," and this Court has observed that the "financial participant" analysis "seems very straightforward."

4.    Over the course of 11 months, Moving Defendants have provided the Trust with audited financial statements, sworn declarations, filings with the SEC, and confirming data, all of which show that Moving Defendants exceed *both* the "notional amount" and "mark-to-market value" thresholds (though they only need to meet one of the two tests) to qualify as a "financial participant" *by many billions of dollars*.  Yet, the Trust has refused to dismiss Moving Defendants from the Adversary Proceeding, on the purported basis that Moving Defendants must provide even more documentation, all of which is wholly unnecessary to establish that the Moving Defendants are "financial participants" and (if it exists at all) would be extraordinarily burdensome to produce.

5.    Recognizing how untenable its position is—that the Moving Defendants have not adequately demonstrated that they are "financial participants"—the Trust has conjured up an entirely new argument in a last-ditch effort to avoid dismissal of its claims.  The Trust posits that the Share Repurchases were neither settlement payments nor transfers in connection with a securities contract.  Noting that Mallinckrodt was incorporated in Ireland, the Trust claims that Irish law (rather than federal law) governs, that the Share Repurchases were "void" under Irish law (because Mallinckrodt was allegedly insolvent when it executed the transactions), and that, as a result, the Share Repurchases were not "qualifying transactions" under the Bankruptcy Code.  The Trust's approach contravenes the plain wording of the Code and years of Third Circuit precedent, which make clear that whether a transfer is a "settlement payment" or made "in connection with a securities contract" under Section 546(e) turns on federal law, not foreign

(or state) law.  Indeed, the Third Circuit has rejected similar arguments, concluding that transfers that were illegal under Delaware law were nevertheless settlement payments within the meaning of Section 546(e).  The Trust's attempt to rewrite the Bankruptcy Code and disregard controlling precedent should be rejected.

6.      In any event, the Trust waived this new argument by not raising it, or any reference to Irish law, during the months it took for the parties to negotiate the Court-ordered Protocol Order governing this Motion, and during three Court hearings.  Only after refusing for nearly a year to acknowledge that Moving Defendants are "financial participants," and faced with mountains of evidence that they were, did the Trust first purport to deny that the Share Repurchases are "qualifying transactions," nullifying the Court-ordered protocol process and its intended purpose.

7.      The Court should grant the Motion, dismiss the Moving Defendants from this Adversary Proceeding, and order such other relief as it deems just and proper.[2]

## BACKGROUND

8.      The following is a recitation of the pertinent allegations in the Amended Complaint, procedural history, and documents that the Court may consider in connection with these Protocol-Based Motions.[3]

---

[2]  Because the Trust's beneficiaries are opioid claimants, Moving Defendants have decided not to seek recovery at this time of the substantial fees they have incurred to date in connection with their submissions under the Protocol Order and otherwise in this Adversary Proceeding.  But they firmly believe, as do undersigned counsel, that the positions taken by the Trust in refusing to dismiss the claims against Moving Defendants go well beyond the boundaries of fair advocacy and are contrary to the terms of both the Protocol Order and the basic command of the Federal Rules—that "the parties" must act "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1; Fed. R. Bankr. P. 7001.

[3]  The Protocol Order provides, in relevant part, that any "Protocol-Based Motion may

A.    The Moving Defendants

9.    Citadel Securities is a registered broker-dealer with the SEC, a leading market maker, and a member of the Financial Industry Regulatory Authority.  Declaration of Ross E. Firsenbaum ("Firsenbaum Decl."), Ex. 2 ¶ 2.  Susquehanna Securities is also a registered broker-dealer and one of the leading market makers for options, trading for its own account as a dealer on the principal U.S. securities exchanges.  *Id.*, Ex. 8 ¶ 2.  As market makers, Moving Defendants play major roles in creating the liquidity on which the securities markets depend.

B.    The Mallinckrodt Share Repurchases

10.    Between August 2015 and April 2018, Mallinckrodt allegedly paid $1.6 billion to repurchase over 35 million shares of its common stock from public shareholders on the open market.  *See* D.I. 209 ("Am. Compl.") ¶¶ 7, 271.  To do so, Mallinckrodt entered into securities purchase agreements with Goldman Sachs & Co. and Morgan Stanley & Co. (collectively, "Brokers"), which authorized the Brokers, as Mallinckrodt's agents, to repurchase the shares on the open market.  *Id.* ¶ 274.[4]

C.    The Protocol Order

11.    Nearly a year ago, Defendants sought entry of a protocol order allowing for the early presentation and resolution of clear threshold defenses, like the Section 546(e) safe harbor,

_____

include for consideration by the Court (i) the Declaration, (ii) Supporting Documentation, and (iii) any other evidence that the Plaintiff and the Defendant exchanged during the process outlined in paragraphs 5–10 [of the Protocol]."  D.I. 185-1 ¶ 11.b.

[4]  The Amended Complaint does not allege any facts showing, and Moving Defendants do not concede, that any of their sales (if any) of Mallinckrodt stock were *to Mallinckrodt* in connection with the Share Repurchases, rather than sales of Mallinckrodt stock on the open market to other counterparties.  Moving Defendants reserve the right to argue that the Trust has not adequately pled (or met its burden of proving at a later stage of this action) that the Moving Defendants received the proceeds of Share Repurchases, and all other defenses (including but not limited to other reasons why Section 546(e) bars the claims at issue) in subsequent motion practice and at trial.  *See* D.I. 185-1 ¶ 22.

that many Defendants have to the Trust's Complaint.  D.I. 48 ¶¶ 2-3, 11-23.  The Trust did not dispute the propriety of such a protocol, representing that it "fully intend[ed]" to "work with Defendants" to negotiate the protocol.  D.I. 50 ¶ 2; Dec. 20, 2022 Hr'g Tr., D.I. 91 at 51:10-25.  As a result, this Court entered the parties' proposed case management order requiring negotiation of a protocol to "address, efficiently and without undue cost, the defense that any Defendant is a conduit, non-transferee, 'stockbroker,' 'financial institution' or 'financial participant'."  D.I. 93 (the "Case Management Order") ¶ 6(c).

12.     Nevertheless, the Trust initially refused to include Section 546(e) defenses in the protocol, requiring Defendants to seek this Court's direction at the next status conference.  *See* Feb. 28, 2023 Hr'g Tr., D.I. 121 at 12:23-13:11.  At that conference, this Court reminded the Trust that the Case Management Order required the Trust to negotiate a protocol that included the Section 546(e) defenses.  *See id.* at 14:6-7.  Negotiations resumed, but the Trust still would not agree to a protocol consistent with this Court's direction, requiring Defendants to seek relief from the Court.  *See* D.I. 132 (the "Protocol Approval Motion").  Defendants argued that a protocol order was needed to "address[] threshold, individual defenses that can be resolved (and which courts frequently decide) with simple, straightforward evidentiary showings," particularly Section 546(e) defenses.  *Id.* ¶ 10.  The Trust purported not to disagree, representing that if the "documentation that a Defendant provides is clear and sufficient to conclusively establish the Defendant's defense, the Trust will be able to voluntarily dismiss that Defendant—and there is no basis to suggest that it would not do so if appropriate."  D.I. 141 ¶ 39.  The Trust thus made clear that there was only one relevant issue:  whether Defendants can prove through documentation their status as "qualifying participants."

13.     Oral argument on the Protocol Approval Motion likewise focused on the

"qualifying participant" prong of Section 546(e), with the Trust making virtually no mention of the separate "qualifying transaction" prong. Indeed, defense counsel explained that under settled precedent, each Share Repurchase was a "quintessential, that is[,] the paradigmatic settlement payment," so the only question for purposes of the safe harbor was whether "the payment [was] made by, to, or for the benefit of one of the qualifying entities," including financial participants. Apr. 19, 2023 Hr'g Tr., D.I. 158 at 14:12-17. Counsel for the Trust voiced no disagreement, arguing simply that each Defendant needed to show that it is a "qualifying participant." *See generally id.*

14.     On that issue, the Court questioned the Trust's position: "some of these issues seem very straightforward. I don't know that I agree [with the Trust] that determining whether someone is a financial participant or not is difficult." *Id.* at 26:16-19. Noting that Defendants "have a right to bring their defenses and have it done quickly," the Court directed the parties to finalize a protocol order in line with Defendants' proposal. *Id.* at 31:7-12.

15.     The parties then finally reached agreement, and this Court entered the parties' agreed Protocol Order. *See* D.I. 185-1. As to the Section 546(e) safe-harbor defense, that Order mirrors the positions the parties had taken in Court. The Protocol Order focuses on whether a Defendant was a qualifying participant, not whether the Share Repurchases were qualifying transactions. *See id.* Under the Protocol Order, a Defendant can establish that it was a qualifying participant by providing the Trust a declaration and supporting documentation showing that it meets the relevant statutory definition (*e.g.*, "financial participant"). *Id.* ¶ 5. The Protocol Order requires only documentation "*sufficient* to establish the factual basis" for a Defendant's status as a qualifying participant and a written explanation of why the documentation and declaration satisfy the defense (with applicable case law). *Id.* ¶ 6(a)

(emphasis added).  If the Trust intended to challenge whether the underlying transactions were "qualifying transactions," it would have had no reason to agree to such a Protocol Order for dismissal.

16.     Indeed, the Protocol Order nowhere suggests or hints that a Defendant presenting a Section 546(e) defense would also need to address whether the Share Repurchases were qualifying transactions.  To the contrary, at its very outset, the Protocol Order describes the Share Repurchases as "consideration [allegedly received by the Defendants] in exchange for transferring shares of stock of Mallinckrodt plc . . . as part of a share repurchase program[.]"  *Id.* at 1, preamble.

17.     Under the Protocol Order, the Trust must, within 45 days of receiving a submission from a Defendant, either (i) "file a notice of dismissal (without prejudice) or (ii) "notify the Defendant in writing that it is unwilling to dismiss the Defendant and state the grounds upon which such position is based."  *Id.* ¶ 9.  The Trust may also request "additional information," but only information the Trust "believes, *in good faith*, is necessary for it to determine whether the Defendant has established the claimed Defense."  *Id.* (emphasis added).  After the Defendant provides that information, the Trust must respond within 45 days.  *Id.*  If the Trust does not dismiss the Defendant, the Defendant may file a motion to dismiss or for judgment "based on the asserted Defense(s)," which motion can rely on "(i) the Declaration, (ii) Supporting Documentation, and (iii) any other evidence that the Plaintiff and the Defendant exchanged" pursuant to the Protocol Order (a "Protocol-Based Motion").  *Id.* ¶ 11.b.

D.     Moving Defendants' Protocol Submissions

1.     *Citadel Securities' Submission*

18.     On June 13, 2023, Citadel Securities made its submission to the Trust pursuant to

the Protocol Order.[5]  *See* Firsenbaum Decl., Ex. 1 ("Citadel Securities' Initial Submission").

Citadel Securities' Initial Submission demonstrated that Citadel Securities is a "financial participant."  It included its 2019 audited financial statement filed with the SEC, showing that, as of December 31, 2019, Citadel Securities had outstanding repurchase and reverse repurchase agreements with gross amounts of $10.443 billion and $4.419 billion, respectively, and outstanding options to purchase securities with a mark-to-market position of $9.460 billion.  *Id.*, Ex. 2 ¶¶ 5-7, Ex. A.  The Submission also included Citadel Securities' SEC-filed Form 13F, which showed that as of December 31, 2019, Citadel Securities' top ten outstanding options positions alone had a notional amount of over $65 billion.  *Id.* ¶¶ 9-11, Ex. B.  Citadel Securities provided a declaration from the Chief Accounting Officer for Citadel Enterprise Americas LLC and Financial and Operations Principal at Citadel Securities attesting to the accuracy of the filings.  *Id.*, Ex. 2.  Thus, although it only needed to satisfy one of the two statutory tests, Citadel Securities showed that it surpassed both thresholds—a total gross dollar notional value of at least $1 billion or mark-to-market positions of at least $100 million—by many billions of dollars in multiple ways.[6]  *See id.*

---

[5]  The submission followed a December 8, 2022, letter that Citadel Securities sent to the Trust explaining that Citadel Securities was a "financial participant" and attaching its 2019 audited financial statement filed with the SEC.  Firsenbaum Decl., Ex. 1 at Ex. A.  After receiving no response, Citadel Securities followed up on March 15, 2023.  *Id.* at Ex. B.  The Trust ignored both letters, acknowledging them for the first time in its April 11, 2023 opposition to the Protocol Approval Motion.  *Id.* at Ex. C.

[6]  Citadel Securities has an additional Protocol-based defense to the Trust's claims—that Citadel Securities was a "Conduit" with respect to certain alleged sales of Mallinckrodt stock identified in Exhibit B to the Amended Complaint.  Citadel Securities has been unable to assert this defense because the Trust provided fundamentally flawed trading data that prevents Citadel Securities from determining which of the alleged sales even occurred at all, and to the extent they did, whether they were executed on a riskless principal basis, which would qualify Citadel Securities as a "Conduit" with respect to such alleged sales.  Citadel Securities has requested data from the Trust that would allow Citadel Securities to properly analyze the alleged sales and reserves all rights, including to assert the Conduit defense after receiving the corrected data.

19.     The Trust responded on July 28, 2023.  *See id.*, Ex. 3.  Once again, it did not dispute that the Share Repurchases were "qualifying transactions," but instead included 18 requests for documents and information regarding Citadel Securities' "financial participant" showing.  *See id.*  The Trust made these voluminous requests, even though it provided no basis to question the accuracy of Citadel Securities' documentation (or declaration). *See id.* at 1-2.

20.     On September 14, 2023, Citadel Securities responded with a 12-page letter, a second sworn declaration, and additional documentation.  *Id.*, Exs. 4 & 5.  Citadel Securities cited binding Third Circuit precedent holding that courts take judicial notice of SEC filings.  *Id.*, Ex. 4 at 4-5.  Citadel Securities also provided the Trust with three spreadsheets containing detailed and voluminous trading records.  *Id.*, Ex. 5 at Exs. A-C.  First, Citadel Securities submitted a spreadsheet that included the details for each of the repurchase agreements and reverse repurchase agreements held by Citadel Securities as of December 31, 2019, as summarized in the SEC-filed financial statements, including the legal name of the counterparty to each such agreement and the value of each such agreement.  *Id.* at Ex. A.  Second, Citadel Securities also submitted a detailed spreadsheet listing each of Citadel Securities' options holdings as of December 31, 2019, as summarized in the SEC-filed financial statements, including each specific security and the details that support the calculation of the value of the holding.  *Id.* at Ex. B.  Third, Citadel Securities submitted yet another spreadsheet, this one listing the details of its top ten outstanding put and call options, as summarized in its Form 13F filing, including each specific security and the data that supports the calculation of the holding.  *Id.* at Ex. C.  As noted, Citadel Securities also included a second declaration detailing the services and systems supporting the data, how such data is maintained, and, again, attesting to the accuracy of the data.  *Id.*

21.     Citadel Securities further provided: (i) the valuation methodology used to calculate the gross amounts and "notional" value of the reverse repurchase and repurchase agreements; (ii) the valuation methodology used to calculate the notional and mark-to-market values of the outstanding options contracts positions; and (iii) confirmation that other than a single approximately $1 million reverse repurchase agreement with a Citadel Securities affiliate (a de minimis amount—less than 0.02%—of the $4.419 billion in total reverse repurchase agreements), which had already been disclosed in Citadel Securities' Initial Submission and the 2019 audited financial statement, none of the repurchase or reverse repurchase agreements or options contracts was with an affiliate.  *Id.*, Exs. 4 & 5.

22.     Yet, on October 27, 2023—44 days after Citadel Securities' supplemental submission, 139 days after its initial Protocol Submission, and 323 days after Citadel Securities first sent the Trust its audited financial statements—the Trust informed Citadel Securities that it would not dismiss it from the Adversary Proceeding.  *Id.*, Ex. 6.  For the first time, the Trust argued that the alleged Share Repurchases from Citadel Securities were neither "settlement payments" nor "transfers made in connection with a securities contract."  *Id.* at 2-7.

23.     Undersigned counsel met and conferred with the Trust's counsel on November 9, 2023, as required by the Protocol Order.  The meet-and-confer did not resolve the dispute.

### 2.     *Susquehanna Securities' Submission*

24.     On June 21, 2023, Susquehanna Securities made its submission to the Trust pursuant to the Protocol Order, demonstrating that Susquehanna Securities is a financial participant.  *See* Firsenbaum Decl., Exs. 7 & 8 (the "Susquehanna Initial Submission").  The submission attached an audited statement of financial condition filed with the SEC showing that, as of December 31, 2019, Susquehanna Securities had outstanding options to purchase or sell

securities with a mark-to-market value of over $38.5 billion, exceeding—by 385 times—the Bankruptcy Code's $100 million threshold.  *Id.*, Ex. 8 ¶ 5, Ex. A.  Susquehanna Securities also included a sworn declaration of its treasurer attesting that the information was accurate.  *Id.*

25.    The Trust responded on August 4, 2023.  *Id.*, Ex. 9.  As with the Trust's initial response to Citadel Securities, this response did not dispute that the Share Repurchases were qualifying transactions.  *See id.*  Instead, without offering any reason to question the accuracy of Susquehanna Securities' audited statement of financial condition filed with the SEC, the Trust argued that this Court would not take judicial notice of that document.  *Id.* at 1-2.  The Trust also made eight requests for voluminous documents and information, with no description of the purpose of the requests or any other explanation of why the Trust needed these additional materials to confirm Susquehanna Securities' status as a financial participant.  *Id.* at 2-3.

26.    On September 1, 2023, Susquehanna Securities responded to the Trust, *id.*, Ex. 10, explaining that the audited statement of financial condition filed with the SEC is precisely the kind of document that courts take judicial notice of, citing to Judge Shannon's recent decision taking judicial notice of a defendant's SEC filing when granting a motion to dismiss pursuant to Section 546(e) and another recent decision by Judge Rakoff of the Southern District of New York doing the same.  *Id.* at 2-3 (citing cases).  Although not required by the Protocol Order, Susquehanna Securities also provided additional information:  (a) an explanation that the options in the audited statement of financial condition were traded on a securities exchange, and thus that the terms of the underlying options contracts are standardized and set by the Options Clearing Corporation, meaning there were no bespoke contracts to produce; (b) the method used to calculate the value of the options contracts (even though that valuation method was already described in detail in the audited statement of financial condition); and (c) confirmation that none

of the options contracts were with affiliates of Susquehanna Securities. *Id.* at 4-7.

27. On October 16, 2023—45 days after Susquehanna Securities submitted its response letter, and 117 days after its Initial Protocol Submission—the Trust informed Susquehanna Securities that it would not dismiss it from the Adversary Proceeding. *Id.*, Ex. 11. As with its letter to Citadel Securities, the Trust argued for the first time that the alleged Share Repurchases were not "settlement payments," and thus not "qualifying transactions" under Section 546(e). *Id.* at 2-6. The Trust also maintained that Susquehanna Securities' audited statement of financial condition filed with the SEC and supplemental information were insufficient to establish that Susquehanna Securities is a financial participant, reprising its position that the Court cannot take judicial notice of SEC filings. *Id.* at 6-7.

28. Undersigned counsel met and conferred with the Trust's counsel on October 24, 2023, but this meeting too resolved nothing.

## ARGUMENT

29. The Amended Complaint purports to assert constructive and intentional fraudulent transfer claims pursuant to Section 544 of the Bankruptcy Code. Am. Compl. ¶¶ 351-84. Section 546(e) provides an absolute "safe harbor" against these claims:

> *Notwithstanding section[] 544* . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial participant . . . or that is a transfer made by or to (or for the benefit of) a . . . financial participant . . . in connection with a securities contract . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (emphasis added).[7]

30. The safe harbor has two requirements: (1) a "qualifying transaction" (*i.e.*, a "settlement payment" or "transfer made in connection with a securities contract"), and (2) a

---

[7] Although Section 546(e) does not bar a claim pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, the Amended Complaint does not purport to bring such a claim.

"qualifying participant" (*i.e.*, the transfer was made by or to (or for the benefit of), among others, a "financial participant").  *Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*, 2023 WL 2552399, at *5 (Bank. D. Del. Mar. 16, 2023).  Both prongs are satisfied here.

## I.   The Share Repurchases Are Qualifying Transactions

31.    The payments that Mallinckrodt allegedly made to Moving Defendants to purchase Mallinckrodt common stock trading on the New York Stock Exchange are qualifying transactions for two independent reasons:  they are "settlement payments" and "transfer[s] made in connection with a securities contract."

### A.    The Share Repurchases Fall Squarely Within The Code's Definition of "Settlement Payment"

32.    *First*, the Share Repurchases are quintessential "settlement payments."  Under controlling Third Circuit precedent, the statutory term "settlement payment" is "extremely broad" and covers "almost all securities transactions."  *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999), *abrogated in part on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018).  A "settlement payment" is simply "the transfer of cash or securities made to complete a securities transaction."  *Id.*; *see also Brandt v. B.A. Cap. Co. LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258 (3d Cir. 2009) (same).  Other circuits agree.  *See, e.g.*, *In re Nine West LBO Sec. Litig.*, 2023 WL 8180356, at *10 (2d Cir. Nov. 27, 2023) (citing *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 339 (2d Cir. 2011) ("Enron II")) (same).

33.    The Third Circuit's definition of a "settlement payment" perfectly describes the Share Repurchases—payments to complete the open-market purchases of Mallinckrodt's publicly-traded shares.  Am. Compl. ¶ 7.  Accordingly, they constitute "settlement payments."  *See Resorts*, 181 F.3d at 516 (payments of cash made to shareholders to complete leveraged

buyout were "settlement payments"); *see also Nine West*, 2023 WL 8180356, at *10 (affirming district court that cash payments to redeem stock were "settlement payments"). For this reason alone, the Share Repurchases were "qualifying transactions."

34. The Share Repurchases also were qualifying transactions because they were transfers made "in connection with a securities contract." 11 U.S.C. § 546(e). The Code defines "securities contract" with "extraordinary breadth," *Nine West*, 2023 WL 8180356, at *10, to include any contract "for the purchase, sale, or loan of a security . . . including any repurchase . . . transaction on any such security," 11 U.S.C. § 741(7)(A)(i), (vii). "Security," in turn, is defined to include "stock." *Id.* § 101(49)(A)(ii). And the "in connection with" standard "sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided." *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 422 (2d Cir. 2014); *Quorum Health*, 2023 WL 2552399, at *5-6 (applying § 546(e) on the pleadings to acquisition of stock, noting that the terms "securities contract" and "security" are "broadly defined" in the Code). The transfer need merely "relate to" or be "associated with" the relevant securities contract, *Madoff*, 773 F.3d at 421, and there is no "temporal" requirement for a transfer to have been "in connection with a securities contract," *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012).

35. The Share Repurchases easily qualify as transfers made "in connection with a securities contract"—indeed, in connection with two separate sets of securities contracts. First, the Amended Complaint alleges that the Share Repurchases were made pursuant to securities purchase agreements between Mallinckrodt and its Brokers, which authorized the Brokers to repurchase shares of Mallinckrodt stock from shareholders, including the Moving Defendants, for Mallinckrodt. Am. Compl. ¶¶ 275-76; *see also Nine West*, 2023 WL 8180356, at *10

14

(debtor's payments to public shareholders for the redemption of shares were made "in connection with a securities contract"); *Deutsche Bank Tr. Co. Ams. v. Large Private Beneficial Owners (In re Trib. Co. Fraudulent Conv. Litig.)*, 946 F.3d 66, 80 & n.12 (2d Cir. 2019) (same).

36. Second, the Share Repurchases separately qualify as transfers made in connection with securities contracts because they were made in connection with each Moving Defendant's open orders to sell the relevant shares of Mallinckrodt stock, which, once accepted by the buyer, Mallinckrodt, were "securities contracts." 11 U.S.C. § 741(7)(A)(i); *Hill v. Full 360 Inc.*, 2019 WL 1280050, at *6-7 (N.Y. Sup. Ct. Mar. 19, 2019) (orders to sell securities are contracts).

37. Finally, the Share Repurchases indisputably "relate to" both (a) the securities purchase agreements between Mallinckrodt and the Brokers, and (b) Moving Defendants' sell orders, which were accepted by Mallinckrodt to satisfy those very securities contracts, and thus are themselves independent securities contracts between Moving Defendants and Mallinckrodt.

38. Against this backdrop, the Trust's belated argument that the Share Repurchases are not "qualifying transactions" because they were purportedly "void" under Irish law is without merit. The Trust relies on two bankruptcy court decisions from other Circuits, neither of which has ever been cited in the Third Circuit for the proposition cited by the Trust[8] and both of which, if read for that proposition, would be plainly inconsistent with (i) binding Third Circuit precedent, (ii) the safe harbor itself, and (iii) caselaw from higher courts within those other

---

[8] *In re TriGem* has twice been cited by this Court, but for reasons wholly unrelated to the meaning of the term "settlement payment." *See Youngman v. Yucaipa Am. All. Fund I, L.P. (In re Ashinc Corp.)*, 629 B.R. 154, 195 & n.171 (Bankr. D. Del. 2021), *rev'd in part by* 2022 WL 2666888 (D. Del. July 11, 2022) (citing *TriGem* for the proposition that the trustee bears the burden of persuasion on the "reasonably equivalent value" element of a fraudulent transfer claim); *Halperin v. All Am. Poly Corp. (In re FBI Wind Down, Inc.)*, 581 B.R. 116, 134 & n.109, 110 (Bankr. D. Del. 2018) (citing *TriGem* in connection with the "earmarking defense" to fraudulent transfer claims).

Circuits. The first, *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857 (Bankr. S.D.N.Y. 2005) ("Enron I"), is an 18-year-old Southern District of New York bankruptcy court decision holding that because an Oregon corporation's repurchase of its shares violated Oregon law, the transactions "would be a nullity and have no legal effect" and thus the transfers would not "be protected from avoidance." *Id.* at 859, 877-78. The second, *Cooper v. Centar Inv. Asia Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855 (Bankr. C.D. Cal. 2010), cited *Enron I*, but did not concern settlement payments at all, let alone standard market purchases and sales of stock. Neither case supports the Trust's arguments, for several reasons.

39.     *First*, the Trust's reading of the cases is contrary to controlling Third Circuit precedent regarding the meaning of the statutory term "settlement payment." The Third Circuit first addressed the issue in *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 753 (3d Cir. 1989). Relying on "the language of the statute" and without reference to state, let alone foreign, law, the Third Circuit held that a "settlement payment" is the "payment of cash to the dealer by the purchaser," which "encompasses transfer of the purchased securities to the purchaser from the dealer." *Id.* at 749, 751-52. In *Resorts*, the Third Circuit reaffirmed that a "settlement payment" is any "transfer of cash or securities made to complete a securities transaction." 181 F.3d at 515. This controlling authority is dispositive.

40.     Indeed, *Resorts* forecloses the Trust's supposition that a payment cannot be a "settlement payment" if it is made to complete a purportedly illegal transaction. The Third Circuit made clear that whether the transaction was void, illegal, or inconsistent with the law of the debtor's place of incorporation was simply irrelevant under the Code. The court acknowledged that the transfer at issue—a tender of shares by a shareholder who previously had demanded an appraisal in lieu of payment—was "contrary to [Delaware] statute and, at least

16

arguably, created an illegal contract." *Id.* at 513 n.5.  But that did not matter to the Third Circuit, which held that the payments made to complete that transaction were "settlement payments." *Id.* at 515.

41.     *Second*, the Trust's argument is inconsistent with the Code itself.  Congress obviously intended that the safe harbor *would* apply to insolvent companies that made securities-related transfers to financial participants.  *See* 11 U.S.C. § 546(e) ("*Notwithstanding section[] . . . 548(a)(1)(B). . . of this title*, the Trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . .  financial participant." (emphasis added)); *id.* § 548(a)(1)(B)(ii)(I) (requiring the trustee to prove debtor "was *insolvent on the date that such transfer was made or such obligation was incurred*" (emphasis added)). The Trust's argument would turn the safe harbor on its head, making it inapplicable simply because, in the Trust's telling, Mallinckrodt was allegedly insolvent at the time of the Share Repurchases.  This illogical result disregards the very purpose of the safe harbor—fraudulent transfers occur in the context of insolvent companies, and the safe harbor is intended to prevent the unwinding of payments made in precisely that context.  The Trust's logic would undermine the certainty and market stability Section 546(e) is designed to achieve, causing its application to turn on whether the fraudulent transfers happen to conflict with the foreign or state law of the jurisdiction in which the debtor was incorporated.

42.     *Third*, the Trust's reading of the two cases it cites is not only contrary to controlling Third Circuit precedent and the structure of the Code; it is contrary to the law of the Circuits in which those cases were decided.  To start, *Enron I* is not consistent with subsequent Second Circuit precedent arising out of the same bankruptcy case.  *See Nine West*, 2023 WL 8180356, at \*10; *see also Enron II*, 651 F.3d at 334.  Reaching the same conclusion as the Third

Circuit, and reversing another decision by the same *Enron I* bankruptcy judge that declined to apply the Section 546(e) safe harbor, the Second Circuit held that a "settlement payment" is a "transfer of cash or securities made to complete [a] securities transaction." *Enron II,* 651 F.3d. at 334 (citation omitted). The legality or voidability of the securities transaction under state law did not matter; all that mattered was that the payment was made to complete the transaction. *See id.* As recognized in a subsequent Southern District of New York Bankruptcy Court decision, "the direction given by the *Enron [II]* majority with respect to [the definition of 'settlement payment'] is both uncomplicated and crystal clear—a settlement payment, quite simply, is a transfer of cash made to complete [a] securities transaction." *Off. Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA), Inc.)*, 453 B.R. 201, 215 (Bankr. S.D.N.Y. 2011). Unsurprisingly, at least one court has expressly questioned the continuing validity of *Enron I* in the Second Circuit. *See Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Invs. Fund, L.P.)*, 467 B.R. 643, 653 (Bankr. N.D. Ill. 2012) (noting that *Enron I* "may not be strong precedent given the Second Circuit's recent broad interpretation of the safe harbor provision in *Enron [II]*").

43.     In another decision, the Second Circuit rejected similar arguments advanced in *Enron I* and concluded that cash withdrawals from accounts managed by Bernie Madoff, one of the most notorious fraudsters in history, were both "settlement payments" and transfers "made in connection with a securities contract." *Madoff*, 773 F.3d at 417-22. The Second Circuit held that the safe harbor applied to the cash payments even though they were "made 'in connection with' a Ponzi scheme and, as a result, were fraudulent." *Id.* The court explained, "The clawback defendants, having every reason to believe that BLMIS [Madoff's firm] was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the

protections afforded to the clients of stockbrokers, including the protection offered by § 546(e)." *Id.* at 420. In contrast, the trustee's argument would "[p]ermit[] the clawback of millions, if not billions, of dollars from BLMIS clients—many of whom are institutional investors and feeder funds—[which] would likely cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)." *Id.* If payments made pursuant to a Ponzi scheme in which the debtor never bought or sold securities were "settlement payments," then the Share Repurchases, which involved actual securities purchases by a legitimate company, surely were as well.

44. The Trust's second cited case, *Cooper v. Centar Invs. (Asia) Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855 (Bankr. C.D. Cal. 2010), did not even concern Section 546(e) and its protection for "settlement payments," but instead Section 546(g), a separate protection for transfers made in connection with swap agreements that makes no reference to "settlement payments." Indeed, if *TriGem* were applied out of context to Section 546(e) and its protection of "settlement payments," as the Trust suggests, it would be contrary to the law of its own circuit, the Ninth.[9] Moreover, *TriGem* involved an extraordinary transaction whereby the debtor agreed to exchange bonds for new convertible securities; the transaction "smell[ed] of an *ad hoc* attempt to evade" regulators and involved a "manifestly one-sided structure" that "was foisted upon [the debtor] by [its parent]." 431 B.R. at 858-59, 866. Here, in contrast, the Share Repurchases were open market purchases of publicly-traded stock from public shareholders—perhaps the most common securities transaction protected as "settlement payments."

45. *Finally*, under the Trust's argument, the "settlement payment" inquiry in each case would require a complex inquiry into the facts and the legality of the transfers under the

---

[9] *See Jonas v. Resol. Tr. Corp. (In re Comark)*, 971 F.2d 322, 326 (9th Cir. 1992) ("We now join with the Third and Tenth Circuits and broadly define the term settlement payment," which "clearly includes a transfer of securities . . . to completes a securities transaction.").

local law of the debtor's place of incorporation. That proposition is inconsistent with Congress' purpose in enacting the "safe harbor"—to minimize instability and displacement in the securities markets. *See Bevill*, 878 F.2d at 747-49; *see also Trib.*, 946 F.3d at 90 (holding that Section 546(e)'s purpose is to ensure "certainty, speed, finality, and stability" in the settlement of securities transactions). Based solely on purported intricacies of Irish corporate law, the Trust asks this Court to unwind settled securities transactions that are five-to-eight years old and that involved open market sales of publicly traded stock on the world's largest stock exchange by paradigmatic financial participants. That approach would result in market uncertainty and unpredictability—the very result that Congress enacted the safe harbor to avoid. *See Enron II*, 651 F.3d at 336 ("Enron's proposed reading . . . would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium."); *see also Trib.*, 946 F.3d at 90 (Section 546(e) "provide[s] certainty as to each transaction's consummation, speed to allow parties to adjust the transaction to market conditions, finality with regard to investors' stakes in firms, and thus stability to financial markets" (citing H.R. Rep. No. 97-420 (1982); H.R. Rep. No. 95-595 (1977))).

46.    Moreover, nothing in the language of the Section 546(e) remotely suggests that state or foreign law is relevant, let alone determinative. To the contrary, "[f]ederal law governs the interpretation of federal statutes." *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 236 (Bankr. N.D. Tex. 2009) (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97 (1991)); *In re Columbia Gas Sys.*, 997 F.2d 1039, 1055 (3d Cir. 1993) ("It is axiomatic that federal law governs questions involving the interpretation of a federal statute"). And Congress is not presumed to have enacted a statutory provision that is ineffectual or self-defeating. *See United States v. McKie*, 112 F.3d 626, 374 (3d Cir. 1997) (courts are obligated to "construe statutes sensibly and avoid

constructions which yield absurd . . . results"); *see also Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) ("[Courts] should not lightly conclude that Congress enacted a self-defeating statute."); *Whyte v. Barclays Bank PLC*, 494 B.R. 196, 199 (S.D.N.Y. 2013) (rejecting trustee's argument against effect of Section 546(g) safe harbor because it would have the "absurd result" of "render[ing] section 546(g) a nullity").[10]

B.    The Share Repurchases Were Transfers Made In Connection With A Securities Contract

47.    Even if the Share Repurchases were not "settlement payments" (which they are), they were certainly transfers "in connection with a securities contract." The Bankruptcy Code defines a "securities contract" broadly to include "any other agreement or transaction that is similar to" a contract for the purchase or sale of a security. 11 U.S.C. § 741(7)(A)(vii). At the very least, the Share Repurchases were "transactions" "similar to" those undertaken under contracts for the purchase and sale of securities. *See Madoff*, 773 F.3d at 419.

48.    The Trust argues that the Moving Defendants were not parties to, and therefore

_____

[10]  Even if Irish law were controlling (which it is not), and even if the Trust's recitation of Irish law were correct (which it has not established), the Trust's argument would be unavailing. First, the Trust has offered no basis (or authority) to support its Irish law argument; it fails to cite even a single Irish case finding a transaction void under the Irish Companies Act. Moreover, its argument turns on a reading of Generally Accepted Accounting Procedures ("GAAP") that makes no sense. The Trust baldly asserts that potential future opioid liabilities were both "probable" and "reasonably estimable" at the time of the Share Repurchases and, therefore, had to be accrued by Mallinckrodt on its balance sheet. *See* Firsenbaum Decl., Exs. 6, 11. But the Trust itself alleges that loss estimations from potential future litigation varied wildly, *see, e.g.*, *Id.*, Ex. 4 at 4-5; Am. Compl. ¶¶ 266-67, as of course did any estimates of the share of the aggregate liability that any one manufacturer of opioids would incur, *see In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 583-84 (S.D.N.Y. 2013) ("[T]here is no plausible allegation that BoA could have reasonably estimated the amount of loss[] [and the] plaintiffs admit as much in arguing that BoA was required to disclose a potential loss of zero to ten billion dollars."). And, in any event, the Trust's accounting argument is doomed because any such liability would have accrued in *future* periods as the result of *future* litigation. *See, e.g.*, Am. Compl. ¶ 253; *In re Chemours Co. Sec. Litig.*, 587 F. Supp. 3d 143, 165-67 (D. Del. 2022) (dismissing allegations that defendants' accruals and disclosures with respect to litigation violated the GAAP requirement that "probable" and "reasonably estimable" losses be accrued).

cannot rely on, the agreements between Mallinckrodt and the Brokers under which the Brokers agreed to act as Mallinckrodt's agent to repurchase Mallinckrodt's shares in the open market. Firsenbaum Decl., Ex. 6 at 6-7. But Section 546(e) does not require the transferee to be a party to the securities contract. Courts have repeatedly held that payments to shareholders for their stock were "in connection with" a securities contract between the company and a third-party intermediary, even though the shareholders themselves were not parties to the agreement. *See Trib.*, 946 F.3d at 80-81; *Nine West*, 2023 WL 8180356, at *10; *In re Madoff Sec.*, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013). The Trust cites no case to the contrary.

49.     The Trust's additional argument that "Citadel [Securities] [has] provided [no] evidence that its receipt of proceeds from the Share Repurchase Transactions was 'in connection with' the Purchase Agreements" (Firsenbaum Decl., Ex. 6 at 7) is irreconcilable with the Trust's own Amended Complaint, which alleges that the Share Repurchases were made pursuant to the securities purchase agreements entered into between Mallinckrodt and the Brokers. Am. Compl. ¶¶ 274-76. As noted, all that is required for a transfer to be "in connection with" a securities transaction is that the transfer "relate to" or be "associated with" the contract in some way. *See supra* ¶¶ 35-37. That "low bar," *Madoff*, 773 F.3d at 422, is plainly reached here. The Amended Complaint alleges that all the Share Repurchases occurred as a result of, and under, the agreements between Mallinckrodt and the Brokers. And, in any event, each of the Share Repurchases was also, by definition, a transfer "in connection with" the agreement between Mallinckrodt and its shareholder under which the shareholder placed an order to sell its stock and Mallinckrodt, through the Brokers, agreed to buy that stock.

C.     The Trust Waived The Argument That The Share Repurchases Are Not Qualifying Transactions

50.     In any event, the Court need not even reach the Trust's "qualifying transaction" arguments because the Trust waived them—in many ways.  *First*, the Trust agreed to a Protocol Order providing for the "dismissal" of a Defendant if such Defendant established a "Defense," which included that the Defendant was a "financial participant."  D.I. 185-1.  At no time during the process that led to the Protocol Order did the Trust dispute that the Share Repurchases were qualifying transactions.  Indeed, the Trust never even hinted at this position, waiting instead to belatedly spring the argument at the proverbial eleventh hour—in Citadel Securities' and Susquehanna Securities' cases, not until the Trust's final letter refusing to dismiss the Defendant.

51.     *Second*, the Protocol Order required the Trust, within 45 days of receiving the Initial Submissions, to "notify the Defendant in writing that it is unwilling to dismiss the Defendant and state the grounds upon which such position is based."  D.I. 185-1 ¶ 9.  But the Trust waited 139 days in the case of Citadel Securities and 117 days in the case of Susquehanna Securities to inform them of its decision not to dismiss them from the Adversary Proceeding on the basis of Irish law, while in the interim demanding that both Defendants provide documentation with no relation whatsoever to the belated, purported Irish law issue.  The Trust's about-face on the "qualifying transaction" prong is plainly prejudicial to Moving Defendants, particularly given that the issue was raised repeatedly in the negotiation and litigation of the Protocol Order, and Moving Defendants have expended significant resources demonstrating that they are "qualifying participants," a showing that would no longer be dispositive if the Trust can belatedly contend that the safe harbor's separate "qualifying transaction" requirement is not met. *See Off. Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 310 (Bankr. D. Del. 2005) (refusing to consider defendants' argument where they failed to assert

it previously, despite having "ample opportunity" to do so).[11]

52.     *Third*, the Trust also waived its argument because it depends entirely on foreign (Irish) law, and therefore required advance notice.[12]  Firsenbaum Decl., Ex. 6 at 2-6; *id.*, Ex. 11 at 2-6.  The Federal Rules require any party that "intends to raise an issue about a foreign country's law [to] *give notice by* a *pleading or other writing*."  Fed. R Civ. P. 44.1 (emphasis added), *as incorporated by* Fed. R. Bankr. P. 9017.  The Trust never provided notice of its intent to raise issues of Irish law—not in its Complaint, during the negotiation of the Protocol Order, or at any time prior to Moving Defendants' completion of their submissions under the Protocol Order.[13]  *See Al Maya Trading Estab. v. Glob. Exp. Mktg. Co.*, 2014 WL 3507427, at *3-5 (S.D.N.Y. July 15, 2014) (rejecting party's reliance on foreign law as violating Rule 44.1 when it did not provide notice of such reliance until six months after filing the initial pleading).

---

[11]  *See also Cohen v. Cohen*, 2022 WL 952842, at *4 (D. Del. Mar. 30, 2022) (defendant waived argument that claims were time barred when it never raised it until reply brief in support of motion for judgment as matter of law); *O'Neal v. Middletown Twp.*, 2019 WL 77066, at *3 (D.N.J. Jan. 2, 2019) (plaintiff's failure to provide "substantive argument in opposition to Defendants' argument" on motion to dismiss waived responsive argument and "conceded the point"); *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (plaintiff "waived his opportunity to contest" argument raised by defendant's motion when plaintiff failed to respond to the argument), *aff'd* 136 F. App'x 551 (3d Cir. 2005).

[12]  The Trust has also failed to meet its burden under Rule 44.1 to prove that the Share Repurchases are void under Irish law.  *See G and G Prods. LLC v. Rusic*, 902 F.3d 940, 950 (9th Cir. 2018) (affirming district court's refusal to apply Italian law to question of accrual and explaining that Rule 44.1 is intended to "encourage the court and counsel to regard the determination of foreign law as a cooperative venture requiring an open and unstructured dialogue among all concerned" but there is nothing "cooperative" about "simply invoking foreign law and expecting a court to decide every legal permutation, including ones that the parties failed to raise").

[13]  Recognizing the Trust's dispositive omission, the Amended Complaint, filed just over a month ago, now alleges that "Mallinckrodt conducted the Share Repurchase Program in violation of Irish Law."  Am. Compl. ¶ 317.  But this does not cure the Trust's failure to provide notice in the original Complaint, during the negotiations of the Protocol Order, or before Moving Defendants completed their Protocol Submissions.

**II.    Each Of The Moving Defendants Is A Qualifying Participant**

      A.      <u>Citadel Securities Is A Financial Participant</u>

53.      The Trust's refusal to acknowledge that Citadel Securities, which executes more than 35% of all U.S.-listed retail volume and ranks as the number one U.S. retail options market maker, Firsenbaum Decl., Ex. 4 at 2, is a financial participant raises questions about whether the Trust is pursuing its claims in good faith.

54.      The Bankruptcy Code defines "financial participant" as any entity that: (a) "at the time it enters into a securities contract," "at the time of the date of the filing of the petition," or "on any day during the 15-month period preceding the date of the filing of the petition" (b) "has one or more [securities contracts] . . . with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties)" or "has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties)," excluding agreements with affiliates.  11 U.S.C. § 101(22A)(A).

55.      Citadel Securities has amply demonstrated that it is a "financial participant."  Its audited financial statements filed with the SEC show that, as of December 31, 2019, which was well within 15 months of Mallinckrodt's petition date (October 12, 2020), it had repurchase agreements and reverse repurchase agreements with gross amounts of $10.443 billion and $4.419 billion, respectively, many times greater than the $1 billion notional or actual principal amount outstanding threshold required by the statute;[14] Citadel Securities also had outstanding options to purchase securities with a mark-to-market position of $9.460 billion, nearly 100 times greater

---

[14] Citadel Securities provided a sworn declaration explaining, among other things, that the sum of Citadel Securities' repurchase agreements and reverse repurchase agreements are materially the same regardless of whether accrued financing interest payable or received is included in the gross principal amounts.  *See* Firsenbaum Decl., Ex. 4 at 8.

than the $100 million market-value threshold.  Firsenbaum Decl., Ex. 2 ¶ 5.  In addition, Citadel Securities' Form 13F filed with the SEC shows that the gross notional amounts of Citadel Securities' top ten outstanding put and call options alone were more than $65 billion—exceeding the $1 billion notional-amount threshold *by $64 billion*.  *Id.* ¶ 11.

56.     On top of this substantial evidence, in response to the Trust's first letter, Citadel Securities produced detailed and voluminous spreadsheets of trading data underlying its SEC filings and included a declaration from a senior official at Citadel Securities attesting that the information was accurate and providing even more detail regarding the calculations that support the amounts in the SEC filings.  *Id.*, Ex. 5 at Exs. A-C.

57.     Yet, the Trust still refused to dismiss Citadel Securities.  It did so without providing any basis to question the accuracy of either the audited financial statements and other documentation, or the sworn, confirming declarations, provided by Citadel Securities.  Rather, the Trust argued that this Court cannot accept Citadel Securities' showing as a matter of law.  That argument, like the Trust's argument regarding the qualifying transaction and Irish law, would render the Protocol Order a nullity.  The Protocol Order expressly provides for defendants to provide documentation demonstrating that they are financial participants, and it expressly authorizes the Court to consider that evidence.  The *audited* financial statements and Form 13F provided by Citadel Securities *were filed with the SEC*.  But even if they had not been, there could be no genuine dispute as to the accuracy of the information contained therein.  Pursuant to the Protocol Order, Citadel Securities has provided the Trust with a sworn declaration under penalty of perjury, and supporting documentation, showing that it meets the statutory thresholds by billions upon billions of dollars.  The evidence that Citadel Securities is a financial participant is overwhelming.  *See* D.I. 185-1 ¶ 5 and App'x A.

58.     The Trust's argument is also wrong, for at least three other reasons.  *First*, courts that have addressed *Section 546(e) safe harbor defenses* specifically in the context of motions to dismiss have relied on a defendant's SEC filings to establish that the defendant was a qualifying participant.  *See, e.g.*, *Quorum Health*, 2023 WL 2552399, at *7 (granting motion to dismiss based on SEC filing showing that defendant exceeded statutory threshold for financial participant status); *In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 203 & n.20 (S.D.N.Y. 2020) (granting motion to dismiss based on 82 defendants' SEC filings showing they were registered investment companies and thus "financial institutions").

59.     Judge Shannon's recent decision in *Quorum Health* is directly on point.  *See* 2023 WL 2552399, at *7.  There, Judge Shannon accepted financial statements filed with the SEC on the very same question at issue here—whether the defendant met the dollar threshold to be a financial participant.  *Id.*  Judge Shannon explained that "[b]ecause SEC filings are required by law to be filed with the SEC, no serious questions as to their authenticity can exist." *Id.* (citation omitted).  He added, "The Third Circuit . . . has taken judicial notice of facts in an SEC filing (not just the existence of the document) when considering a motion to dismiss." *Id.*  The Trust's vague contention that "SEC statements are often found to be incorrect," Firsenbaum Decl., Ex. 6 at 9; *id.*, Ex. 11 at 8, offers no reason for this Court to depart from this settled law—especially since the pertinent financial statements were audited by a public accounting firm, sworn as accurate to regulators, and show that Citadel Securities meet the threshold for a financial participant by tens of billions of dollars.

60.     *Second*, even outside of the Section 546(e) context, the Third Circuit has repeatedly taken judicial notice of defendants' SEC filings, including for the facts contained in those documents.  *See, e.g.*, *Oran v. Stafford*, 226 F.3d 275, 289-90 (3d Cir. 2000) (taking

judicial notice of facts of stock sales in defendants' Forms 4 and 5 and Form 14A Proxy

Statement); *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 151 n.5 (3d Cir. 2019) (taking judicial

notice of fact of divestiture contained in the defendant's Form 8-K).

61.     The cases the Trust cites where courts refused to take judicial notice of

documents, Firsenbaum Decl., Ex. 6 at 8 n.21, are readily distinguishable.  As an initial matter,

all occurred in connection with traditional motions to dismiss pursuant to Rule 12(b)(6), unlike

this case where the Moving Defendants have provided evidence under the Protocol Order, which

expressly authorizes the Court to consider the evidence that the parties exchanged pursuant to

that Order.  In addition, and critically, each of the Trust's cases involved allegations either that

the documents were intentionally false or that the defendants had engaged in misconduct, and

even then, the courts often still took judicial notice of documents.[15]

---

[15]  *See Doe v. Princeton Univ.*, 30 F.4th 335, 343 (3d Cir. 2022) (refusing to take judicial
notice of a university's investigative report because the complaint alleged that the report was
incorrect); *In re Envision Healthcare Corp.*, 2019 WL 3494407, at *1-3 (D. Del. Aug. 1, 2019)
(plaintiff alleged that defendants made materially false or misleading statements in their proxy
statement filed with the SEC in securities fraud class action); *Mervyn's LLC v. Lubert-Adler Grp.
IV, LLC (In re Mervyn's LLC)*, 426 B.R. 488, 494 (Bankr. D. Del. 2010) (documents were not
SEC filings and plaintiff alleged that defendant engaged in fraud); *see also Hennessy v. Penril
Datacomm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995) (affirming refusal to take
judicial notice of fact in form 10-K where witness testimony contradicted that asserted fact); *In
re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *3 (N.D. Cal. Dec. 4, 2008) (plaintiff alleged
that defendants made false and misleading statements and omissions in public disclosures, but
court still took judicial notice of facts of "stock sales contained in [SEC filings]").

        Indeed, many of the Trust's cited cases *actually support* taking judicial notice of Moving
Defendants' SEC filings.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.
1999) (taking judicial notice of statements in SEC filings in securities fraud action not for their
truth, but recognizing that a court may take judicial notice of facts in SEC filings "that are not
subject to reasonable dispute because they are capable of accurate and ready determination by
resort to sources whose accuracy cannot reasonably be questioned"); *Lovelace v. Software
Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (recognizing that a court in a securities fraud
case may, on defendant's motion to dismiss, "consider the contents of relevant public disclosure
documents which (1) are required to be filed with the SEC, and (2) are actually filed with the
SEC"); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (affirming district court's

62.     *Third*, Citadel Securities provided the Trust with detailed spreadsheets, backed by a sworn declaration, underlying its SEC filings—precisely the type of data Citadel Securities provides to regulators.  These spreadsheets independently establish that Citadel Securities surpasses the "financial participant" threshold by billions of dollars.  And even if the Trust had raised any serious dispute about the accuracy or authenticity of Citadel Securities' SEC filings, which it has not, this data would end that dispute.

B.      <u>Susquehanna Securities Is A Financial Participant</u>

63.     Susquehanna Securities has also amply demonstrated that it is a "financial participant."  Susquehanna Securities' *audited* statement of financial condition *filed with the SEC* shows that Susquehanna Securities had, as of December 31, 2019, outstanding mark-to-market options contract positions of *over $38.5 billion*, none of which were with affiliates.  Firsenbaum Decl., Ex. 8 ¶ 5 and Ex. A at 8-10, notes E, H & K.  *It thus satisfies the statutory criteria by more than $38 billion.  Id.*

64.     As with Citadel Securities, the Trust has offered no basis to question the accuracy of Susquehanna Securities' statement of financial condition.  Instead, the Trust contends in its letter that it needs all sorts of documents to "verify" Susquehanna Securities' audited statement of financial condition.  *Id.*, Ex. 11 at 7.  That argument is a makeweight.  Again, the Trust offers

---

decision to take judicial notice of SEC filings in securities fraud class action and holding that "a district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'" (quoting Fed. R. Evid. 201(b)(2))); *Halperin v. Morgan Stanley Inv. Mgmt., Inc. (In re Tops Holding II Corp.)*, 646 B.R. 617, 647-48 (Bankr. S.D.N.Y. 2022) (taking judicial notice of facts of stock options awards to directors disclosed in debtor's SEC filings).

Finally, *Lum v. Bank of Am.*, is inapposite. 361 F.3d 217, 221 n.3 (3d Cir. 2004). There, the Third Circuit held it was improper to take judicial notice of the plaintiff's deposition testimony in a prior matter as to his understanding of the term "prime rate," where the key issue in dispute in that case was what the prime rate actually was. *See id.*

no reason to question the accuracy of a statement of financial condition that was (1) audited by independent auditors, (2) filed with the SEC, and (3) further supported by a sworn declaration. There is no need, for example, for the Trust to demand and review copies of all the "options contracts" underlying Susquehanna Securities' $38.5 billion in options positions, something Susquehanna could not have provided in any event since, as it informed the Trust, the options were traded on a national exchange and there are, accordingly, no contracts in Susquehanna Securities' possession beyond its trade order. *See id.*, Ex. 10 at 5.

65.     Nor can the Trust justify its claimed need to learn how Susquehanna Securities values its options positions, *see id.*, when Susquehanna Securities provided that information repeatedly—in the audited SEC filing itself, in its initial submission to the Trust, in its declaration, and in its second submission to the Trust—and when an independent public auditing firm has audited the financial statements, *see id.*, Ex. 7; *id.*, Ex. 8 at Ex. A; *id.*, Ex. 10 at 6-7.

## CONCLUSION

66.     For these reasons, the Moving Defendants respectfully request that the Court enter the proposed order submitted herewith as Exhibit A granting the relief requested by the Protocol Motion and dismissing the Moving Defendants from the Adversary Proceeding.[16]

---

[16]     As noted above, Moving Defendants do not now seek an award of attorneys' fees and costs from the Trust, recognizing that it operates for the benefit of opioid victims.  But the Trust's refusal to dismiss them pursuant to the Protocol Order certainly meets the standard for such an award. *See Doe v. Keane*, 117 F.R.D. 103, 104-05 (W.D. Mich. 1987) (granting request for attorneys' fees when plaintiff was presented with pre-motion evidence that claim failed as a matter of law but continued to pursue claims); *see also Brown v. Chinen*, 2010 WL 1783573, at *1, *5 (D. Haw. Feb. 26, 2010) (similar).  Should this Court agree that Moving Defendants are entitled to dismissal pursuant to the Protocol Order, and should the Trust nevertheless continue to pursue claims against Moving Defendants, they reserve their rights to seek an award of the fees and costs they incurred negotiating the Protocol Order, making submissions to the Trust pursuant to the Protocol Order, and moving to dismiss pursuant to the Protocol Order.

Dated:  December 8, 2023
        Wilmington, Delaware


By: */s/ Jeremy W. Ryan*
Jeremy W. Ryan (No. 4057)
Andrew L. Brown (No. 6766)
**POTTER ANDERSON CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Email:  jryan@potteranderson.com
        abrown@potteranderson.com

*-and-*

Philip D. Anker *(admitted pro hac vice)*
Noah A. Levine *(admitted pro hac vice)*
Ross E. Firsenbaum *(admitted pro hac vice)*
Michael McGuinness *(admitted pro hac vice)*
Austin M. Chavez (*pro hac vice application
forthcoming*)
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8000
Email: philip.anker@wilmerhale.com
        noah.levine@wilmerhale.com
        ross.firsenbaum@wilmerhale.com
        mike.mcguinness@wilmerhale.com
        austin.chavez@wilmerhale.com

*Counsel to Defendants Citadel Securities
LLC and Susquehanna Securities, LLC*