## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MALLINCKRODT PLC, | : | Case No. 20-12522 (JTD) |
|  | : |  |
| Reorganized Debtor.[1] | : |  |
|  | : |  |
| OPIOID MASTER DISBURSEMENT TRUST II, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Adversary Proceeding |
| vs. | : | No. 22-50435 (JTD) |
|  | : |  |
| ARGOS CAPITAL APPRECIATION MASTER FUND LP, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

### PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS T. ROWE PRICE ASSOCIATES, INC. AND RELATED FUNDS FROM AMENDED COMPLAINT

Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
COLE SCHOTZ P.C.
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
jalberto@coleschotz.com
preilley@coleschotz.com

Anthony De Leo (admitted *pro hac vice*)
COLE SCHOTZ P.C.
1325 Ave. of the Americas
19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Jeffrey A. Liesemer
(admitted *pro hac vice*)
Quincy M. Crawford, III
(admitted *pro hac vice*)
Serafina Concannon (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W., Suite 1100
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Co-Counsel to Plaintiff Opioid Master Disbursement Trust II*

Dated: January 19, 2024

---

[1] The Reorganized Debtor in this chapter 11 case is Mallinckrodt plc ("**Mallinckrodt**"). On May 3, 2023, the Court entered an order closing the chapter 11 cases of the Reorganized Debtor's debtor-affiliates (together with Mallinckrodt the "**Debtors**"). A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Reorganized Debtor's claims and noticing agent at http://restructuring.ra.kroll.com/Mallinckrodt. The Reorganized Debtor's mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

I.    Mallinckrodt's Wrongful Opioid Practices ............................................................... 3

II.   Mallinckrodt's Share Repurchase Program ............................................................... 5

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ................................................................................................. 9

I.    TRP Is a Transferee and Properly Named Defendant Because It Had Dominion and Control
      Over Share Repurchase Proceeds ............................................................................ 9

      A.   The Trust's Amended Complaint Sufficiently Pleads That TRP Is an Initial Transferee,
           and the Burden Rests with Movants to Establish the Lack of Dominion and Control ..... 10

      B.   As the Funds' Investment and Portfolio Manager, TRP Had Dominion and Control over
           the Funds' Assets, Including the Share Repurchase Proceeds ......................................... 12

      C.   Movants' Arguments That TRP Had No Dominion and Control Are Unavailing ........... 16

           1.   TRP's Putative Role as Agent Is Not Dispositive ................................................... 16

           2.   Neither TRP's Alleged Fiduciary Status nor Federal Regulations Preclude TRP
                from Having Dominion and Control ............................................................... 18

           3.   The Labels and Limitations Highlighted by Movants Are Neither Dispositive Nor
                Availing ............................................................................................. 20

           4.   TRP Had the Ability to Use the Funds' Assets, Including the Share Repurchase
                Proceeds, for Its Own Purposes ...................................................................... 21

II.   The Funds Have No Safe Harbor Defense Under § 546(e) ..................................................... 23

      A.   The Share Repurchases Were Not Qualifying Transactions Because They Were Void *Ab
           Initio* Under Irish Law .................................................................................... 24

      B.   The Funds Are Not Qualifying Participants Because They Have Failed to Demonstrate
           That They Are '40 Act Investment Companies "in Connection with a Securities Contract"
           ................................................................................................................ 25

III.  Movants' Grievances About the Protocol Process Have Nothing to do with the Merits of the
      Claims and Defenses Presented Here ........................................................................ 28

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein),*
    260 B.R. 698 (E.D. Pa. 2001) ...........................................................................9, 21

*Abele v. Mod. Fin. Plans Servs., Inc. (In re Cohen),*
    300 F.3d 1097 (9th Cir. 2002) ...............................................................................9

*Bailey v. Big Sky Motors, Ltd. (In re Ogden),*
    314 F.3d 1190 (10th Cir. 2002) .............................................................................9

*Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P. (In re
Bankr. Est. of Norske Skogindustrier ASA),*
    629 B.R. 717 (Bankr. S.D.N.Y. 2021) ................................................................24

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),*
    397 B.R. 1 (S.D.N.Y. 2007) ...............................................................15, 17, 20, 22

*Bonded Fin. Servs., Inc. v. European Am. Bank,*
    838 F.2d 890 (7th Cir. 1988) .......................................................................9, 10, 21

*Brown Publ'g Co. Liquidating Tr. v. AXA Equitable Life Ins. Co. (In re Brown
Publ'g Co.),*
    492 B.R. 610 (Bankr. E.D.N.Y. 2013), *remanded in part*, 519 B.R. 13
    (E.D.N.Y. 2014) ...................................................................................................23

*Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner,
Heine, Underberg, Manley, Myerson & Casey),*
    130 F.3d 52 (2d Cir. 1997) .............................................................................9, 23

*Connelly v. Lane Const. Corp.,*
    809 F.3d 780 (3d Cir. 2016) ................................................................................11

*Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC),*
    458 B.R. 155 (Bankr. D. Del. 2011) .................................................................9, 12

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),*
    323 B.R. 857 (Bankr. S.D.N.Y. 2005) .......................................................24, 27, 28

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),*
    596 B.R. 275 (Bankr. S.D.N.Y. 2018) ..............................................................23, 28

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) ................................................................................11

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*,
  No. 10-10799 (KJC), 2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ............................24

*Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.)*,
  155 B.R. 332 (Bankr. S.D.N.Y. 1993) ........................................................................23

*Indus. Enters. of Am., Inc. v. Tabor Acad. (In re Pitt Penn Holding Co.)*,
  No. 09-11475 (BLS), 2011 WL 4352373 (Bankr. D. Del. Sept. 2011) ...............................27

*Isaiah v. JP Morgan Chase Bank*,
  960 F.3d 1296 (11th Cir. 2020) .................................................................................12

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
  926 F.2d 1406 (3d Cir. 1991) ..................................................................................19

*Kirschner v. FitzSimons (In re Tribune Co. Fraudulent Conveyance Litig)*,
  No. 12-02652 (S.D.N.Y. Apr. 24, 2014) ....................................................................30

*Louisiana Firefighters' Ret. Sys. v. N. Tr. Invs., N.A*,
  No. 09 C 7203, 2011 WL 1770266 (N.D. Ill. May 6, 2011) ..........................................19

*Lowe v. SEC*,
  472 U.S. 181 (1985) ..............................................................................................26

*Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.)*,
  892 F.2d 26 (4th Cir. 1989) ....................................................................................10

*Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
  426 B.R. 96 (Bankr. D. Del. 2010) ...........................................................................12

*Miller v. Black Diamond Cap. Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*,
  642 B.R. 371 (Bankr. D. Del. 2022) ..........................................................................27

*Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*,
  321 B.R. 388 (Bankr. D. Del. 2005) ..........................................................................14

*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*,
  848 F.2d 1196 (11th Cir. 1988) ...............................................................................10

*Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt plc)*,
  No. 22-50433-JTD, (Bankr. D. Del. Jan. 18, 2024) ....................................................26

*In re Orion HealthCorp, Inc.*,
  No. 18-08048 (Bankr. E.D.N.Y. Aug. 23, 2018) .........................................................30

- iii -

*Paloian v. LaSalle Bank, N.A.*,
  619 F.3d 688 (7th Cir. 2010) ...........................................................................19, 20

*Peachtree Special Risk Brokers, LLC v. Kartzman (In re Rocco Co., Inc.)*,
  No. 10-18799 (DHS), 2014 WL 7404566 (D.N.J. Dec. 29, 2014) ...........................................9

*Picard v. BNP Paribus S.A. (In re Bernard L. Madoff)*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...................................................................10

*Picard v. Platinum All Weather Fund Ltd. (In re Bernard L. Madoff)*,
  No. 08-01789 (CGM), 2023 WL 3964150 (Bankr. S.D.N.Y. June 12, 2023)..................16, 17

*Picard v. ZCM Asset Holding Co. (Bermuda) Ltd. (In re Bernard L. Madoff)*,
  No. 08-01789 (CGM), 2023 WL 8010194 (Bankr. S.D.N.Y. Nov. 17, 2023) .......................12

*Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.)*,
  59 B.R. 873 (Bankr. S.D.N.Y. 1986)......................................................................23

*Sec. First Nat'l Bank v. Brunson (In re Coutee)*,
  984 F.2d 138 (5th Cir. 1993) ...............................................................................9

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999)...................................................................12

*Taunt v. Hurtado (In re Hurtado)*,
  342 F.3d 528 (6th Cir. 2003) ...........................................................................9, 22

*United States v. Butler*,
  297 U.S. 1 (1936)............................................................................................26

*Universal Serv. Admin Co. v. Post-Confirmation Comm. of Unsecured Creditors
  of Incomnet Commc'ns Corp. (In re Incomnet, Inc.)*,
  463 F.3d 1064 (9th Cir. 2006) ............................................................................10

*Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*,
  288 B.R. 189 (Bankr. D. Del. 2003) .....................................................................10

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*,
  503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated in part by Kirschner v.
  Large Priv. Beneficial Owners (In re Trib. Fraud. Conv. Litig.)*, 818 F.2d 92
  (2d Cir. 2016)...........................................................................................12, 30

*Zazzali v. AFA Fin. Grp., LLC*,
  No. 10–54524 PJW, 2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012)..............................24

**Statutes**

11 U.S.C. § 101(22)(A) .................................................................................................26

11 U.S.C. § 101(22)(B) ...............................................................................25, 26, 27, 28

11 U.S.C. § 546(e) .............................................................................................. *passim*

11 U.S.C. § 546(g) .......................................................................................................27

11 U.S.C. § 550(a) ..............................................................................................9, 15, 16

15 U.S.C. § 80a-1 to 80a-64 ..............................................................................18, 25, 26

15 U.S.C. § 80b-1 to 80b-21 ........................................................................................18

Companies Act 2014 of Ireland ...................................................................................24

**Other Authorities**

17 C.F.R. § 270.17f-2(a) ..............................................................................................19

17 C.F.R. § 270.17f-2(d) ..............................................................................................19

17 C.F.R. § 275.206(4)-2(b)(5) .....................................................................................18

Fed. R. Civ. P. 8(a)(2) ..................................................................................................10

Fed. R. Civ. P. 12(b)(6) ................................................................................................19

Restatement (Third) of Trusts § 2 (2003) .....................................................................19

Plaintiff, the Opioid Master Disbursement Trust II ("**Trust**"),[2] by and through its undersigned counsel, hereby submits its opposition to the motion (Adv. D.I. 217) ("**Motion**" or "**Mot.**") to dismiss defendants T. Rowe Price Associates, Inc. ("**TRP**") and related T. Rowe Price funds ("**Funds**," and together with TRP, "**Movants**") from the Trust's Amended Complaint (Adv. D.I. 205) ("**Amended Complaint**" or "**Am. Compl.**"). For the reasons that follow, the Motion should be denied.

## PRELIMINARY STATEMENT

It is a core tenet of bankruptcy that creditors must be paid in full before distributions are made to shareholders. In Mallinckrodt's situation, the opposite occurred. For years, Mallinckrodt engaged in wrongful practices in connection with its opioid painkillers. These practices were widespread, ranging from aggressive marketing that led to the overprescribing of opioids to Mallinckrodt's failure to properly monitor and block suspicious orders for its opioid drugs. As a result of its wrongful conduct, Mallinckrodt accumulated an enormous class of opioid-related creditors holding claims with an aggregate total of multiple billions of dollars, if not trillions. And, while Mallinckrodt's wrongful practices were continuing, the scrutiny of its regulators increasing, and its legal exposure widening, Mallinckrodt decided it was high time to pay its shareholders. From 2015 through 2018, Mallinckrodt engaged in a program by which it repurchased approximately 36 million of its own shares, for close to **$1.6 billion** and received no value in return for those repurchases. As a consequence, opioid creditors (and other unsecured creditors) were

---

[2]    The Trust is a statutory trust established under the *Modified Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt PLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* ("**Plan**") [D.I. 7670]. As used herein, citations to "**D.I. __.**" refer to documents filed in *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del.). Citations to "**Adv. D.I. __.**" refer to documents filed in the above-captioned adversary proceeding ("**Proceeding**"). The Plan, *inter alia*, vested the Trust with authority to investigate and prosecute claims arising out of Mallinckrodt's repurchase of its shares between 2015 and 2018 ("**Share Repurchase Claims**") for the benefit of the Debtors' unsecured creditors. The claims asserted in this Proceeding are Share Repurchase Claims.

left holding an empty bag, and the absolute priority rule was upended. The Trust commenced this proceeding for the benefit of creditors to claw back much of the value that Mallinckrodt fraudulently transferred to shareholders through its repurchase trades.

Among the beneficiaries of Mallinckrodt's share repurchases were defendants TRP and the Funds, which received a windfall of approximately ███████ in exchange for worthless shares. In an effort to skirt accountability for their windfall, TRP and the Funds have moved to dismiss the Trust's claims against them. TRP argues that it should be dismissed from this proceeding because it never owned Mallinckrodt stock and never received any repurchase proceeds. But even TRP concedes that ownership and receipt are not the sole touchstones for determining whether a person was a transferee of a fraudulent transfer. Instead, the test is whether the person had dominion and control over the transferred funds. As the Funds' investment manager, TRP possessed dominion and control in spades. Among other things, the investment management agreements that TRP entered into with the Funds vested TRP with the level of authority and discretion that gave it dominion and control. TRP is therefore a properly identified transferee and defendant. Its request for dismissal should be denied.

As for the Funds, they argue for dismissal on the basis that avoidance and recovery of their repurchase proceeds are barred by the securities safe harbor of 11 U.S.C. § 546(e). But, to avail themselves of that affirmative defense, the Funds must establish that the repurchases were a qualifying transaction and that they are a qualifying participant (here, a financial institution). They can do neither. As explained in the Trust's opposition to Citadel Securities and Susquehanna Securities' motion to dismiss, the share repurchases are not qualifying transactions because they were void *ab initio* under applicable nonbankruptcy law and therefore are neither a settlement payment nor a transfer made in connection with a securities contract under § 546(e). Nor are the

Funds a qualifying participant in the form of a "financial institution," as defined in the Bankruptcy Code, because they fail to establish the requisite "connection" to a relevant securities contract. For all the reasons set forth herein, the Court should deny the Motion.

## FACTUAL BACKGROUND

### I. MALLINCKRODT'S WRONGFUL OPIOID PRACTICES

1. Mallinckrodt and its direct and indirect subsidiaries are a global pharmaceutical enterprise, which, among other things, was the largest producer and seller of opioid medications in the United States, and one of the largest in the world. Am. Compl. ¶ 2.

2. Before entering chapter 11, Mallinckrodt engaged in aggressive and deceptive marketing of opioids, including putting sales representatives under intense pressure to sell its branded opioid products from 2007 until at least 2015. *Id.* ¶¶ 103, 124-34. Mallinckrodt's army of sales representatives were trained to use false and misleading statements to sell opioids. *Id.* ¶¶ 135-38, 142-49. For instance, sales representatives misled prescribers about the addictive potential of its branded opioids. *Id.* ¶¶ 150-51. Mallinckrodt also intentionally targeted doctors who were known to be high prescribers of opioids to sell its products and many of those doctors later faced criminal or disciplinary action for overprescribing opioids. *Id.* ¶¶ 193-226. Mallinckrodt also sought to shift the perception that opioids were dangerous and highly addictive by sponsoring front groups that encouraged prescribers to give patients opioids long-term to treat chronic pain. *Id.* ¶¶ 186-92. And it worked in concert with industry peers to persuade prescribers, patients, and regulators that opioids were safe and effective treatments for chronic pain, despite knowing that opioids were highly addictive and ineffective at treating such pain. *Id.* ¶ 178. Mallinckrodt's wrongful conduct led the Drug Enforcement Administration ("**DEA**") to call it "the kingpin within the drug cartel" of companies driving the opioid epidemic. *Id.* ¶ 2.

3.      Mallinckrodt also failed to implement necessary and required systems to detect and report suspicious orders of opioids. *Id.* ¶¶ 193-236. The DEA had repeatedly informed Mallinckrodt of these legal obligations, including as early as 2007, and provided compliance training and materials to Mallinckrodt to assist it in meeting such obligations. *Id.* ¶¶ 195-98. Mallinckrodt was also aware of the necessity of such monitoring because it regularly tracked media reports describing the widespread diversion and abuse of opioid products. *Id.* ¶ 200. And Mallinckrodt's products accounted for high percentages of sales of opioids in certain states that were particularly known for their significant rates of opioid diversion and abuse, such as Florida, where 500 million of Mallinckrodt's opioid pills ended up. *Id.* ¶ 201.

4.      As early as 2009, Mallinckrodt gave internal presentations explaining that it manufactured 10 of the 13 most abused drugs, and it created internal analyses and reports of its opioid distribution which showed, for example, that the vast majority of its opioids ended up in states with the highest diversion rates. *Id.* ¶¶ 202-03, 206-08. Mallinckrodt was also aware of the significant fines that other pharma companies, such as Rite Aid, Cardinal Health, and McKesson, paid as a result of failing to report suspicious opioid sales to regulators. *Id.* ¶¶ 218-19.

5.      Despite its knowledge that its products were being diverted, Mallinckrodt had an ineffective suspicious order monitoring system—which, among other things, relied on improper formulas to identify suspicious orders, unjustifiably exempted Mallinckrodt's largest customers, failed to track customers whom other pharma companies had identified as suspicious or who changed addresses, and shipped opioids to customers even after putting shipping restrictions on them—and its managers knew that it was such, as demonstrated through contemporaneous communications. *Id.* ¶¶ 210-14. This resulted in the massive diversion of Mallinckrodt's opioids

to the black market for recreational use and abuse and exposed Mallinckrodt to significant legal liability. *Id.* ¶ 215.

6.      Mallinckrodt's wrongful acts and omissions ultimately resulted in an "all-consuming tidal wave of litigation," with more than 3,000 lawsuits filed against Mallinckrodt around the country. *Id.* ¶¶ 6, 257. After filing for bankruptcy on October 12, 2020, Mallinckrodt itself estimated that it had "[opioid-related] liability in excess of $30 billion" based on the settlements it had entered into before it filed chapter 11. *Id.* ¶ 264.[3]

## II.      MALLINCKRODT'S SHARE REPURCHASE PROGRAM

7.      While Mallinckrodt was manufacturing and selling opioids, promoting a false and dangerous narrative to change the medical consensus regarding the proper uses and risks of opioid drugs, and incurring crushing opioid-related liability, it also implemented a program by which it repurchased or redeemed its ordinary shares from shareholders ("**Share Repurchases**"), thereby favoring its shareholders over its creditors. Am. Compl. ¶ 7. Mallinckrodt's board of directors authorized the Share Repurchases on four separate occasions: (a) on January 22, 2015, it authorized $300 million of share repurchases; (b) on November 19, 2015, it authorized $500 million; (c) on March 16, 2016, it authorized $350 million; and (d) on March 1, 2017, it authorized $1 billion. *Id.* ¶ 270. The Share Repurchases occurred between August 4, 2015, and April 23, 2018. In total, Mallinckrodt repurchased approximately 35.57 million shares for approximately $1.6 billion. *Id.* ¶ 271.

8.      Among the beneficiaries of the Share Repurchases were TRP and its affiliated Funds. While engaging in the Share Repurchases, Mallinckrodt transferred at least ██████ to TRP and the Funds. *Id.* ¶ 85.

---

[3]      *See also In re Mallinckrodt plc*, No. 20-12522 (Bankr. D. Del. Dec. 6, 2021) Hr'g Tr. 63:3-5.

9.     Mallinckrodt implemented the Share Repurchases through two brokers, Goldman Sachs & Co. and Morgan Stanley & Co. ("**Brokers**"), with whom Mallinckrodt had entered into certain purchase agreements ("**Purchase Agreements**") whereby the Brokers repurchased Mallinckrodt's outstanding ordinary shares in accordance with price, quantity, and timing terms. *Id.* ¶¶ 274-75.[4]

10.     Mallinckrodt authorized the Share Repurchases in part to artificially inflate the market price of its shares during a period of consistent, dramatic decline in Mallinckrodt's value due to its opioid business.  *Id.* ¶ 273.  Indeed, Mallinckrodt's board knew about Mallinckrodt's substantial opioid liabilities before it authorized the Share Repurchases, as well as throughout the program's duration.  As early as 2007, fellow opioid manufacturer Purdue Pharma settled claims for hundreds of millions of dollars with 26 states and the District of Columbia on account of allegations that it had encouraged physicians to overprescribe its opioid products.  *Id.* ¶¶ 240-41. Reports of abuse and diversion of Purdue Pharma's extended-release opioid product, OxyContin, were circulating within Mallinckrodt well before then—as early as 2000. *Id.* ¶ 136.  Also, in 2007, Purdue Frederick Company, an affiliate of Purdue Pharma, pled guilty to felony charges for misbranding OxyContin, including marketing and promoting it as less addictive, despite knowing that to be untrue.  *Id.* ¶ 241.  As part of the plea agreement, Purdue Frederick agreed to pay over $600 million in fines.  *Id.*  By spring 2014, almost a year before the Board authorized the Share Repurchase Program, the first government had filed a lawsuit against Purdue Pharma seeking substantial damages relating to the opioid crisis, including claims for public nuisance. *Id.* ¶ 251.

11.     Mallinckrodt's board and executives knew or should have known that Mallinckrodt's misconduct gave rise to substantial liabilities.  Mallinckrodt engaged in the same

---

[4]     The Trust disagrees with Movants' characterization of the Brokers as Mallinckrodt's agents (Mot. ¶ 13) and reserves all rights.

types of wrongful conduct as Purdue Pharma, including deceptive marketing of opioids and failing

to identify and monitor suspicious orders.  *See id.* ¶¶ 277-326; *see also supra* paras. 2-6.  ███



████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Am. Compl. ¶¶ 2,

5, 104, 118, 266.

12.     Mallinckrodt's board received reports of, and exercised control over,

pharmaceutical sales, marketing, and promotional strategies.  *Id.* ¶¶ 109-13.  ███████

████████████████████████████████████████████████ *Id.*  ¶  277.

████████████████████████████████████████████████

████████████████████  *Id.* ¶ 323.  In addition, numerous public studies published since at

least the early 2000s documented the abuse of opioids and estimated the societal costs of such

abuse to be in the tens or hundreds of billions of dollars annually.  *Id.* ¶¶ 237-43.  ████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████  *Id.* ¶ 285.  ████████████████████████████████████

████████████████████  *Id.* ¶ 309.

13.     By 2011, Mallinckrodt itself was under investigation by a U.S. Attorney's office

as, well as the DEA, for failing to properly identify, halt, and report suspicious orders and for

conspiring to unlawfully distribute controlled substances.  *Id.* ¶ 231.  The federal government

claimed that Mallinckrodt "sold excessive amounts of the most abused forms of oxycodone, 30mg

and 15mg tablets, placing them into a stream of commerce that would result in diversion [and that]

even though Mallinckrodt knew of the pattern of excessive sales of its oxycodone feeding massive

diversion, it continued to incentivize and supply these suspicious sales" and "never notified the DEA of suspicious orders in violation of the CSA [Controlled Substances Act]." *Id.* ¶ 234. In 2013 and 2014, Mallinckrodt was subjected to additional investigations by the DEA, the City of Chicago, and the U.S. Attorney's office. *Id.* ¶¶ 248-49, 252. By June 2017, while in the midst of repurchasing its shares, Mallinckrodt was named as a defendant in thousands of cases that victims of the opioid epidemic filed. *Id.* ¶ 253.

14. Even aside from the substantial opioid liabilities it had at the time of the Share Repurchases, Mallinckrodt did not have enough cash on hand to fund the Share Repurchases and had to engage in a series of intercompany loans and complex intercompany transactions to obtain sufficient funds. *Id.* ¶ 327. ████████████████████████████████████

████████████████████████████████████████████ *Id.* ¶ 328. ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 330-34, 336-39, 342. As a result of Mallinckrodt's staggering opioid liabilities and its general liquidity issues, Mallinckrodt did not have sufficient distributable reserves when it engaged in the Share Repurchases, rendering them void under Irish law. *Id.* ¶¶ 317, 335.[5]

## STANDARD OF REVIEW

15. The Trust incorporates by reference paragraphs 13 through 18 of the Citadel/Susquehanna Opposition, as if they were fully set forth herein.

---

[5] For further explanation regarding applicable Irish law, and why Mallinckrodt's Share Repurchases were void pursuant to the same, the Trust incorporates by reference paragraphs 20 through 45 of the Citadel/Susquehana Opposition, as if they were fully set forth herein.

<u>**ARGUMENT**</u>

**I.     TRP IS A TRANSFEREE AND PROPERLY NAMED DEFENDANT BECAUSE IT HAD DOMINION AND CONTROL OVER SHARE REPURCHASE PROCEEDS**

16.     TRP asserts that, as investment adviser to the Funds, it was so far removed that it never could have exercised dominion and control over the share repurchase proceeds and thus cannot be a transferee and proper defendant in this Proceeding.  But the relevant facts and law do not support TRP's position.

17.     Section 550(a) of the Bankruptcy Code permits recovery of the property transferred in an avoided transaction from the "initial transferee of such transfer."  11 U.S.C. § 550(a).  To determine whether someone is an initial transferee under § 550(a), courts typically follow the Seventh Circuit's decision in *Bonded Financial Services, Inc. v. European American Bank*, which held that a transferee must have "dominion over the money or other asset" and "the right to put the money to one's own purposes."  838 F.2d 890, 893 (7th Cir. 1988).[6]  Delaware bankruptcy courts have adopted the *Bonded* standard, which is generally referred to as the "dominion and control" test.  *See, e.g.*, *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 158 (Bankr. D. Del. 2011) (Walsh, J.) ("This Court has adopted the Seventh Circuit's 'dominion and control' test for whether a party is a transferee within the meaning of § 550.") (citation omitted).[7]

---

[6]     *See Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 533 (6th Cir. 2003); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1196 (10th Cir. 2002); *Abele v. Mod. Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1102 (9th Cir. 2002); *Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57-58 (2d Cir. 1997); *Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 139 (5th Cir. 1993).

[7]     *See also Peachtree Special Risk Brokers, LLC v. Kartzman (In re Rocco Co., Inc.)*, No. 10-18799 (DHS), 2014 WL 7404566, at *9 (D.N.J. Dec. 29, 2014) ("[C]ourts in the Third Circuit, like other jurisdictions, have adopted the 'dominion and control' or 'conduit' test announced by the Seventh Circuit in *Bonded Fin. Serv., Inc. v. European Am. Bank* . . . ."); *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 260 B.R. 698, 714 (E.D. Pa. 2001) (same).

18.     To satisfy the test, the recipient of the property must have some ability to put it to their own purposes. *Bonded*, 838 F.2d at 893. But a demonstration of complete and unfettered control is not required—a party can be an initial transferee even if it cannot use the funds it receives for purposes unrelated to the transaction. *Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.)*, 892 F.2d 26, 29 (4th Cir. 1989) (holding that even though a defendant put funds into an account for the ultimate transfer to another party and "could not have used the funds for other purposes," the defendant was still the initial transferee). Dominion and control may still exist even if the recipient's use of the funds is constrained in some way. *See Universal Serv. Admin Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1075 (9th Cir. 2006) (holding that legal limits on the recipient's use of funds did not prevent it from having sufficient dominion and control over them to be a transferee). The test "is a very flexible, pragmatic one; . . . courts must look beyond the particular transfers in question to the entire circumstance of the transactions." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988) (citation and quotation omitted).

A.     **The Trust's Amended Complaint Sufficiently Pleads That TRP Is an Initial Transferee, and the Burden Rests with Movants to Establish the Lack of Dominion and Control**

19.     At the outset, Movants argue that the Amended Complaint fails to allege that TRP was a transferee, but this is incorrect. Mot. ¶ 33. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," nothing more. Fed. R. Civ. P. 8(a)(2). A plaintiff need only "allege the 'necessary vital statistics—the who, when, and how much . . . .'" *Picard v. BNP Paribus S.A. (In re Bernard L. Madoff)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *cf. Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189,

192 (Bankr. D. Del. 2003) (stating that, to survive a motion to dismiss, a preference complaint must include an identification of the nature and amount of each antecedent debt and an identification of each alleged preference transfer by date of the transfer, name of the debtor/transferor, name of the transferee, and the amount of the transfer).

20.     The Amended Complaint satisfies these straight-forward requirements.  It identifies the *who*:  it names TRP and the Funds as defendants, both in its main text (¶ 85) and in Exhibit A to the Amended Complaint that the Trust served on TRP and the Funds.  *See* Am. Compl., Ex. A (identifying "T. Rowe Price Associates, Inc. and T. Rowe Price Funds" as defendants).  The Amended Complaint also identifies the *how much*:  it alleges that "Mallinckrodt transferred at least ███████████ *to* T. Rowe Price Associates, Inc. and the T. Rowe Price Funds as part of the Share Repurchase Transfers."  Am. Compl. ¶ 85 (emphasis added).  In addition, the Amended Complaint identifies the *when*:  Exhibit B to the Amended Complaint lists each of the repurchase trades pertaining to TRP and the Funds by the trade date, the number of shares traded, and the amount of the proceeds exchanged.  Am. Compl., Ex. B.  For each of the listed trades, Ex. B identifies the defendant as "T. Rowe Price Associates, Inc."  *Id*.  The Amended Complaint sufficiently pleads that TRP is an initial transferee, and, for purposes of the Motion, the Court should assume "all factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009) (stating that a complaint is not required to be "rich with detail").

21.     Movants next assert that the Amended Complaint fails to allege facts showing that TRP exercised control over the funds and that the Trust has the burden to make that showing.  Mot. ¶¶ 33, 35.  But Movants have it backwards:  the burden is *theirs* to show that TRP lacked dominion

and control. *See Lambertson*, 458 B.R. at 159 (stating that "the *defendant* must establish that it lacked dominion and control over the transfer") (emphasis added and internal quotation marks omitted); *see also Isaiah v. JP Morgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) (stating that "the mere conduit defense is an affirmative defense that must be proved *by the defendant* seeking its protection") (emphasis added); *Picard v. ZCM Asset Holding Co. (Bermuda) Ltd. (In re Bernard L. Madoff)*, No. 08-01789 (CGM), 2023 WL 8010194, at *6 (Bankr. S.D.N.Y. Nov. 17, 2023) (commenting that defendant "improperly attempts to flip the burden of proof" when it asserts that the trustee did not plead sufficient facts to show dominion and control). The Court should reject Movants' attempt to shift their burden of proof.[8]

### B. As the Funds' Investment and Portfolio Manager, TRP Had Dominion and Control over the Funds' Assets, Including the Share Repurchase Proceeds

22. TRP had dominion and control over the Funds and their assets, including the share repurchase proceeds, because it was more than a mere "adviser" of the Funds; TRP was the manager of the Funds' portfolios and investments. While Mallinckrodt was engaging in the Share Repurchases, TRP acted as manager of the Funds' investment portfolios, and its relationship with the Funds was governed by investment management agreements.[9] Under those agreements, TRP had the authority to "supervise *and direct* the investments of [each] Fund in accordance with the

---

[8]    Movants' reliance on the *Mervyn's, Lyondell*, and *Stratton Oakmont* decisions to support their burden argument is misplaced. Mot. ¶ 35 (citing *Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102-04 (Bankr. D. Del. 2010); *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 382-83 (Bankr. S.D.N.Y. 2014), *abrogated in part by Kirschner v. Large Priv. Beneficial Owners (In re Trib. Fraud. Conv. Litig.)*, 818 F.2d 92 (2d Cir. 2016); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999)). *None* of these decisions addressed the proper allocation of the burden when applying the dominion and control test. And *none* of these decisions involved an investment manager with a role similar to TRP's. *See* Am. Compl. ¶ 85 (alleging that TRP "is an investment management corporation"). Rather, it was apparently clear to at least two of the courts that the defendants in question were conduits or intermediaries. *See Mervyn's*, 426 B.R. at 103 (describing defendant in question "as a financial intermediary"); *Stratton Oakmont*, 234 B.R. at 315 (stating that defendant in question "was a mere conduit").

[9]    Citations to "**TRP Ex. __**" refer to the exhibits annexed to the Second Decl. of Sean McCaslin (Adv. D.I. 227-12). A second volume of those exhibits (TRP Exs. V through HH) is docketed at Adv. D.I. 227-11.

Fund's investment objectives, program and restrictions as provided in its prospectus . . . ."[10] The agreements also authorized TRP, *inter alia*, "as agent and attorney-in-fact with respect to [each] Fund . . . *in its discretion* and *without prior consultation with the Fund*, to . . . buy, sell, exchange, convert, lend, and otherwise trade in any stocks, bonds, and other securities or assets[.]"[11] Thus, the sale of Mallinckrodt shares back to Mallinckrodt and the receipt of the sale proceeds fell within TRP's direction, discretion, and thus its dominion and control. By TRP's own admission, it "executed" the share repurchase trades that resulted in receipt of the proceeds.[12]

23. The Funds' prospectuses confirm the extent of TRP's dominion and control. They specify that TRP "oversees the selection of the fund's investments and management of the fund's portfolio pursuant to an investment management agreement between [TRP] and the fund."[13] The prospectuses also disclose that, for each Fund, TRP—not the Fund—establishes "an Investment Advisory Committee," whose chairman or co-chairmen "has day-to-day responsibility for managing [each] fund's portfolio . . . ."[14]

24. Each Fund's prospectus also makes disclosures about "Principal Risks," which include—alongside such risks as "Risks of U.S. stock investing" and "Foreign investing risk"— an "Active management risk" that is described as follows: each Fund "is subject to the risk that the investment adviser's [*i.e.*, TRP's] judgments about the attractiveness, value, or potential appreciation of the fund's investments may prove to be incorrect," which would cause the Fund to "underperform," meaning diminished returns or losses.[15] If TRP, as "investment adviser," were

---

[10]   TRP Exs. B at 1; E at 1; H at 1-2; S at 1-2; W at 1; Z at 1-2; FF at 1-2.

[11]   *Id.*

[12]   Second Decl. of S. McCaslin ¶ 6 (Adv. D.I. 227-12).

[13]   *E.g.*, TRP Exs. C at 29; D at 25; F at 27; G at 30; K at 11; M at 10-11; N at 10; O at 10-11; Q at 11; R at 10-11; V at 11; CC at 10; EE at 11; HH at 28.

[14]   *E.g.*, *id.*

[15]   *E.g.*, TRP Exs. C at 2-3; D at 2-3; F at 2-3; G at 3; K at 2; L at 2; Q at 2; R at 2-3; T at 4; U at 4-5; V at 4; Y at 3;

so passively removed from the Funds' assets, with none of its fingertips touching the share repurchase proceeds, there would have been no need to disclose an *active* management risk. Yet, that risk is disclosed in the very documents Movants rely on.

25. Two decisions in particular—*U.S. Interactive* and *Manhattan Investment Fund*—reinforce the point that TRP had sufficient dominion and control to be a transferee. In *U.S. Interactive*, the litigation administrators for the chapter 11 debtors filed an avoidance action against Samson Travel, which handled corporate travel arrangements and meeting planning for the debtors. *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 390-91 (Bankr. D. Del. 2005). In particular, the administrators sought recovery of funds deposited into Samson's bank account, which were then, according to Samson, disbursed to hotels and airlines to pay for the debtors' meetings and not for Samson's "own use or purpose." *Id.* at 396. On that basis, Samson argued that it was a mere conduit, not a transferee. *Id.* Judge Walrath, however, disagreed, finding that Samson had dominion and control over the deposited funds because it had the power to decide which third parties to pay with the funds received and thus could distribute the funds as it "saw fit." *Id.* "The essence of dominion is the power to control or direct resources." *Id.* (citing *Bonded*, 838 F.2d at 893). Here, as in *U.S. Interactive*, TRP had the power, as investment manager, to control and direct resources. Among other things, TRP had the power to use the Funds' assets to buy and sell securities within its own discretion and without prior consultation with the relevant Fund.[16]

26. In *Manhattan Investment Fund*, the chapter 11 trustee sought to avoid and recover $141.4 million that the debtor had deposited into its *own* margin account with Bear Stearns, its

---

BB at 3-4; CC at 3-5; DD at 3-5; EE at 3-5; GG at 2-3; HH at 2-3.

[16] *See supra* para. 22.

prime broker.  *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 4 (S.D.N.Y. 2007).  Bear Stearns had a security interest in the margin account funds that served as collateral to cover losses from the debtor's short selling.  *Id*. at 6.  Faced with an avoidance action by the trustee, Bear Stearns argued, *inter alia*, that it was not a § 550(a) transferee because it did not have "unfettered control" of the funds since federal regulations precluded it from "using customer funds in its own investing or for its 'proprietary' purposes."  *Id*. at 18 (footnote omitted).  The bankruptcy court nevertheless concluded that Bear Stearns was a transferee, and the district court affirmed.  *Id*. at 21.  The district court found that, while the debtor's short positions remained open, Bear Stearns (1) had the ability to "initiate affirmative measures with respect to the funds[,]" (2) did not have to respond to directions from the debtor, (3) could use the funds to close out the debtor's short positions at any time, and (4) received benefits from the transactions, including $2.4 million in commissions.  *Id*. at 17-20.  In sum, the district court found that Bear Stearns had "powerful discretion" that gave it "'dominion and control' over the transfers."  *Id*. at 21.

27.     Like Bear Stearns, TRP had the ability to initiate affirmative measures as to the Funds' assets, including the authority to close out positions in their portfolios through its power and discretion to sell securities.[17]  And, just as Bear Stearns did not have to respond to the debtor's directions, TRP was free to buy and sell securities within the Funds' portfolios within its discretion and without prior consultation with the Funds.[18]  Indeed, TRP's dominion and authority was so pronounced that the Funds' prospectuses disclosed to investors, as a "principal" risk, an "Active investor risk" that could cause a Fund to underperform.[19]

---

[17]  *See id*.

[18]  *See id*.

[19]  *See supra* note 15 and accompanying text.

28.     Movants' own documents demonstrate that TRP had sufficient dominion and control over the share repurchase proceeds to qualify as a transferee under § 550(a) of the Bankruptcy Code.  Accordingly, Movants' request to dismiss TRP from this Proceeding should be denied.

## C.     Movants' Arguments That TRP Had No Dominion and Control Are Unavailing

### 1.     *TRP's Putative Role as Agent Is Not Dispositive*

29.     Movants assert that TRP's putative role as agent militates against any conclusion that it was a transferee with dominion and control (Mot. ¶¶ 38, 42-44), but nothing in the caselaw suggests that agency status alone establishes that a party is not an initial transferee or lacked dominion and control over funds.  On the contrary, caselaw shows that agents may have sufficient dominion and control over their principals' funds to qualify as a § 550(a) transferee in transactions they were engaged in on behalf of their principals.  In *Picard v. Platinum All Weather Fund Limited (In re Bernard L. Madoff)*, the liquidation trustee sued an investment company and its customer for investment activities that were alleged fraudulent transfers.  No. 08-01789 (CGM), 2023 WL 3964150, at *2, *7 (Bankr. S.D.N.Y. June 12, 2023).  The defendant investment company moved to dismiss, arguing that it was a mere conduit, because it had "acted as an agent" for the client, was not the owner of the shares or funds at issue, and was "'merely an intermediary for its customer[.]'"  *Id*. at *2, *9.  The bankruptcy court denied the motion, holding that the uncontested fact that the company took certain actions as an agent did not render it a mere conduit or non-transferee as a matter of law.  *See id*. at *11.  The court noted that whether the company was a mere conduit or non-transferee was a "fact-intensive inquiry" and that discovery in the proceeding "may reveal evidence of a defendant acting as more than a mere conduit."  *Id*. at *10-11 (citations omitted).

30.     The court's decision in *Manhattan Investment Fund* also refutes Movants' agency argument.  In that case, Bear Stearns tried to "paint itself as merely a provider of 'back office' services" and an agent that did not qualify as an initial transferee.  397 B.R. at 20.  But the "general relationship" between Bear Stearns and the debtor was "not the key"—the actual factual specifics of the dominion and control over the funds in the debtor's account was.  *Id*.  If agency status itself were a shield, the court's detailed factual analysis to assess dominion and control would have been unnecessary.  TRP's putative status as an agent is irrelevant to the analysis because it does not resolve the "key" question:  whether TRP had dominion and control over the share repurchase funds.  *Id*.

31.     Unable to muster a convincing case about TRP's agency status, Movants resort to a slippery-slope policy argument, asserting that the Trust's position "would upend traditional principles of agency law" and usher in a dystopian world in which agents and even trustees would be "personally liable" in claw-back actions.  Mot. ¶ 44.  This Court should reject such hyperbolic rhetoric, for finding that TRP had dominion and control over the share repurchase funds will not turn agency law on its head and orchestrate the collapse of the American financial system.  This is because, as the *Madoff* court noted, the dominion and control test is a "fact-intensive inquiry" that turns on the specific facts and circumstances of each individual case.  A finding that an agent had dominion and control in one case will not require the same finding in another case with different facts.  As shown above, under the facts and circumstances *of this case*, TRP had dominion and control of the Funds' assets, including the share repurchase proceeds, and was therefore properly identified as an initial transferee.  At a minimum, the current record before this Court raises factual issues that make determination of dominion and control inappropriate on a motion to dismiss or summary judgment.  The Motion should be denied.

### 2. Neither TRP's Alleged Fiduciary Status nor Federal Regulations Preclude TRP from Having Dominion and Control

32.     Movants contend that TRP did not have dominion and control because, as a result of regulations promulgated under the federal Investment Advisers Act, TRP owed fiduciary duties to act in the Funds' best interests and was prohibited from having custody of or making use of the Funds' assets. Mot. ¶ 38. Their argument—which relies on a selective reading and quotation of the regulations—lacks merit.

33.     Movants assert that one regulation in particular prohibits TRP from making use of the proceeds "for its own benefit" and selectively quote the language as follows: "[i]f you are an investment adviser registered . . . under section 203 of the [Investment Advisers Act], it is a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the [Investment Advisers Act] for you to have custody of client funds or securities" (emphasis added)[.]" *Id.* Without using an ellipsis, Movants omit the key word "unless," which follows immediately after "funds or securities" at the end of the quote, and all the exceptions to that general rule that are below that key word. Perhaps the most important and relevant exception that Movants neglect to mention is 17 C.F.R. § 275.206(4)-2(b)(5), which provides: "You [*i.e.*, the investment adviser] are not required to comply with this section (17 CFR 275.206(4)-2) [sic] with respect to the account of an investment company registered under the Investment Company Act of 1940 (15 U.S.C. 80a-1 to 80a-64)." By Movants' own admission, the Funds are investment companies registered under the '40 Act (Mot. ¶ 49), so the very prohibition that Movants selectively highlight does not even apply to TRP.

34.     Movants cite other regulations to support their blanket assertion that TRP has "no legal right to make use of fund assets or their proceeds," Mot. ¶ 38 (citing 17 C.F.R. § 270.17f-2(a) & (d)), but the regulations fail to support it. As a threshold matter, these regulations apply to

a "registered management investment company," and Movants fail to establish whether TRP or any of the Funds is such a company. Moreover, the regulatory language quoted by Movants either has permissive wording (*see* 17 C.F.R. § 270.17f-2(a), which provides that investments "may be maintained" in the custody of a registered investment company) or features a notable exception to the general rule cited (*see id.* § 270.17f-2(d), which provides: "[e]xcept as otherwise provided by law[.]"). For these reasons, Movants cannot carry their burden of persuasion with these regulations. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991) (stating that party moving for dismissal under Rule 12(b)(6) bears the burden of persuasion). And, in any event, Movants' blanket assertion is incorrect: TRP *did* have a legal right to use the Funds' assets or their proceeds through, *inter alia*, its power under the investment management agreements to buy and sell securities in each Fund's portfolio within TRP's discretion and without prior consultation with the Fund.[20]

35. Aside from the regulations, even if Movants are correct that TRP had fiduciary obligations to the Fund, TRP's status as a fiduciary, by itself, is not dispositive. In *Paloian v. LaSalle Bank, N.A.*, the court found a bank acting as trustee (which presumptively had fiduciary duties)[21] for a securitized investment pool to be an initial transferee of payments that the debtor made to the bank in its capacity as trustee. 619 F.3d 688, 691 (7th Cir. 2010). In so finding, the court rejected the bank's arguments that "it was simply a conduit for placing the money in the trust" and an "agent of the pool's investors and therefore . . . [an] inappropriate target of a turnover

---

[20]    *See supra* notes 10 and 11 and accompanying text.

[21]    *See* Restatement (Third) of Trusts § 2 (2003). ("A trust . . . is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee."); *cf. Louisiana Firefighters' Ret. Sys. v. N. Tr. Invs., N.A*, No. 09 C 7203, 2011 WL 1770266, at *3 (N.D. Ill. May 6, 2011) (refusing to dismiss, in part, a breach of fiduciary duty claim against a collateral pool investment manager).

order." *Id*. The court noted that "lots of decisions hold that an entity that receives funds for use in paying down a loan, *or passing money to investors in a pool*, is an 'initial transferee' even though the recipient is obliged by contract to apply the funds according to a formula." *Id*. at 692 (emphasis added and citing cases). Thus, on analogous facts, *Paloian* supports the determination that TRP, despite its alleged fiduciary status, is an initial transferee and was properly named as a defendant. Movants' fiduciary and regulatory arguments do not establish any legal limitations on TRP's dominion and control over the share repurchase funds.

### 3. The Labels and Limitations Highlighted by Movants Are Neither Dispositive Nor Availing

36. Movants assert that the investment management agreements refer to the Funds' securities, including the Mallinckrodt securities they held, as "investments of the Fund" and not the investments of TRP. Mot. ¶ 39. But the descriptive wording or labels used by those agreements do not mean that TRP lacked dominion and control. The court in *Manhattan Investment Fund* rejected a similar argument by Bear Stearns that the funds at issue were put into the debtor's "own account" and therefore Bear Stearns could not be the transferee. 397 B.R. at 17 n.26. The court concluded that the "ability to use the money in an account—not the name given to that account— [was] the crucial question to be decided." *Id*. Similarly, here, for the reasons noted above, the share repurchase proceeds were within TRP's dominion and control. The fact that the agreements describe the asset in question as "investments of the Fund" is irrelevant, much less controlling.

37. Movants also highlight language in the agreements requiring TRP to supervise and direct the Funds' investments "in accordance with the Fund's investment objectives, program and restrictions . . . and such other limitations as the Fund may impose in writing to the Manager [TRP]." Mot. ¶ 39 (quoting exhibit to Firsenbaum declaration). But Movants fail to point to any specific investment objective, program, restriction, or other limitation that actually curtailed TRP's

ability to exercise dominion and control as investment manager. Movants cannot carry their burden simply by pointing to objectives, programs, restrictions, or limitations in the abstract. Indeed, a review of each Fund's investment objective fails to support any argument that TRP's hands were tied. For example, one prospectus describes the Fund's investment objective as follows: "The fund seeks to provide long-term capital growth by investing primarily in the common stocks of growth companies."[22] This is hardly the stuff of limitation. The Court should reject Movants' arguments.

**4.** ***TRP Had the Ability to Use the Funds' Assets, Including the Share Repurchase Proceeds, for Its Own Purposes***

38. Movants assert that TRP "did not have the contractual or legal authority to use" the Funds' assets "for its own benefit" and that there is no evidence that TRP used those assets "for its own purposes." Mot. ¶¶ 40-41. Movants' assertions are incorrect for several reasons.

39. First, as noted above, the investment management agreements with the Funds granted TRP the contractual and legal authority to use the Funds' assets. Among other things, the agreements vested TRP with the power to buy and sell securities within the Funds' portfolios within its discretion and without prior consultation with the Funds.

40. Second, the dominion-and-control test merely requires that the party had "the *right* to put the money to one's own purposes." *Bonded*, 838 F.2d at 893 (emphasis added). There is no requirement to show that the party actually did put the money to its own purposes. *See Blatstein*, 260 B.R. at 717 (finding that dominion and control existed when person had the right to put money to personal use even if she never did).

---

[22] TRP Ex. C at 1.

41.     Third, TRP did have the right to put the Funds' assets to its own purposes:  it was managing the Funds' investments in exchange for management fees whose amounts were calculated based on both the Funds' daily average net assets and the combined net assets of all TRP funds.[23]  Moreover, through the Share Repurchases, TRP exchanged "worthless" shares in Mallinckrodt plc for approximately ██████.  Am. Compl. ¶¶ 1, 85.  Effectively, the Share Repurchases increased the value of the combined net assets of all the Funds by ██████.  Because TRP's fees were tied to the assets in its Funds, TRP benefited from the increased values resulting from its dominion and control of the Funds' assets.[24]

42.     Movants call TRP's collection of management fees "legally irrelevant" (Mot. ¶ 43), which not only is incorrect but is also unsupported.  The district court in *Manhattan Investment Fund* found Bear Stearns's receipt of a $2.4 million commission relevant to its finding that Bear Stearns received a benefit.  397 B.R. at 20.  TRP's receipt of analogous management fees is therefore relevant here.

43.     Movants cite four cases in support of their argument that the management fees are irrelevant, but all of them are inapposite.[25]  Three of the four cases involved true conduits that had

---

[23]    *E.g.*, TRP Exs. B at 3-4; C at 29-30; D at 25-26; E at 4-5; F at 27-28; G at 29-30; H at 3; J at 11; K at 11; L at 11; M at 13; N at 10; O at 11; P at 11; R at 11; S at 5-6; T at 29; U at 31; V at 12-13; W at 4-5; X at 25-26; Y at 29-30; Z at 4-5; BB at 41-42; CC at 10-11; DD at 10-11; EE at 11-12; FF at 8-9; GG at 25-26; HH at 28-29.

[24]    Moreover, some courts have held that a similar level of authority over the funds in question means a defendant need not personally profit over its use of the funds.  *See Manhattan Inv. Fund*, 397 B.R. at 20-21; *Hurtado*, 342 F.3d at 534.  Accordingly, even if TRP did not specifically profit from the Share Repurchases, it exercised sufficient dominion and control over the Funds to qualify as a transferee.

[25]    Mot. ¶ 43 (citing *Christy v. Alexander & Alexander of N.Y., Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52 (2d Cir. 1997); *Brown Publ'g Co. Liquidating Tr. v. AXA Equitable Life Ins. Co. (In re Brown Publ'g Co.)*, 492 B.R. 610 (Bankr. E.D.N.Y. 2013), *remanded in part*, 519 B.R. 13 (E.D.N.Y. 2014); *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.)*, 155 B.R. 332 (Bankr. S.D.N.Y. 1993); *Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.)*, 59 B.R. 873, 875 (Bankr. S.D.N.Y. 1986)).

nowhere near the authority or dominion and control that TRP possessed, so whatever fees or commissions they collected were not enough to make them transferees.[26]

44.     As for the fourth case, *Hooker Investments*, Movants misstate its holding.  Movants assert that, in *Hooker*, an "escrow agent's deduction of escrow fees did not make it a transferee."  Mot. ¶ 43 (citing *Hooker*, 155 B.R. at 336, 340).  But the escrow agent's status as a transferee was *not* at issue in *Hooker*.  The issue in *Hooker* was whether a real estate broker (not the escrow agent) whose commission was paid directly from an earnest money escrow was an initial transferee or a subsequent transferee.  155 B.R. at 340-41.  (The court in *Hooker* held that the broker, at most, was a subsequent transferee.  *Id*. at 341.)  Accordingly, when correctly analyzed and described, *Hooker* is of no help to Movants.

45.     For all the reasons explained above, TRP had dominion and control over the Funds' assets and therefore was properly identified as a transferee and properly named as a defendant.  Movants' arguments to the contrary are unavailing and, at most, raise factual issues that are not appropriate for resolution on a motion to dismiss or on summary judgment.  Thus, either way, their Motion should be denied.

## II.     THE FUNDS HAVE NO SAFE HARBOR DEFENSE UNDER § 546(e)

46.     The Funds contend that they should be dismissed from this Proceeding because they are protected by the securities safe harbor under 11 U.S.C. § 546(e).  The § 546(e) safe harbor is an affirmative defense on which Movants carry the burden of proof and persuasion.  *See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 307

---

[26]   In particular, *Finley* involved an insurance broker that "had no discretion or authority to do anything else but transmit the money, which is just what it did."  130 F.3d at 59.  *Brown Publishing* involved an insurance company that, after deducting its fee, deposited the net premiums for a life insurance policy into an account that held the policy's cash surrender value and death benefit; the insurance company "had no control over the funds" in that account.  492 B.R. at 617-18.  *Black & Geddes* featured a collection agent that was collecting payments owed to a common carrier, and the court found that the agent was a mere conduit.  59 B.R. at 874-75.

(Bankr. S.D.N.Y. 2018) ("The section 546(e) safe harbor is an affirmative defense as to which the Defendants bear the burden of proof.").  Moreover, the § 546(e) defense "requires a determination of fact and is not suitable for disposition on a motion to dismiss."  *FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, No. 10-10799 (KJC), 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013); *see also Zazzali v. AFA Fin. Grp., LLC*, No. 10–54524 PJW, 2012 WL 4903593, at *11 (Bankr. D. Del. Aug. 28, 2012) (stating "it is premature to dismiss this count on the basis of the 546(e) defense" because "the defense is a fact-based inquiry").

47.     Section 546(e) applies when two requirements are met:  (1) there is a *qualifying transaction* and (2) there is a *qualifying participant*.  *See Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P. (In re Bankr. Est. of Norske Skogindustrier ASA)*, 629 B.R. 717, 757 (Bankr. S.D.N.Y. 2021).  Neither is satisfied here.

### A.     The Share Repurchases Were Not Qualifying Transactions Because They Were Void *Ab Initio* Under Irish Law

48.     The Share Repurchases were neither a "settlement payment" nor a "transfer made in connection with a securities contract" under § 546(e), for the reasons explained in the Trust's Citadel/Susquehanna Opposition.  In short, transfers to repurchase or redeem a company's shares do not qualify as a "settlement payment" or "transfer made in connection with a securities contract" where the transfers are void under applicable law.  *See Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 877 (Bankr. S.D.N.Y. 2005).  Here, under Irish law—the applicable law here—the Share Repurchases are void *ab initio* because when Mallinckrodt engaged in them, it did not have profits available for distribution.  *See, e.g.*, Companies Act 2014 of Ireland §§ 102, 105.  The Trust incorporates by reference paragraphs 20 through 52 of the Citadel/Susquehanna Opposition and Exhibits 1-5 thereto, as if they were fully set forth herein.[27]

---

[27]     As explained in paragraphs 46-52 of the Citadel/Susquehanna Opposition, the Trust did not waive its right to

49.     The Funds have failed to carry their burden to demonstrate the contrary.  On this basis alone, their dismissal request should be denied.

**B.      The Funds Are Not Qualifying Participants Because They Have Failed to Demonstrate That They Are '40 Act Investment Companies "in Connection with a Securities Contract"**

50.     The Funds contend that they are qualifying participants because they satisfy the Code's definition of "financial institution" since they are companies registered under the Investment Company Act of 1940.  Mot. ¶¶ 48-49.  Their argument lacks merit.

51.     In relevant part, the Bankruptcy Code defines "financial institution" as "*in connection with a securities contract* (as defined in section 741) an investment company registered under the Investment Company Act of 1940."  11 U.S.C. § 101(22)(B) (emphasis added).  The Funds cannot establish that they are financial institutions because they have not pointed to any relevant securities contract they were connected to.  The Funds point to the Purchase Agreements and argue that those agreements suffice to make the Funds a financial institution.  Mot. ¶¶ 49-50, 53.  But, even assuming *arguendo* (without conceding) that the Purchase Agreements fit the Code's definition of "securities contract," none of the Funds was a party to those agreements and therefore did not have the requisite connection with them.[28]

52.     The Funds argue that they need not be parties to the Purchase Agreements because the "in connection with" wording establishes a "low bar" that they can meet, citing the *Nine West* and *Madoff* cases.  But the courts in *Nine West* and *Madoff* were not interpreting § 101(22)(B) to determine whether a '40 Act investment company satisfied the definition of "financial institution."  Instead, they were applying the words "in connection with a securities contract" in § 546(e) itself,

---

challenge the "qualifying transaction" prong of § 546(e) or to hold defendants to their burden on § 546(e) issues.

[28]     *See* Exs. 1 & 2, annexed hereto.

which is a crucial difference.  In § 546(e), the words "in connection with a securities contract" modify the word "transfer."  In § 101(22)(B), however, those same words modify not a transfer but a *person*—*i.e.*, the '40 Act investment company.  Therefore, the person, not the transfer, must have the requisite connection with the securities contract.  The Funds miss this crucial distinction when they assert "the Code simply requires that there be a 'connection' between that contract and the transfer at issue."  Mot. ¶ 52.  Not so.  The definition of "financial institution" in § 101(22)(B) requires a connection between the securities contract and the investment company.  And the Funds have not established that connection because they were not parties to the Purchase Agreements.

53.     If a '40 Act investment company could point to any securities contract to satisfy the definition of "financial institution," those six words would become superfluous, because what '40 Act investment company does not deal with securities contracts in the ordinary course?[29]  This would be contrary to proper statutory interpretation.  *See, e.g.*, *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute."); *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."); *see also* Opinion at 35, *Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt plc)*, No. 22-50433-JTD (Jan. 18, 2024), D.I. 57 (holding that statutes cannot be read to render statutory terms superfluous).  Moreover, if Congress wanted '40 Act investment companies to automatically qualify as a "financial institution," just as a "commercial or savings bank" automatically qualifies as one (*see* § 101(22)(A)), it would have included '40 Act investment companies under § 101(22)(A), where no such qualifier exists, instead

---

[29]     An investment company under the '40 Act is "an issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities . . . ."  *See Investment Company Act of 1940 Definition*, Investopedia,
https://www.investopedia.com/terms/i/investmentcompanyact.asp#:~:text=The%20Act%20defines%20an%20investment,total%20assets%20(exclusive%20of%20government (last visited Jan. 18, 2024).

of under § 101(22)(B). Those six words must mean something more limited than just any securities contract, and the Funds cannot simply wave this statutory limitation away by stating that *any old contract will do*. The Court should reject the Funds' arguments.

54. The Funds also lack the requisite connection with the Purchase Agreements because those agreements do not reference any specific Share Repurchases, including any specific repurchase trades that the Funds were involved with. *See Miller v. Black Diamond Cap. Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*, 642 B.R. 371, 389-90 (Bankr. D. Del. 2022) (Owens, J.) (refusing to dismiss avoidance claims on the basis of an alleged securities agreement under § 546(e) where (1) the transfers were made three months after the agreement, (2) the agreement did "not reference a contemplated distribution," and (3) the trustee did not allege that the distribution was made from the proceeds of sale governed by the agreement).[30] As such, the Funds have not established how the share repurchase proceeds received by them were in connection with the Purchase Agreements.

55. The Funds also cannot establish the requisite connection with the Purchase Agreements because, for the reasons set forth in the Citadel/Susquehanna Opposition, those agreements were void *ab initio* under Irish law.[31] In *Enron*, the court examined whether the safe harbor in § 546(g) protected the transfer allegedly "made . . . in connection with a swap agreement." 323 B.R. at 878 (quoting 11 U.S.C. § 546(g)). Because the entire transaction was void under applicable law, the "in connection with" language of § 546(g) did not apply. *Id*. ("If it is determined that the transaction violated Oregon law, the agreement would be a nullity and have

---

[30] *See also Indus. Enters. of Am., Inc. v. Tabor Acad. (In re Pitt Penn Holding Co.)*, No. 09-11475 (BLS), 2011 WL 4352373, at *12 (Bankr. D. Del. Sept. 2011) (Shannon, J.) (refusing to dismiss claim where disputed issues of material fact remained as to whether transfers were in connection with a securities contract or as a charitable gift).

[31] *See* Citadel/Susquehanna Opposition ¶¶ 20-32.

no legal effect.  As a consequence, the transfer would not have been made under or in connection with a swap agreement and it would not be protected from avoidance under section 546(g) of the Bankruptcy Code.").  This reasoning applies with equal force to the "in connection with" language in § 101(22)(B).  *See Enron*, 323 B.R. at 877 ("An agreement that is void under controlling state law has no legal force or effect and carries no enforceable obligations.").

56.     Because the Share Repurchases were nullities, there were no securities contracts in connection with the Funds.[32]  Accordingly, the Funds do not satisfy the definition of "financial institution" in § 101(22)(B) and are not qualifying parties.  The Motion should be denied *in toto*.

## III.  MOVANTS' GRIEVANCES ABOUT THE PROTOCOL PROCESS HAVE NOTHING TO DO WITH THE MERITS OF THE CLAIMS AND DEFENSES PRESENTED HERE

57.     Movants expend 17 paragraphs across nearly 8 pages of their Motion, venting their supposed grievances about the Protocol[33] process and insinuating that the Trust has acted in an underhanded fashion and in bad faith.  Mot. ¶¶ 14-30.  The Trust disagrees with Movants' assertions, which they try to present as "background."

58.     At the outset, the Protocol was entered into at the insistence of defendants (Mot. ¶ 14), and while the Trust negotiated in good faith, it repeatedly stated that a protocol was not the appropriate method to address certain defenses, especially the § 546(e) defenses, which are anything but "simple."  *See* Mot. ¶ 1.  Nevertheless, to date, the Trust has dismissed 28 defendants

---

[32]     In a prior Protocol submission to the Trust, the Funds suggested that they "effectively entered into a contract with the counterpart of each trade on the trade date of each transaction."  Adv. D.I. 227-10, Ex. 4 at 5.  But the Funds have neither specifically identified nor provided any such contracts, even though any such contracts were specifically requested by the Trust as part of the Protocol process.  Letter From Justin R. Alberto to T. Rowe Price Associates, Inc., Attn: Phillip D. Anker dated August 11, 2023, Adv. D.I. 218 at 3907.  As such they have not met their burden of showing that such contracts existed.  *See Fairfield Sentry Ltd.*, 596 B.R. at 307.

[33]     As used herein, "**Protocol**" means the *Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities* that this Court approved by order dated May 15, 2023 [Adv. D.I. 185-1].

from this Proceeding, seven of which it dismissed under the Protocol process. Since this Court approved the Protocol, the Trust has received 20 Protocol dismissal demands from 48 defendants. As the Trust received its first dismissal demand on June 13, 2023, those numbers amount to more than one defendant per week, whose dismissal requests the Trust must carefully review and evaluate.

59. Once the Trust receives a dismissal demand, the Trust has 45 days to either decide whether to grant voluntary dismissal or to request more information from the defendant. Protocol ¶ 9. If the Trust requests information, the Trust has 45 days from the time it receives a response to that request to either voluntarily dismiss the defendant or state the substantive grounds for not doing so. *Id*. At no time has the Trust missed a 45-day deadline or requested an extension of that window. Much of the "delay" Movants complain about may be attributed to the amount of time it takes them to respond to the Trust's information requests. On average, defendants have waited 45 days to provide the Trust with additional information, and in one instance as long as 63 days.[34]

60. The Trust is not an unsecured creditor seeking to maximize avoidance recoveries to preserve a profit margin. It is a fiduciary. Many States, counties, other municipalities, and opioid victims are looking to the Trust to provide the much-needed funding that can abate the opioid scourge in communities across the country and to compensate victims. The opioid epidemic that Mallinckrodt and other pharma manufacturers ignited still rages, claiming more overdose victims every day.[35] With so many human lives at stake, the Trust must take each dismissal

---

[34] A chart showing the time in which defendants have responded to information requests from the Trust is attached as **Exhibit 1** to the Declaration of Serafina Concannon filed contemporaneously herewith.

[35] *See, e.g.*, Deidre McPhillips, *Overdose deaths continue to rise in the US, reaching another record level, provisional data shows*, https://amp.cnn.com/cnn/2023/09/13/health/overdose-deaths-record-april-2023/index.html (last visited Jan. 16, 2024); Danny Spewak, *As the opioid epidemic persists, groups in the community fight to end the crisis* (Nov. 23, 2023), https://www.kare11.com/article/news/local/as-the-opioid-epidemic-persists-groups-in-the-community-fight-to-end-the-crisis/89-ebabf027-8bb3-41a2-bbbf-1ae5531c40e3.

demand it receives seriously and perform its required due diligence carefully, especially as to the

§ 546(e) defenses, which are "complex and fact-intensive," often require "extensive fact and expert

discovery,"[36] are not amenable to fast-track procedures, and as far as the Trust is aware, have never

been included in a protocol prior to this Proceeding.[37]  And with the Trust facing a corpus reduced

by almost $1 billion as a result of Mallinckrodt's second chapter 11 filing, it may not be an

exaggeration to say that the issues in this Proceeding not only carry monetary consequences but

life-and-death consequences as well.

61.     Contrary to what Movants might expect, the Trust has no duty to kowtow to the

demands and threats of rich financial companies or to ensure that they bear minimal burden and

inconvenience in avoidance litigation.  Their convenience cannot be the prime consideration when

they have profited too well at the expense of opioid victims.  The Court should reject Movants'

cynical attempts to paint the Trust as the "bad guy," especially when their insinuations and asserted

grievances have nothing to do with the merits.

## **<u>CONCLUSION</u>**

For all the reasons explained above, the Court should deny the Motion.

[*Signature of counsel appears on following page.*]

---

[36]     Adv. D.I. 141 ¶ 27 & n.13.

[37]     *See, e.g.*, Stipulation and Order Regarding Protocol for Dismissal of Conduits and Non-Transferees, *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, No. 10-04609 (Bankr. S.D.N.Y. Dec. 4, 2014), D.I. 2124 (Adv. D.I. 49-02); Stipulation and Order Regarding Protocol for Initial Discovery and Dismissal of Conduits and Non-Transferees, *In re Orion HealthCorp, Inc.*, No. 18-08048 (Bankr. E.D.N.Y. Aug. 23, 2018), D.I. 61 (Adv. D.I. 49-3); Conduit Protocol, *Kirschner v. FitzSimons (In re Tribune Co. Fraudulent Conveyance Litig)*, No. 12-02652 (S.D.N.Y. Apr. 24, 2014), D.I. 4239 (Adv. D.I. 49-4).

Dated: January 19, 2024
Wilmington, Delaware

Respectfully submitted,

**COLE SCHOTZ P.C.**

/s/ Justin R. Alberto
Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
jalberto@coleschotz.com
preilley@coleschotz.com

Anthony De Leo, Esq.
(admitted *pro hac vice*)
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
adeleo@coleschotz.com

*Co-Counsel to the Opioid*
*Master Disbursement Trust II*

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq. (admitted *pro hac vice*)
Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
Quincy M. Crawford, III, Esq. (admitted *pro hac vice*)
Serafina Concannon, Esq. (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 862-5000
Fax: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com
jliesemer@capdale.com
mcrawford@capdale.com
sconcannon@capdale.com

*Co-Counsel to the Opioid*
*Master Disbursement Trust II*