# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MALLINCKRODT PLC, *et al.*, | : | Case No. 20-12522 (JTD) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| OPIOID MASTER DISBURSEMENT TRUST II, | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | No. 22-50435 (JTD) |
| | : | |
| v. | : | |
| | : | |
| ARGOS CAPITAL APPRECIATION MASTER FUND LP, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MOTION TO DISMISS THE AMENDED COMPLAINT AS TO DEFENDANTS TOWER RESEARCH CAPITAL LLC, SPIRE X TRADING LLC, AND LATOUR TRADING LLC PURSUANT TO THE PROTOCOL ORDER RELATING TO CONDUITS, NON-TRANSFEREES, "STOCKBROKERS," "FINANCIAL INSTITUTIONS," "FINANCIAL PARTICIPANTS," AND DISSOLVED ENTITIES

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................ 3

    A.    The Tower Defendants.................................................................................... 3

    B.    The Mallinckrodt Share Repurchases ..................................................... 4

    C.    The Protocol Order ....................................................................................... 4

    D.    The Tower Defendants' Protocol Submissions...................................... 4

ARGUMENT ..................................................................................................................... 10

    I.    The Court Should Dismiss Tower Research Because It Is A Non-Transferee ............. 10

    II.    The Court Should Dismiss Spire X And Latour Pursuant To Section 546(e) ............... 17

    A.    The Share Repurchases Are Qualifying Transactions ......................... 17

    B.    Spire X And Latour Are Qualifying Participants ................................. 18

CONCLUSION................................................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bailey v. Big Sky Motors, Ltd. (In re Ogden),*
    314 F.3d 1190 (10th Cir. 2002) ..................................................................16, 17

*Bd. of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,*
    806 F. Supp. 2d 662 (S.D.N.Y. 2011) ...........................................................23

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),*
    397 B.R. 1 (S.D.N.Y. 2007) ................................................................12, 13, 14

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank,*
    838 F.2d 890 (7th Cir. 1988) ....................................................................10, 16

*Brown v. Chinen,*
    2010 WL 1783573 (D. Haw. Feb. 26, 2010) ...................................................28

*Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner,*
    *Heine, Underberg, Manley, Myerson & Casey),*
    130 F.3d 52 (2d Cir. 1997) ......................................................10, 11, 15, 16

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,*
    399 F.3d 651 (6th Cir. 2005) ......................................................................25

*Corning Glass Works v. Brennan,*
    417 U.S. 188 (1974) ...................................................................................24

*Doe v. Keane,*
    117 F.R.D. 103 (W.D. Mich. 1987) ...............................................................28

*Durkin v. Piper Tr. Co. (In re Denman & Co.),*
    186 B.R. 707 (Bankr. C.D. Cal. 1995) .....................................................15, 16

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,*
    894 F.3d 339 (D.C. Cir. 2018) .....................................................................24

*Feeley v. NHAOCG, LLC,*
    62 A.3d 649 (Del. Ch. 2012) .......................................................................13

*Frantz v. Nationwide Ins. Co.,*
    2021 WL 2014990 (M.D. Pa. May 19, 2021) ............................................26, 27

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) .......................................................................25

*Geltzer v. D'Antona (In re Cassandra Grp.),*
    312 B.R. 491 (Bankr. S.D.N.Y. 2004) ...........................................................................16

*Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.),*
    2023 WL 2552399 (Bank. D. Del. Mar. 16, 2023) ........................................................17

*Iannacone v. IRS (In re Bauer),*
    318 B.R. 697 (Bankr. D. Minn. 2005) ....................................................................12, 16

*In re Phila. Newspapers, LLC,*
    599 F.3d 298 (3d Cir. 2010) ...........................................................................................22

*Kyle v. Apollomax, LLC,*
    987 F. Supp. 2d 519 (D. Del. 2013) ...............................................................................13

*Largo Legacy Grp., LLC v. Charles,*
    2021 WL 2692426 (Del. Ch. June 30, 2021) ..................................................................13

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),*
    181 F.3d 505 (3d Cir. 1999) ...........................................................................................18

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ..................................................................................................26, 27

*Luria v. Hicks (In re Taylor, Bean & Whitaker Mortg. Corp.),*
    2017 WL 4736682 (Bankr. M.D. Fla. Mar. 14, 2017) ..............................................23, 27

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC),*
    426 B.R. 96 (Bankr. D. Del. 2010) ..............................................................10, 11, 12, 15

*New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo,*
    80 F.4th 158 (2d Cir. 2023) ...........................................................................................25

*Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt plc),*
    No. 22-50433 (JTD), 2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) .........................18

*Payne v. Pauley,*
    337 F.3d 767 (7th Cir. 2003) .........................................................................................26

*PT China LLC v. PT Korea LLC,*
    2010 WL 761145 (Del. Ch. Feb. 26, 2010) ....................................................................13

*Rowello v. Healthcare Benefits, Inc.,*
    2013 WL 6576449 (D.N.J. Dec. 13, 2013) ...............................................................26, 27

*Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.),*
    127 F.3d 1195 (9th Cir. 1997) .......................................................................................16

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ...................................................................11, 12

*SEC v. SBB Rsch. Grp., LLC*,
    2020 WL 6075873 (N.D. Ill. Oct. 15, 2020) ..................................................................25

*United States v. Lachman*,
    387 F.3d 42 (1st Cir. 2004) ...........................................................................................24

*United States v. Stein*,
    881 F.3d 853 (11th Cir. 2018) .......................................................................................26

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*,
    503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated in part on other grounds
    by Deutsche Bank Tr. Co. Ams. v. Large Priv. Beneficial Owners (In re
    Trib. Fraudulent Conv. Litig.)*, 818 F.3d 98 (2d Cir. 2016), *vacated and
    superseded by* 946 F.3d 66 (2d Cir. 2019) ...............................................................11, 12

## STATUTES

11 U.S.C. § 101 .................................................................................................... *passim*

11 U.S.C. § 102 ...........................................................................................................22

11 U.S.C. § 544 ...........................................................................................................17

11 U.S.C. § 546 .......................................................................................... 2, 4, 17, 18

11 U.S.C. § 548 ...........................................................................................................17

11 U.S.C. § 550 ....................................................................................................10, 12

11 U.S.C. § 561 ...........................................................................................................22

11 U.S.C. § 741 ................................................................................................18, 19, 22

## RULES

Fed. R. Bankr. P. 7001 .................................................................................................3

Fed. R. Civ. P. 1 ...........................................................................................................3

## OTHER AUTHORITIES

Alicia Tuovila, *Mark to Market (MTM):  What It Means in Accounting, Finance,
    and Investing*, INVESTOPEDIA,
    https://www.investopedia.com/terms/m/marktomarket.asp .............................................24

CFTC, Form 1-FR-FCM, *Instructions: Statement of Financial Condition - Asset* (Mar. 2010), https://www.cftc.gov/sites/default/files/IndustryOversight/Intermediaries/1fr-fcminstructions.pdf ..............................................................................23

Corp. Fin. Inst., *What is Mark to Market*, https://corporatefinanceinstitute.com/resources/valuation/mark-to-market/ ...................24

FASB, *Accounting Standards Codification: Overview and Background* (2020), https://asc.fasb.org/1943274/2147479442 .......................................................25

FASB, *Broad Transactions: 820 Fair Value Measurement - Glossary*, https://asc.fasb.org/1943274/2147482224 .......................................................25

Federal Reserve Bank of New York, *Federal Reserve Bank of New York Staff Reports:  A Primer on the GCF Repo Service*, Rep. No. 671 (May 2014), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr671.pdf ........................................................................................................23

FINRA, *Filing & Reporting:  Frequently Asked Questions about Derivatives and Other Off-Balance Sheet Items (OBS)*, https://www.finra.org/filing-reporting/derivatives-and-other-balance-sheet-items-obs/faq ...........................................23

Moorad Choudhry, *The Repo Handbook* (2d ed. 2010)................................................23

SEC, *Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-to-Market Accounting* (2008), https://www.sec.gov/files/marktomarket123008.pdf ...........................................24

Pursuant to the Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities entered on May 15, 2023 [D.I. 185-1] (the "Protocol Order"), Tower Research Capital LLC ("Tower Research"), Spire X Trading LLC ("Spire X"), and Latour Trading LLC ("Latour"; collectively with Tower Research and Spire X, the "Tower Defendants") move to dismiss the claims brought against them by the Opioid Master Disbursement Trust II (the "Trust") in the above captioned Adversary Proceeding.

## PRELIMINARY STATEMENT

This is another straightforward motion for dismissal under the Protocol Order.

1.      Defendants Citadel Securities LLC ("Citadel Securities"), Susquehanna Securities, LLC ("Susquehanna Securities"), T. Rowe Price Associates, Inc. ("TRP"), several funds managed by TRP (the "TRP Funds"), and Rock Creek MB, LLC, RIEF Trading LLC, GF Trading LLC, and RIEF RMP LLC (the "Renaissance Funds") have already filed motions to dismiss pursuant to the Protocol Order.  *See* D.I. 215 (the "CS/SSLLC Motion"); D.I. 217 (the "TRP Motion"); D.I. 242 (the "Renaissance Motion"; collectively, the "Pending Protocol Motions").[1]

2.      The Pending Protocol Motions address legal issues that are common with the Tower Defendants' arguments for dismissal under the Protocol Order, so the Tower Defendants will avoid repeating those arguments and will, instead, incorporate them by reference.  In particular, Tower Research incorporates the argument set forth in the TRP Motion demonstrating why, as a matter of law, a manager that managed a fund that allegedly received proceeds from

---

[1] Unless otherwise defined, defined terms in this Motion have the same meanings as in the TRP Motion.

1

the Share Repurchases is a Non-Transferee and thus not a proper defendant.  As set forth in the

TRP Motion, the transferee is the investment fund that allegedly received the transfer for its

account, not the manager that did not.  Spire X and Latour also incorporate the arguments set

forth in the Pending Protocol Motions that the Share Repurchases were both "settlement

payments" and "transfers made in connection with a securities contract," and thus "qualifying

transactions" pursuant to Section 546(e).

      3.      In this motion (the "<u>Motion</u>"), Tower Research shows how it, like TRP, has

demonstrated that it is a Non-Transferee.  It has provided the Trust with three sworn declarations

and supporting documentation showing that it was a manager that did not beneficially hold any

Mallinckrodt stock and did not receive any proceeds of sales of Mallinckrodt stock.  Moreover,

like Citadel Securities, Susquehanna Securities, and the Renaissance Funds, each of Spire X and

Latour has demonstrated that it is a "financial participant" and thus a qualifying participant

pursuant to Section 546(e) as well.  Spire X and Latour have provided the Trust with four sworn

declarations, audited financial statements, and other financial records confirming that, on a

statutorily relevant date, each had outstanding repurchase agreements, reverse repurchase

agreements, or securities contracts exceeding the statutory thresholds for financial participant

status.

      4.      Nevertheless, the Trust has refused to dismiss the Tower Defendants pursuant to

the Protocol Order.  The Trust has offered no valid basis to dispute the information that the

Tower Defendants have provided or otherwise to refuse to dismiss them from this Adversary

Proceeding.  The Court should grant the Motion, dismiss the Tower Defendants from the Adversary Proceeding, and grant such other relief as it deems just and proper.[2]

## BACKGROUND

A.  <u>The Tower Defendants</u>

5.  Tower Research acts on behalf of various affiliated entities but does not purchase or sell securities for its own account.  *See* Declaration of Ross E. Firsenbaum, dated January 29, 2024 (the "<u>Firsenbaum Decl.</u>"), Ex. 2 ¶¶ 4, 6.  Instead, it trades on behalf of its affiliated entities, which hold title to the relevant securities and receive the proceeds of the sales of such securities. *Id.*, Ex. 2 ¶ 4.

6.  Tower Research acts as Spire X's manager.  *Id.*, Ex. 2 ¶ 5; *see also id.*, Ex. 8 at Ex. A at 1-3.  Tower Research manages Spire X's securities portfolio and trades securities on Spire X's behalf; Spire X holds title to the relevant securities and receives the proceeds of the sales of such securities.  *See id.*, Ex. 2 ¶¶ 4-6.

7.  Latour is a market-maker on several exchanges and trades for its own account. *Id.*, Ex. 3 ¶ 4.  Its operations consist primarily of trading in exchange-traded funds, equities, and futures in the United States and Canada.  *Id.*

---

[2]  Because the Trust's beneficiaries are opioid claimants, the Tower Defendants, like the other Defendants that have filed motions to dismiss pursuant to the Protocol Order, have decided not to seek recovery of the substantial fees they have incurred to date in connection with their submissions under the Protocol Order and otherwise in this Adversary Proceeding.  But, like the other Defendants, the Tower Defendants firmly believe, as do undersigned counsel, that the positions taken by the Trust in refusing to dismiss the claims against the Tower Defendants go well beyond the boundaries of fair advocacy and are contrary to the terms of both the Protocol Order and the basic command of the Federal Rules—that "the parties" must act "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1; Fed. R. Bankr. P. 7001.

B.    The Mallinckrodt Share Repurchases

8.    The Tower Defendants incorporate by reference Section B of the Background Section of the CS/SSLLC and TRP Motions. *See* D.I. 215 ¶ 10; D.I. 217 ¶ 13.

9.    Tower Research did not purchase or beneficially hold shares of Mallinckrodt stock for its own account or receive the proceeds of any sales of Mallinckrodt stock (including but not limited to the sales identified in Exhibit B to the Amended Complaint). Firsenbaum Decl., Ex. 2 ¶ 6.

10.    Spire X beneficially held the shares of Mallinckrodt stock identified in Exhibit B of the Amended Complaint directed to Tower Research, and Spire X received the proceeds of the alleged sales of Mallinckrodt stock in the same exhibit.[3] *Id.*

11.    Similarly, Latour beneficially held the shares of Mallinckrodt stock identified in Exhibit B of the Amended Complaint directed to Latour, and received the proceeds of the alleged sales of Mallinckrodt stock identified in the same exhibit. *See id.*, Ex. 3 ¶ 4.[4]

C.    The Protocol Order

12.    The Tower Defendants incorporate by reference Section C to the Background Sections of the CS/SSLLC and TRP Motions. *See* D.I. 215 ¶¶ 11-17; *see also* D.I. 217 ¶¶ 14-23.

D.    The Tower Defendants' Protocol Submissions

13.    On July 11, 2023, the Tower Defendants made a submission to the Trust pursuant

---

[3] The Amended Complaint does not allege any facts showing, and the Tower Defendants do not concede, that any of their sales of Mallinckrodt stock were *to Mallinckrodt* in connection with the Share Repurchases, rather than sales of Mallinckrodt stock on the open market to other counterparties. The Tower Defendants reserve the right to argue that the Amended Complaint has not adequately pled (or, at a later stage, met the applicable burden of proof) that Spire X and Latour received Share Purchase proceeds, and all service related and other defenses (including but not limited to other reasons why Section 546(e) bars the claims at issue), in subsequent motion practice and at trial. *See* D.I. 185-1 ¶ 22.

[4] *See supra* n. 3.

to the Protocol Order.  *See* Firsenbaum Decl., Ex. 1 (the "<u>Tower Defendants' Initial Protocol</u> <u>Submission</u>").  The Tower Defendants' Initial Protocol Submission demonstrated that Tower Research was a non-transferee and that Spire X and Latour were both "financial participants" as defined by the Bankruptcy Code, and included the following documentation:

       a.     A redacted excerpt of the audited financial statement of Spire X for the calendar year 2019 showing that as of December 31, 2019, Spire X had outstanding reverse repurchase and repurchase agreements with an aggregate mark-to-market value of approximately $302,499,000, Firsenbaum Decl., Ex. 2 ¶ 7 & Ex. A at 26; and

       b.     A haircut report showing that Latour received an extension of credit from ABN AMRO Clearing Chicago LLC ("<u>ABN AMRO</u>") of approximately $1.112 billion on October 12, 2020 (the Petition Date) to support its daily trading activities pursuant to the securities account agreement executed by Latour and ABN AMRO, which was also provided to the Trust, *id.*, Ex. 3 ¶¶ 5-6 & Exs. A-B.

14.     The Tower Defendants' Initial Protocol Submission also included a sworn declaration from Tower Research's Chief Investment Officer attesting that Tower Research did not beneficially hold any shares of Mallinckrodt stock, and did not receive any proceeds of any sales of such stock.  *Id.*, Ex. 2 (the "<u>First Cogman Declaration</u>").  The First Cogman Declaration further disclosed that Spire X held title to the shares of Mallinckrodt stock listed in Exhibit B of the Amended Complaint directed to Tower Research and received the proceeds of the sales of such shares.  *Id.*, Ex. 2 ¶¶ 4-6.

15.     Additionally, the Tower Defendants' Initial Protocol Submission included a sworn declaration from Latour's Chief Executive Officer, attesting to the authenticity and

accuracy of the financial documents showing that Latour received an extension of credit from ABN AMRO on October 12, 2020 with a value of approximately $1.112 billion. *Id.*, Ex. 3.

16. The Trust waited the full 45 days it was allowed under the Protocol Order, Protocol Order ¶ 9, before responding to the Tower Defendants' Initial Protocol Submission. *See id.*, Ex. 4. Contrary to its representation to this Court that it would dismiss a Non-Transferee after the Non-Transferee identified the actual shareholders and the Protocol Order's requirement that the Trust in fact do so, *see* TRP Motion ¶¶ 18, 22, the Trust refused to dismiss Tower Research even after Tower Research identified Spire X as the actual shareholder. Nor did the Trust provide any basis to question the accuracy of Spire X or Latour's documentation (or of the two sworn declarations). *See generally id.*, Ex. 4. Instead, the Trust requested the "[l]egal basis, including relevant case law, for why Tower Research's status as a 'managing member' [of Spire X] establishes its defense as a non-transferee." *Id.*, Ex. 4 at 1. And the Trust made thirteen requests for documents and information in connection with Spire X and Latour's showings that each was a "financial participant," seeking, among other documents and information:

      a. an unredacted copy of Spire X's audited financial statement, and an explanation whether that document was "submitted to any regulatory authority or other independent agency";

      b. Spire X's "[b]asis for alleging" that its repurchase and reverse repurchase agreement positions represent a "mark-to-market position," and an explanation of how those values were calculated;

      c. Copies of all repurchase and reverse repurchase agreements;

      d. The dates on which Spire X entered into such agreements, and their expiration dates;

e. Copies of all ISDA Master Agreements, Master Repurchase Agreements, Global Master Repurchase Agreements, and "all other relevant agreements" that show Spire X as a counterparty to all of its repurchase and reverse repurchase agreements;

f. Organizational charts;

g. Explanations of the "[l]egal and factual basis" to assert that an extension of credit or a margin loan is a "securities contract" under the Bankruptcy Code;

h. Copies of all securities agreements relating to the margin loan Latour received from ABN AMRO (which Latour already provided); and

i. Declarations further verifying the authenticity of Latour's supporting documentation. *Id.*, Ex. 4 at 1-3.

17. The Trust did not explain why it purported to need this information, or how the requested information was relevant to Tower Research's status as a non-transferee, or Spire X's and Latour's statuses as financial participants. *See generally id.*, Ex. 4.

18. Nevertheless, on October 11, 2023, the Tower Defendants responded with a 7-page letter and a second sworn declaration from Tower Research's Chief Investment Officer, *see id.*, Ex. 6 (the "Second Cogman Declaration"). The letter cited well-established caselaw holding that a defendant is not a "transferee" unless it has "dominion and control" over the relevant funds, and that Tower Research did not have dominion and control over the relevant funds since it never received them in the first place. *Id.*, Ex. 5 at 2-3. The Second Cogman Declaration also provided additional information in response to the Trust's requests, including explanations of how Spire X calculated the mark-to-market positions of its outstanding repurchase and reverse repurchase agreements, *see id.*, Ex. 6 ¶ 5, confirmation that none of Spire

X's repurchase and reverse repurchase agreements were with affiliates, *id.*, Ex. 6 ¶ 6, and confirmation that "fair value" of such agreements, as disclosed in the 2019 audited financial statement, represents Spire X's "mark-to-market" positions in such agreements, *id.*, Ex. 6 ¶ 4.

19. On November 21, 2023, 41 days after the Tower Defendants' supplemental submission, the Trust informed the Tower Defendants it would not dismiss them from the Adversary Proceeding.[5] *See* Firsenbaum Decl., Ex. 7. Citing only a single out-of-circuit bankruptcy court decision with materially different facts, the Trust argued that Tower Research had failed to show that it lacked "dominion and control over the [alleged] proceeds received from the Share Repurchase Transactions," and the fact that Tower Research did not "receive" the proceeds was "irrelevant." *Id.*, Ex. 7 at 2-3. **The Trust did not dispute that Latour was a financial participant**. *See id.* However, the Trust nevertheless refused to dismiss Latour and Spire X because, for the first time as to these defendants, the Trust argued that the alleged Share Repurchases were not "settlement payments" and thus not qualifying transactions. *See id.*, Ex. 7 at 3-8. And without providing any factual basis to question the documents' accuracy, the Trust maintained that Spire X's audited financial statements—which were audited by an independent auditing firm—were insufficient to establish that Spire X was a financial participant. *Id.*, Ex. 7 at 8-9.

20. The Trust also made three additional arguments in its response, citing no authority in support of each. First, despite the clear statutory language of 11 U.S.C. § 101(22A) to the contrary, the Trust argued that Spire X could not rely on the "mark-to-market" positions of its repurchase and reverse repurchase agreements and instead must satisfy the $1 billion notional

---

[5] In the intervening time between the Tower Defendants' Initial Protocol Submission and the Trust's November 21, 2023 letter, the Trust filed the Amended Complaint, re-naming Tower Research as a Defendant. D.I. 209 ¶ 88.

threshold for financial participant status.  *Id.*, Ex. 7 at 9-10.  Second, the Trust argued (incorrectly) that Spire X had failed to demonstrate how "fair value" can be used "interchangeably" with "mark-to-market" value.  *Id.*, Ex. 7 at 10.  Third, the Trust argued (incorrectly) that Spire X had failed to explain how the terms "payable" and "receivable" as used in the audited financial statements could describe the "mark-to-market" positions of Spire X's repurchase and reverse repurchase agreements.  *Id.*, Ex. 7 at 9-10.

21.     While unnecessary, in an attempt to narrow the outstanding issues requiring resolution by the Court, on December 6, 2023, the Tower Defendants provided the Trust with yet another letter, additional documentation and a *third* sworn declaration, which included:

> a.      Organizational documents for Spire X, including its Delaware limited liability company ("LLC") agreement, and legal authority demonstrating that Tower Research, as the manager of Spire X, had no right to make use of Spire X's assets, *see id.*, Ex. 8 at 3-4; *see also id.*, Ex. 9 at Exs. A-C;

> b.      A spreadsheet of positional data associated with Spire X's repurchase and reverse repurchase agreements underlying the audited financial statement previously provided, *see id.*, Ex. 9 at Ex. D; and

> c.      Financial documentation showing that on October 12, 2020 (the Petition Date), Spire X, like Latour, received an extension of credit from ABN AMRO with a value of $308,151,994, *id*., Ex. 9 at Exs. D-G.

22.     Undersigned counsel met and conferred with the Trust's counsel on December 7, 2023, in accordance with the Protocol Order.  The Trust responded to the Tower Defendants' December 6, 2023 submission on December 22, 2023.  *See id.*, Ex. 10.  The Trust nevertheless refused to dismiss the Tower Defendants, adding two additional arguments—that Spire X put

forward only "conclusory" and "self-serving" declarations, and that (again, citing no authority) the extension of credit that Latour received from ABN AMRO did not exceed the requisite $1 billion notional or principal amount threshold.  *Id.*

## ARGUMENT

**I.      The Court Should Dismiss Tower Research Because It Is A Non-Transferee**

23.      The Court should dismiss Tower Research because it, like TRP, was not a transferee with respect to the alleged Share Repurchases.  Section 550 of the Bankruptcy Code provides that a trustee may recover an avoided fraudulent transfer only from a "transferee" (or the entity for whose benefit the debtor made the transfer).  *See* 11 U.S.C. § 550(a) ("[T]he trustee may recover . . . from [] the initial transferee of such transfer or the entity for whose benefit such transfer was made; or [] any immediate or mediate transferee . . . .").  Indeed, to state a claim, the plaintiff must allege facts showing that the defendant is a transferee.  *See Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102-04 (Bankr. D. Del. 2010).

24.      To determine whether an entity is a "transferee," courts have adopted the "dominion and control" test.  *Id.* (citing *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)); *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997) (same).  Under that test, an entity qualifies as a "transferee" only if it had "dominion over the money or other asset [and] the right to put the money to one's own purposes."  *Bonded Fin.*, 838 F.2d 893.  The "transferee must have the legal right to use the funds to whatever purpose he or she wishes."  *Mervyn's Holdings*, 426 B.R. at 103 (citations and quotations omitted).  These cases distinguish between "transferees" and "conduits"—the latter being entities that may have received the funds at issue but nevertheless were not transferees because they did not have dominion and control

over the funds and instead had to forward them to another party. *See, e.g.*, *Finley*, 130 F.3d at 57-58; *Mervyn's Holdings*, 426 B.R. at 103-04.

25. The Amended Complaint does not allege any facts showing that Tower Research was a transferee with respect to the Share Repurchases. While it makes the same conclusory allegation as to Tower Research that it makes about nearly every defendant—that Mallinckrodt transferred funds to Tower Research through the Share Repurchases—Am. Compl. ¶¶ 17, 88, it does not allege (nor could it allege) that Tower Research beneficially held Mallinckrodt stock or received proceeds from the sale of Mallinckrodt stock for its own account. Nor does the Amended Complaint allege any facts (or even make a conclusory allegation for that matter) showing that Tower Research exercised dominion and control over such shares or proceeds. *See id.* For this reason alone, the Amended Complaint should be dismissed as against Tower Research. *See Mervyn's Holdings*, 426 B.R. at 102-04 (granting motion to dismiss because plaintiff failed to plead that bank had "dominion and control" over funds); *see also Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 382-83 (Bankr. S.D.N.Y. 2014) (granting motion to dismiss claims "against conduits and any holders who were not beneficial holders" because such entities "cannot be held liable as recipients of fraudulent transfers"), *abrogated in part on other grounds by Deutsche Bank Tr. Co. Ams. v. Large Priv. Beneficial Owners (In re Trib. Fraudulent Conv. Litig.)*, 818 F.3d 98 (2d Cir. 2016); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 314-15 (Bankr. S.D.N.Y. 1999) (granting motion to dismiss because the complaint only plausibly alleged that the defendant was a "mere conduit").

26. In addition, under the Protocol Order, the Court is not bound by the allegations in the Amended Complaint and can consider the evidence that Tower Research has provided the Trust pursuant to the Protocol Order. D.I. 185-1 ¶ 11(b). That evidence shows that Tower

Research was a non-transferee with respect to the alleged sales of Mallinckrodt stock identified in Exhibit B to the Amended Complaint. Tower Research has provided the Trust with *three* sworn declarations and pages of supporting documentation that satisfy the requirements in the Protocol Order for a non-transferee to be dismissed, and which conclusively demonstrate that Tower Research is merely the manager of Spire X, and in that role did not own any Mallinckrodt stock, did not receive any Share Purchase proceeds, and did not have dominion and control over any proceeds that it or Spire X is alleged to have received. *See* Firsenbaum Decl., Exs. 2, 6, & 9. Tower Research is entitled to dismissal as a non-transferee. *See Iannacone v. IRS (In re Bauer)*, 318 B.R. 697, 702 (Bankr. D. Minn. 2005) (defendant that "did not receive" the funds "was never a transferee, and certainly was not an initial one" (internal citations and quotations omitted)).

27. The Trust's refusal to dismiss Tower Research hinges on its unfounded assertion that Tower Research "has failed to show that it lacks dominion and control over the Funds." Firsenbaum Decl., Ex. 7 at 1. That position flips the law on its head. It is the Trust's burden to plead (and later show with evidence) that Tower Research is a transferee (which it was not). *See* 11 U.S.C. § 550; *see also Mervyn's Holdings*, 426 B.R. at 102-04 (granting motion to dismiss because plaintiff failed to allege that bank had "dominion and control" over funds at issue); *In re Lyondell Chem. Co.*, 503 B.R. at 382-83 (granting motion to dismiss claims against non-beneficial holders); *Sec. Stratton Oakmont*, 234 B.R. at 313-15 (granting motion to dismiss because plaintiff failed to plausibly allege "dominion and control").

28. The only legal authority upon which the Trust relies is *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007), an out-of-circuit case where the court held that Bear Stearns was a transferee with respect to funds the debtor had

deposited in a margin account *at Bear Stearns* that Bear Stearns required the debtor to fund as collateral for margin loans Bear Stearns provided. *Id.* at 21. Those facts are entirely different from those present here, for at least two reasons.

29. *First*, Bear Stearns was *not* merely a manager of the debtor. Rather, it was the debtor's secured lender. *See id.* at 5. This was critical to the court's finding that Bear Stearns exercised "dominion and control" over the relevant transfers: the transferred cash, held at Bear Stearns, became effectively Bear Stearns's collateral to secure its loans of stock to the debtor to support the latter's short-selling activities. *See id.* at 19. The account agreement provided Bear Stearns with significant control over the debtor's positions in the margin account, including provisions that prevented the debtor from withdrawing funds from the account if it had open short positions (*i.e.*, so long as it had an outstanding loan balance with Bear Stearns), and authorizing Bear Sterns itself to "[u]se the funds . . . to liquidate the Fund's open short positions, with or without the Fund's consent." *Id.* at 5-6.

30. Here, by contrast, Tower Research made no loans to Spire X. Rather, it simply acted as Spire X's manager, and had neither a legal nor contractual right to make use of the proceeds of the alleged Share Repurchases for its own purposes.[6]

---

[6] In fact, if Tower Research had used Spire X's assets or securities for its own purposes, it would have violated applicable law. The manager of a Delaware LLC owes fiduciary duties to the LLC, including the duties of care and loyalty. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 (Del. Ch. 2012) (consistent with "[n]umerous Court of Chancery decisions," holding that "managers of an LLC owe fiduciary duties" to the LLC); *see also Kyle v. Apollomax , LLC*, 987 F. Supp. 2d 519, 524 (D. Del. 2013) (explaining that even "[w]here the LLC agreement is silent with respect to fiduciary duties, Delaware law imposes default fiduciary duties on managers of an LLC"). If a manager uses LLC assets for its own purposes, it breaches those duties. *See Largo Legacy Grp., LLC v. Charles*, 2021 WL 2692426, at *15 (Del. Ch. June 30, 2021) (manager's self-dealing at the expense of the LLC breached the duty of loyalty); *see also PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *6 (Del. Ch. Feb. 26, 2010) (finding that manager breached fiduciary duties when it used LLC funds for his own purposes to "conduct his own business," and misappropriated LLC resources for his personal benefit).

31.     Spire X's LLC agreement and related documentation confirm that Tower Research acted solely as Spire X's manager and had no right to make use of Spire X's assets for its own purposes. The LLC agreement names Tower Research as Spire X's "Manager," *see* Firsenbaum Decl., Ex. 9 at Ex. A at 1, 5, and the corresponding Grant of Authority, which sets the boundaries of Tower Research's discretionary authority over Spire X assets (including its securities portfolio), authorizes Tower Research only to perform specified functions "***in the name and on behalf of the Company [Spire X]***," including selling and buying securities *owned by Spire X. Id.* at Ex. B at 1 (emphasis added). Specifically, the Grant of Authority gives Tower Research the right to "open, maintain and close, ***in the name of the Company [i.e., Spire X]***, accounts with brokers, dealers, custodians and similar firms providing execution, custody, clearance, margin financing, and similar services as may be deemed necessary or desirable to effectuate transactions in Financial Instruments." *Id.* at 1 (emphasis added). The Officer's Certificate, which authorizes Tower Research's COO to act as agent for Spire X, authorizes that officer only to act with the "authority of the Manager [] ***on behalf of the Company [Spire X]***." *Id.*, Ex. C at 1 (emphasis added).

32.     *Second*, in the *Manhattan Investment Fund* case, Bear Stearns, in fact, had exercised its contractual rights as the debtor's secured creditor to use the funds in question to "cover certain of the [debtor's] positions." *Manhattan Inv.*, 397 B.R. at 21. Here, no such evidence exists, nor could it, since, as discussed above, Tower Research did not have the

contractual or legal authority to use Spire X's assets for its own benefit, and Tower Research did not do so with respect to any Share Repurchase proceeds.  *See* Firsenbaum Decl., Ex. 2 ¶¶ 4, 6.[7]

33.     The Trust's remaining grounds for refusing to dismiss Tower Research are equally unfounded.  That Tower Research could execute trades for Spire X, or "bind" Spire X to trades, does not show that Tower Research had "dominion and control" over the proceeds that Spire X allegedly received.  *See* Firsenbaum Decl., Ex. 6 at 2-3; *id.*, Ex. 10 at 1-4.  The Trust identifies no evidence (because there is none) showing that Tower Research had the ability to take Spire X's proceeds, or any other of its assets, and use them for its own purposes.  That distinction is dispositive.  *See Mervyn's Holdings*, 426 B.R. at 103 (bank, as trustee and holder of the proceeds, was not a transferee despite "fulfilling an instruction to make the funds available to a third party"); *see also Finley*, 130 F.3d at 59 (insurance broker that "transferred" insurance premiums on behalf of debtor was not a transferee); *Durkin v. Piper Tr. Co. (In re Denman & Co.)*, 186 B.R. 707, 712 (Bankr. C.D. Cal. 1995) (broker for debtor was not "transferee," despite provision in account agreement that authorized it to act as "absolute owner" of securities positions, because broker was "fiduciary" and trustee provided no evidence broker "misappropriated" the funds).

34.     That Tower Research had discretionary authority to trade securities for Spire X, *see* Firsenbaum Decl., Ex. 10 at 2, does not help the Trust either.  Tower Research was Spire X's manager.  It had such discretionary authority only to act for the benefit of Spire X, not for itself.  *See* Firsenbaum Decl., Ex. 2 ¶¶ 4, 6; *see also id.*, Ex. 9 at Exs. A-C.  Since Tower Research was

---

[7]  While in its letter to the TRP Defendants the Trust cited two additional cases that purportedly supported its position that TRP was a "transferee" (which it was not), the Trust did not do so in its response to the Tower Defendants' Initial Protocol Submission, perhaps recognizing after reading the TRP Motion that those cases do not support its position.  *Compare* D.I. 218 & 227-13, Ex. 6 at 3 n.6 *with* Firsenbaum Decl., Ex. 7 at 2-3; *see also* D.I. 217 at 19 n.9.

not trading Spire X's Mallinckrodt shares for its own account, it was not a transferee. *Finley*, 130 F.3d at 57; *see also Geltzer v. D'Antona (In re Cassandra Grp.)*, 312 B.R. 491, 497 (Bankr. S.D.N.Y. 2004) (finding attorney who received funds and had "broad powers to act on [debtor's] behalf," but did not have "legal right to put the Payments to his own personal use," was not a transferee); *Bauer*, 318 B.R. at 703-04 (manager of IRA account was not a transferee even though he was client's "fiduciary" and "directed" the transfer that the plaintiff sought to avoid); *Durkin*, 186 B.R. at 712 (debtor's broker was not "transferee," despite account agreement authorizing broker to act as "absolute owner" of securities, because broker was "fiduciary" and trustee provided no evidence broker "misappropriated" the funds).

35. Finally, the Trust's arguments would upend the most basic, settled principles of agency law. Under the Trust's position, every asset manager acting as an agent on behalf of its clients would be personally liable in a claw-back action seeking to recover funds paid, not to or for the benefit of the asset manager, but instead to and for the benefit of the managed account. Similarly, any trustee would be personally liable for payments it received on behalf of the underlying trust it administered, even if the trustee was not a beneficiary of the trust. That would turn on its head the law of agency (and of investment managers, trusts, and LLC managers), which holds that agents are not liable in claw-back actions for funds transacted on behalf of the principal. *See Bonded Fin.*, 838 F.2d at 893 ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."); *see also Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1199 (9th Cir. 1997) (rejecting argument that would "have the anomalous result that every agent or principal of a corporation would be deemed the initial transferee when he or she effected a transfer of property in his or her representative capacity"); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1204

(10th Cir. 2002) (entity that received the "[the funds] in trust or as agent for someone else" was not an "initial transferee").

## II.      The Court Should Dismiss Spire X And Latour Pursuant To Section 546(e)

36.      The Amended Complaint purports to assert constructive and intentional fraudulent conveyance claims pursuant to Section 544 of the Bankruptcy Code.  Am. Compl. ¶¶ 351-84.  Section 546(e) of the Bankruptcy Code provides an absolute "safe harbor" against such claims as they relate to Spire X and Latour:

> *Notwithstanding section[] 544* . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial participant . . . or that is a transfer made by or to (or for the benefit of) a . . . financial participant . . . in connection with a securities contract . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (emphasis added).[8]  The safe harbor applies where two requirements are met: (a) there is a "qualifying transaction" (*i.e.*, a "settlement payment" or "transfer . . . made in connection with a securities contract"), and (b) there is a "qualifying participant" (*i.e.*, the transfer was made by or to (or for the benefit of) a financial institution or other entity set forth in the statute). *Golden v. Cmty. Health Sys., Inc. (In re Quorum Health Corp.)*, 2023 WL 2552399, at *5 (Bank. D. Del. Mar. 16, 2023) (Shannon, J.).  Both prongs are met here.

### A.      The Share Repurchases Are Qualifying Transactions

37.      Spire X and Latour incorporate by reference Section I of the Argument Section of the CS/SSLLC Motion.  It demonstrates why all of the alleged Share Repurchases were both "settlement payments" and "transfers made in connection with a securities contract," and, in any event, that the Trust has waived any argument to the contrary.  *See* CS/SSLLC Mot. ¶¶ 31-52.

---

[8]  Although Section 546(e) does not bar a claim pursuant to section 548(a)(1)(A) of the Bankruptcy Code, the Amended Complaint does not purport to bring such a claim.

38.     In addition, this Court recently held at the motion to dismiss stage in a separate adversary proceeding brought by the Trust, *Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt plc)*, No. 22-50433 (JTD), 2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ("*Covidien*"), that Mallinckrodt's payments to Covidien (and other transfers) in exchange for shares of Mallinckrodt stock were qualifying transactions under Section 546(e) both because they were settlement payments and transfers in connection with a securities contract.  *See id.* at *15 (citing *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999) for propositions that Code's definition of "settlement payment" is "extremely broad" and that "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction.").  The same is true for the Share Repurchases.  *See* CS/SSLLC Mot. ¶¶ 31-46.

B.      Spire X And Latour Are Qualifying Participants

39.     The Bankruptcy Code defines "financial participant" as any entity that: (a) "at the time it enters into a securities contract . . . [or] repurchase agreement," "at the time of the date of the filing of the petition," or "on any day during the 15-month period preceding the date of the filing of the petition" (b) "has one or more [securities contracts or repurchase agreements] . . . with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties)" or "has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties)," excluding agreements with affiliates.  11 U.S.C. § 101(22A)(A).  The term "securities contract" is defined broadly to include includes any "contract for the . . . loan of a security," *id.* § 741(7)(A)(i), "any margin loan," *id.* § 741(7)(A)(iv), or "any extension of credit for the clearance or settlement of securities

transactions," *id.* § 741(7)(A)(v).  "Security" is, in turn, defined broadly to include "stock" and "bond[s]."  11 U.S.C. § 101[49)(A)(ii), (iv).

40.     Each of Latour and Spire X has demonstrated that it is a "financial participant." Indeed, the Trust's response to the Tower Defendants' protocol submission does not even contest that Latour is a financial participant.  *See* Firsenbaum Decl., Exs. 7 at 8-10 & Ex. 10.  Nor could it; Latour provided the Trust with financial records showing that it received an extension of credit from ABN AMRO on the Petition Date of approximately $1.112 billion, well above the statutory threshold.  *Id.*, Ex. 3 at Exs. A & B.

41.     Spire X provided the Trust with two independent grounds upon which it too satisfied the relevant statutory threshold for financial participant status.  *First*, Spire X provided the Trust with financial records showing that on October 12, 2020 (the Petition Date), ABN AMRO extended Spire X credit in the amount of approximately $308 million to support its daily trading activities, again over the statutory threshold.  *Id.*, Ex. 9 at Exs. E-G.  This is the same type of evidence for which Latour showed its "financial participant" status—evidence that the Trust did not dispute as to Latour.

42.     *Second*, Spire X provided the Trust with its 2019 financial statement, audited by an independent auditing firm, showing that, as of December 31, 2019—a date within 15 months of the petition date (October 12, 2020)—it had aggregate outstanding mark-to-market reverse repurchase and repurchase agreement positions in excess of the $100 million statutory threshold. *See* Firsenbaum Decl., Ex. 2 ¶ 7 & Ex. A at 26.  Specifically, Spire X's audited financial statement shows that Spire X had outstanding mark-to-market repurchase and reverse repurchase agreement positions with non-affiliates of over $302 million.  *Id.*  The Trust did not provide any basis to question the accuracy of Spire X's audited financial statements, its financial records, or

the *three* confirming declarations *sworn under penalty of perjury* attesting to the accuracy of those documents either.

43. Instead, the Trust made five arguments to justify its refusal to dismiss Spire X from the Adversary Proceeding. Each is without merit.

44. *First*, as with Citadel Securities, Susquehanna Securities, and the Renaissance Funds, the Trust argues that it "lacks the evidentiary basis it needs to verify the accuracy of Spire X's [showing]." Firsenbaum Decl., Ex. 7 at 8. That argument is a makeweight. The Trust offers no basis to question the accuracy of financial statements *audited by independent auditors* and further supported by *sworn declarations under penalty of perjury* from Tower Research's Chief Investment Officer attesting to their accuracy. There is no need, for example, for the Trust to demand and review copies of all of Spire X's repurchase and reverse repurchase agreements, *see* Firsenbaum Decl., Ex. 4 at 2, or organizational charts concerning Tower entities, *see id.* If the point of such requests was to determine whether any of the transactions at issue were with affiliates (something the Trust never stated), Spire X provided that information in a detailed spreadsheet of positional data associated with each of the repurchase and reverse repurchase agreements, confirming that none of those agreements were with Spire X affiliates. Firsenbaum Decl., Ex. 9 at Ex. D.

45. The Trust's assertion that Spire X failed to explain how the $302 million in repurchase and reverse repurchase agreements represents the mark-to-market positions in such agreements, *see id.*, Ex. 7 at 9-10, ignores that Spire X did just that. Spire X's audited financial statement itself explained how such agreements were valued, *see id.*, Ex. 2 at Ex. A at 25-26, and Spire X provided the Trust with a sworn declaration from its manager's Chief Investment Officer explaining that the "mark-to-market" positions were calculated using the market value of the

securities purchased and sold by Spire X pursuant to those agreements as of December 31, 2019, *id.*, Ex. 6 ¶ 4.

46. Even when Spire X provided the Trust with the additional information it requested, including, for example, positional data identifying the counterparties to Spire X's repurchase and reverse repurchase agreements and the mark-to-market positions associated with each such agreement, *see id.*, Ex. 9 at Ex. D, the Trust still refused to dismiss Spire X, *id.*, Ex. 10. Instead of seriously engaging with the supporting documentation, the Trust made borderline frivolous arguments, such as quibbling with Spire X's use of the phrase "mark-to-market *values*" instead of "mark-to-market *positions*" *id.*, Ex. 10 at 5, despite the fact that Tower Research's sworn declarations used the latter term, *id.*, Ex. 2 ¶ 7; *see also id.*, Ex. 6 ¶¶ 3-5, and that such terms are interchangeable. Thus, even when presented with information "verifying" Spire X's audited financial statement, the Trust rejected it out of hand.

47. Moreover, the Trust's argument, if accepted, would render the Protocol Order a nullity. The Protocol Order calls for a defendant to "attach[] as Exhibit[s] . . . supporting documentation showing that [it is a financial participant]," and it expressly authorizes the Court to consider that evidence. D.I. 185-1 ¶¶ 5-6, 11 & app. A (form Declaration) ¶ 3. The audited financial statements provided by Spire X demonstrate that it exceeded the $100 million mark-to-market threshold by hundreds of millions of dollars. And Spire X, as required by the Protocol Order, provided a sworn declaration attesting to the accuracy of those financial statements. *See* D.I. 185-1 ¶ 5 and app. A. Under the express terms of the Protocol Order, nothing more is required to show that Spire X is a financial participant and thus qualifying participant.

48. *Second*, the Trust—citing no authority—argues that because repurchase and reverse repurchase agreements are, in essence, short-term financing agreements, they must

exceed Section 101(22A)'s $1 billion "notional or actual principal amount outstanding" threshold. Firsenbaum Decl., Ex. 7 at 9-10.  But this argument contradicts the plain language of the Bankruptcy Code.  An entity is a financial participant if it has "one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate)," which include securities contracts, as defined in section 741(7) (11 U.S.C. § 561(a)(1)) and repurchase agreements (*id.* § 561(a)(4)), "of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) . . . ___or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions___."  11 U.S.C. § 101(22A)(A) (emphasis added).  As required by the Code, the word "or" is "not exclusive," 11 U.S.C. § 102(5), and must be read disjunctively so as to provide alternative options.  *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 305 (3d Cir. 2010) (holding that the Code's use of the term "or" "operates to provide alternatives" and must be read "in the disjunctive").  Applying this principle to Section 101(22A), an entity can alternatively rely on either the "total gross dollar value . . . in notional or actual principal amount outstanding" of its repurchase agreements, __or__ "[the] gross mark-to-market positions [in] . . . ___such agreements___."  (emphasis added).[9]

49.     The Trust's argument that reverse repurchase and repurchase agreements cannot have "mark-to-market" positions—that is, cannot be valued using the market value of the securities purchased or sold pursuant to the repurchase or reverse repurchase agreement, Firsenbaum Decl., Ex. 7 at 9-10—also lacks any basis in any authority because it is wrong.

---

[9]  The same logic applies to the credit ABN AMRO extended to Spire X on October 12, 2020.  *See supra* ¶ 40.  The Trust's argument that Spire X cannot rely on the "mark-to-market" value of this credit again contradicts the plain language of the statute.

Courts, regulators, and leading treatises alike recognize that repurchase agreements can be recorded as "mark-to-market" positions on balance sheets, based on the value of the securities purchased or sold pursuant to that agreement. *See, e.g.*, *Bd. of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 666 (S.D.N.Y. 2011) ("Although the borrower [in a repurchase agreement] passes legal title to the securities to the lender, it retains both the economic benefits and market risk of the transferred collateral through retained beneficial ownership, and ***continues to mark-to-market the price of the security on its balance sheet***" (emphasis added)); Moorad Choudhry, *The Repo Handbook* 155-56 (2d ed. 2010) (in connection with a repurchase agreement, "the repo seller will continue to ***mark-to-market the price of the stock on his book each day*** . . . ." (emphasis added)).[10] This is hardly a controversial concept. Indeed, the caselaw contains at least one decision in which a bankruptcy court held that a defendant was a financial participant based on its sworn statement that it had mark-to-market positions in repurchase agreements in excess of $100 million. *Luria v. Hicks (In re Taylor, Bean & Whitaker Mortg. Corp.)*, 2017 WL 4736682, at *3-5 (Bankr. M.D. Fla. Mar. 14, 2017).

---

[10] FINRA, *Filing & Reporting: Frequently Asked Questions about Derivatives and Other Off-Balance Sheet Items (OBS)* (last visited Jan. 17, 2024), https://www.finra.org/filing-reporting/derivatives-and-other-balance-sheet-items-obs/faq ("With respect to reverse repos, firms should report the ***market value of the securities that are the subject of the reverse repo***." (emphasis added)); CFTC, Form 1-FR-FCM, *Instructions: Statement of Financial Condition - Asset* at 4-4 (Mar. 2010), https://www.cftc.gov/sites/default/files/IndustryOversight/Intermediaries/1fr-fcminstructions.pdf (providing that "[s]ecurities purchased under a reverse-repurchase agreement may be considered current assets" in statements of financial condition); Federal Reserve Bank of New York, *Federal Reserve Bank of New York Staff Reports: A Primer on the GCF Repo Service*, Rep. No. 671 at 10 (May 2014), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr671.pdf (explaining how "fire sales" may, in the context of repurchase and reverse repurchase agreements, force "those dealers to mark down securities on their balance sheets (for example, through mark-to-market accounting practices) or provide more securities as collateral" to such agreements).

50.      *Third*, the Trust's argument that Spire X has failed to demonstrate how the "fair value" of the repurchase and reverse repurchase agreements relates to the "mark-to-market" positions in such agreements, Firsenbaum Decl., Ex. 7 at 9-10, cannot be reconciled with accounting principles widely accepted by regulators, market participants, and courts alike, which equate "fair value" with "mark-to-market" value. *See* SEC, *Report and Recommendations Pursuant to Section 133 of the Emergency Economic Stabilization Act of 2008: Study on Mark-to-Market Accounting* at 2 (2008), https://www.sec.gov/files/marktomarket123008.pdf ("[W]hen securities are actively traded, changes in ***fair value are required to be recognized in the income statement. This is the specific meaning of 'mark-to-market' accounting***." (emphasis added)); *see also EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 349 (D.C. Cir. 2018) (recognizing FASB standards that define "mark-to-market" accounting as "reflecting ***fair market value of investment assets***" (emphasis added)).[11]  There is no reason to think that Congress intended the term "mark-to-market" to mean anything other than this accepted industry meaning. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 201-02 (1974) ("Where Congress has used technical words or terms of art, 'it (is) proper to explain them by reference to the art or science to which they (are) appropriate'"); *see also United States v. Lachman*, 387 F.3d 42, 53 (1st Cir. 2004) (holding there are "instances where a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage").

---

[11]  *See also* Alicia Tuovila, *Mark to Market (MTM):  What It Means in Accounting, Finance, and Investing*, INVESTOPEDIA (last updated Nov. 17, 2023), https://www.investopedia.com/terms/m/marktomarket.asp ("Mark to market (MTM) is a method of measuring the ***fair value of accounts that can fluctuate over time***, such as assets and liabilities." (emphasis added)); Corp. Fin. Inst., *What is Mark to Market*, https://corporatefinanceinstitute.com/resources/valuation/mark-to-market/ (last visited Jan. 17, 2024) ("The term mark to market refers to a method under which the ***fair values of accounts that are subject to periodic fluctuations can be measured***, i.e., assets and liabilities." (emphasis added)).

51.     *Fourth*, the Trust's argument that the audited financial statement's description of

Spire X's reverse repurchase and repurchase agreements as "payables" and "receivables" means

that such values are principal amounts rather than mark-to-market positions, *see* Firsenbaum

Decl., Ex. 7 at 9-10, is inconsistent with the same basic accounting rules.  A "receivable" is an

amount to be received, and a "payable" is an amount to be paid.  "Fair value" is the "price that

would be *received* to sell an asset or *paid* to transfer a liability in an orderly transaction between

market participants at the measurement date," FASB, *Broad Transactions: 820 Fair Value

Measurement - Glossary*, https://asc.fasb.org/1943274/2147482224 (emphasis added)[12]; *see also

SEC v. SBB Rsch. Grp., LLC*, 2020 WL 6075873, at *3 (N.D. Ill. Oct. 15, 2020) (recognizing

under GAAP that fair value "equals an exit price").  Thus, a "receivable" at "fair value" is the

amount of money that would be received for a sold security on the measurement date, and a

"payable" at "fair value" conversely is the amount of money that would need to be paid to

purchase a security.  *See id.*  And as just explained, "fair value" is the same as "mark-to-market"

value.  *See supra* ¶ 50.  Thus, Spire X's disclosure of its outstanding reverse repurchase and

repurchase agreements as "*receivables and payables* for securities under repurchase agreements*,

measured at fair value*," Firsenbaum Decl., Ex. 2 at Ex. A at 26 (emphasis added), is entirely

consistent with—and confirms—the conclusion that such values represent the mark-to-market

---

[12]  Regulators and courts accept the FASB's accounting standards "as authoritative."  *See
Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 159-60 n.4 (2d Cir. 2000) (recognizing that "[t]he
SEC treats the FASB's standards as authoritative"); *see also New Eng. Carpenters Guaranteed
Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 172 n.9 (2d Cir. 2023) ("The Accounting
Standards Codification ('ASC') is the 'source of authoritative generally accepted accounting
principles,' commonly referred to as 'GAAP,' published by the [FASB] 'to be applied by
nongovernmental entities.'" (quoting FASB, *Accounting Standards Codification: Overview and
Background*, 105-10-05-1 (2020), https://asc.fasb.org/1943274/2147479442); *City of Monroe
Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 677-78 & n.22 (6th Cir. 2005) (relying on
FASB GAAP standards and recognizing that such standards are treated as "authoritative" by the
SEC).

positions in such agreements. And lest there is any doubt, the declaration of Tower Research's Chief Investment Officer lays this point to rest, attesting that these "payables" and "receivables" represent the mark-to-market positions of Spire X's repurchase and reverse repurchase agreements, calculated using the market value of the securities purchased and sold by Spire X under the reverse repurchase and repurchase agreement. Firsenbaum Decl., Ex. 6 ¶¶ 4-5.

52.     *Fifth and finally*, the Trust's argument that Spire X cannot rely on purportedly "conclusory" and "self-serving" declarations,[13] *see* Firsenbaum Decl., Ex. 10 at 1-2, is a red herring. Spire X's three sworn declarations are not "conclusory"—they, among other things, confirm the accuracy of Spire X's audited financial statements and other financial documents, and provide explanations of how none of Spire X's reverse repurchase and repurchase agreements were with affiliates, and how the mark-to-market positions in such agreements were calculated. *See* Firsenbaum Decl., Exs. 2, 3, 6 & 9.

53.     Moreover, the Trust relies on cases that are inapplicable for multiple reasons.[14] As a threshold matter, this motion is brought pursuant to the *Protocol Order*, which requires a Defendant to provide the Trust with a "sworn declaration substantially in the form attached hereto as Appendix A." *See* D.I. 185-1 ¶ 5 & app. A. The template declaration only requires a Defendant to assert that it "believes that it was a 'financial participant,' as defined by 11 U.S.C.

---

[13] Of course, all declarations or affidavits submitted by a defendant in support of a motion for dismissal are necessarily "self-serving," but that is no basis to reject them. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) ("It is not the self-serving nature of the affidavits [rejected by courts as insufficient to oppose a summary judgment motion], however, that sealed their fate in these cases. After all, most affidavits submitted for these purposes are self-serving."); *see also United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (agreeing that "most affidavits submitted [in response to a summary judgment motion] are self-serving" (quoting *Pauley*, 337 F.3d at 772) (alteration in original)).

[14] *See, e.g.*, *Frantz v. Nationwide Ins. Co.*, 2021 WL 2014990, at *3 (M.D. Pa. May 19, 2021); *Rowello v. Healthcare Benefits, Inc.*, 2013 WL 6576449, at *5 (D.N.J. Dec. 13, 2013); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

§ 101(22A)" and "attach[] . . . supporting documentation showing that [defense]." *Id.* at app. A ¶¶ 2(d), 3. The Tower Defendants did just that. They provided three sworn declarations from Tower Research's Chief Investment Officer that provided facts showing that Spire X is a financial participant, along with supporting documentation. And, even if this were not a Protocol-Based Motion contemplating the exchange of such documentation and declarations, Spire X's sworn declarations made under penalty of perjury are more than sufficient to establish Spire X's status as a financial participant. *See Luria*, 2017 WL 4736682, at *3-5 (granting motion for summary judgment based on affidavit that asserted the defendant met the statutory thresholds for financial participant status, when trustee "presented no record evidence nor argument refuting these facts").

54.     Further, putting aside the Protocol Motion, the Trust's cited cases are easily distinguishable for multiple reasons (and in many cases support dismissal). In one case, the contested declaration or affidavit was inconsistent with prior statements made by the affiant. *See, e.g.*, *Frantz*, 2021 WL 2014990, at *3 (rejecting declaration submitted in support of summary judgment motion that contradicted affiant's deposition testimony). In the other cases, the movant's declaration or affidavit was uncorroborated. *See Rowello*, 2013 WL 6576449, at *5 (rejecting affidavit submitted in opposition to summary judgment motion where movant provided supporting testimony, evidence, and other documentation supporting movant's version of events, and the opposing party's declaration relied solely on his "belief" and uncorroborated facts not in the record); *Lujan*, 497 U.S. at 888-89 (rejecting affidavit submitted in opposition to summary judgment motion that assumed key facts). Here, by contrast, the Trust has not presented any evidence calling into question the accuracy of the Tower Defendants' sworn declarations and documentation, and the three sworn declarations from Tower Research's Chief

Investment Officer attest to facts based on his personal knowledge and his review of the Tower

Defendants' relevant records, including financial statements audited by an independent

accounting firm and other financial documents. *See* Firsenbaum Decl., Exs. 2, 6 & 9.

## CONCLUSION

55.     For these reasons, the Tower Defendants respectfully request that the Court enter

the proposed order submitted herewith as Exhibit A granting the relief requested by the Motion

and dismissing the Tower Defendants from the Adversary Proceeding.[15]

---

[15] As noted above, the Tower Defendants do not now seek an award of attorneys' fees
and costs from the Trust, recognizing that it operates for the benefit of opioid victims. But the
Trust's refusal to dismiss them pursuant to the Protocol Order meets the standard for such an
award. *See Doe v. Keane*, 117 F.R.D. 103, 104-05 (W.D. Mich. 1987) (granting request for
attorneys' fees when plaintiff was presented with pre-motion evidence that claim failed as a
matter of law but continued to pursue claims); *see also Brown v. Chinen*, 2010 WL 1783573, at
\*1, \*5 (D. Haw. Feb. 26, 2010) (similar). Should this Court agree that the Tower Defendants are
entitled to dismissal pursuant to the Protocol Order, and should the Trust nevertheless continue
to pursue claims against the Tower Defendants, the Tower Defendants reserve their rights to seek
an award of the fees and costs they incurred negotiating the Protocol Order, making submissions
to the Trust pursuant to the Protocol Order, and moving to dismiss pursuant to the Protocol
Order.

Dated:  January 29, 2024
Wilmington, Delaware

*/s/Jeremy W. Ryan*

Jeremy W. Ryan (No. 4057)
Andrew L. Brown (No. 6766)
**POTTER ANDERSON CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Email: jryan@potteranderson.com
      abrown@potteranderson.com

*-and-*

Philip D. Anker *(admitted pro hac vice)*
Noah A. Levine *(admitted pro hac vice)*
Ross E. Firsenbaum *(admitted pro hac vice)*
Michael McGuinness *(admitted pro hac vice)*
Austin M. Chavez *(admitted pro hac vice)*
**WILMER CUTLER PICKERING**
  **HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8000
Email: philip.anker@wilmerhale.com
      noah.levine@wilmerhale.com
      ross.firsenbaum@wilmerhale.com
      mike.mcguinness@wilmerhale.com
      austin.chavez@wilmerhale.com

*Counsel to Defendants Tower Research*
*Capital LLC, Spire X Trading LLC, and*
*Latour Trading LLC*