# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MALLINCKRODT PLC, | : | Case No. 20-12522 (JTD) |
|  | : |  |
| Reorganized Debtor.[1] | : |  |
|  | : |  |
| OPIOID MASTER DISBURSEMENT TRUST II, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Adversary Proceeding |
| vs. | : | No. 22-50435 (JTD) |
|  | : |  |
| ARGOS CAPITAL APPRECIATION MASTER FUND LP, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS THE AMENDED COMPLAINT AS TO DEFENDANTS TOWER RESEARCH CAPITAL LLC, SPIRE X TRADING LLC, AND LATOUR TRADING LLC

Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
COLE SCHOTZ P.C.
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
jalberto@coleschotz.com
preilley@coleschotz.com

Anthony De Leo
COLE SCHOTZ P.C.
1325 Ave. of the Americas
19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393

Kevin C. Maclay (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
Jeffrey A. Liesemer
(admitted *pro hac vice*)
Quincy M. Crawford, III
(admitted *pro hac vice*)
Serafina Concannon (admitted *pro hac vice*)
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W., Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Co-Counsel to Plaintiff Opioid Master Disbursement Trust II*

Dated: February 19, 2024

---

[1] The Reorganized Debtor in this chapter 11 case is Mallinckrodt plc ("**Mallinckrodt**"). On May 3, 2023, the Court entered an order closing the chapter 11 cases of the Reorganized Debtor's debtor-affiliates (together with Mallinckrodt, "**Debtors**"). A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Reorganized Debtor's claims and noticing agent at http://restructuring.ra.kroll.com/Mallinckrodt. The Reorganized Debtor's mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 2

STANDARD OF REVIEW .................................................................................... 3

ARGUMENT ......................................................................................................... 3

I.  Tower Is a Transferee and Properly Named Defendant Because It Had Dominion and Control Over Share Repurchase Proceeds .......................................................... 3

    A.  The Trust's Amended Complaint Sufficiently Pleads That Tower Is an Initial Transferee, and the Burden Rests with Movants to Establish the Lack of Dominion and Control ....... 5

    B.  As Spire X's Managing Member, Tower Had Dominion and Control over Spire X's Assets, Including the Share Repurchase Proceeds ............................................. 7

    C.  Movants' Arguments That Tower Had No Dominion and Control Are Unavailing ........ 11

        1.  Tower's Putative Role as Agent Is Not Dispositive ................................. 11

        2.  Tower Did Not Act Solely for the Benefit of Spire X ............................... 13

        3.  The Labels and Limitations That Movants Highlighted Are Neither Dispositive Nor Availing ...................................................................................... 14

        4.  Tower Had the Ability to Use Spire X's Assets, Including the Share Repurchase Proceeds, for Its Own Purposes ................................................. 14

II.  Spire X and Latour Have No Safe Harbor Defense Under § 546(e) ..................... 15

    A.  The Share Repurchases Are Not Qualifying Transactions Because They Were Void *Ab Initio* Under Irish Law ................................................................... 16

    B.  Spire X Also Fails to Establish That It Is a Qualifying Participant ............... 17

        1.  Spire X's Repurchase and Reverse Repurchase Agreements Are, as a Matter of Economic Substance, Secured Loans That Fail to Meet the Statutory Threshold of at Least $1 Billion in Principal Amounts Outstanding ............................. 18

        2.  Spire X's Credit Agreement Is Also a Loan That Fails to Meet the Statutory Threshold of at Least $1 Billion in Principal Amounts Outstanding ............... 25

        3.  Alternatively, Spire X's Documentation Is Insufficient to Show Its Financial Participant Status ........................................................................ 27

CONCLUSION ..................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*,
 260 B.R. 698 (E.D. Pa. 2001) ............................................................................4, 15

*Abele v. Mod. Fin. Plans Servs., Inc. (In re Cohen)*,
 300 F.3d 1097 (9th Cir. 2002) ...................................................................................3

*In re Appraisal of Columbia Pipeline Grp., Inc.*,
 No. 12736-VCL, 2019 WL 3778370 (Del. Ch. Aug. 12, 2019) ...............................25

*Bailey v. Big Sky Motors, Ltd. (In re Ogden)*,
 314 F.3d 1190 (10th Cir. 2002) ...........................................................................3, 13

*Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P. (In re
 Bankr. Est. of Norske Skogindustrier ASA)*,
 629 B.R. 717 (Bankr. S.D.N.Y. 2021) ....................................................................16

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
 806 F. Supp. 2d 662 (S.D.N.Y. 2011) ......................................................................22

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
 397 B.R. 1 (S.D.N.Y. 2007) .......................................................................... *passim*

*Bonded Fin. Servs., Inc. v. European Am. Bank*,
 838 F.2d 890 (7th Cir. 1988) ...............................................................................4, 15

*Branch v. Ernst & Young U.S.*,
 311 F. Supp. 2d 179 (D. Mass. 2004) ......................................................................25

*Carnegie Inst. of Wash. v. Pure Grown Diamonds, Inc.*,
 No. 20-CV-189 (JSR), 2020 WL 5209822 (S.D.N.Y. Aug. 31, 2020)....................30

*CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*,
 506 B.R. 346 (S.D.N.Y. 2014), *aff'd*, 791 F.3d 277 (2d Cir. 2015) .......................19

*Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner,
 Heine, Underberg, Manley, Myerson & Casey)*,
 130 F.3d 52 (2d Cir. 1997)....................................................................................4, 15

*Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt.
 Corp.)*,
 896 F.2d 54 (3d Cir. 1990)..................................................................................18, 25

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016)...........................................................................6, 29

*Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*,
458 B.R. 155 (Bankr. D. Del. 2011) ..................................................................4, 6

*Durkin v. Piper Tr. Co. (In re Denman & Co.)*,
186 B.R. 707 (Bankr. C.D. Cal. 1995)...................................................................15

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*,
323 B.R. 857 (Bankr. S.D.N.Y. 2005)...................................................................16

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018)...................................................................16

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)....................................................................................6

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*,
No. 10-10799 (KJC), 2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ...........16

*Iannacone v. IRS (In re Bauer)*,
318 B.R. 697 (Bankr. D. Minn. 2005) .....................................................................5

*Isaiah v. JP Morgan Chase Bank*,
960 F.3d 1296 (11th Cir. 2020) ...............................................................................6

*Jonas v. Resol. Tr. Corp. (In re Comark)*,
971 F.2d 322 (9th Cir. 1992) .................................................................................20

*Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*,
625 B.R. 291 (Bankr. D. Del. 2020) ......................................................................27

*Louisiana Firefighters' Ret. Sys. v. N. Tr. Invs., N.A*,
No. 09 C 7203, 2011 WL 1770266 (N.D. Ill. May 6, 2011) ..................................13

*Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.)*,
892 F.2d 26 (4th Cir. 1989) .....................................................................................4

*Luria v. Hicks (In re Taylor, Bean & Whitaker Mortg. Corp.)*,
No. 3:09-BK-07047-JAF, 2017 WL 4736682 (Bankr. M.D. Fla. Mar. 14,
2017) ......................................................................................................................22

*Marx v. Centran Corp.*,
747 F.2d 1536 (6th Cir. 1984) ...............................................................................19

*Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
426 B.R. 96 (Bankr. D. Del. 2010) .................................................................6, 7, 15

- iii -

*Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*,
    321 B.R. 388 (Bankr. D. Del. 2005) ................................................................8, 9

*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*,
    848 F.2d 1196 (11th Cir. 1988) ...........................................................................5

*Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt plc)*,
    No. 20-12522 (JTD), 2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ................17

*Paloian v. LaSalle Bank, N.A.*,
    619 F.3d 688 (7th Cir. 2010) ........................................................................13, 14

*Peachtree Special Risk Brokers, LLC v. Kartzman (In re Rocco Co., Inc.)*,
    No. 10-18799 (DHS), 2014 WL 7404566 (D.N.J. Dec. 29, 2014) .........................4

*Picard v. BNP Paribus S.A. (In re Bernard L. Madoff)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...................................................................5

*Picard v. Platinum All Weather Fund Ltd. (In re Bernard L. Madoff)*,
    No. 08-01789 (CGM), 2023 WL 3964150 (Bankr. S.D.N.Y. June 12, 2023) ...........11, 12

*Picard v. ZCM Asset Holding Co. (Bermuda) Ltd. (In re Bernard L. Madoff)*,
    No. 08-01789 (CGM), 2023 WL 8010194 (Bankr. S.D.N.Y. Nov. 17, 2023) ..........6

*Resol. Tr. Corp. v. Aetna Cas. & Sur. Co. of Illinois*,
    25 F.3d 570 (7th Cir. 1994) ...............................................................................19

*Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*,
    127 F.3d 1195 (9th Cir. 1997) ...........................................................................13

*Sec. First Nat'l Bank v. Brunson (In re Coutee)*,
    984 F.2d 138 (5th Cir. 1993) ...............................................................................4

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ...............................................................6, 7

*SEC v. Miller*,
    495 F. Supp. 465 (S.D.N.Y. 1980) ................................................................19, 20

*Taunt v. Hurtado (In re Hurtado)*,
    342 F.3d 528 (6th Cir. 2003) ...........................................................................3, 15

*Trs. of IBEW Loc. 351 Pension Fund v. GLNetwork, Inc.*,
    No. 20-02703 (FLW), 2021 WL 5567820 (D.N.J. Nov. 29, 2021) .......................10

*United States v. Erickson*,
    601 F.2d 296 (7th Cir. 1979) .............................................................................19

*United States v. Manko,*
   979 F.2d 900 (2d Cir.1992)................................................................................19, 20

*Universal Serv. Admin Co. v. Post-Confirmation Comm. of Unsecured Creditors*
   *of Incomnet Commc'ns Corp. (In re Incomnet, Inc.),*
   463 F.3d 1064 (9th Cir. 2006) ...........................................................................4

*Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.),*
   288 B.R. 189 (Bankr. D. Del. 2003) ...................................................................5

*Warner v. Zent,*
   997 F.2d 116 (6th Cir. 1993) .............................................................................19

*Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),*
   503 B.R. 348 (Bankr. S.D.N.Y. 2014), *abrogated in part by Kirschner v.*
   *Large Priv. Beneficial Owners (In re Trib. Fraud. Conv. Litig.),* 818 F.2d 92
   (2d Cir. 2016)...................................................................................................6

*Westchester Cnty. Sav. & Loan Ass'n v. Legel Braswell Gov't Sec. Corp. (In re*
   *Legel, Braswell Gov't Sec. Corp.),*
   648 F.2d 321 (5th Cir.1981) ..............................................................................19

*Zazzali v. AFA Fin. Grp., LLC,*
   No. 10–54524 PJW, 2012 WL 4903593 (Bankr. D. Del. Aug. 28, 2012) ..............16

**Statutes**

11 U.S.C. § 101(22A)(A)................................................................................................18, 21

11 U.S.C. § 546(e) ......................................................................................................... *passim*

11 U.S.C. § 550(a) .........................................................................................................3, 9, 11

11 U.S.C. § 550(a)(1).....................................................................................................3

11 U.S.C. § 561(a)(1)-(6)...............................................................................................18

Companies Act 2014.......................................................................................................16

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019).......................................................................20, 21

Fed. R. Civ. P. 8(a)(2).....................................................................................................5

Fed. R. Civ. P. 12(b)(6)...................................................................................................2, 29

Moorad Choudhry, *The Repo Handbook* (2d ed. 2010)................................................19, 20

Restatement (Third) of Trusts § 2 (2003) ......................................................................................13

Plaintiff, the Opioid Master Disbursement Trust II ("**Trust**"),[2] by and through its undersigned counsel, hereby submits its opposition to the motion [Adv. D.I. 286] ("**Motion**" or "**Mot.**") to dismiss the Amended Complaint [Adv. D.I. 205] ("**Amended Complaint**" or "**Am. Compl.**") as to defendants Tower Research Capital LLC ("**Tower**"), Spire X Trading LLC ("**Spire X**"), and Latour Trading LLC ("**Latour**," and together with Tower and Spire X, "**Movants**"). For the reasons that follow, the Court should deny the Motion.

<u>**PRELIMINARY STATEMENT**</u>

By their Motion, Movants seek dismissal from this Proceeding on two principal grounds. As explained below, neither of these grounds has merit. First, Tower contends that it was a "non-transferee" when the share repurchases occurred and that Spire X is the true transferee instead. But Tower is the managing member of Spire X, and the documents governing Tower's role in that capacity—chiefly, an LLC agreement and grant of authority—show that Tower had dominion and control over Spire X and its assets when the share repurchases occurred. On this basis, Tower is an initial transferee under the Bankruptcy Code and a properly named defendant in this Proceeding. The Court should deny the Motion with respect to Tower.

Second, Spire X and Latour contend that the transfers to them are protected by the securities safe harbor under § 546(e) of the Bankruptcy Code. Their arguments fail too. Spire X and Latour fail to carry their burden to establish that the share repurchases were qualifying transactions. This is because the repurchases themselves, under applicable Irish law, were void *ab initio* and therefore

---

[2]    The Trust is a statutory trust established under the *Modified Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* ("**Plan**") [D.I. 7670]. As used herein, citations to "**D.I. __.**" refer to documents filed in *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del.). Citations to "**Adv. D.I. __.**" refer to documents filed in the above-captioned adversary proceeding ("**Proceeding**"). The Plan, *inter alia*, vested the Trust with authority to investigate and prosecute claims arising out of Mallinckrodt's repurchase of its shares between 2015 and 2018 ("**Share Repurchase Claims**") for the benefit of the Debtors' unsecured creditors. The claims asserted in this Proceeding are Share Repurchase Claims.

cannot be settlements payments or transfers in connection with a securities contract under § 546(e). Spire X also fails to demonstrate that it is a qualifying participant because the repurchase agreements, reverse repurchase agreements, and credit extensions it relies on were *loans*, not mark-to-market positions. And these loans do not meet the threshold of $1 billion or more in principal amounts outstanding. Spire X thus does not satisfy the definition of "financial participant" under the Bankruptcy Code.[3] Alternatively, Spire X fails to establish that it is qualifying participant based on its refusal to substantiate the information it submitted to the Trust under the Protocol.[4]

Movants have chosen to bring their Protocol-based defenses as a "motion to dismiss." The Protocol expressly provides that it does not alter the legal standard for motions to dismiss under Rule 12(b)(6). Protocol ¶ 15. The core question on a 12(b)(6) motion is whether the complaint alleges sufficient facts to establish plausible claims. Fed. R. Civ. P. 12(b)(6). For the reasons stated herein and in the Trust's opposition briefs to the other dismissal motions in this Proceeding, the Trust's amended complaint satisfies that standard. And nothing in the instant Motion undermines that. The Court should deny the Motion.

## FACTUAL BACKGROUND

1. For the material facts describing Mallinckrodt's opioid-related misconduct and the program Mallinckrodt implemented ("**Share Repurchase Program**") to transfer nearly $1.6 billion to shareholders to repurchase its ordinary shares ("**Share Repurchases**"), the Trust incorporates by reference paragraphs 1-14 of *Plaintiff's Opposition to Motion to Dismiss T. Rowe*

---

[3]     The Trust does not challenge Latour's status as a financial participant based on the information Latour provided. Nevertheless, Latour does not have the benefit of the § 546(e) safe harbor because Movants have not established a qualifying transaction.

[4]     As used herein, "**Protocol**" means the *Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities* that this Court approved by order dated May 15, 2023 [Adv. D.I. 185-1].

*Price Associates, Inc. and Related Funds from Amended Complaint* [Adv. D.I. 264], as if they were fully set forth herein.

2.      Together, Movants received almost ███████ from Mallinckrodt as a result of the Share Repurchase Program:  Tower received at least ███████ (Am. Compl. ¶ 88); Spire X received at least ███████ (*id.* ¶ 82); and Latour received at least ███████ (*id.* ¶ 59).

## STANDARD OF REVIEW

3.      The Trust incorporates by reference paragraphs 13 through 18 of *Plaintiff's Opposition to Motion to Dismiss Citadel Securities and Susquehanna Securities from Amended Complaint* [Adv. D.I. 263] ("**Citadel/Susquehanna Opp.**"), as if they were fully set forth herein.

## ARGUMENT

### I.      TOWER IS A TRANSFEREE AND PROPERLY NAMED DEFENDANT BECAUSE IT HAD DOMINION AND CONTROL OVER SHARE REPURCHASE PROCEEDS

4.      Tower's argument that its declarations and documentation "conclusively" demonstrate that Tower was a non-transferee (Mot. ¶ 26) is erroneous.  Tower asserts that it is a non-transferee because it was "merely the manager of Spire X" and "did not receive any Share Repurchase proceeds."  *Id.*  The relevant facts and law do not support Tower's position.

5.      Section 550(a) of the Bankruptcy Code permits recovery of the property transferred or its value in an avoided transaction from the "initial transferee of such transfer . . . ."  11 U.S.C. § 550(a)(1).  To determine whether someone is an initial transferee under § 550(a), courts typically follow the Seventh Circuit's decision in *Bonded Financial Services, Inc. v. European American Bank*, which held that a transferee must have "dominion over the money or other asset" and "the right to put the money to one's own purposes."  838 F.2d 890, 893 (7th Cir. 1988).[5]  Delaware

---

[5]      *See Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 533 (6th Cir. 2003); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1196 (10th Cir. 2002); *Abele v. Mod. Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097,

bankruptcy courts have adopted the *Bonded* standard, which is generally referred to as the "dominion and control" test. *See, e.g.*, *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 158 (Bankr. D. Del. 2011) (Walsh, J.) ("This Court has adopted the Seventh Circuit's 'dominion and control' test for whether a party is a transferee within the meaning of § 550.") (citation omitted).[6]

6.    As noted above, to satisfy the test, the recipient of the property must have some ability to put it to the recipient's own purposes. *Bonded*, 838 F.2d at 893. But a demonstration of complete and unfettered control is not required—a party can be an initial transferee even if it cannot use the funds it receives for purposes unrelated to the transaction. *Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.)*, 892 F.2d 26, 29 (4th Cir. 1989) (holding that even though a defendant put funds into an account for the ultimate transfer to another party and "could not have used the funds for other purposes," the defendant was still the initial transferee). Dominion and control may still exist even if the recipient's use of the funds is constrained in some way. *See Universal Serv. Admin Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1075 (9th Cir. 2006) (holding that legal limits on the recipient's use of funds did not prevent it from having sufficient dominion and control over them to be a transferee). The test "is a very flexible, pragmatic one; . . . courts must look beyond the particular transfers in question to the entire circumstance of the

1102 (9th Cir. 2002); *Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57-58 (2d Cir. 1997); *Sec. First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 139 (5th Cir. 1993).

6    *See also Peachtree Special Risk Brokers, LLC v. Kartzman (In re Rocco Co., Inc.)*, No. 10-18799 (DHS), 2014 WL 7404566, at *9 (D.N.J. Dec. 29, 2014) ("[C]ourts in the Third Circuit, like other jurisdictions, have adopted the 'dominion and control' or 'conduit' test announced by the Seventh Circuit in *Bonded Fin. Serv., Inc. v. European Am. Bank . . . .*"); *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 260 B.R. 698, 714 (E.D. Pa. 2001) (same).

transactions." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988) (citation and quotation omitted).

A. **The Trust's Amended Complaint Sufficiently Pleads That Tower Is an Initial Transferee, and the Burden Rests with Movants to Establish the Lack of Dominion and Control**

7.     At the outset, Movants argue that the Amended Complaint fails to allege that Tower was a transferee (Mot. ¶ 25), but this is incorrect.  A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" nothing more.  Fed. R. Civ. P. 8(a)(2).  A plaintiff need only "allege the 'necessary vital statistics—the who, when, and how much . . . .'" *Picard v. BNP Paribus S.A. (In re Bernard L. Madoff)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *cf. Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003) (stating that, to survive a motion to dismiss, a preference complaint must include an identification of the nature and amount of each antecedent debt and an identification of each alleged preferential transfer by date of the transfer, name of the debtor/transferor, name of the transferee, and the amount of the transfer).

8.     The Amended Complaint satisfies these straightforward requirements.  It identifies the *who*: it names Tower as a defendant, both in its main text (¶ 88) and in Exhibit A to the Amended Complaint that the Trust served on Movants.  *See* Am. Compl., Ex. A (identifying "Tower Research Capital LLC" as defendant).  The Amended Complaint also identifies the *how much*: it alleges that "Mallinckrodt transferred at least ███████████ *to* Tower Research Capital LLC as part of the Share Repurchase Transfers." Am. Compl. ¶ 88 (emphasis added).[7]  In addition, the Amended Complaint identifies the *when*: Exhibit B to the Amended Complaint lists each of

---

[7]     Movants' reliance on *Iannacone v. IRS (In re Bauer)*, 318 B.R. 697, 702 (Bankr. D. Minn. 2005), is misplaced. In *Bauer*, the defendant merely directed the flow of funds but was not a recipient of the funds.  Here, the Amended Complaint alleges that Tower received over ██████ from Mallinckrodt.

the repurchase trades pertaining to Tower by the trade date, the number of shares traded, and the amount of the proceeds exchanged. Am. Compl., Ex. B. For each of the listed trades, Ex. B identifies the defendant as "Tower Research Capital LLC." *Id.* The Amended Complaint sufficiently pleads that Tower is an initial transferee, and, for purposes of the Motion, the Court should assume "all factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009) (stating that a complaint is not required to be "rich with detail").

9. Movants' assertion that the burden is on the Trust to show that Tower exercised dominion and control (Mot. ¶ 27) is backwards. The burden is on Movants to show that Tower lacked dominion and control. *See Lambertson*, 458 B.R. at 159 (stating that "the *defendant* must establish that it lacked dominion and control over the transfer") (emphasis added and quotation omitted); *see also Isaiah v. JP Morgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) (stating that "the mere conduit defense is an affirmative defense that must be proved *by the defendant* seeking its protection") (emphasis added); *Picard v. ZCM Asset Holding Co. (Bermuda) Ltd. (In re Bernard L. Madoff)*, No. 08-01789 (CGM), 2023 WL 8010194, at *6 (Bankr. S.D.N.Y. Nov. 17, 2023) (commenting that defendant "improperly attempts to flip the burden of proof" when it asserts that the trustee did not plead sufficient facts to show dominion and control). The Court should reject Movants' attempt to shift their burden of proof.[8]

---

[8] Movants' reliance on the *Mervyn's, Lyondell*, and *Stratton Oakmont* decisions to support their burden argument is misplaced. Mot. ¶ 27 (citing *Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102-04 (Bankr. D. Del. 2010); *Weisfelner v. Fund I (In re Lyondell Chem. Co.)*, 503 B.R. 348, 382-83 (Bankr. S.D.N.Y. 2014), *abrogated in part by Kirschner v. Large Priv. Beneficial Owners (In re Trib. Fraud. Conv. Litig.)*, 818 F.2d 92 (2d Cir. 2016); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999)). None of these decisions addressed the proper allocation of the burden when applying the dominion and control test. And none of these decisions involved a managing member with a role similar to Tower's. Rather, it was apparently

**B.    As Spire X's Managing Member, Tower Had Dominion and Control over Spire X's Assets, Including the Share Repurchase Proceeds**

10.    Tower had dominion and control over Spire X and its assets, including the share repurchase proceeds, because in its role as the managing member of Spire X, Tower had broad discretion over managing Spire X's portfolios and investments, and it managed Spire X's assets for its own purposes.  When Mallinckrodt was engaging in the Share Repurchases, Tower acted as manager of Spire X's investment portfolio, and its relationship with Spire X was governed or evidenced by a limited liability company agreement dated March 13, 2014 ("**LLC Agreement**"), a grant of authority from Spire X to Tower dated April 1, 2017 ("**Grant of Authority**"), and an officer's certificate of Spire X dated September 8, 2015 ("**Officer's Certificate**").[9]  These documents show that Tower had significant dominion and control over Spire X and its assets that support Tower's status as initial transferee.

11.    For instance, the LLC Agreement provides, in relevant part, that:

- Tower shall manage the business and affairs of Spire X and "shall be responsible for policy setting, approving the overall direction of [Spire X] and **making all decisions affecting the business and affairs of [Spire X]**";

- "[Tower] shall have **authority to bind [Spire X] to any third party with respect to any matter**";

- "[Tower] shall have the **authority to appoint and terminate officers of [Spire X]** . . . and retain and terminate officers, employees, representatives, agents and consultants of [Spire X] and **to delegate such duties to any such officers, employees, representatives, agents and consultants** as may be required by applicable law or regulation or **as [Tower] otherwise deems appropriate**, including the power, acting individually or jointly, to represent and bind [Spire X] in all matters, in accordance with the scope of their respective duties";

---

clear to at least two of the courts that the defendants in question were conduits or intermediaries.  *See Mervyn's*, 426 B.R. at 103 (describing defendant in question "as a financial intermediary"); *Stratton Oakmont*, 234 B.R. at 315 (stating that defendant in question "was a mere conduit").

[9]    *See* Adv. D.I. 287, Ex. 9, Exs. A-C.

- "[Tower] shall have the power and authority to create and issue such other classes and/or series of interests in [Spire X] having such rights, powers and obligations as may be **determined by [Tower] in its sole discretion**";

- "[Spire X's] net profits or net losses shall be determined on an annual basis in accordance with the **manner determined by [Tower]**"; and

- "[Tower] shall **determine profits available for distribution** and the amount, if any, to be distributed to the Member, and shall authorize and distribute on the Common Interests, the determined amount when, as and if declared by [Tower][.]"[10]

12.     Similarly, the Grant of Authority shows numerous enumerated functions that Spire X granted to Tower, including to:

- "buy, sell, or sell short, for current or future delivery, or otherwise **trade in any manner, any financial or similar instrument whatsoever**";

- "borrow money, post margin or collateral, or **enter into transactions having any similar leveraging effect as may be deemed necessary or desirable** to effectuate transactions in Financial Instruments";

- "**incur expenses on behalf of** [Spire X] in connection with transactions in Financial Instruments"; and

- "take **any and all actions necessary to effectuate**" the enumerated actions.[11]

13.     Thus, the sale of Mallinckrodt shares and the receipt of the sale proceeds fell within Tower's direction, discretion, and thus its dominion and control.  By Tower's own admission, it "executed" the share repurchase trades that resulted in receipt of the proceeds.[12]

14.     Two decisions in particular—*U.S. Interactive* and *Manhattan Investment Fund*—reinforce the point that Tower had sufficient dominion and control to be a transferee.  In *U.S. Interactive*, the litigation administrators for the chapter 11 debtors filed an avoidance action against

---

[10]     *Id.*, Ex. A, arts. 3.1, 3.3, 3.4, 4.1, 5.1, 5.2 (emphasis added).  The Officer's Certificate also provides that Tower "shall have authority to bind [Spire X] to any third party with respect to any matter."  *Id.*, Ex. C.

[11]     *Id.*, Ex. B (emphasis added).

[12]     *See* Adv. D.I. 287, Ex. 8 at 2.

Sampson Travel, which handled corporate travel arrangements and meeting planning for the debtors. *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 390-91 (Bankr. D. Del. 2005). In particular, the administrators sought recovery of funds deposited into Sampson's bank account, which were then, according to Sampson, disbursed to hotels and airlines to pay for the debtors' meetings and not for Sampson's "own use or purpose." *Id.* at 396. On that basis, Sampson argued that it was a mere conduit, not a transferee. *Id.* Judge Walrath, however, disagreed, finding that Sampson had dominion and control over the deposited funds because it had the power to decide which third parties to pay with the funds received and thus could distribute the funds as it "saw fit." *Id.* "The essence of dominion is the power to control or direct resources." *Id.* (citing *Bonded*, 838 F.2d at 893). Here, as in *U.S. Interactive*, Tower had the power, as Spire X's managing member, to control and direct resources. Indeed, the LLC Agreement is clear that Tower was in charge of approving the overall direction of Spire X and making *all* decisions that affect the business and affairs of Spire X.[13] In addition, the Grant of Authority empowered Tower to "buy, sell, or sell short, for current or future delivery, or otherwise *trade in any manner, any financial or similar instrument whatsoever*" on behalf of Spire X.[14]

15.     In *Manhattan Investment Fund*, the chapter 11 trustee sought to avoid and recover $141.4 million that the debtor had deposited into its *own* margin account with Bear Stearns, its prime broker. *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 4 (S.D.N.Y. 2007). Bear Stearns had a security interest in the margin account funds that served as collateral to cover losses from the debtor's short selling. *Id.* at 6. Faced with an avoidance action by the trustee, Bear Stearns argued, *inter alia*, that it was not a § 550(a) transferee because it did

---

[13]     Adv. D.I. 287, Ex. 9, Ex. A, art. 3.1.

[14]     *Id.*, Ex. B (emphasis added).

not have "unfettered control" of the funds since federal regulations precluded it from "using customer funds in its own investing or for its 'proprietary' purposes." *Id*. at 18 (footnote omitted). The bankruptcy court nevertheless concluded that Bear Stearns was a transferee, and the district court affirmed. *Id*. at 21. The district court found that, while the debtor's short positions remained open, Bear Stearns (1) had the ability to "initiate affirmative measures with respect to the funds[,]" (2) did not have to respond to directions from the debtor, (3) could use the funds to close out the debtor's short positions at any time, and (4) received benefits from the transactions, including $2.4 million in commissions. *Id*. at 17-20. In sum, the district court found that Bear Stearns had "powerful discretion" that gave it "'dominion and control' over the transfers." *Id*. at 21.

16.     Like Bear Stearns, Tower had the ability to initiate affirmative measures as to Spire X's assets, including the authority to close out positions in its portfolio through its power and discretion to sell securities.[15] And, just as Bear Stearns did not have to respond to the debtor's directions, Tower was free to buy and sell securities within Spire X's portfolio and had broad authority to act on behalf of Spire X in numerous other respects.[16]

17.     Movants try to distinguish *Manhattan Investment Fund* on the basis that Bear Stearns was the debtor's secured lender and not a manager. Mot. ¶ 29. But Movants' argument actually supports the Trust's position. In *Manhattan Investment Fund*, Bear Stearns was not affiliated with the debtor, whereas here, Tower is not only Spire X's affiliate, but also its sole manager and insider. Furthermore, the LLC Agreement and Grant of Authority were signed by the same individual on behalf of Tower, Spire X, and Spire X's sole member,[17] suggesting that these entities are alter egos of one another. *See, e.g.*, *Trs. of IBEW Loc. 351 Pension Fund v.*

---

[15]    *See id*.

[16]    *See id*.

[17]    *See* Adv. D.I. 287, Ex. 9, Exs. A, B.

*GLNetwork, Inc.*, No. 20-02703 (FLW), 2021 WL 5567820, at *3 (D.N.J. Nov. 29, 2021) (finding companies were alter egos of each other where, among other things, one individual was managing member or partner of both and signed letters on behalf of both entities).  These facts bolster the conclusion that Tower had dominion and control over Spire X and its assets.

18.     Movants' own documents demonstrate that Tower had dominion and control over the share repurchase proceeds to qualify as a transferee under § 550(a) of the Bankruptcy Code. Accordingly, the Court should deny Movants' request to dismiss Tower from this Proceeding.

**C.     Movants' Arguments That Tower Had No Dominion and Control Are Unavailing**

**1.     *Tower's Putative Role as Agent Is Not Dispositive***

19.     Movants assert that Tower's putative role as agent militates against any conclusion that it was a transferee with dominion and control (Mot. ¶¶ 31, 35), but nothing in the caselaw suggests that agency status alone establishes that a party is not an initial transferee or lacked dominion and control over funds.  On the contrary, caselaw shows that agents may have sufficient dominion and control over their principals' funds to qualify as a § 550(a) transferee in transactions they were engaged in on behalf of their principals.  In *Picard v. Platinum All Weather Fund Limited (In re Bernard L. Madoff)*, the liquidation trustee sued an investment company and its customer for investment activities that were alleged fraudulent transfers.  No. 08-01789 (CGM), 2023 WL 3964150, at *2, *7 (Bankr. S.D.N.Y. June 12, 2023).  The defendant investment company moved to dismiss, arguing that it was a mere conduit, because it had "acted as an agent" for the client, was not the owner of the shares or funds at issue, and was "merely an intermediary for its customer[.]"  *Id*. at *9 (quotation omitted).  The bankruptcy court denied the motion, holding that the uncontested fact that the company took certain actions as an agent did not render it a mere conduit or non-transferee as a matter of law.  *See id*. at *11.  The court noted that whether the

company was a mere conduit or non-transferee was a "fact-intensive inquiry" and that discovery in the proceeding "may reveal evidence of a defendant acting as more than a mere conduit." *Id*. at *10-11 (citations omitted).

20.     The court's decision in *Manhattan Investment Fund* also refutes Movants' agency argument.  In that case, Bear Stearns tried to "paint itself as merely a provider of 'back office' services" and an agent that did not qualify as an initial transferee. 397 B.R. at 20.  But the "general relationship" between Bear Stearns and the debtor was "not the key"—the actual factual specifics of dominion and control over the funds in the debtor's account were.  *Id*.  If agency status alone were a shield, the court's detailed factual analysis to assess dominion and control would have been unnecessary.  Tower's putative status as an agent is irrelevant to the analysis because it does not resolve the "key" question:  whether Tower had dominion and control over the share repurchase funds.  *Id*.

21.     Unable to muster a convincing case about Tower's agency status, Movants resort to a slippery-slope policy argument, asserting that the Trust's position "would upend the most basic, settled principles of agency law" and usher in a dystopian world in which agents and even trustees would be "personally liable" in claw-back actions.  Mot. ¶ 35.  This Court should reject such hyperbolic rhetoric, for finding that Tower had dominion and control over the share repurchase proceeds will not turn agency law on its head and orchestrate the collapse of the American financial system.  This is because, as the *Madoff* court noted, the dominion and control test is a "fact-intensive inquiry" that turns on the specific facts and circumstances of each individual case.  A finding that an agent had dominion and control in one case will not require the same finding in another case with different facts.[18]  As shown above, under the facts and

---

[18]     For instance, in the cases Movants cite, defendants lacked the necessary discretion that distinguishes transferees with dominion and control from mere conduits who acted as intermediaries without power.  *See* Mot. ¶ 35 (citing

circumstances *of this case*, Tower had dominion and control over Spire X's assets, including the share repurchase proceeds, and was therefore properly identified as an initial transferee. Alternatively, at a minimum, the current record before this Court raises factual issues that make determination of dominion and control inappropriate on a motion to dismiss or summary judgment.

### 2. Tower Did Not Act Solely for the Benefit of Spire X

22.    Movants' argument that Tower did not have dominion and control because it had "discretionary authority only to act for the benefit of Spire X, not for itself[,]" fares no better.  Mot. ¶ 34.  Tower had the legal right to use Spire X's assets and proceeds and had power and authority under the LLC Agreement and Grant of Authority to buy and sell securities in Spire X's portfolio "in any manner" and to act on Spire X's behalf in many other respects.[19]

23.    Moreover, Movants' supporting cases are inapposite, as they concern fiduciaries, and Movants have not established—and have not even argued (other than suggesting in a footnote)[20]—that Tower is Spire X's fiduciary.  But even if Tower had fiduciary obligations to Spire X, Tower's status as a fiduciary, by itself, would not be dispositive.  In *Paloian v. LaSalle Bank, N.A.*, the court found a bank acting as trustee (which presumptively had fiduciary duties)[21] for a securitized investment pool to be an initial transferee of payments that the debtor made to the bank in its capacity as trustee.  619 F.3d 688, 691 (7th Cir. 2010).  In so finding, the court rejected the bank's arguments that "it was simply a conduit for placing the money in the trust" and an

---

*Bonded*, 838 F.2d at 893; *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1199 (9th Cir. 1997); *Ogden*, 314 F.3d at 1204.

[19]    *See supra* notes 10 and 11 and accompanying text.

[20]    *See* Mot. ¶ 30 n.6.

[21]    *See* Restatement (Third) of Trusts § 2 (2003). ("A trust . . . is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee."); *cf. Louisiana Firefighters' Ret. Sys. v. N. Tr. Invs., N.A*, No. 09 C 7203, 2011 WL 1770266, at *3 (N.D. Ill. May 6, 2011) (refusing to dismiss, in part, a breach of fiduciary duty claim against a collateral pool investment manager).

"agent of the pool's investors and therefore . . . [an] inappropriate target of a turnover order." *Id*. The court noted that "lots of decisions hold that an entity that receives funds for use in paying down a loan, *or passing money to investors in a pool*, is an 'initial transferee' even though the recipient is obliged by contract to apply the funds according to a formula." *Id*. at 692 (emphasis added and citing cases). Thus, on analogous facts, *Paloian* supports the determination that Tower, despite any potential fiduciary status, is an initial transferee and was properly named as a defendant.

### 3. The Labels and Limitations That Movants Highlighted Are Neither Dispositive Nor Availing

24.     Movants assert that the LLC Agreement and Grant of Authority "confirm" that Tower had no dominion and control over Spire X. Mot. ¶ 31. But this ignores the numerous provisions in these documents that evidence Tower's dominion and control. Movants focus on the fact that the Grant of Authority refers to *Spire X's* securities. Mot. ¶ 31. But such labels do not mean that Tower lacked dominion and control. The court in *Manhattan Investment Fund* rejected a similar argument by Bear Stearns that the funds at issue were put into the debtor's "own account" and therefore Bear Stearns could not be the transferee. 397 B.R. at 17 n.26. The court concluded that the "ability to use the money in an account—not the name given to that account—[was] the crucial question to be decided." *Id*. Similarly, here, for the reasons noted above, the share repurchase proceeds were within Tower's dominion and control. The fact that the agreements describe the asset in question as "securities owned by Spire X" (Mot. ¶ 31 (emphasis omitted)) is not controlling.

### 4. Tower Had the Ability to Use Spire X's Assets, Including the Share Repurchase Proceeds, for Its Own Purposes

25.     Movants assert that Tower "did not have the contractual or legal authority to use Spire X's assets for its own benefit" and that there is no evidence that Tower used those assets for

its own purposes.  Mot. ¶ 32.  Movants' assertions are incorrect for several reasons.  As noted above, the agreements between Spire X and Tower granted Tower the contractual and legal authority to use Spire X's assets.  Among other things, the agreements vested Tower with the power to buy and sell securities within Spire X's portfolio in any manner.[22]

26.  Additionally, the dominion-and-control test merely requires that the party had "the *right* to put the money to one's own purposes."  *Bonded*, 838 F.2d at 893 (emphasis added).  There is no requirement to show that the party actually did put the money to its own purposes.  *See Blatstein*, 260 B.R. at 717 (finding that dominion and control existed when person had the right to put money to personal use even if she never did).  Moreover, some courts have held that a defendant that has a similar level of authority over assets that Tower has need not personally profit over its use of the assets.  *See Manhattan Inv. Fund*, 397 B.R. at 20-21; *Hurtado*, 342 F.3d at 534.

27.  For all the reasons explained above, Tower had dominion and control over Spire X's assets and therefore was properly identified as a transferee and properly named as a defendant. Movants' arguments to the contrary are unavailing and, at most, raise factual issues that are not appropriate for resolution on a motion to dismiss or on summary judgment.  The Court should thus deny their Motion.

## II.  SPIRE X AND LATOUR HAVE NO SAFE HARBOR DEFENSE UNDER § 546(e)

28.  Spire X and Latour contend that they should be dismissed from this Proceeding because they are protected by the securities safe harbor under 11 U.S.C. § 546(e).  The § 546(e) safe harbor is an affirmative defense on which Movants carry the burden of proof and persuasion.

---

[22]  Adv. D.I. 287, Ex. 9, Ex. B.  Movants' cases (Mot. ¶ 33) are inapposite.  The disputed transferees in *Mervyn's*, 426 B.R. at 103, *Finley*, 130 F.3d at 59, and *Durkin v. Piper Tr. Co. (In re Denman & Co.)*, 186 B.R. 707, 712 (Bankr. C.D. Cal. 1995), lacked the discretion and contractual rights to use the funds for their own purposes.  Here, Tower was granted ample rights to use Spire X's assets as evidenced in the LLC Agreement and Grant of Authority, and in its ability to control how the assets were invested.

*See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 307 (Bankr. S.D.N.Y. 2018) ("The section 546(e) safe harbor is an affirmative defense as to which the Defendants bear the burden of proof."). Moreover, the § 546(e) defense "requires a determination of fact and is not suitable for disposition on a motion to dismiss." *FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, No. 10-10799 (KJC), 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013); *see also Zazzali v. AFA Fin. Grp., LLC*, No. 10–54524 PJW, 2012 WL 4903593, at *11 (Bankr. D. Del. Aug. 28, 2012) (stating "it is premature to dismiss this count on the basis of the 546(e) defense" because "the defense is a fact-based inquiry").

29. Section 546(e) applies when two requirements are met: (1) there is a *qualifying transaction* and (2) there is a *qualifying participant*. *See Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, L.P. (In re Bankr. Est. of Norske Skogindustrier ASA)*, 629 B.R. 717, 757 (Bankr. S.D.N.Y. 2021). Here, Latour has not satisfied the "qualifying transaction" prong, and Spire X has not satisfied either prong.

## A.    The Share Repurchases Are Not Qualifying Transactions Because They Were Void *Ab Initio* Under Irish Law

30. The Share Repurchases were neither a "settlement payment" nor a "transfer made in connection with a securities contract" under § 546(e), for the reasons explained in the Trust's Citadel/Susquehanna Opposition. In short, transfers to repurchase or redeem a company's shares do not qualify as a "settlement payment" or "transfer made in connection with a securities contract" when the transfers are void under applicable law. *See Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 877 (Bankr. S.D.N.Y. 2005). Here, under Irish law—the applicable law here—the Share Repurchases are void *ab initio* because, when Mallinckrodt engaged in them, it did not have profits available for distribution. *See, e.g.*, Companies Act 2014

of Ireland §§ 102, 105. The Trust incorporates by reference paragraphs 20 through 52 of the Citadel/Susquehanna Opposition and Exhibits 1-5 thereto, as if they were fully set forth herein.[23]

31. This Court's ruling in *Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt plc)*, No. 20-12522 (JTD), 2024 WL 206682, at \*15 (Bankr. D. Del. Jan. 18, 2024) does not undermine the Trust's argument that the Share Repurchases are not settlement payments within the meaning of § 546(e). Neither this Court nor any of the cases that it cited addressed whether payments that are void under applicable law constituted "settlement payments." That issue was not before the Court in *Covidien*. Moreover, when analyzing whether there was a settlement payment, this Court cited to the Mallinckrodt-Covidien spinoff agreement. *Id.* That spinoff agreement expressly provided that it is "governed and construed according to the laws of the State of New York[.]"[24] Here, Irish law governed the Share Repurchases,[25] and under Irish law, the Share Repurchases were void *ab initio*.

32. Spire X and Latour have not met their burden to establish a qualifying transaction and thus have no defense under § 546(e).

**B.     Spire X Also Fails to Establish That It Is a Qualifying Participant**

33. In addition to failing to establish a qualifying transaction, Spire X has failed to show that it is a qualifying participant. Spire X has provided two separate grounds that it alleges support its status as a qualifying participant, but it misses the mark on both, because it relies on the wrong dollar-amount threshold in the Code's definition of "financial participant." To qualify as a

---

[23]     As explained in paragraphs 46-52 of the Citadel/Susquehanna Opposition, the Trust did not waive its right to challenge the "qualifying transaction" prong of § 546(e) or to hold defendants to their burden on § 546(e) issues.

[24]     Separation and Distribution Agreement by and Between Covidien plc and Mallinckrodt plc § 11.2(a), *Opioid Master Disbursement Trust II v. Covidien Unlimited Co. (In re Mallinckrodt PLC)*, No. 20-12522 (JTD) (Bankr. D. Del. Dec. 23, 2022), D.I. No. 16-9.

[25]     Declaration of Anne Harkin, Adv. D.I. 263, Ex. 1 ¶¶ 4, 7-8.

"financial participant," a defendant bears the burden of establishing either "at the time it enters into a securities contract . . . at the time of the date of the filing of the petition," or "on any day during the 15-month period preceding the date of the filing of the petition" that the defendant "has one or more [qualifying] agreements or transactions[26] . . . of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding . . . or has gross mark-to-market positions of not less than $100,000,000[,]" excluding any agreements with affiliates. 11 U.S.C. § 101(22A)(A). Spire X alleges that it meets the threshold of having $100 million or more in mark-to-market positions but relies on agreements and transactions that are essentially loans, not mark-to-market positions, and these loans do not have $1 billion or more in notional or actual principal amount outstanding. Accordingly, Spire X fails to qualify as a "financial participant" under the Bankruptcy Code.

> **1.** ***Spire X's Repurchase and Reverse Repurchase Agreements Are, as a Matter of Economic Substance, Secured Loans That Fail to Meet the Statutory Threshold of at Least $1 Billion in Principal Amounts Outstanding***

34. Spire X alleges that, as of December 31, 2019, it had "aggregate outstanding mark-to-market repurchase and reverse repurchase agreement positions with non-affiliates of over $302 million." Mot. ¶ 42. Spire X, however, misapprehends the nature of repurchase agreements and reverse repurchase agreements (also known as "repos" and "reverse repos"[27]). As a matter of economic substance, repos and reverse repos are a form of short-term secured borrowing and lending. *See, e.g.*, *Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 896 F.2d 54, 55 (3d Cir. 1990) ("There is no question . . . that repurchase agreements . . .

---

[26]    Those agreements are "securities contracts, as defined in section 741(7)," "commodity contracts, as defined in section 761(4)," "forward contracts," "repurchase agreements," "swap agreements," or "master netting agreements[.]" 11 U.S.C. § 561(a)(1)-(6).

[27]    *See* Declaration of Dr. Israel Shaked ("**Shaked Decl.**") ¶ 3, annexed hereto as **Exhibit A**.

closely resemble secured loans, . . . in which the buyer of securities lends the seller cash for a brief period, using the securities as collateral.") (citation omitted); *SEC v. Miller*, 495 F. Supp. 465, 467 (S.D.N.Y. 1980) ("From a purely economic perspective, . . . a repo is essentially a short-term collateralized loan, and the parties to these transactions tend to perceive them as such.").[28]  In the declaration annexed hereto, Dr. Israel Shaked[29] states that repos and reverse repos are "considered the same as a secured borrowing or a collateralized loan."[30]

35.     Repos and reverse repos may

> be viewed as comprising two distinguishable transactions, which, although agreed upon simultaneously, are performed at different times: (1) the borrower agrees to sell, and the lender agrees to buy, upon immediate payment and delivery, specified securities at a specified price; and (2) the borrower agrees to buy and the lender agrees to sell, with payment and delivery at a specified future date . . . the same securities *for the same price plus interest on the price*.

*Miller*, 495 F. Supp. at 466–67 (emphasis added);[31] *see also United States v. Manko*, 979 F.2d 900, 902 (2d Cir.1992) ("In effect, a repurchase agreement is a loan in the amount of the proceeds of

---

[28]     *See also, e.g.*, *Resol. Tr. Corp. v. Aetna Cas. & Sur. Co. of Illinois*, 25 F.3d 570, 579 (7th Cir. 1994) ("The conclusion that some repurchase transactions are 'in the nature of a loan' . . . because they are in economic substance collateralized lending, *finds substantial support in caselaw*.") (emphasis added and citing cases); *Warner v. Zent*, 997 F.2d 116, 120 (6th Cir. 1993) (stating that reverse repurchase agreements represented "collateralized borrowings"); *Marx v. Centran Corp.*, 747 F.2d 1536, 1539 (6th Cir. 1984) (characterizing repos as short-term secured loans); *Westchester Cnty. Sav. & Loan Ass'n v. Legel Braswell Gov't Sec. Corp. (In re Legel, Braswell Gov't Sec. Corp.)*, 648 F.2d 321, 324 n.5 (5th Cir.1981) (commenting that "[a] . . . repo 'is essentially a short-term collateralized loan' although it is in the form of a sale" (quoting *Miller*, 495 F. Supp. at 467); *United States v. Erickson*, 601 F.2d 296, 300 n.4 (7th Cir. 1979) (observing that a repurchase agreement is in substance a secured loan); *CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*, 506 B.R. 346, 355 n.6 (S.D.N.Y. 2014) ("The weight of authority in this Circuit supports the conclusion that repurchase agreements are more akin to secured loans." (citations omitted)), *aff'd*, 791 F.3d 277 (2d Cir. 2015); Moorad Choudhry, *The Repo Handbook* at 5 (2d ed. 2010) ("Repo is essentially a secured loan.") (hereinafter, "***Repo Handbook***").

[29]     Dr. Shaked is Professor Emeritus of Finance and Economics at Boston University's Questrom School of Business and Senior Managing Director of The Michel-Shaked Group, a firm that provides corporate finance and business consulting services to law firms, governmental agencies, and corporations worldwide.  Shaked Decl. ¶ 7.  Among his many other qualifications (*id.* ¶¶ 7-15), Dr. Shaked has published five books, including *Finance and Accounting for Lawyers*. *Id.* ¶ 13.

[30]     *Id.* ¶¶ 17, 27; *see also id.* ¶ 18 (quoting authorities describing repos as a "secured loan" or "collateralized loan") (footnotes omitted).

[31]     *See also* Shaked Decl. ¶¶ 16, 26.

the original sale, collateralized by [the security], *with interest equal to the difference between the sale and repurchase prices*.") (emphasis added). "A seller [borrower] in a repo transaction is entering into a repo, whereas a buyer [lender] is entering into a *reverse repo*. . . . That is, a reverse repo is a purchase of securities that are sold back on termination."[32]

36.     As with other loans, repos and reverse repos involve a principal amount outstanding (*i.e.*, the cash that the repo borrower receives in exchange for providing the underlying securities as collateral)[33] and interest that is part of the price on which the repo borrower repurchases the securities. *See Manko*, 979 F.2d at 902 (noting that repo interest is "equal to the difference between the sale and repurchase prices").[34] Moreover, parties to the repo transaction "customarily refer to the underlying securities as 'collateral,' and the risk of a change in the value of the collateral remains with the borrower, even though the lender 'owns' it for the term of the agreement." *Miller*, 495 F. Supp. at 467 (footnotes omitted); *see also*, *e.g.*, *Jonas v. Resol. Tr. Corp. (In re Comark)*, 971 F.2d 322, 323 (9th Cir. 1992) (observing that "the securities 'sold' to the dealer can be viewed as . . . collateral").

37.     Even Spire X considers its repos and reverse repos to be secured loans because it says so in its financial statement.[35] Moreover, when Spire X acts as the lender under a reverse repo, it treats and recognizes the transaction in its statement of financial condition "as a

---

[32]     *Repo Handbook* at 117.

[33]     *See id*. at 145 (referring to the "borrowed amount" as "repo principal"); *id*. at 146 (showing as figure 5.12 an exemplar of a Bloomberg screen identifying amount of "repo principal"); *id*. at 152 (identifying "Principal" component of repo transaction); *Principal*, *Black's Law Dictionary* (5th ed. 1979) (defining "principal" as "[a]mount of debt, not including interest"); Shaked Decl. ¶ 25 (stating that the $94.505 million reported in Spire X's financial statement for repurchase agreements constitutes "the principal plus interest agreed to be paid by [Spire X as the repo borrower]").

[34]     *See also*, *e.g.*, *Repo Handbook* at 118-19, 121, 136, 175, 277, 280, 282-83, 284, 296 (making numerous references to "repo interest"); *id*. at xx (stating that "repo is an interest-rate instrument").

[35]     *See* Adv. D.I. 287, Ex. 2, Ex. A at 26 (stating that cash received by Spire X under a repo "reflect[s] its economic substance as a loan to [Spire X]").

receivable[,]"[36] just as a lender would treat a loan owed to it.[37]  When Spire X is acting as the borrower under a repo, it treats and recognizes the transaction in its statement of financial condition "as a payable[,]"[38] similar to the way a borrower would treat a loan that it owed.[39]

38.     Spire X's financial statement, as of December 31, 2019, shows reverse repurchase agreements involving U.S. Treasury bonds in the amount of $207.995 million, and repurchase agreements involving U.S. Treasury bonds in the amount of $94.504 million.[40]  Because the latter sum is a payable, the sum is expressed as a negative number (*i.e.*, "(94,504)").  As explained above, these receivables and payables are the contract amounts that represent the principal and interest that is owed *by* Spire X (in the case of repos) and the principal and interest that is owed *to* Spire X (in the case of reverse repos).  Thus, the only dollar threshold in § 101(22A) that is applicable to these repo and reverse repo amounts is the $1 billion "in notional or actual principal amount outstanding[.]"  11 U.S.C. § 101(22A)(A).  Dr. Shaked agrees, concluding that the amounts reported in the Spire X financial statement constitute "the notional or actual principal amount plus interest owed under those repo and reverse repo agreements."  Shaked Decl. ¶¶ 5, 36 (footnote omitted).  Because the repo and reverse repo amounts reported in its financial statement are well below the $1 billion threshold, Spire X has not established itself as a "financial participant" under the Bankruptcy Code.  *See id.*

39.     Movants, however, insist that the lower $100 million threshold in § 101(22A) applies because "Spire X had outstanding mark-to-market repurchase and reverse repurchase

---

[36]    *Id*. at 25.

[37]    *See Receivable*, *Black's Law Dictionary* (11th ed. 2019) (defining "receivable" as an "amount owed . . . .").

[38]    Adv. D.I. 287, Ex. 2, Ex. A at 26.

[39]    *See Account Payable*, *Black's Law Dictionary* (11th ed. 2019) (defining "account payable" as an "account reflecting a balance owed to a creditor").

[40]    Adv. D.I. 287, Ex. 2, Ex. A at 26.

- 21 -

agreement positions with non-affiliates of over $302 million" (that is, the total of the $207.995 million and the $94.504 million reported in the financial statement).  Mot. ¶ 42.  But Dr. Shaked rejects Movants' argument that these amounts are mark-to-market positions.  As he explains, "the $94.5 million is not the marked-to-market value of the underlying securities on Spire X's balance sheet, but rather the agreed upon, contractual price that is akin to the principal amount of a secured loan plus the outstanding interest charge."  Shaked Decl. ¶ 25.  Similarly, on the reverse repo side, the "[t]he $208.0 million is not the marked-to-market value of the underlying securities on Spire X's balance sheet, but rather the agreed upon, contractual price that is akin to the principal amount of a secured loan plus the outstanding interest charge."  *Id*. ¶ 34.  Just because Movants self-servingly call these repos and reverse repos "mark-to-market positions" does not make them so, as Dr. Shaked's analysis attests.

40.    Movants argue that "repurchase agreements can be recorded as 'mark-to-market' positions on balance sheets, based on the value of the securities purchased or sold pursuant to that agreement" (Mot. ¶ 49), but their assertion is incorrect.[41]  It is *not* the *repurchase agreement* that is recorded at mark-to-market but rather the underlying *security* serving as the collateral that is so recorded.  *See, e.g.*, *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 666 (S.D.N.Y. 2011) ("Although the borrower [in a repurchase agreement] passes legal title to the securities to the lender, it retains both the economic benefits and market risk of the transferred collateral through retained beneficial ownership, and continues to mark-to-market the

---

[41]    The decision in *Taylor, Bean & Whitaker* is of no help to Movants.  *See* Mot. ¶ 49 (citing *Luria v. Hicks (In re Taylor, Bean & Whitaker Mortg. Corp.)*, No. 3:09-BK-07047-JAF, 2017 WL 4736682 (Bankr. M.D. Fla. Mar. 14, 2017)).  The issue before this Court here—*i.e.*, whether the $100 million threshold applies to repos and reverse repos—was not litigated or decided in *Taylor Bean*.  The plaintiff-trustee in *Taylor Bean* did not contest the bare assertion that the debtor had more than $100 million of mark-to-market positions in "mortgage loans and/or repurchase agreements" but chose instead to litigate the issue of whether a debtor could ever be a "financial participant" under the Code.  2017 WL 4736682, at *4-5.  In addition, the $100 million threshold was not essential to the court's determination that the debtor was a financial participant because the debtor also had more than "$1 billion of principal value" in securitized mortgage loans.  *Id*. at *5.

*price of the security* on its balance sheet.") (emphasis added).  Spire X's financial statement recognizes the same principle:  "*Securities sold* under agreements to repurchase are *not derecognized* [*i.e.*, not removed] from the Statement of Financial Condition since [Spire X] retains substantially all of the risks and rewards of ownership."[42]

41.    Moreover, Movants' argument would apply only when there are "securities sold" under a repurchase agreement—*i.e.*, when Spire X is acting as the repo borrower.  The underlying securities are *not* recognized or recorded on the balance sheet in the case of a reverse repurchase agreement—*i.e.*, when Spire X is acting as the repo lender.  This approach is set forth in the applicable accounting standard promulgated by the Financial Accounting Standards Board (FASB), which provides in relevant part:  as to noncash collateral, "the obligor (transferor) shall continue to carry the collateral as its asset, *and the secured party (transferee) shall not recognize the pledged asset*."[43]  Spire X articulates the same principle in its financial statement:  "Securities purchased under agreements to resell at a specified future date *are not recognized* in the Statement of Financial Condition . . . ."[44]  "This means that the securities 'bought' by Spire X in regards to

---

[42]    Adv. D.I. 287, Ex. 2, Ex. A at 26 (emphasis added).

[43]    FASB, Accounting Standards of Codification ("**ASC**") ¶ 860-30-25-5d. ("Noncash Collateral"), https://asc.fasb.org/1943274/2147481557/860-30-25-5 (last visited Feb. 16, 2024) (emphasis added); *see also* Shaked Decl. ¶ 31 (quoting ASC ¶ 860-30-25-5d.).

[44]    Adv. D.I. 287, Ex. 2, Ex. A at 25 (emphasis added).  In a footnote, Movants try to deflect this point by citing to the standards of the Financial Industry Regulatory Authority ("**FINRA**") and the Commodity Futures Trading Commission ("**CFTC**") to suggest that the collateral securing the repo lender's loan in a reverse repo would be reported or considered as current assets.  *See* Mot. at 23, n.10 (citations omitted).  But these cited standards are inapposite.  For starters, the FINRA standard, on its face, applies to *off-balance sheet items*.  *See* FINRA, *Filing & Reporting: Frequently Asked Questions about Derivatives and Other Off-Balance Sheet Items (OBS)*, https://www.finra.org/filing-reporting/derivatives-and-other-balance-sheet-items-obs/faq (last visited Feb. 16, 2024).  Off-balance sheet items "are typically those not owned by … the company."  Adam Hayes, Investopedia, *Off-Balance Sheet (OBS) Activities: Types and Examples*, https://www.investopedia.com/terms/o/off-balance-sheet-obs.asp (last visited Feb. 16, 2024).  Thus, Spire X cannot point to this standard as a basis for arguing that it holds a mark-to-market position in the underlying securities when it is acting as the repo lender.  The cited CFTC standard applies only to futures commission merchants or "**FCMs**."  *See* CFTC, Form 1-FR-FCM, *Instructions: Introduction* at 1-1 https://www.cftc.gov/sites/default/files/IndustryOversight/Intermediaries/1fr-fcminstructions.pdf (last visited Feb. 16, 2024).  Spire X has not demonstrated that it is an FCM, which makes the CFTC standard irrelevant.

its reverse repurchase agreements do not transfer to Spire X's balance sheet, and thus Spire X does not have marked-to-market securities on its balance sheet relating to reverse repurchase agreements."  Shaked Decl. ¶ 32.[45]

42.　Thus, only in the case of repurchase agreements (*i.e.*, when Spire X is the repo borrower) is the underlying security recognized on the balance sheet.[46]  If Movants are contending that the $94.504 million noted in the financial statement reflects Spire X's "mark-to-market position" in the underlying Treasuries—and the Trust is not conceding that it does so reflect—that amount is still below the $100 million threshold, so Spire X cannot be a financial participant on that basis.

43.　Movants argue that the $207.995 million and $94.504 million sums in the financial statement must be "mark-to-market value" of the underlying securities because the financial statement notes that these sums are "at fair value as of December 31, 2019."  Mot. ¶ 51 (quoting Adv. D.I. 287, Ex. 2, Ex. A at 26).  But "fair value" must be interpreted in the context in which it is used—that is, by reference to the words *receivables* (*i.e.*, what is owed to Spire X)[47] and *payables* (*i.e.*, what Spire X owes)[48]—and therefore must mean something other than merely "mark-to-market value."  As noted, the $207.995 million and $94.504 million sums are principal and interest that Spire X and its counterparties agreed to when they entered into the repos and

---

[45]　Dr. Shaked explains that this approach is similar to a traditional mortgage:  "In a traditional mortgage, the lender (repo buyer in repo transactions) lends money to a mortgage borrower (repo seller in repo transactions) and as a result records a loan receivable on its balance sheet. *The collateral, which in this case is the property, is not recorded on the lender's balance sheet* because the economic benefits of the property remain with the borrower (i.e., the borrower can live in the house or rent out the property).  The borrower records the property as an asset but also has a corresponding liability to repay the lender.").  *Id.* ¶ 28 (emphasis added).

[46]　*See id.* ¶¶ 25, 32.

[47]　*See supra* note 29.

[48]　*See supra* note 31.

reverse repos.[49]  Thus, here, *fair value* means the contract prices or amounts that Spire X and its counterparties, as willing lenders and borrowers, agreed to in arm's length transactions, without temporal or financial duress.  *See Branch v. Ernst & Young U.S.*, 311 F. Supp. 2d 179, 181 (D. Mass. 2004) ("'Fair value' is the *negotiated price* that a willing and sophisticated buyer would pay for an asset in an arm's-length transaction in which neither the buyer nor the seller is acting under temporal or financial duress.") (emphasis added and citation omitted); *In re Appraisal of Columbia Pipeline Grp., Inc.*, No. 12736-VCL, 2019 WL 3778370, at *17 (Del. Ch. Aug. 12, 2019), *judgment entered*, (Del. Ch. 2019) (stating that, on three occasions, "the Delaware Supreme Court has endorsed using the *deal price* in an arm's-length transaction as evidence of fair value") (emphasis added and footnote omitted).  Accordingly, Movants' efforts to confine "fair value" to mean only "mark-to-market value" is unavailing.[50]  Spire X cannot establish itself as a "financial participant" under the Code based on its repos and reverse repos, especially at the motion to dismiss stage.

### 2. Spire X's Credit Agreement Is Also a Loan That Fails to Meet the Statutory Threshold of at Least $1 Billion in Principal Amounts Outstanding

44. In addition to relying on the repos and reverse repos, Movants argue that Spire X is a "financial participant" under the Code because, on October 12, 2020 (Mallinckrodt's petition date), "ABN AMRO extended Spire X credit in the amount of approximately $308 million to support [Spire X's] daily trading activities," which allegedly exceeds the $100 million threshold for mark-to-market positions.  Mot. ¶ 41 (citing Adv. D.I. 287, Exs. E-G).  But, as the words *extended credit* suggest, ABN AMRO extended a *loan* to Spire X, not a mark-to-market position.

---

[49]  *See* Shaked Decl. ¶¶ 25, 34.

[50]  An analogy to this are squares and rectangles:  all squares are rectangles, but not all rectangles are squares.  Thus, just because Movants contend that mark-to-market value is always fair value does not mean the reverse is true.

*See* Shaked Decl. ¶ 35.  "Thus, the $100 million threshold is not relevant to ABN AMRO's loan to Spire X.  Instead, the applicable threshold is the $1 billion in notional or actual principal amount outstanding.  Spire X's $308 million loan balance falls short of that threshold."  *Id.*

45.     The Securities Account Agreement, which Movants cite as the basis for ABN AMRO's extension of credit to Spire X, has the hallmarks of a loan agreement.  It provides for the accrual and computation of interest.[51]  It provides for collateral and liens to secure Spire X's obligations.[52]  It includes Spire X's representations, warranties, and express acknowledgements.[53]  Similarly, the Finance Conditions Acknowledgement between ABN AMRO and Spire X provides for the computation of Spire X's "finance usage" or borrowing limit.[54]  It also includes solvency requirements and solvency ratios for Spire X.[55]  Additionally, ABN AMRO's "haircut report" for Spire X shows that Spire X had a credit limit of $570 million and, on October 12, 2020 (Mallinckrodt's petition date), had credit extended to it ("Credit util.") in the amount of approximately $308 million.[56]

46.     These documents show that, in both form and economic substance, the arrangement between ABN AMRO and Spire X was an extension of credit or loan, not a mark-to-market position.  *See* Shaked Decl. ¶ 35 ("What was presented in these documents is a credit facility and not a mark-to-market position.").  Accordingly, the $1 billion threshold for principal amounts

---

[51]   Adv. D.I. 287, Ex. 9, Ex. E at 2-3, 8.

[52]   *Id.* at 3, 7.

[53]   *Id.* at 6-7 ("[Spire X] acknowledges and agrees that the extension of credit by AACC to [Spire X] is a privilege and not a right, and any such extensions . . . place AACC and its funds at risk.  It is further acknowledged and agreed that in light of AACC's right to protect itself, AACC is not obligated in any way or at any time to extend credit to [Spire X], and decisions of AACC to extend credit to [Spire X] and permit [Spire X] to trade on margin are made in AACC's sole and absolute discretion, and such decision may be changed or rescinded at any time and without prior notice to [Spire X].").

[54]   Adv. D.I. 287, Ex. 9, Ex. F at 1.

[55]   *Id.* at 2.

[56]   Adv. D.I. 287, Ex. 9, Ex. G at 1.

outstanding applies, and Spire X's loan balance of $308 million falls well below it.  For these reasons, Spire X has failed to establish that it is a "financial participant" under the Bankruptcy Code.[57]

### 3. Alternatively, Spire X's Documentation Is Insufficient to Show Its Financial Participant Status

47.     Throughout the Protocol process, Spire X has refused to substantiate the summary information contained in its nonpublic, incomplete, and redacted financial statement and in the declarations submitted to the Trust.   Spire X's refusal constitutes alternative grounds for determining that it has failed to establish itself as a qualifying participant under § 546(e).

48.     Because of the highly factual nature of the § 546(e) defense, which often requires expert testimony and survives summary-judgment motions, yet alone motions to dismiss,[58] the Trust in good faith asked for additional information from Movants that was relevant to their defenses, such as a complete and unredacted version of Spire X's financial statement; copies of any financial statements filed with a regulatory agency; copies of the reverse repurchase and repurchase agreements that Spire X was relying on; a summary schedule listing each of these agreements and the values that sum to the total amounts that Spire X relies on to support its alleged defense; and an organizational chart of Movants and their affiliates that could show whether Spire

---

[57]    Movants are incorrect that the Trust refused to dismiss Latour on the basis that "the extension of credit that Latour received from ABN AMRO did not exceed the requisite $1 billion notional or principal amount threshold."  Mot. ¶ 22.  Because ABN AMRO extended credit to Latour in excess of $1 billion (*see* Adv. D.I. 287, Ex. 3, Ex. B (haircut report)), the Trust is not challenging Latour's status as a qualifying participant.  Nevertheless, Latour does not have the benefit of the § 546(e) safe harbor because Movants have not established a qualifying transaction.

[58]    *See, e.g.*, *Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*, 625 B.R. 291, 303 (Bankr. D. Del. 2020) (denying motion for summary judgment with respect to whether debtor was a financial participant); *45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 748 (Bankr. S.D.N.Y. 2019) ("any dismissal of this case based on the safe harbor is premature. . . . [because] [s]ection 546(e) provides defendants with an affirmative defense, and unless this affirmative defense is clearly established on the face of the complaint, invocation of the safe harbor does not defeat a plaintiff's otherwise valid complaint.") (citation and quotation omitted) (denying motion to dismiss on the basis of, among other things, defendant's argument that one of the transferees was a financial institution).

X entered into any repos or reverse repos with affiliates—*i.e.*, the types of contracts that cannot be used towards establishing the "financial participant" dollar-amount thresholds.[59] Such information would allow the Trust to verify the summary information in the financial statement—which was not even publicly filed and provided to the Trust with heavy redactions.

49. Despite the Trust's information requests, Spire X initially provided no additional documentation to support its assertion that it had "mark-to-market repurchase and reverse repurchase agreement positions"[60] of over $302 million.[61] On the eve of the parties' meet-and-confer, Spire X provided a spreadsheet that it apparently generated internally purportedly containing additional information about its repos and reverse repos, including counterparty information.[62] But an internally generated spreadsheet is no substitute for the actual repurchase and reverse repurchase agreements that Spire X entered into with counterparties. Nor is it a substitute for Spire X's complete and unredacted financial statement. Such documents would give the Trust greater wherewithal to hold Movants to their burden. But, for now, Movants are providing only what they want the Trust to see, thus leaving the Trust at an informational disadvantage.

50. Movants incorrectly assert that "[t]here is no need, for example, for the Trust to demand and review copies of all of Spire X's repurchase and reverse repurchase agreements" (Mot. ¶ 44), and that the Trust must accept their summary documentation at face value—that is, for its truth.[63] On the contrary, the Protocol expressly authorizes the Trust to request "additional

---

[59]   *See* Adv D.I. 287, Ex. 4.

[60]   Mot. ¶ 42.

[61]   *See* Adv. D.I. 287, Ex. 5.

[62]   *See id.*, Ex. 9, Ex. D.

[63]   The Trust's dismissal of seven defendants under the Protocol refutes the Movants' argument that the Trust's failure to dismiss them based on their supporting documentation renders the Protocol a nullity. Moreover, the Protocol was designed to allow Defendants to move forward with certain affirmative defenses that were otherwise stayed by

information that [the Trust] believes, in good faith, is necessary for it to determine whether the Defendant has established the claimed Defense."  Protocol ¶ 9.  And the Protocol does not alter the burden of proof or persuasion on any issue.  *Id.* ¶ 15.

51.     It would be particularly untenable to require the Trust to take Movants at their word when Movants have a history of questionable practices.  For example, in 2019, Tower agreed to pay a staggering $67.4 million in criminal penalties, criminal disgorgement, and victim compensation to the CFTC in settling an investigation that uncovered that its traders "[f]raudulently placed thousands of bogus orders they never intended to execute—to deceive other market participants and move the market for their own benefit[.]"[64]  And, in 2015, Latour was charged with violating SEC rules over a nearly four-year period in which it sent millions of non-compliant orders to U.S. exchanges, as a result of which it paid $8 million in combined penalties.[65]

52.     Movants contend that the Trust has offered no basis to question the accuracy of the financial statement and Movants' declarations.  Mot. ¶ 44.  But the Trust does not need to provide counter-evidence in response to a motion to dismiss since the focus under Rule 12(b)(6) is whether the Amended Complaint pleads sufficient facts to establish plausible claims, which it does.  *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  If Movants now insist that this Court should treat their "motion to dismiss" as a motion for summary judgment,

---

the case management order.  Adv. D.I. 93 at 3.

[64]     Press Release, *Tower Research Capital LLC Agrees to Pay $67 Million in Connection With Commodities Fraud Scheme*, U.S. Dep't of Justice, Office of Public Affairs (Nov. 7, 2019), https://www.justice.gov/opa/pr/tower-research-capital-llc-agrees-pay-67-million-connection-commodities-fraud-scheme (quotation omitted).

[65]     Press Release, *Latour Trading Charged With Market Structure Rule Violations*, U.S. Securities and Exchange Commission (Sept. 30, 2015), https://www.sec.gov/news/press-release/2015-221.

then this Court should not subscribe to their refusal to produce the documents that the Trust requested under the Protocol, while arguing at the same time that the Trust has failed to produce information to the Court showing a genuine factual dispute. In either case, dismissal should be denied here.

53.     Throughout this process, Movants have ignored the fact that the Trust is a fiduciary seeking to avoid and recover fraudulently transferred funds for the benefit of opioid victims and other creditors, and that its commitments include verifying the accuracy of the information Movants provided under the Protocol. Movants' desire for summary dismissal cannot relieve them of their burden of proof and persuasion. Protocol ¶ 15. And Movants are not entitled to dismissal simply because they *say* they meet the requirements of § 546(e). The Trust is entitled to test those representations.

54.     In addition, the Protocol does not require the Court to consider any evidence for its truth, particularly on a motion to dismiss. This is even more evident here, where Spire X's financial statement was not filed with the SEC or any other regulatory agency. *See Carnegie Inst. of Wash. v. Pure Grown Diamonds, Inc.*, No. 20-CV-189 (JSR), 2020 WL 5209822, at *4 (S.D.N.Y. Aug. 31, 2020) (explaining that nonpublic documents cannot be the subject of judicial notice). Because Movants gave the Trust no ability to test the validity of information in financial statements that were not even subject to regulatory scrutiny, the Court should be especially hesitant to consider them.

## **CONCLUSION**

For all the reasons explained above, the Court should deny the Motion.

[*Signature of counsel appears on following page.*]

Dated: February 19, 2024
Wilmington, Delaware

Respectfully submitted,

**COLE SCHOTZ P.C.**

/s/ Justin R. Alberto
Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
jalberto@coleschotz.com
preilley@coleschotz.com

Anthony De Leo, Esq.
(admitted *pro hac vice*)
1325 Avenue of the Americas
19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
adeleo@coleschotz.com

*Co-Counsel to the Opioid*
*Master Disbursement Trust II*

**CAPLIN & DRYSDALE, CHARTERED**
Kevin C. Maclay, Esq. (admitted *pro hac vice*)
Todd E. Phillips, Esq. (admitted *pro hac vice*)
Jeffrey A. Liesemer, Esq. (admitted *pro hac vice*)
Quincy M. Crawford, III, Esq. (admitted *pro hac vice*)
Serafina Concannon, Esq. (admitted *pro hac vice*)
One Thomas Circle, NW, Suite 1100
Washington, D.C. 20005
Tel: (202) 862-5000
Fax: (202) 429-3301
kmaclay@capdale.com
tphillips@capdale.com
jliesemer@capdale.com
mcrawford@capdale.com
sconcannon@capdale.com

*Co-Counsel to the Opioid*
*Master Disbursement Trust II*

# EXHIBIT "A"

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | |
| | : | Chapter 11 |
| MALLINCKRODT PLC, *et al.,* | : | Case No. 20-12522 (JTD) |
| | : | (Jointly Administered) |
| Reorganized Debtors. | : | |
| | : | |
| | : | |
| OPIOID MASTER DISBURSEMENT TRUST II, | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | No. 22-50435 (JTD) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| ARGOS CAPITAL APPRECIATION MASTER | : | |
| FUND LP, *et al.,* | : | |
| Defendants. | : | |
| | : | |

## DECLARATION OF DR. ISRAEL SHAKED

**Table of Contents**

I.      Introduction ................................................................................................................... 1

II.     Qualifications ................................................................................................................ 3

III.    Repurchase Agreements ................................................................................................ 6

   A.  Overview of Repurchase Agreements ......................................................................... 6

   B.  Accounting Treatment of Repurchase Agreements ..................................................... 8

   C.  Spire X's "Mark-to-Market" Repo Position as of December 31, 2019 .............................. 9

IV.    Reverse Repurchase Agreements ................................................................................ 10

   A.  Overview of Reverse Repurchase Agreements .......................................................... 10

   B.  Accounting Treatment of Reverse Repurchase Agreements ...................................... 12

   C.  Spire X's "Mark-to-Market" Reverse Repo Position as of December 31, 2019 ................ 14

V.     ABN AMRO Credit Facility ........................................................................................ 15

VI.    Summary of Opinions .................................................................................................. 15

**DECLARATION OF DR. ISRAEL SHAKED**

## I.     Introduction

1.   I, Israel Shaked, under penalty of perjury under the laws of the United States, declare that I
     have personal knowledge of the information contained in this declaration, and that the
     following is true and correct to the best of that knowledge.

2.   I have reviewed and analyzed certain documents regarding Mallinckrodt plc, Tower
     Research Capital, Spire X Trading LLC ("Spire X"), and Latour Trading LLC (collectively
     referred to as the "Defendants") listed in Exhibit 1.

3.   I was asked by counsel to review and analyze Spire X's claim that, as of December 31,
     2019, Spire X "had aggregate outstanding mark-to-market reverse repurchase and
     repurchase agreement positions in excess of the $100 million statutory threshold"[1] and that
     "Spire X's audited financial statement shows that Spire X had outstanding mark-to-market
     repurchase and reverse repurchase agreement positions with non-affiliates of over $302
     million."[2]  Specifically, I was asked by counsel to determine whether, in my opinion,
     repurchase ("repo") agreements and reverse repurchase ("reverse repo") agreements, such as
     those executed by Spire X, should be measured as mark-to-market assets or if they represent
     the gross notional or actual principal amount outstanding of the repo and reverse repo
     agreements.

---

[1] Motion to Dismiss the Amended Complaint as to Defendants Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC Pursuant to the Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities, filed on January 29, 2024, p. 19 (Docket 286) ("Motion to Dismiss").

[2] Motion to Dismiss the Amended Complaint as to Defendants Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC Pursuant to the Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities, filed on January 29, 2024, p. 19 (Docket 286) ("Motion to Dismiss").

4. It is my understanding that the definition of a "financial participant" is outlined in 11 U.S. Code § 101 of the Bankruptcy Code. Subsection 22A of 11 U.S. Code 101 defines financial participant as the following:

> A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition; or

> (B) a clearing organization (as defined in section 402 of the Federal Deposit Insurance Corporation Improvement Act of 1991).

5. Based on my review of the available evidence, it is my opinion that the $302.5 million that the Spire X claims represents gross "mark-to-market" positions for securities under repo agreements and reverse repo agreements is an amount that is the notional or actual principal amount plus interest owed under those repo and reverse repo agreements.[3] As this amount is below the statutory threshold of having had at least $1 billion in notional or actual principal amount outstanding,[4] Spire X has failed to establish itself as a financial participant based on this threshold.

6. The remainder of this declaration outlines my qualifications, findings, and support for the conclusions summarized above.

---

[3] Interest may also include other fees and expenses related to the repurchase and reverse repurchase agreements.

[4] 11 U.S.C. § 101(22A).

## II. Qualifications

7. I am a Professor Emeritus of Finance and Economics at Boston University's Questrom School of Business in Boston, Massachusetts and Senior Managing Director of The Michel-Shaked Group, a firm that provides corporate finance and business consulting services to law firms, governmental agencies and corporations worldwide. For over 43 years, I have taught at Boston University courses at the doctoral, graduate and undergraduate levels on various topics, including financial institutions and markets, corporate finance, business valuation, financial economics, and general management. For 19 years, I was the Director of the Boston Chartered Financial Analysts ("CFA") Examination Review Program, a three-level program preparing investment professionals for a series of examinations leading to a worldwide certification by the CFA Institute (f/k/a Association for Investment Management and Research).

8. I was a contributing editor to the American Bankruptcy Institute Journal for 20 years. I was the co-founder and Director of the Institute of Chartered Pension Professionals ("ICPP"). The ICPP offered board members of public employee pension funds a certification program covering a wide range of investment-related topics, including economics, accounting, valuation, equity securities, fixed income securities, portfolio selection and management, alternative investments (including real estate), and ethics.

9. In addition to my academic work, for the last four decades, I have also provided consulting, valuation, investment, investment banking, and general business consulting services to companies worldwide on a wide range of issues including valuation, restructuring, investment analysis, economic analysis, modeling, corporate finance, solvency, marketing, general management, accounting, capital markets, financial analysis and other issues. I have

delivered hundreds of seminars on these topics to senior corporate executives in North and South America, Europe and Asia and to law firms nationwide. I have also acted as a consultant to numerous governmental agencies, including the U.S. Securities and Exchange Commission, the U.S. Internal Revenue Service, The Department of Justice, The U.S. Department of Labor, Pension Benefit Guarantee Corporation, Federal Deposit Insurance Corporation, and the Commonwealth of Massachusetts.

10. As co-founder and Senior Managing Director of The Michel-Shaked Group, I have experience working on litigation analysis and expert witness projects on various topics, including valuation, profitability analysis, capital markets, securities, damages, economic analysis, investments, antitrust, statistics, distress/restructuring, bankruptcy, preference, fraudulent conveyance, solvency, capital adequacy, intellectual property, employment, taxation, derivatives, accounting, insider trading, investment banking, real estate, insurance, and health care. I have testified before the U.S. Congress' House Ways and Means Committee on the issues of leveraged buyouts ("LBOs"), acquisitions and taxation. I have also been accepted as an expert witness and testified in U.S. Tax Court on behalf of both the IRS and petitioners. Additionally, I have testified as an expert witness in the United States Bankruptcy Courts, United States District Courts, Delaware Chancery Court and other courts.

11. I have performed economic, financial and overall management analyses of numerous companies covering a wide range of industries including aerospace and defense, airlines, aircraft leasing, asset management, auto and truck, basic materials, biotechnology, business services, capital goods, cement, chemicals, communications/networking, consumer products, distribution, electronics, energy, engineering & construction, entertainment, financial services, food & beverage, gaming/casinos, health care services and products,

home improvement, imaging, insurance, leisure & hospitality, manufacturing, media, mining, movie studios/production, natural resources, nursing homes, metals, oil & gas, personal & household products, personal services, pharmaceuticals, pharmacy/drug distribution, institutional pharmacies, real estate, professional sports franchises, recreational products, restaurants, retail, semiconductors, services, software & programming, steel & iron, supermarkets, technology, television network, tobacco, transportation, travel & cruise, and electric, gas, and water utilities.

12. My research covers several areas including valuation, economic and profitability analyses, financial distress/restructuring, solvency, capital adequacy, preferences, fraudulent conveyance, bankruptcy, LBOs, international business, investments, mergers and acquisitions, corporate structure analysis, corporate financial decisions, accounting, investment analysis, damages and capital markets. As shown in Exhibit 2, I have published extensively on these subjects in leading journals such as the Butterworths Journal of International Banking and Financial Law, California Management Review, Commercial Lending Review, European Financial Management, Financial Analysts Journal, Financial Management, The Financial Review, The Financier, Journal of Business Finance and Accounting, Journal of Applied Finance, Journal of Corporate Finance, Journal of Forensic Economics, Journal of General Management, Journal of International Business Studies, Journal of Portfolio Management, Journal of Risk and Insurance, Journal of Taxation, Journal of Corporate Renewal, Journal of Banking & Finance, Journal of Money, Credit and Banking, The Machinery & Technical Specialists Journal, The Corporate Growth Report, Litigation Economics Review, Managerial Finance, North American Journal of Economics and Finance, Strategy and Business, Social Science and Medicine, and the American Bankruptcy Institute Journal.

13. I have published five books: Finance and Accounting for Lawyers, Takeover Madness: Corporate America Fights Back, The Complete Guide to A Successful Leverage Buyout, and A Practical Guide to Bankruptcy Valuation (First and Second Editions).

14. I have a Doctor of Business Administration from the Harvard Graduate School of Business Administration. In addition, I have a Bachelor of Arts in Economics and a Bachelor of Arts in Statistics from the Hebrew University of Jerusalem. I also have a Master of Business Administration with a concentration in Finance from the Hebrew University of Jerusalem.

15. My curriculum vitae is attached as Exhibit 2. The documents that I considered in preparing this declaration are listed in Exhibit 1.

## III. Repurchase Agreements

### A. Overview of Repurchase Agreements

16. Repo agreements, such as those held by Spire X, are transactions where one party sells securities to another party, and agrees, as part of the same transaction, to repurchase the same or identical securities on a specified date and at an agreed upon price.[5] Spire X's financial statements reiterate this definition by explaining that a repo agreement is when a party "sells a financial asset and enters into an agreement to repurchase the same asset at a fixed price at a specified future date."[6] Figure 1 below presents an illustrative example of a typical repo transaction entered into by Spire X in which it obtains short-term financing (i.e., cash) by providing collateral (U.S. Treasuries).

---

[5] Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010, pp. 115-116. Throughout this report, the party that sells securities to another party and agrees to buy back the same or identical securities at a future date is referred to as the "repo borrower" or the "repo seller." The counterparty to this transaction is referred to as the "repo lender" or the "repo buyer."

[6] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 26 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

**Figure 1: Illustrative Example of Repurchase Agreement**



17. Economically, a repo transaction is considered the same as a secured borrowing or a collateralized loan. In essence, the repo seller borrows funds from a counterparty (repo buyer) with an obligation to pay the loan back at a future date at an agreed upon price. Generally, the loan is collateralized with liquid financial assets, such as U.S. Treasuries. This collateral is marked-to-market to measure the securitization of the funds, ensuring that the lender is not under-collateralized for the funds loaned.

18. While technically a repo transaction is a purchase and sale of certain assets, mechanically and economically it functions as a secured loan. For example, consider the following:

> "[e]ach **repo** [repurchase or reverse repurchase] **transaction** is **economically similar to a loan collateralized by securities**."[7]

> "Although an asset is sold outright at the start of a repo, the commitment of the seller to buy back the asset in the future means that the buyer has only temporary use of that asset, while the seller has only temporary use of the cash proceeds of the initial sale. Thus, although **repo** is structured legally as a sale and repurchase of securities, it **behaves economically like**

---

[7] "Repo and Reverse Repo Agreements," Federal Reserve Bank of New York, July 28, 2021. (Emphasis added).

**a collateralised or secured deposit** (and **the principal use of repo is in fact the secured borrowing and lending of cash**).[8]

"**Repo is essentially a secured loan**. The term comes from sale and repurchase agreement; however, this is not necessarily the best way to look at it. Although in a classic repo transaction legal title of an asset is transferred from the 'seller' to the 'buyer' during the term of the repo, in the author's opinion that this detracts from the **essence of the instrument: a secured loan of cash**."[9]

"In essence **a repo agreement is a secured loan (or collateralised loan)** in which the repo rate reflects the interest charged on the cash being lent."[10]

19. To reflect the economics of the transaction, repo agreements are accounted for similar to a secured loan.

## B. Accounting Treatment of Repurchase Agreements

20. Under the accounting rules, the repo seller reflects its obligation to repurchase the same, or identical, financial asset at a future date on its balance sheet as a liability. The repo seller will also reflect the marked-to-market value of the collateral underlying the repurchase agreement on its balance sheet as an asset. For example, consider the following:

"In a repo transaction then, while legal title to collateral is transferred to the 'buyer', the accounting treatment (in most jurisdictions) recognises that the economic impact of the collateral remains with the 'seller'. **Therefore, for the seller, bonds given as collateral remain on its balance sheet**. The corresponding double-entry liability is the repo cash. Coupon or dividend cash flow from the asset continues to accrue to the seller. The book-keeping entries are the opposite for the repo buyer. **So in its accounting treatment a repo trade appears as a secured loan and not an actual sale transaction**."[11]

---

[8] "What is a repo?," International Capital Markets Association. Available at: https://www.icmagroup.org/market-practice-and-regulatory-policy/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/1-what-is-a-repo/. Accessed February 9, 2024. (Emphasis added).

[9] Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010, p. 5. (Emphasis added).

[10] Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010, p. 117. (Emphasis added).

[11] Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010, pp. 307-308. (Emphasis added).

21. As described in Spire X's audited financial statements, the collateral for the loan (e.g., U.S. Treasuries) is not derecognized (i.e., removed) from the repo seller's balance sheet because the benefits of ownership are retained.[12] The cash received from the loan is recorded as an asset, with a corresponding liability for the obligation to repurchase the financial asset, and the difference recorded as a loss.[13]

22. This is consistent with accounting rules outlined in the Financial Accounting Standards Board Accounting Standards Codification ("ASC") 860. For example, ASC 860-30-25-5 states that:

> "[T]he obligor (transferor) [repo seller] **shall continue to carry the collateral as its asset**, and **the secured party** (transferee) [repo buyer] **shall not recognize the pledged asset**."[14]

23. The collateral (U.S. Treasuries in the case of Spire X) are held on the balance sheet by the repo seller and not derecognized. This means that the securities "sold" by Spire X in regards to its repurchase agreements remain on Spire X's balance sheet.

**C. Spire X's "Mark-to-Market" Repo Position as of December 31, 2019**

24. Spire X claims that as of December 31, 2019, it had gross "mark-to-market" positions for securities under repurchase agreements totaling approximately $302.5 million. Of that $302.5 million, Spire X states that approximately $94.5 million was comprised of repo agreements and $208 million of reverse repo agreements. In its Motion to Dismiss, Spire X

---

[12] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 26 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

[13] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 26 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

[14] ASC 860-30-25-5. (Emphasis added).

correctly claimed that the securities underlying a repo agreement are marked-to-market on the balance sheet of the repo seller.   For example, consider the following:

> "Although the borrower [**repo seller**] [in a repurchase agreement] passes legal title to the securities to the lender, it **retains both the economic benefits and market risk of the transferred collateral through retained beneficial ownership, and continues to mark-to-market the price of the security on its balance sheet**"[15]

25.   When Spire X enters into a repo agreement, the securities that are pledged as collateral (which are U.S. Treasuries in the case of Spire X) are recorded on Spire X's balance sheet and are not recorded on or transferred to the counterparty's balance sheet at any point. Thus, the underlying securities relating to the $94.5 million in repurchase agreements are marked-to-market, but the $94.5 million amount disclosed in footnote 5 to Spire X's balance sheet is the payable amount agreed upon in the repo agreement (i.e., the principal plus interest agreed to be paid by the repo seller).  In other words, the $94.5 million is not the marked-to-market value of the underlying securities on Spire X's balance sheet, but rather the agreed upon, contractual price that is akin to the principal amount of a secured loan plus the outstanding interest charge.

## IV.   Reverse Repurchase Agreements

### A.  Overview of Reverse Repurchase Agreements

26.   Reverse repo agreements, such as those held by Spire X, represent the other side of a repo agreement.  Reverse repo agreements are transactions where one party (repo buyer) buys securities from another party (repo seller), and agrees, as part of the same transaction, to

---

[15] See, e.g., Bd. of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., 806 F. Supp. 2d 662, 666 (S.D.N.Y. 2011).  See also, Motion to Dismiss the Amended Complaint as to Defendants Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC Pursuant to the Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities, filed on January 29, 2024, p. 23 (Docket 286).

resell the same or identical securities on a specified date and at an agreed upon price.[16] Spire X's financial statements reiterate this definition by explaining that a reverse repo agreement is when a party "purchases a financial asset and enters into an agreement to resell the same asset at a fixed price at a specified future date."[17] Figure 2 below presents an illustrative example of a typical reverse repo transaction from the perspective of Spire X.

**Figure 2: Illustrative Example of Reverse Repurchase Agreement**



27. Economically, a reverse repo transaction is considered the same as a secured lending or a collateralized loan. In essence, the repo seller borrows funds from a counterparty (repo buyer) with an obligation to pay the loan back at a future date at an agreed upon price. Because a reverse repo transaction behaves identically to a traditional repo agreement (the

---

[16] Choudhry, Moorad. <u>The Repo Handbook</u>. 2nd Edition. Elsevier Ltd. 2010, pp. 115-116.

[17] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 25 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

other side of the transaction), the statements above regarding similarities of secured loans and repo agreements also apply to reverse repo agreements.

**B. Accounting Treatment of Reverse Repurchase Agreements**

28. The economics and accounting treatment of a reverse repo transaction are similar to those of a traditional mortgage. In a traditional mortgage, the lender (repo buyer in repo transactions) lends money to a mortgage borrower (repo seller in repo transactions) and as a result records a loan receivable on its balance sheet. The collateral, which in this case is the property, is not recorded on the lender's balance sheet because the economic benefits of the property remain with the borrower (i.e., the borrower can live in the house or rent out the property). The borrower records the property as an asset but also has a corresponding liability to repay the lender.

29. Under the accounting rules for the treatment of reverse repo agreements, the repo buyer records on its balance sheet a receivable for the agreed upon price at which the repo seller will buy back the same, or identical, financial asset at a future date. The repo buyer will not reflect the marked-to market value of the collateral underlying the reverse repo agreement on its balance sheet. The collateral for this reverse repo transaction (e.g., U.S. Treasuries) is not derecognized (i.e., removed) from the repo seller's balance sheet because the benefits of ownership are retained by the repo seller.[18] Therefore, the repo buyer does not reflect the

---

[18] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 26 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

collateral on its balance sheet.[19]  This is supported by the Repo Handbook (a source cited by the Defendants in their Motion to Dismiss), which contains the following:[20]

> **Repo buyer (cash lender)**
>
> Securities transferred are not entered in the balance sheet; changes in the market value of the securities have no effect on the buyer's balance sheet.

30. This accounting treatment is summarized in Spire X's redacted financial statements as the following:

> "[T]he transaction [reverse repurchase agreement] **is treated as a receivable** and recognized in the Statement of Financial Condition as a receivable for securities purchased under agreements to resell. **Securities purchased under agreements to resell** at a specified future date **are not recognized in the Statement of Financial Condition**… The **corresponding cash paid is derecognized and a corresponding receivable is recorded in the Statement of Financial Condition reflect [sic] the Company's right to receive it** (cash collateral on securities borrowed and reverse repurchase agreements).  The difference between the purchase and resale prices is treated as revenue."[21]

31. This is consistent with accounting rules outlined in ASC 860.  The relevant portion of ASC 860-30-25-5 states that:

> "[T]he obligor (transferor) [repo seller] **shall continue to carry the collateral as its asset**, and **the secured party** (transferee) [repo buyer] **shall not recognize the pledged asset**."[22]

---

[19] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 26 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

[20] Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010, p. 281.

[21] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019, p. 25 (Exhibit A to the Declaration of John Cogman dated July 10, 2023). (Emphasis added).

[22] ASC 860-30-25-5.

32. The collateral (U.S. Treasuries in the case of Spire X) is held on the balance sheet by the repo seller and not derecognized. This means that the securities "bought" by Spire X in regards to its reverse repurchase agreements do not transfer to Spire X's balance sheet, and thus Spire X does not have marked-to-market securities on its balance sheet relating to reverse repurchase agreements.

## C. Spire X's "Mark-to-Market" Reverse Repo Position as of December 31, 2019

33. Spire X claims that as of December 31, 2019, it had gross "mark-to-market" positions for securities under repurchase agreements totaling approximately $302.5 million.[23] Of that $302.5 million, Spire X states that approximately $208.0 million is comprised of reverse repo agreements and $94.5 million was comprised of repo agreements.[24] In its Motion to Dismiss, Spire X correctly claimed that the securities underlying a repo agreement are marked-to-market on the balance sheet of the *repo seller*.[25] However, in reverse repo agreements that Spire X entered into (the $208.0 million as of December 31, 2019), Spire X was not a "repo seller" but was instead a "repo buyer." As a result, Spire X would not record the mark-to-market value of the underlying securities on its balance sheet. Instead, these securities are marked-to-market on the balance sheet of the repo seller (i.e., the counterparty to Spire X's reverse repo agreements). For example, consider the following from the Repo Handbook, a source that Spire X references in its Motion to Dismiss:

---

[23] Declaration of John Cogman dated July 10, 2023, p. 3.

[24] Spire X Trading LLC, Financial Statements and Independent Auditors' Report, December 31, 2019 (Exhibit A to the Declaration of John Cogman dated July 10, 2023).

[25] Motion to Dismiss the Amended Complaint as to Defendants Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC Pursuant to the Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities, filed on January 29, 2024, p. 23 (Docket 286).

> "…the **repo buyer entering into a reverse repo trade does not take on the risks and rewards associated with the collateral transferred**, so that these assets are **not recorded on its balance sheet**."[26]

34. In other words, when Spire X enters into a reverse repo agreement, the securities that are pledged as collateral (which are U.S. Treasuries in this case) are recorded on the counterparty's balance sheet and are not recorded on Spire X's balance sheet. The $208.0 million is not the marked-to-market value of the underlying securities on Spire X's balance sheet, but rather the agreed upon, contractual price that is akin to the principal amount of a secured loan plus the outstanding interest charge.

## V.  ABN AMRO Credit Facility

35. I have reviewed the ABN AMRO documents provided by the Defendants. What was presented in these documents is a credit facility and not a mark-to-market position. Furthermore, defendants describe that ABN AMRO extended credit to Spire X,[27] acknowledging that this was a loan. Thus, the $100 million threshold is not relevant to ABN AMRO's loan to Spire X. Instead, the applicable threshold is the $1 billion in notional or actual principal amount outstanding. Spire X's $308 million loan balance falls short of that threshold.

## VI.  Summary of Opinions

36. Based on my review of the evidence, it is my opinion that the $302.5 million that Spire X claims represents gross "mark-to-market" positions for securities under repo agreements and reverse repo agreements is an amount that is the notional or actual principal amount plus

---

[26] Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010, pp. 308. (Emphasis added).

[27] Motion to Dismiss the Amended Complaint as to Defendants Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC Pursuant to the Protocol Order Relating to Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," and Dissolved Entities, filed on January 29, 2024, p. 19 (Docket 286).

interest owed under those repo and reverse repo agreements. As this amount is below the statutory threshold of having had at least $1 billion in notional or actual principal amount outstanding,[28] Spire X has failed to establish itself as a financial participant based on this threshold.

Respectfully submitted,

_I. Shaked_

_____

Dr. Israel Shaked
February 19, 2024

---

[28] 11 U.S.C. § 101(22A).

# Exhibits

**Exhibit 1**

# Mallinckrodt plc
## Documents and Other Information Considered

### DOCUMENTS RELATED TO TOWER RESEARCH'S MOTION TO DISMISS

- In re: Mallinckrodt plc, et al., Reorganized Debtors, Declaration of David Faucon, July 10, 2023.
- In re: Mallinckrodt plc, et al., Reorganized Debtors, Declaration of John Cogman, July 10, 2023.
- In re: Mallinckrodt plc, et al., Reorganized Debtors, Motion to Dismiss the Amended Complaint As To Defendants Tower Research Capital LLC, Spire X Trading LLC, And Latour Trading LLC Pursuant To The Protocol Order Relating To Conduits, Non-Transferees, "Stockbrokers," "Financial Institutions," "Financial Participants," And Dissolved Entities, filed on January 29, 2024.
- In re: Mallinckrodt plc, et al., Reorganized Debtors, Second Declaration of John Cogman, October 11, 2023.
- In re: Mallinckrodt plc, et al., Reorganized Debtors, Third Declaration of John Cogman, December 19, 2023.
- Re: Opioid Master Disbursement Trust II v. Argos Capital Appreciation Master Fund, LC, et al., Adv. Pro. No 22-50435 (Bankr. D. Del.), letter from Cole Schotz P.C. and Caplin & Drysdale, Chartered, August 25, 2023.
- Re: Opioid Master Disbursement Trust II v. Argos Capital Appreciation Master Fund, LC, et al., Adv. Pro. No 22-50435 (Bankr. D. Del.), letter from Cole Schotz P.C. and Caplin & Drysdale, Chartered, November 21, 2023.
- Re: Opioid Master Disbursement Trust II v. Argos Capital Appreciation Master Fund, LC, et al., Adv. Pro. No 22-50435 (Bankr. D. Del.) – Protocol Submission on Behalf of Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC, letter from Phillip D. Anker, July 11, 2023.
- Re: Opioid Master Disbursement Trust II v. Argos Capital Appreciation Master Fund, LC, et al., Adv. Pro. No 22-50435 (Bankr. D. Del.) – Protocol Submission on Behalf of Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC, letter from Phillip D. Anker, October 11, 2023.
- Re: Opioid Master Disbursement Trust II v. Argos Capital Appreciation Master Fund, LC, et al., Adv. Pro. No 22-50435 (Bankr. D. Del.) – Protocol Submission on Behalf of Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC, letter from Phillip D. Anker, December 6, 2023.
- Re: Opioid Master Disbursement Trust II v. Barclays Capital Inc., Adv. Proc. No. 22-50435 (Bankr. D. Del.), letter from from Cole Schotz P.C. and Caplin & Drysdale, Chartered, December 22, 2023.

**EXHIBITS TO THE COGMAN AND FAUCON DECLARATIONS**

- Exhibit A to the Declaration of John Cogman, July 10, 2023.
- Exhibit A to the Declaration of David Faucon, July 10, 2023.
- Exhibit B to the Declaration of David Faucon, July 10, 2023.
- Exhibit D to the Third Declaration of John Cogman, December 19, 2023.
- Exhibit E to the Third Declaration of John Cogman, December 19, 2023.
- Exhibit F to the Third Declaration of John Cogman, December 19, 2023.
- Exhibit G to the Third Declaration of John Cogman, December 19, 2023.

**OTHER**

- 11 U.S.C. § 101(22A).
- ASC 860-30-25-5.
- Bd. of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., 806 F. Supp. 2d 662, 666 (S.D.N.Y. 2011).

**TEXTBOOKS AND OTHER PUBLICATIONS**

- Choudhry, Moorad. The Repo Handbook. 2nd Edition. Elsevier Ltd. 2010.
- "Repo and Reverse Repo Agreements," Federal Reserve Bank of New York, July 28, 2021.
- "What is a repo?," International Capital Markets Association.

Any other items cited in the report not listed are incorporated herein by reference.

**Exhibit 2**                           **ISRAEL SHAKED**

*Work Address (Academic):*                                    *Work Address (Practice):*
Boston University                                             The Michel-Shaked Group
Questrom School of Business                                   2 Park Plaza
595 Commonwealth Avenue (Room 518G)                           Suite 500
Boston, MA  02215                                             Boston, MA  02116
Tel:  (617) 353-2665                                          Tel: (617) 426-4455
Fax: (617) 353-6667                                           Fax: (617) 426-6555
E-mail: shaked@bu.edu                                         E-mail: ishaked@michel-shaked.com

## EDUCATION

| | |
|---|---|
| 1976-1980 | **HARVARD GRADUATE SCHOOL OF BUSINESS ADMINISTRATION** |

Doctor of Business Administration, June 1980. Special field: Finance. Received Harvard Business School and Jerusalem Institute of Management Fellowships. Won the Harvard Business School Division of Research thesis competition.

**HEBREW UNIVERSITY OF JERUSALEM** Jerusalem, Israel

1974-1976    Master of Business Administration (MBA), with concentration in finance.  Graduated summa cum laude. Fellowship recipient.

1970-1973    Bachelor of Arts in Economics and Bachelor of Arts in Statistics.  Both summa cum laude.

## TEACHING EXPERIENCE

2022-Present    BOSTON UNIVERSITY QUESTROM SCHOOL OF BUSINESS, Boston, MA
*Professor Emeritus.*

1978-2021    BOSTON UNIVERSITY QUESTROM SCHOOL OF BUSINESS, Boston, MA
*Professor, Finance/Economics.*  Taught various courses at the doctoral, graduate and undergraduate level. Won the Boston University School of Management Broderick Prize for excellence in teaching in the years 1982-1983 and 1984-1985.  Finance department nominee for Broderick prize for excellence in teaching, 1981-1982, and 1980-1981.

1984-2002    Director, BOSTON CHARTERED FINANCIAL ANALYSTS (CFA) REVIEW PROGRAM
A 3-level program preparing financial analysts, portfolio managers, brokers, and other investment professionals for an examination leading to worldwide certification. The program is one of the world's most prestigious of its kind. Its core curriculum consists of the following modules:

    * Equity Securities Analysis                  * Financial Accounting
    * Fixed Income Securities Analysis       * Economic Analysis
    * Portfolio Management                   * Quantitative Analysis
    * Derivative Securities                     * Ethical and Professional Standards

1994-2001    Director, THE INSTITUTE OF CHARTERED PENSION PROFESSIONALS (ICPP)
The Institute sponsors various activities for board members of pension funds, support staff and other individuals associated with pension plans. The Chartered Pension Professionals (CPP) certification is designated by the Institute. The certification program covers a wide range of investment-related areas such as equity securities, fixed income securities, economics, portfolio management, and fiduciary responsibility. Responsibilities included directing the program and teaching in each of the subject matter areas.

| 1977-1978 | UNIVERSITY OF MASSACHUSETTS, Boston, MA |
| | *Instructor, Theory of Finance* |

**BUSINESS EXPERIENCE**

| 1985-present | BACK BAY MANAGEMENT CORPORATION |
| | Founder and President |

| 1980-1992 | BOSTON MANAGEMENT GROUP |
| | Managing Director |

| 1991-present | THE MICHEL-SHAKED GROUP |
| | Co-founder and Managing Director |

| 1997-2016 | AMERICAN BANKRUPTCY INSTITUTE |
| | Board Member and Contributing Editor (American Bankruptcy Institute Journal) |

| 1980-present | Various consulting activities, including investment banking and financial services, mergers/acquisitions, LBOs, financial distress/bankruptcy, litigation analysis and expert witness work for law firms on numerous financial issues, and executive management development programs in general management, finance, and marketing. |

| 1980-1988 | Education consultant: Goodyear Publishing Co.; John Wiley & Sons, Inc.; McGraw-Hill Book Co. |

| 1990-1992 | CFO SEMINARS CORPORATION |
| | Co-founder and partner. A joint venture with the CFO Magazine - nationwide offering of seminars for financial executives. |

| 1986-1990 | Finance Columnist, Bostonia Magazine. |

| 1977-1978 | JERUSALEM INSTITUTE OF MANAGEMENT, Jerusalem, Israel, and HARVARD BUSINESS SCHOOL, Boston, MA. Course development for executive development programs and case writing in area of Management Information Systems. |

| 1975-1976 | KOOR CHEMICAL WORKS, LTD., Tel-Aviv, Israel |
| | Senior Economist, Planning and Control Division |

| 1973-1975 | URDAN METALLURGICAL WORKS, LTD., Natania, Israel |
| | Director of management information system and Assistant to the CFO/Comptroller |

| 1969-1970 | ISRAELI AIRCRAFT INDUSTRY |
| | Quality control and measurement methods department |

| 1969 | NILI WIRING, INC., Israel |
| | Production and installation of various metal wire products |

| 1966-1969 | MILITARY SERVICE |

**HONORS**

American Bankruptcy Institute's 2017 Book Award for the book: <u>A Practical Guide to Bankruptcy Valuation</u>, 2nd edition, published in March 2017. Award Ceremony: ABI's Annual Meeting, April 22, 2017, Washington, D.C.

"Muni Bonds, Pension Liabilities and Investment Due Diligence." (with B. Orelowitz and S. Mangiero) Top Ten List-Social Science Research Network, 2014.

Article awarded the Citation of Excellence and the Highest Quality Rating by ANBAR Electronic Index (1999) – "After Bankruptcy: Can Ugly Ducklings Turn into Swans?" <u>Financial Analysts Journal</u> (with A. Michel and C. McHugh).

The article "Does Business Diversification Affect Performance?" was listed 6th on the list of the "Most Frequently Cited <u>Financial Management</u> Articles" over the previous 25 years (1970-1995).

Won The Boston University School of Management Broderick Prize for excellence in teaching in the year 1982/83.

Won The Boston University School of Management Broderick Prize for excellence in teaching in the year 1984/85.

Nominated for the "Metcalf Award" - the highest teaching honor at Boston University - 1987.

Nominated for the "Metcalf Award" - the highest teaching honor at Boston University - 1991.

Finance/Economics Department nominee for Broderick Prize for excellence in teaching in the year 1980/81.

Finance/Economics Department nominee for Broderick Prize for excellence in teaching in the year 1981/82.

The book <u>The Complete Guide to a Successful Leveraged Buyout</u> selected by two book clubs -Fortune Book Club and MacMillan Executive Book Club.

The article "Japanese Leverage: Myth or Reality?" (<u>Financial Analysts Journal</u>) included as a required reading for the Chartered Financial Analysts Examination, 1987-1990.

Testified before the U.S. House Ways and Means Committee on the issue of takeovers and leveraged buyouts, March 1989.

Expert testimony on "Conflict of Interest Abuses in Commercial Banking Institutions." A report by the United States General Accounting Office to The Subcommittee On Commerce, Consumer and Monetary Affairs, Committee on Government Operations, U.S. House of Representatives, January 1989.

Research methodology and results on deposit insurance included in the report "Deposit Insurance In A Changing Environment", submitted by the Federal Deposit Insurance Corporation (FDIC) to Committee on Banking, Housing and Urban Affairs (U.S. Senate) and Committee on Banking, Finance and Urban Affairs (U.S. House of Representatives), April, 1983.

Invited Speaker - Universidad Peruana de Ciencias Aplicadas - Financial Tools Applied to Marketing Decisions - Lima, Peru, April 10, 1996.

American Bankruptcy Institute Journal Editorial Board, 1997 – 2017.

Steering Committee - Universidad Peruana de Ciencias Aplicadas, Lima, Peru, 1997 – present.

## GOVERNMENT RELATIONS

Testified before the U.S. House Ways and Means Committee on the issue of takeovers and leveraged buyouts, March 1989.

Expert testimony on "Conflict of Interest Abuses in Commercial Banking Institutions." A report by the United States General Accounting Office to The Subcommittee On Commerce, Consumer and Monetary Affairs, Committee on Government Operations, U.S. House of Representatives, January 1989.

Research methodology and results on deposit insurance included in the report "Deposit Insurance In A Changing Environment", submitted by the Federal Deposit Insurance Corporation (FDIC) to Committee on Banking, Housing and Urban Affairs (U.S. Senate) and Committee on Banking, Finance and Urban Affairs (U.S. House of Representatives), April, 1983.


## PUBLICATIONS

(Book)        A Practical Guide to Bankruptcy Valuation (with R. Reilly). 2nd edition, American Bankruptcy Institute, 2017.

(Book)        A Practical Guide to Bankruptcy Valuation (with R. Reilly). American Bankruptcy Institute, 2013.

(Book)        The National Directory of Public Employee Retirement Systems - 1999 (ed. with A. Michel). Institute of Chartered Pension Professionals.

(Book)        The National Directory of Public Employee Retirement Systems - 1998 (ed. with A. Michel). Institute of Chartered Pension Professionals.

(Book)        The National Directory of Public Employee Retirement Systems - 1997 (ed. with A. Michel). Institute of Chartered Pension Professionals.

(Book)        The National Directory of Public Employee Retirement Systems - 1996 (ed. with A. Michel). Institute of Chartered Pension Professionals.

(Book)        Finance and Accounting for Lawyers (with A. Michel). Legal Financial Press, 1996.

(Book)        The Complete Guide to A Successful Leveraged Buyout (with A. Michel). Dow Jones-Irwin, 1988.

(Book)        Takeover Madness: Corporate America Fights Back (with A. Michel). John Wiley & Sons, 1986.


"Demystifying a Company's Systematic Risk." (with B. Orelowitz), American Bankruptcy Institute Journal, February 2022.

"The Cost-of-Capital Dilemma: Valuation During Abnormal Market Conditions." (with B. Orelowitz and P. Dionne), American Bankruptcy Institute Journal, April 2021.

"The Airline Industry and Covid-19: Saving for a Rainy Day." (with B. Orelowitz), American Bankruptcy Institute Journal, May 2020.

"Do Security Breaches Matter? The Shareholder Puzzle." (with A. Michel and J. Oded), European Financial Management Journal, Vol.26 Issue: 2, pp. 288-315, March 2020.

"Institutional Investors and Firm Performance: Evidence from IPOs." (with A. Michel and J. Oded), <u>North American Journal of Economics and Finance</u>, Vol.51, January 2020.

"What Determines Institutional Investors' Holdings in IPO Firms?" (with A. Michel and J. Oded), <u>International Review of Finance</u>, Forthcoming, accepted for publication in 2020.

"Behavioral Characteristics of IPO Underpricing." (with A. Michel and J. Oded), Venezia, I. (Ed.) <u>Behavioral Finance: How Near is the End?</u> World Scientific Publishers, 2020.

"Credibility Test: Management Projections vs. Market Evidence." (with P. Dionne), <u>American Bankruptcy Institute Journal</u>, August 2019.

"Use and Abuse of Quantitative Bankruptcy Prediction Models." (with P. Dionne), <u>American Bankruptcy Institute Journal</u>, December 2018.

"10 Common Causes of Distress." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, July 2018.

"The Role of the Corporate Finance Expert in Debt-Equity Litigation: Lessons from ScottishPower (Part II)." (with D. Plastino and P. Dionne), <u>Journal of Taxation</u>, April 2018.

"The Role of the Corporate Finance Expert in Debt-Equity Litigation: Lessons from ScottishPower (Part I)." (with D. Plastino and P. Dionne), <u>Journal of Taxation</u>, March 2018.

"Key Valuation Issues in Distressed Investing." (with B. Orelowitz), <u>Journal of Corporate Renewal</u>, January/February 2018.

"Understanding Retail Bankruptcy." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, November 2017.

"Warning Signs of Financial Distress." (with E. Altman), <u>American Bankruptcy Institute Journal</u>, November 2016.

"Judging Fraud: The Case of Relying on Wrong Information." (with B. Orelowitz and E. Weisfelner), <u>American Bankruptcy Institute Journal</u>, August 2016.

"The Predictable Unpredictability of Global Oil Prices, and What It Means for Professionals." (with D. Plastino and P. Dionne), <u>American Bankruptcy Institute Journal</u>, April 2016.

"Index Correlation: Implications for Asset Allocation." (with J. Oded and A. Michel), <u>Managerial Finance</u>, Vol.41 Issue: 11, pp. 1236-1256, 2015.

"Have We Learned from Previous Stock Meltdowns?" (with A. Michel), <u>American Bankruptcy Institute Journal</u>, November 2015.

"Contingent Liabilities: GAAP vs. Valuation Perspective." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, August 2015.

"Operating Leverage: The Often-Overlooked Risk Factor." (with D. Plastino), <u>American Bankruptcy Institute Journal</u>, April 2015.

"Decision Trees for Decision-Makers." (with D. Plastino), <u>American Bankruptcy Institute Journal</u>, February 2015.

"Capital Adequacy and the Debt-Refinancing Assumption." (with P. D'Arezzo and D. Plastino), <u>American Bankruptcy Institute Journal</u>, December 2014.

"Role of Uncertainty in Determining a Distressed Company's Fate." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, October 2014.

"Muni Bonds, Pension Liabilities and Investment Due Diligence."  (with B. Orelowitz and Susan Mangiero), <u>American Bankruptcy Institute Journal</u>, July 2014.

"FMV and Going-Concern Value Compared: An Expert's Perspective."  (with B. Orelowitz), American <u>Bankruptcy Institute Journal</u>, April 2014.

 "Ownership Structure and Performance: Evidence from the Public Float in IPOs." (with Jacob Oded and Allen Michel), <u>Journal of Banking and Finance</u>, January 2014.

"Buyouts Gone Bad: Common Themes in Failed Leveraged Transactions."  (with David Plastino and Paul D'Arezzo), <u>American Bankruptcy Institute Journal</u>, December 2013.

"Cornerstone of Financial Decision-Making: Credible Projections." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, October 2013.

"The Valuation of NOLs in a Bankruptcy Reorganization." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, July 2013.

"Quantifying the Impact of Fraud: Application of the Guideline Publicly Traded Company Approach." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, April 2013.

"A Primer to Cost of Capital for the Distressed/Bankrupt Company." (with P. D'Arezzo), American <u>Bankruptcy Institute Journal</u>, February 2013.

"Soft Capital, Hard Times: Distressed Professional and Financial Services Firms." (with D. Plastino), <u>American Bankruptcy Institute Journal</u>, October 2012.

"Case Studies in Corporate Bankruptcy Valuation." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, August 2012.

"Debtor Beware: Double-Edged Sword of Financial Leverage." (with D. Plastino), <u>American Bankruptcy Institute Journal</u>, April 2012.

"Bankruptcy Valuation Hearings: As Highly Contested as Ever." (with B. Orelowitz), <u>American Bankruptcy Institute Journal</u>, November 2011.

"To Be or Not to Be Confirmed: A Debtor's Post-Reorganization Viability." (with P. D'Arezzo), <u>American Bankruptcy Institute Journal</u>, December/January 2011.

"Not All Buybacks Are Created Equal: The Case of Accelerated Stock Repurchases." (with A. Michel and J. Oded), <u>Financial Analysts Journal</u>, Volume 66, No. 6, November/December 2010.

"Comparable Company Valuation Methodology: Details Often Overlooked." (with B. Orelowitz and M. Marcus), <u>American Bankruptcy Institute Journal</u>, April 2010.

"Playing the Market (Approach): Going Beyond the DCF Valuation Methodology." (with D. Plastino and P. D'Arezzo), <u>American Bankruptcy Institute Journal</u>, December/January 2010.

"A Review of Fairness Opinions and Proxy Statements: 2005-2006." (with S. Kempainen), <u>Journal of Applied Finance</u>, Volume 19, No. 1&2, 2009.

"Earnings: Quality vs. Quantity." (with D. Plastino and P. D'Arezzo), <u>American Bankruptcy Institute Journal</u>, April 2009.

"Financial Crisis of 2008 and Preliminary Framework for Analyzing Financially-distressed Firms." (with D. Plastino and P. D'Arezzo), <u>American Bankruptcy Institute Journal</u>, December/January 2009.

"Company Valuation: How Good is Goodwill?" (with D. Plastino and P. D'Arezzo), <u>American Bankruptcy Institute Journal</u>, April 2008.

"Liquidity and Control Valuation Discounts/Premiums and the Bankrupt Firm." (with D. Plastino and P. D'Arezzo), <u>American Bankruptcy Institute Journal</u>, December/January 2008.

"Capturing the Complexity: The Importance of Financial Analysis in an Asbestos Bankruptcy Filing." (with H. Tullar). <u>American Bankruptcy Institute Journal</u>. May 2007.

"Had the Information Been Known: Lessons from Enron's Insolvency." (with A. Michel and D. Plastino), <u>American Bankruptcy Institute Journal</u>, December/January 2007.

"Understanding Fair Market Value in Bankruptcy." (with A. Michel and S. Kempainen), <u>American Bankruptcy Institute Journal</u>, May 2006.

"The *Mirant* Valuation Saga: Epic Battle of Experts."  (with A. Michel, B. Orelowitz, and M. Marcus), <u>American Bankruptcy Institute Journal</u>, December/January 2006.

"Fraud-on-the-market Theory: Is a Market Efficient?" (with A. Michel and S. Feinstein), <u>American Bankruptcy Institute Journal</u>, May 2005.

"Fiduciary Responsibility: The Case of Defined Contribution Plans." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, December/January 2005.

"Valuation of Credit Guarantees: An Application of Economic Theory in Litigation." (with S. Feinstein and A. Michel), <u>Journal of Forensic Economics</u>, Winter 2004.

 "Fair Market Value and Built-in Capital Gains: Economic Rationale Should Prevail."   (with C. Grimm and A. Michel), <u>American Bankruptcy Institute Journal</u>, May 2004.

"Solvency Analysis: A Primer on Applying Discounted Cash Flow." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, December/January 2004. (Reprinted in <u>Bankruptcy Law Section Newsletter</u>, Boston Bar Association, April 2004.)

"An Analysis of the Relevance and Bias of Analyst Recommendations: The Case of Bankrupt Companies." (with A. Michel), <u>The Financier</u>, Vol. 10, Nos. 1-4 2003.

"The Preference Claims Puzzle: Wealth Transfer Implications of Controversial Judicial Preference Rulings." (with A. Michel and H. Tullar). <u>Litigation Economics Review</u>, Vol. 6, No. 1, 2003.

"Bias in Analyst Recommendations: The Curious Case of Bankrupt Companies." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, June 2003.

"What Drives Firms to Distress? Seven Common Causal Factors." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, December/January 2003.

"Deepening Insolvency: Plaintiff vs. Defendant." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, May 2002.

"Does the Stock Market Differentiate Winners from Losers? The Case of One-vs. Two-Time Bankruptcy Filers." (with A. Michel and C. McHugh), <u>The Financier</u>, Vol. 9, Nos. 1-4 2002.

"Understanding Insurance Companies in Financial Distress." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, December/January 2002.

"Managing Your Expert for a Successful Outcome: The 10 Commandments." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, May 2001.

"The Paradox of Corporate Bankruptcy in a Robust Economy." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, November 2000.

"Post-Bankruptcy Operating Performance: Two-Time Filers vs. One-Time Filers." (with A. Michel and C. McHugh), <u>American Bankruptcy Institute Journal</u>, March 2000.

"Chapter 22s: Lessons of Two-Time Bankruptcies." (with A. Michel and C. McHugh), <u>The Financier</u>, Summer/Autumn 1999.

"Protecting Future Product Liability Claimants." (with A. Michel and S. Feinstein), <u>American Bankruptcy Institute Journal</u>, December/January 1999.

"Valuing the Financially Distressed Firm." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, April 1999.

"Post-bankruptcy Results: Is There Life After Death?" (with A. Michel and C. McHugh), <u>American Bankruptcy Institute Journal</u>, December/January 1999.

"Emerging from Bankruptcy: Can an Ugly Duckling Turn into a Swan?" (with A. Michel and C. McHugh), <u>Financial Analysts Journal</u>, May/June 1998. (Reprinted in <u>The Machinery & Technical Specialties Journal,</u> March 1999.)

"Creating Value in the Distressed Firm." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, May 1998.

"Value Creation: Lessons from Failed Acquisitions." (with A. Michel), <u>American Bankruptcy Institute Journal</u>, November 1997.

"Creating Value Through EVA: Myth or Reality?" (with A. Michel and P. Leroy), <u>The Journal of Strategy and Business</u>, Fourth Quarter 1997.

"Lessons from Failed Corporate Marriages: Transactional Myopia and Organizational Overconfidence." (with A. Michel), <u>Strategy and Business</u>, Fourth Quarter, 1996.

"Corporate Acquisitions in the 1990s: Paying Attention to Information Technology" (with N. Pliskin, M. Buck-Lew and C. Wardle), <u>Journal of General Management</u>, Winter 1992.

"A Survival Kit for Recovering Funds from Junk Bond Defaults." (With A. Michel and G. Landy), <u>Financial Analysts Journal</u>, Fall 1992.

"Valuation of Damage Claims: An Application of Corporate Finance." (with A. Michel), <u>Journal of Business Finance and Accounting</u>, April 1992.

"Protecting Confidential Information: What Works?" (with A. Michel and S. Hamid), <u>Commercial Lending Review</u>, Spring 1992.

"Fraudulent Conveyance in Leveraged Buyouts: The Financial Issues" (With A. Michel), <u>Cornerstone Research</u>, February 1992. (Reprinted in <u>The Corporate Growth Report</u>, March 1992.)

"RJR Nabisco: A Case Analysis of a Complex Leveraged Buyout" (with A. Michel). <u>Financial Analysts Journal</u>, September/October, 1991.

"An Evaluation of Investment Banker Acquisition Advice: The Shareholders' Perspective" (with A. Michel and You-Tay Lee). <u>Financial Management</u>, Summer 1991.

"The Foreign Acquirer Bonanza: Myth or Reality?" (With A. Michel and D. McClain). <u>Journal of Business Finance & Accounting</u>, April 1991.

"Innovations in Corporate Finance: Convertible Exchangeable Preferred Stock" <u>Butterworth's Journal of International Banking and Financial Law</u>, July 1990.

"The Application of Corporate Finance to the Courtroom: The Case of Damage Valuation - A Reply" (with A. Michel). <u>Financial Management</u> Letters, Spring 1990.

"What Every LBO Lender Must Know About Valuation" (with A. Michel). <u>Commercial Lending Review</u>, Spring 1990.

"The LBO Nightmare: Fraudulent Conveyance Risk" (with A. Michel). <u>Financial Analysts Journal</u>, March-April, 1990.

"The Risk/Return Paradox Revisited" (with A. Michel). <u>Public Administration - Economic and Finance:</u> <u>Current Issues in the North American and Caribbean Countries</u>, edited by E. Ortiz, CIDE/NAEFA, Mexico, 1989.

"Assessing LBO Risk: The Case of Fraudulent Conveyance" (with A. Michel). <u>Financial Management</u> Letters, Winter 1989.

"The Application of Corporate Finance to the Courtroom: The Case of Damage Claim Valuation" (with A. Michel). <u>Financial Management</u> Letters, Autumn 1989.

"Leveraged Buyouts: The Financial Issues" (with A. Michel). <u>Journal of Corporate Finance</u>, Spring 1988.

"Corporate Takeovers: Excess Returns and the Multiple Bidding Phenomena" (with A. Michel). <u>Journal of Business Finance and Accounting</u>, Summer 1988.

"The Merger Game: Are Acquirers Victims of the Winner's Curse?" (with R. Dickie and A. Michel). <u>Journal of General Management</u>, Summer 1988.

"Trucking Deregulation and Motor-Carrier Performance: The Stockholders' Perspective" (with A. Michel). <u>Financial Review</u>, May 1987.

"Multinational Corporations vs. Domestic Corporations: Financial Performance and Characteristics" (with A. Michel), <u>Journal of International Business Studies</u>, Spring 1987.

"Airline Deregulation and the Probability of Air-Carrier Insolvency" (with A. Michel), <u>Financial Review</u>, February 1987.

"Country and Industry Influence on Dividend Policy: Evidence from Japan and the U.S." (with A. Michel), <u>Journal of Business Finance and Accounting</u>, Autumn 1986.

"Are Multinational Corporations Safer?" <u>Journal of International Business Studies</u>, Vol. 17(1), Spring 1986.

"Industry Influence on Pension Funding" (with A. Michel), <u>Journal of Portfolio Management</u>, Spring 1986.

"The Proprietary Hospital Industry: A Financial Analysis 1972- 1982" (with A. Michel and J. Daley), <u>Social Science and Medicine</u>, Vol. 21, 1985.

"International Equity Market and the Investment Horizon" <u>Journal of Portfolio Management</u>, February 1985.

"Does Business Diversification Affect Performance?" (with A. Michel).  <u>Financial Management</u>, Winter 1985.

"Japanese Leverage:  Myth or Reality?" (with A. Michel).  <u>Financial Analysts Journal</u>, July/August 1985.

"Are Conglomerates Safer?" (with A. Michel).  <u>Research in Finance</u>, edited by H. Levy, JAI Press, Inc., Greenwich, CT., 1985.

"Measuring Prospective Probabilities of Insolvency:  An Application to the Life Insurance Industry."  <u>Journal of Risk and Insurance</u>, March 1985.

"Evaluating Merger Performance" (with A. Michel).  <u>California Management Review</u>, Spring 1985.

"The Valuation of FDIC Deposit Insurance Using Option-Pricing Estimates" (with A. Marcus). <u>Journal of Money, Credit and Banking</u>.  November 1984. (Reprinted in <u>The Regulation and Supervision of Banks</u>, edited by Maximilian J.B. Hall, Reader in Banking and Financial Regulation, The University of Loughborough, April 2000.)

"Airline Performance Under Deregulation: The Shareholders' Perspective" (with A. Michel). <u>Financial Management</u>, Summer 1984.

"The Relationship Between Accounting Measures and Prospective Probability of Insolvency: An Application to the Banking Industry" (with A. Marcus).  <u>Financial Review</u>, February 1984.


## BOOK REVIEWS

(Book review of) George J. Benston <u>Financial Services: The Changing Institutions and Government Policy</u>, Prentice-Hall, Inc., Englewood Cliffs, New Jersey, 1983.  <u>Southern Economic Journal</u>, January 1985.

(Book review of) Kallberg, G. and K. Parkinson <u>Current Asset Management</u>, John Wiley & Sons, Inc., 1984 <u>Journal of Finance</u>, June 1985.


## OTHER PUBLICATIONS

"Analyzing the Insolvent Firm: The Case of Deepening Insolvency" (with A. Michel).  <u>Bankruptcy Law Section Newsletter</u>, Boston Bar Association, July 2001.

"Fraudulent Conveyance: The Financial Issues" (with A. Michel).  <u>Massachusetts Lawyers Weekly,</u> April 5, 1993.

"A Guide to Corporate Valuation: Gaining Credibility and Avoiding Pitfalls" (with A. Michel).  <u>Massachusetts Lawyers Weekly</u>, April 5, 1993.

"Seller Beware: Yesterday's LBO Success May Breed Tomorrow's Legal Nightmares" (with A. Michel). <u>Institutional Investor</u>, December 1990.

"Buying and Selling the American Dream: Advice on Small Business Transactions" (with A. Michel).  <u>Bostonia</u>, March/April 1990.

"Takeovers Are Not to Blame" (with A. Michel).  <u>Computerworld</u>, Vol. XXIV, No. 11, March 1990.

"Corporate Takeovers Needed In A Healthy, Free Market" (with A. Michel).  <u>The Boston Globe</u>, January 16, 1990.

"Takeovers: Corporate Hemlock or the Key to a Productive Corporate America?" (with A. Michel). <u>CFO Magazine</u>, January 1990.

"The Lessons of Congress: Corporate America Should Listen and Take Notice" (with A. Michel). <u>Bostonia</u>, November/December, 1989.

"Survival of the Fittest: Do Corporate Mergers Weed Out Underachievers? (with A. Michel). <u>Bostonia</u>, September/October, 1989.

"Europe 1992: Without Clear Policies, Corporate America Could Be Shut Out" (with A. Michel). <u>Bostonia</u>, July/August, 1989.

"Europe's Economic Walls: Breaking Them Down Will Require Cooperation and Compromise" (with A. Michel). <u>Bostonia</u>, May/June 1989.

"Our Banana Republic: If We Continue as a Service Based Economy, We Are a Nation at Risk" (with A. Michel). <u>Bostonia</u>, March/April 1989.

"Wall Street Fallout: The Stock Market Isn't Decidedly Republican or Democratic" (with A. Michel). <u>Bostonia</u>, January/February, 1989.

"OPEC: Tiger or Paper Tiger?" (with A. Michel). <u>Bostonia</u>, November/December, 1988.

"Bearish, Bullish, or Foolish? An Investment Guide for the Perplexed" (with A. Michel). <u>Bostonia</u>, September/October 1988.

"Corporate Takeovers Aren't Just a Feeding Frenzy" (with A. Michel). <u>Bostonia</u>, July/August 1988.

"The Leveraged Buyout Market" (with A. Michel). <u>The Robb Report</u>, July 1988.

"Poison Pills Are Tough to Swallow" (with A. Michel). <u>Bostonia</u>, May/June 1988.

"Are Airline Incentives Just Pie in the Sky" (with A. Michel). <u>Bostonia</u>, March/April 1988.

"Bonds: The 'Safe' Alternative" (with A. Michel). <u>Bostonia</u>, January/February 1988.

"Free Enterprise Under Siege" (with A. Michel). <u>Bostonia</u>, November/December 1988.

"Time Sharing's Promises, Prizes, and Pitfalls" (with A. Michel). <u>Bostonia</u>, September/ October 1987.

"Massachusetts Capitalism: Many Shares, No Votes" (with A. Michel). <u>The Boston Globe</u>, July 28, 1987.

"Credit Bureaus: Who's Rating Whom?" (with A. Michel). <u>Bostonia</u>, June/July, 1987.

"The Blackmailing of Corporate America" (with A. Michel). <u>Bostonia</u>, April/May, 1987.

"Do the Massachusetts' Blue Sky Laws Protect Investors?" (with A. Michel). <u>Bostonia</u>, February/March, 1987.

"Witches, Computers and Stock Market Volatility" (with A. Michel), <u>Bostonia</u>, December/January, 1987.

"In Banking the Word is Revolution, not Evolution" (with A. Michel). <u>Bostonia</u>, October/November, 1986.

"Takeover Madness" (with A. Michel). <u>B.U. Today</u>, Vol. 3 No. 4, September 4, 1986.

"Battling the Hostile Attack: Can the Shareholder Win?" (with A. Michel). <u>Cornell Enterprise</u>, Spring 1986.

"Battling Corporate Raiders" (with A. Michel). <u>Boston Business Journal</u>, June 23, 1986.

"Turning a Profit from Takeover Attempts" (with A. Michel). Lead editorial article, <u>The Wall Street Journal</u>, June 4, 1986.


Quoted in numerous nonacademic papers/magazines, including:

| | |
|---|---|
| Akron Beacon Journal | Knight Ridder Tribune Business News |
| Associated Press | The Lexington Herald Leader (KY) |
| Belleville News (IL) | London Financial Times |
| Boston Business Journal | Los Angeles Times |
| The Boston Globe | New England Times |
| The Boston Herald | New York Magazine |
| Business Week | The Orange County Register |
| Business Week Careers | The Orlando Sentinel |
| Christian Science Monitor | The Pantagraph Bloomington (IL) |
| The Cincinnati Post | The Patriot Ledger (Quincy, MA) |
| Dallas Morning News | The San Francisco Chronicle |
| The Economic Time (India) | Schenectady Gazette (NY) |
| Employment Review | Seattle Post - Intelligencer |
| The Financial News | Standard Times |
| The Harrisburg Patriot | The Star - Ledger (NJ) |
| Hartford Courant | Telegram & Gazette (Worcester, MA) |
| Houston Chronicle | The Tulsa Tribune |
| INC. Magazine | The Wall Street Journal |
| Industry Week | Worcester Business Journal |
| The Journal Record | Worcester Telegram & Gazette |

## WORKS UNDER JOURNAL REVIEW/IN PROGRESS

### BOOKS IN PROGRESS

<u>The Complete Guide to Corporate Valuation</u> (with B. Orelowitz and S. Kempainen)


## T.V./RADIO PROGRAMS

(TV) "Airline Deregulation." <u>TV-4's</u> "Live on 4", Boston, January 7, 1986.

(Radio) "Takeover Madness." A one hour talk show, <u>WKOX-1200</u>, Framingham, MA, June 10, 1986.

(Radio) "Takeover Defenses." Lawrence Ingram's Highlite, <u>WNWK-FM</u>, New York City, June 11, 1986.

(TV) "Takeover Madness." <u>Financial News Network (FNN)</u>, June 17, 1986.

(TV) "The Case of People Express." <u>TV-5</u>, Boston, June 23, 1986.

(Radio) "Takeover Defenses." <u>AMEX Business Talk</u>, aired by a syndication of 10 different radio stations, New York City, June-July, 1986.

(Radio) "The Stock Market." <u>WMRE AM 1510</u>, Boston, September 15, 1986.

(Radio) "The Tax Reform." <u>WMRE AM 1510</u>, Boston, September 29, 1986.

(TV) "The Gillette-Revlon Takeover Battle." <u>TV-5</u>, Boston, November 16, 1986.

(TV) "The Gillette-Revlon Takeover Battle." <u>TV-5</u>, Boston, November 19, 1986.

(Radio) "The Gillette-Revlon Takeover Battle." <u>WBUR-90.9 FM</u>, Boston, November 20, 1986.

(Radio) "The Gillette-Revlon Takeover Battle." <u>WMJX-106.7 FM</u>, Boston, November 24, 1986.

(TV) "The Gillette-Revlon Takeover Battle." <u>TV-5</u>, Boston, November 24, 1986.

(TV) "Continental Airline Pricing Strategy." <u>TV-5</u>, Boston, January 29, 1987.

(Radio) "Continental Airline Pricing Strategy." <u>WBUR-90.9 FM</u>, Boston, February 2, 1987.

(Radio) "Abuses of Inside Information on Wall Street." <u>WMJX-106.7 FM</u>, Boston, February 22, 1987.

(Radio) "The Gillette-Revlon Takeover Battle (Round II)." <u>WMJX-106.7 FM</u>, Boston, June 19, 1987.

(Radio) "The Gillette-Revlon Takeover Battle (Round II)." <u>WBUR-90.9 FM</u>, Boston, June 19, 1987.

(TV) "Eastern Airline's Financial Strategy." <u>TV-5</u>, Boston, July 30, 1987.

(TV) "A Profitability Analysis of the Airline Industry." <u>TV-4</u>, Boston, August 1, 1987.

(Radio) "The Shearson-E.F. Hutton Merger." Barry Gray's Talk Show, <u>WMCA</u>, New York City, December 3, 1987.

(Radio) "The Dart Group-Stop & Shop Takeover Battle." <u>WBUR-90.9 FM</u>, Boston January 22, 1988.

(Radio) "The Federated Department Stores - Campeau-Macy's Takeover Battle." <u>WBZ-1030 AM</u>, Boston, March 1, 1988.

(Radio) "The Federated Department Stores - Campeau-Macy's Takeover Battle." <u>WBZ-1030 AM</u>, Boston, March 30, 1988.

(Radio) "The Gillette-Coniston Partners Proxy Fight." <u>WFCR-88.5 FM</u>, Amherst, April 20, 1988.

(TV) "Eastern Airline's Financial Strategy." <u>TV-7</u>, Boston, July 15, 1988.

(TV) "The Pillsbury-Grand Metropolitan Takeover Battle." <u>TV-7</u>, Boston, December 19, 1988.

(TV) "The Financial Scandal Involving A Dean Witter's Broker." <u>TV-5</u>, Boston, February 14, 1989.

(Radio) "The Eastern Airline Strike." <u>WEEI-590</u>, Boston, March 3-4, 1989.

(TV) "The Eastern Airline Strike." <u>TV-56</u>, Boston, March 5, 1989.

(TV) "The Eastern Airline Strike." <u>TV-4</u>, Boston, March 6, 1989.

(Radio) "The Eastern Airline Strike." <u>WEEI-590</u>, Boston, March 8, 1989.

(TV) "The Eastern Airline Strike." <u>TV-5</u>, Boston, March 9, 1989.

(TV) "Peter Ueberroth's Attempt To Buy Eastern." <u>TV-4</u>, Boston, April 11, 1989.

(TV) "The October 1989 Stock Market Crash." <u>TV-7</u>, Boston, October 16, 1989.

(TV) "The Financial Condition of Drexel Burnham Lambert." WQTV-68, Boston, February 12, 1990.

(TV) "The Recent Economic Indicators:  Good News or Bad News?" TV-5, February 21, 1990.

(Radio) "The Norton-BTR Takeover Battle."  WBZ-AM 1030, April 20-26, 1990.

(TV) "The Acquisition of the Foxboro Corporation".  TV-5, June 26, 1990.

(TV) "The Divestiture of Tobacco Companies' Stocks".  PBS-The Nightly Business Report, July 5, 1990.

(TV) "The Airline Industry Profitability and Fuel Prices". TV-4, November 16, 1990.

(TV) "The FDIC Guideline for Deposits In Failed Banks". TV-4, Boston, January 7, 1991.

(TV) "The FDIC Handling of The Bank of New England Bankruptcy".  TV-4, Boston, January 8, 1991

(TV) "Pan Am's Filing For Bankruptcy".  TV-4, Boston, January 8, 1991.

(TV) "The Airline Industry's Fare War", TV-56, April 10, 1992.

(TV) "Airline Deregulation:  Does It Work," TV-56, April 23, 1992.

(TV) "Talk of New England:  The Merger/LBO Mania in Perspective". New England Cable News, May 24, 1992.

(TV) "The Fare War In the Airline Industry," New England Cable News, May 11, 1993.

(TV) "The Cruise Line Industry," New England Cable News, March 16, 1994.

(TV) "The Media Mergers", TV-5, July 31, 1995.

(TV) "The Media Mergers", TV-68, August 1, 1995.

(TV) "Analysis of U.S. Air Buyout Possibility", New England Cable News, October 3, 1995.

(TV) "The Bank of Boston - Baybanks Merger", TV-68, December 13, 1995.

(TV) "Analysis of Discount Air Carriers," New England Cable News, May 15, 1996.

(TV) "The Business Implications of TWA's Crash," New England Cable News, July 18, 1996.

(Radio) "Trends in Business Education," WBUR 90.9, July 25, 1996.

(Radio) "The FTC Intervention in the Staples-Office Depot Merger," WBZ-AM 1030, March 10, 1997.

(Radio) "The Staples-Office Depot Merger," WBZ-AM 1030, July 1, 1997.

(Radio) "The Citicorp-Travelers Merger," National Public Radio (NPR), April 7, 1998.

(TV) "Logan Airport Flight Delays," New England Cable News, September 13, 1999.

(TV) "MCI Worldcom Acquisition of Sprint," TV-4, October 5, 1999.

(TV) "Potential Expansion of Logan Airport," New England Cable News, March 20, 2000.

(TV) "Possible US Air Flight Attendant Strike," New England Cable News, March 22, 2000.

(TV) "Analysis of the Failed Microsoft Settlement," TV-4's "Live on 4", TV-4, Boston, April 2, 2000.

(TV) "Analysis of the Proposed Merger of United Airlines and US Airways," New England Cable News, May 24, 2000.

(TV) "Financial Distress of Converse, Inc.," New England Cable News, October 18, 2000.

(TV) "Impact of Pilot Slowdown on Delta Airlines," New England Cable News, December 5, 2000.

(TV) "Economic Impact of the September 11th Terrorist Attacks on the Airline Industry," New England Cable News, September 13, 2001.

(TV) "Economic Impact of the September 11th Terrorist Attacks on the Airline Industry," New England Cable News, September 17, 2001.

(Radio) "Airlines Versus Other Competing Modes of Transportation," WRKO-AM 680, September 25, 2001.

(TV) "Airlines Versus Other Competing Modes of Transportation," New England Cable News, September 26, 2001.

(TV) "Analysis of New Airport Security Proposals," New England Cable News, November 1, 2001.

(TV) "Business Impact of Crash of American Airlines Flight 587 on Airline Industry," New England Cable News, November 12, 2001.

(TV) "Analysis of New Federal Airport Security Proposals," New England Cable News, November 13, 2001.

(TV) "Analysis of Amtrak Proposed Service Cuts," New England Cable News, February 1, 2002.

(TV) "Analysis of Amtrak Reform Council Proposals," New England Cable News, February 7, 2002.

(TV) "Analysis of New MassPort Chief Executive Officer," New England Cable News, April 11, 2002.

(TV) "Analysis of Raytheon's Financial Performance," New England Cable News, June 18, 2002.

(TV) "Analysis of Federal Airport Security," New England Cable News, November 19, 2002.

(TV) "Analysis of Possible United Airlines Bankruptcy," New England Business Day. New England Cable News, December 5, 2002.

(TV) "Analysis of United Airlines Bankruptcy Filing," New England Cable News, December 9, 2002.

(TV) "Impact of Iraq War on Massachusetts Defense Companies," New England Cable News, March 25, 2003.

(TV) "Impact of Iraq War on U.S. Airline Industry/Emergence of U.S. Air from Bankruptcy," New England Cable News, April 1, 2003.

(TV) "An Analysis of the International Air Travel Industry," New England Cable News, May 15, 2003.

(TV) "An Analysis of the Proposed Layoffs at American Airlines," New England Cable News, July 2, 2003.

(TV) "An Analysis of Federal Subsidies for Amtrak," New England Cable News, October 6, 2003.

(TV) "Analysis of Jet Blue's New Boston Service," Greater Boston, WGBH, January 15, 2004.

(TV) "Analysis of U.S. Airways Bankruptcy." New England Cable News, September 13, 2004.

(TV) "Analysis of Airbus Super Jumbo and Competition with Boeing." <u>New England Cable News</u>, January 18, 2005.

(TV) "Influence of London Terrorist Attacks on Financial Markets." <u>Channel 7</u>, July 8, 2005.

(Radio) "Analysis of Gillette's shareholders' approval of the Gillette-P&G Merger Proposal." <u>WBUR</u>, July 12, 2005.

(Radio) "Analysis of Adidas-Reebok Merger." <u>WBUR</u>, August 3, 2005.

(TV) "Financial Condition of Delta and Implications for Logan Airport's Terminal A." <u>WGBH</u>, August 11, 2005.

(TV) "Analysis of Northwest and Delta Airlines Bankruptcy Filings." Business Day. <u>New England Cable News</u>, Boston, September 14, 2005

(TV) "Verizon Communications Plan to Cut Managers' Pensions." Business Day, <u>New England Cable News</u>, Boston December 6, 2005.

(TV) "Boston Scientific's Revised Bid for Guidant." <u>New England Cable News</u>, January 17, 2006.

(TV) "An Analysis of U.S. Airways Group's Bid to Acquire Delta Airlines." <u>New England Cable News</u>. November 15, 2006.

(TV) "The Sale of GE's Plastics Division to Saudi Arabia's Saudi Basic Industries." <u>New England Cable News</u>, May 18, 2007.

(TV) "Analysis of Virgin America (new airline)." <u>New England Cable News</u>, July 19, 2007.

(TV) "Analysis of Airports' Prospective Challenges." <u>New England Cable News</u>, November 21, 2007.

(TV) "Analysis of Merger Between Anheuser-Busch and InBev." <u>WCBV</u>, July 14, 2008.

(TV) "Analysis of United/Continental Merger." <u>New England Cable News</u>, April 30, 2010.

(TV) "United customers face delays from grounded Boeing 757s." <u>New England Cable News</u>, February 16, 2011.

(TV) "Partisan Dispute to Partially Shut Down FAA." <u>WCVB Channel 5 News</u>, July 22, 2011.

(TV) "Facebook Planned IPO." <u>Fox News</u>, November 29, 2011.

(TV) "The Potential Consequences of Boeing 787 Dreamliners' Problems." <u>New England Cable News</u>, January 7, 2013.

(TV) "Analysis of the American Airlines-U.S. Air Merger." <u>New England Cable News</u>, November 12, 2013.

(TV) "U.S. Airport Safety-Re: Belgium Attack." <u>WCVB-TV5, Boston</u>, March 23, 2016.

(TV) "Maintained Enhanced Security at Logan Airport After Istanbul Attack." <u>New England Cable News,</u> June 29, 2016.

(TV) "Perspectives on the Stock Market." <u>Channel 7, CBS Boston</u>, February 5, 2018.

(TV) "Perspectives on the Stock Market." <u>Channel 25, FOX Boston</u>, February 6, 2018.

**CASES ON TAKEOVER DEFENSES**

"T. Boone Pickens Plays Pac-Man" Mesa Petroleum vs. Cities Services

"Corporate World War III" Bendix vs. Martin Marietta

"Movies, Vodka, and Fried Chicken - Pac Man Entertainment" General Cinema vs. Heublein

"The Halloween Surprise: Mobil's Trick or Treat" Mobil vs. Marathon

"The Carriage Trade Defense: Racketeering Charges and Lock-Ups" Carl Icahn vs. Marshall Field

"The Treasury Lock-Up: Putting the Aggressor in Handcuffs" Ampco-Pittsburgh vs. Buffalo Forge

"It All Started with 'Young Lady, Everything Has a Price" Western Pacific Industries vs. Cone Mills

"The Bass Family, the Belzbergs, and a Surprise Guest" The Bass Brothers and the Belzbergs vs. Suburban Propane

"Is the Winner a Victim of 'The Winner's Curse'?" Williams Cos. vs. Northwest Energy

"T. Boone Pickens Strikes Again: A Self-Tender Christmas Present" Mesa Petroleum vs. General American Oil

"Battling the Posner Attack" SEPCO vs. Graniteville

"My Grand Plan Is to Stay Out of Trouble" Coastal Corp. vs. Texas Gas Resources

"While the San Francisco 49ers Fought Their Way to a Superbowl Victory, A Crown Jewel War Was Kicked Off" Whittaker vs. Brunswick

"Marvin Is Burning the House Down: A Fatman Defense" Gearhart Industries vs. Smith International

"King of Spirits and Queen of Minerals: An All-Canadian Scorched Earth War" Joseph E. Seagram & Sons vs. St. Joe Minerals

"A New Course in the Curriculum: 'How to Bake A Poison Cake'" National Education vs. Bell & Howell

"The 'Dallas' Stage: Oil Barons, Boardroom Backbiting, and Courtroom Drama" Tesoro Petroleum vs. Enstar

"From Woodrow Wilson to Nancy Reagan: The China-Gate and the Poison Pill" Brown Foreman vs. Lenox

"The Great Textile Battle: Will Carl Icahn Sew Up Dan River?" Carl Icahn vs. Dan River

"The Grumman Pension Fund Dilemma: LTV or Loyalty" LTV vs. Grumman

"The Unfriendly Skies" Texas International Airlines vs. Continental Airlines

"The T. Boone Pickens Philosophy: The Most Fertile Oil Field Is the Floor of the New York Stock Exchange" Mesa Petroleum vs. Gulf Oil

"Irwin Jacobs' Tavern: Everything You Ever Wanted in A Beer, and More" Irwin Jacobs vs. Pabst Brewing

"What Did Odysseus Say Returning from Troy? 'You're Going to Like Us, TWA'" Odyssey Partners vs. Trans World Corporation

**CASES ON LEVERAGED BUYOUTS**

"Metromedia - King Kluge's Golden Touch"

"ARA Services - A Defensive LBO?"

"Shoe Corporation of America (SCOA) - An LBO Close to the Heart"

"Levi Strauss - 'Thank You Bruce Springsteen'"

"Gibson Greetings - The Granddaddy of LBOs"

"Thatcher Glass - The Price of Failure"

"Brentano's - Trimming Dead Wood"

"Macy's:  Shopping for an LBO"

"Dr. Pepper's Battleground:  The Cola Wars and the Bidding Battles"

"How Sweet Is Holly Sugar?"

"Mary Kay's Cosmetic:  Going Private"

"The Battle for Storer:  Coniston vs. KKR"

"A Pantry Raid at Revlon"

"Gambling for Jobs:  The Wierton Steel ESOP Leveraged Buyout"

"The Dan River ESOP:  A Product of Carl Icahn's 'Scare 'Em Strategy'"

"The Sharks and the Blue Bell ESOP:  Playing in the Big Leagues with the Bass Brothers and the Belzbergs"

**CASES IN MANAGEMENT INFORMATION SYSTEMS**

Jointly financed by the Jerusalem Institute of Management and Harvard Business School:
- Rim-Jerusalem Furniture Ltd.
- Ha'retz Daily Newspaper Ltd.
- Makhteshim-MIS
- Isasbest

**A SELECT LIST OF PRESENTATIONS**

"Corporate Valuation: Before, During and Post-Pandemic" Valuation Conference, The American Bankruptcy Institute (ABI), Ritz-Carlton, New Orleans, LA, May 2, 2023.

"The Role of the Financial Expert in Bankruptcy Litigation" Boston Bar Association, October 18, 2021.

"Chesapeake Case Study" Valuation Conference (Valcon 2021), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA), Virtual, May 12, 2021.

"The Cost of Equity: How Much Do You Want It to Be?" Valuation Conference (VALCON 2020: How to Flex When in Flux), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA), Four Seasons, Las Vegas, Nevada, February 27, 2020.

"Understanding a Company's True Financial Health" Mayer Brown LLP, New York, NY, February 11, 2020.

"Valuing a Privately Held Company" Chicago Bar Association, Chicago, IL, February 5, 2020.

"Cross Examining a Valuation Expert" Chicago Bar Association, Chicago, IL, January 30, 2020.

"Cross Examining a Valuation Expert" Massachusetts Bar Association, Boston, MA, January 28, 2020.

"Valuing a Company" Coller School of Management, Tel-Aviv University, Israel, January 8, 2020.

"Cross Examination of a Securities Expert Witness" New York City Bar Association, New York, NY, December 16, 2019.

"Market Evidence in Valuation Disputes" (a panel format) New York City Bankruptcy Litigation Roundtable (sponsored by the Institutional Investor Educational Foundation (IIEF)), New York, NY, October 25, 2019.

"Use and Abuse of Quantitative Bankruptcy Prediction Models" Valuation Conference (VALCON 2019: Cutting-Edge Valuation Solutions), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA), Four Seasons, Las Vegas, Nevada, February 28, 2019.

"Private Equity Dividend Recapitalization: The Case of Retail Distress" Coller School of Management, Tel-Aviv University, Israel, December 26, 2018.

"Director Duties in Restructurings, Bankruptcy Avoidance Action, Cross-Border Insolvency, and Credit Document Loopholes" (a panel format) New York City Bankruptcy Litigation Roundtable (sponsored by the Institutional Investor Educational Foundation (IIEF)), New York, NY, November 30, 2018.

"Understanding Retail Bankruptcy: The Case of Payless ShoeSource Inc." Valuation Conference (VALCON 2018: Cutting-Edge Valuation Solutions), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA), Four Seasons, Las Vegas, Nevada, May 17, 2018.

"Challenging Valuation Analyses: The Investment Banker's Perspective" Coller School of Management, Tel-Aviv University, Israel, December 28, 2017.

 "Understanding Retail Distress: The Case of Payless ShoeSource" Institutional Investor's Global Shareholder Activism Conference, New York City, November 30-December 1, 2017.

"Application of Financial Theory to Damages Calculation in the Medical Field" Coller School of Management, Tel-Aviv University, Israel, March 29, 2017.

"Valuation Assumptions: Case Studies of Failed Tests of Reasonableness" Valuation Conference (VALCON 2017: Emerging Valuation Issues in Bankruptcy and Beyond), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA) and the University of Texas School of Law, Four Seasons, Las Vegas, Nevada, March 3, 2017.

"Bankruptcy Ideas Worth Spreading" TED Talk, Winter Leadership Conference, The American Bankruptcy Institute (ABI), Terranea Resort, Rancho Palos Verdes, CA, December 3, 2016.

"Valuation Discounts Under Siege: The Case Against Irrationality" (with B. Orelowitz), LandVest, Boston, MA, November 14, 2016.

"Institutional Investors and Firm Performance: Evidence from IPOs" (with A. Michel and J. Oded) Seminar at Boston University Questrom School of Business, Boston, MA, October 11, 2016.

"E&P Restructurings, Private Equity Sponsors in Chapter 11 Cases, and LBO Transactions" (a panel format) New York City Bankruptcy Litigation Roundtable (sponsored by the Institutional Investor Educational Foundation (IIEF) and Grant and Eisenhofer), New York, NY, October 6, 2016.

"Valuation of Social Media Assets" Valuation Conference (VALCON 2016: Emerging Valuation Issues in Bankruptcy and Beyond), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA) and The University of Texas School of Law, Four Seasons, Las Vegas, Nevada, March 16, 2016.

"Delaware Appraisal Actions Roundtable" Institutional Investor Foundation, New York, NY, February 24, 2016.

"Expert Witness in U.S. Tax Court" The American Law Institute Conference on Handling Tax Controversy: Current Trends in Civil Tax Controversies and Litigation, Washington D.C., October 8-9, 2015.

"Assessment and Quantification of Long-Term, Unliquidated Debt" Valuation Conference (VALCON), The American Bankruptcy Institute (ABI) and Association of Insolvency & Restructuring Advisors (AIRA), Four Seasons, Las Vegas, Nevada, February 25, 2015.

"Valuation Issues in the Bankruptcy Arena" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, December 24, 2014.

"Kerr-McGee and Fraudulent Conveyance Actions, No Action Clauses, In Pari Delicto, and an Update on Detroit and State and Municipal Restructurings" (a panel format) New York City Bankruptcy Litigation Roundtable (sponsored by Grant & Eisenhofer and the Institutional Investor Educational Foundation (IIEF), New York, NY, June 5, 2014.

"A Comparison of the Role of the Financial Expert in Bankruptcy: USA vs. Israel" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, January 5, 2014.

"Cross-Examining a Financial Expert in Valuation Cases: The Key Issues" Sullivan & Worcester, Boston, MA, November 5, 2013.

"Ownership Structure and Performance: Evidence from the Public Float in IPOs" World Finance Conference, Larnaka, Cyprus, July 1, 2013.

"Debt vs. Equity Panel" International Fiscal Association.  Boston, MA, April 25, 2013.

"Valuation of the Closely Held Business" Hartford Business Roundtable, Hartford, CT, May 21, 2013.

"Getting Down to Business: The Valuation of Closely Held Companies for Compensation and Employee Separation Purposes" Boston Business Roundtable (sponsored by Murtha Cullina LLP), Boston, May 14, 2013.

"The Role of the Financial Expert in the Bankruptcy Process" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, December 31, 2012.

"Ownership Structure and Performance: Evidence from the Public Float in IPOs" Eastern Finance Association Annual Meeting, Boston, April 13, 2012.

"Bankruptcy: The Good, the Bad and the Ugly" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, January 2, 2012.

"The Role of the Financial Expert in Bankrupt Company's Valuation" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, May 9, 2011.

"Not All Buybacks Are Created Equal: The Case of Accelerated Stock Repurchases." 2010 FMA Annual Meeting, New York, New York, October 20-23, 2010.

 "The Role of the Financial Expert in Bankrupt Company's Valuation" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, March 10, 2010.

"The Role of the Financial Expert in Bankrupt Company's Valuation" American Society of Appraisal (ASA) - Business Valuation (BV), Boston, October 19, 2009.

"A Guide to Corporate Valuation: Gaining Credibility and Avoiding Pitfalls" Kasowitz, Benson, Torres & Friedman, LLP, New York City, June 3, 2009.

"The Role of the Financial Expert in Fraudulent Conveyance Litigation" Mecklenberg County Bar W.D.N.C. Bankruptcy Seminar, Charlotte, North Carolina, May 8, 2009.

"Bankruptcy: A Company's Decline is a Financial Expert's Chance to Shine" Leon Recanati Graduate School of Business Administration, Tel-Aviv University, Israel, June 16, 2008.

"Enron's Value: How Low Did It Go?" Financial Management Association Annual Meeting, Salt Lake City, Utah, October 13, 2006.

"Mergers & Acquisitions: History & Current Trends" (with H. Tullar), Alumni Reunion Affair, October 8, 2006.
"Cross-Border Mergers & Acquisitions" Boston University Breakfast Briefing, New York City, New York, April 24 and 25, 2006.

"Valuation: Art or Science?  The Attorney's Perspective" Boston University, Boston, Massachusetts, January 26, 2006.

"Key Valuation Issues: The Attorney's Perspective" The American Corporate Counsel Association, Boston, Massachusetts, November 16, 2005.

"Highly Contested Valuation Battles: The Case of Mirant Corp" (with A. Michel), Financial Management Association Annual Meeting, Chicago, Illinois, October 14, 2005.

"On-Going Court Valuation Disputes: Built-in Capital Gains" (with A. Michel), Financial Management Association Annual Meeting, New Orleans, Louisiana, October 7, 2004.

"Relevant Financial Issues for ERISA Attorneys" (with A. Michel), U.S. Department of Labor, Boston, Massachusetts, March 30, 2004.

"Deepening Insolvency: Plaintiff vs. Defendant" (with A. Michel), Financial Management Association Meeting, Denver, Colorado, October 9, 2003.

"Analysis of Fraudulent Conveyances/Preferences" (with A. Michel), NYU Law School, New York, New York, November 22, 2002.

"Fraudulent Conveyance/Preferences: Plaintiff vs. Defendant Perspectives" (with A. Michel), Financial Management Association Meeting, San Antonio, Texas, October 17, 2002.

"Valuation Perspectives" American Electronics Association's (AeA) M&A Conferences Series, Waltham, Massachusetts, June 25, 2002.

"Analysis of Fraudulent Conveyances/Preferences" (with A. Michel), Harvard Law School, Boston, Massachusetts, March 2, 2002.

"Analysis of Fraudulent Conveyances/Preferences" (with A. Michel), Boston Bar Association Meeting, Boston, Massachusetts, January 12, 2002.

"Evaluating the Reasonability of Management's Projections" (with A. Michel), Financial Management Association Meeting, Toronto, Canada, October 19, 2001.

"The Role of the Financial Expert in Complex Litigation" (with A. Michel), Financial Management Association Meeting, Seattle, Washington, October 27, 2000.

"The Many Facets of a Valuation Case: An Expert Witness' Perspective" (with A. Michel), Financial Management Association Meeting, Orlando, Florida, October 7 1999.

"Valuing Damages: Compensatory and Punitive" Financial Management Association Meeting, Chicago, IL, October 15, 1998.

"Business Damages" (with A. Michel), Bingham Dana, Boston, Massachusetts, April 21, 1998.

"Emerging from Bankruptcy: Analysis of Disclosure Statement Projections" (Co-chaired Panel Session), Financial Management Association Meeting, Honolulu, Hawaii, October 16, 1997.

"Creating Shareholder Value," Coopers & Lybrand's Financial Services Power Learning Series, Dallas, Texas, July 11-14, 1997.

"Analysis of Control Premium Court Decisions 1980-1995" (Co-chaired Panel Session) Financial Management Association Meeting, New Orleans, Louisiana, October 10, 1996.

"Emerging Markets' Securities: Myth and Reality" The Central Bank of Trinidad, June 21, 1996.

"Financial Tools Applied to Marketing Decisions" Universidad Peruana de Ciencias Aplicadas, Lima, Peru, April 10, 1996.

"Key Issues Facing the Expert Witness" (Co-chaired Panel Session), Financial Management Association 25th Annual Meeting, New York, New York, October 21, 1995.

"Controversial Issues in the Courtroom: The Role of the Expert Witness" (Chaired Panel Session), Financial Management Association 24th Annual Meeting, St. Louis, Missouri, October 13, 1994.

"Corporate Acquisitions: Industry Influence on Target Performance," (with A. Michel), Financial Management Association 23rd Annual Meeting, Toronto, Canada, October 13-16, 1993.

"The Winner's Curse and Multiple Bidding Phenomena: The Shareholders' Perspective" (with A. Michel), Financial Management Association 23rd Annual Meeting, Toronto, October 13-16, 1993.

"Pitfalls in Corporate Valuation: The Attorney's Perspective" (with A. Michel), The Corporate Law Committee of the Boston Bar Association, Boston, Massachusetts, May 11, 1993.

"Do Poison Pills Matter? Evidence from the 80s" (with A. Michel and S. W. Kim), Financial Management Association Meetings, Chicago, October 1991.

"Mergers and Acquisition for Middle-Market Companies" (with A. Michel), CFO Seminars, New York City (Co-chairman of the conference's Program Committee), May 16-17, 1991.

"Financing Alternatives for Middle-Market Companies" (with A. Michel), CFO Seminars, New York City (Co-chairman of the conference's Program Committee), June 13-14, 1991.

"Cost Containment for Middle-Market Companies" (with A. Michel), CFO Seminars, New York City (Co-chairman of the conference's Program Committee), June 20-21, 1991.

"An Evaluation of Investment Banker Acquisition Advice: The Shareholders' Perspective" (with A. Michel and Y. T. Lee), Financial Management Association Meetings, Orlando, October 1990.

"Financing Alternatives for Middle-Market Companies" (with A. Michel), CFO Seminars, New York City (Co-chairman of the conference's Program Committee), November 1-2, 1990.

"Maximizing Cash Flow" (with A. Michel), CFO Seminars, New York City (Co-chairman of the conference's Program Committee), November 29-30, 1990.

"Multinational Corporations vs. Domestic Corporations: Financial Performance and Characteristics" Conference on Research in International Finance, Jouy En Josas, France, June 19-20, 1986.

"The Foreign Acquirer Bonanza: Myth or Reality?" (with A. Michel, D. McClain), North American Economics and Finance Association Meetings, New Orleans, December 1986.

"The Risk/Return Paradox Revisited," (with A. Michel), North American Economics and Finance Association Meetings, New York, December, 1985.

"The Case of Multiple Bidding: Are Acquirers Victims of the Winner's Curse?" (with A. Michel), Western Finance Association, Phoenix, June, 1985.

"Do Target Firms' Shareholders Gain from Multiple Bidding?" (with Allen Michel), Twentieth Annual Conference of the Western Finance Association, Scottsdale, Arizona, 1985.

"Are Conglomerates Safer?" (with A. Michel), North American Economics and Finance Associations Meetings, Dallas, December 1984.

"Are Multinational Corporations Safer?" Annual Meetings of the Allied Social Science Associations (also: The North American Economics and Finance Association), Dallas, Texas, December 28-30, 1984.

"Airline Performance Under Deregulation: The Shareholder's Perspective" (with A. Michel), Financial Management Association Meetings, Toronto, October 1984.

"Are Conglomerates Safer?" (with A. Michel), Financial Management Association Meetings, Toronto, October 1984.

"Airline Deregulation and Financial Performance of Air Carriers" (with A. Michel), Eastern Economics Association, Boston, March 1983.

"Measuring Life Insurance Company Safety: An Integrative Approach" and "The Valuation of FDIC Deposit Insurance Using Option-Pricing Estimates" L 'association Francaise de Finance 4th International Meeting, Carry-Le-Rouet, France, June 9-10, 1983.

"The Valuation of FDIC Deposit Insurance: Empirical Estimates Using the Option Pricing Framework" (with A. Marcus), The Annual Meetings of the Allied Social Science Associates, New York City, December 1982.

## A SELECT LIST OF MEMBERSHIPS

The American Finance Association (AFA)

Financial Management Association (FMA)

American Bar Association (ABA) (Associate)

American Bankruptcy Institute (ABI)

National Association of Forensic Economics (NAFE)

Association of Insolvency & Restructuring Advisors (AIRA)