# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MALLINCKRODT PLC, *et al.*, | : | Case No. 20-12522 (JTD) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| | : | |
| OPIOID MASTER DISBURSEMENT TRUST II, | : | Adversary Proceeding |
| | : | |
| Plaintiff, | : | No. 22-50435 (JTD) |
| | : | |
| v. | : | |
| | : | |
| ARGOS CAPITAL APPRECIATION MASTER FUND LP, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS THE AMENDED COMPLAINT AS TO
DEFENDANTS TOWER RESEARCH CAPITAL LLC, SPIRE X TRADING LLC, AND
LATOUR TRADING LLC PURSUANT TO THE PROTOCOL ORDER RELATING TO
CONDUITS, NON-TRANSFEREES, "STOCKBROKERS,"
"FINANCIAL INSTITUTIONS," "FINANCIAL PARTICIPANTS,"
AND DISSOLVED ENTITIES**

# TABLE OF CONTENTS

I. Tower Research Is A Non-Transferee .................................................................................. 1

II. Latour And Spire X Are Protected By The Section 546(e) Safe Harbor ............................ 5

    A. The Share Repurchases Are "Qualifying Transactions" ......................................... 5

    B. Latour And Spire X Are Qualifying Participants ..................................................... 6

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*,
    397 B.R. 1 (S.D.N.Y. 2007) ................................................................................3

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006) ..............................................................................12

*Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*,
    806 F. Supp. 2d 662 (S.D.N.Y. 2011) .................................................................9

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) ...............................................................................2

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ..........................................................................................13

*CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*,
    506 B.R. 346 (S.D.N.Y. 2014) ............................................................................7

*Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*,
    896 F.2d 54 (3d Cir. 1990) ..................................................................................7

*Doherty v. Allstate Indem. Co.*,
    734 F. App'x 817 (3d Cir. 2018) .......................................................................13

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000) ................................................................................................8

*Iannacone v. IRS (In re Bauer)*,
    318 B.R. 697 (Bankr. D. Minn. 2005) ................................................................3

*Lockhart v. Hoenstine*,
    411 F.2d 455 (3d Cir. 1969) ..............................................................................15

*Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*,
    181 F.3d 505 (3d Cir. 1999) ................................................................................6

*M.S. v. Susquehanna Twp. Sch. Dist.*,
    969 F.3d 120 (3d Cir. 2020) ..............................................................................12

*Moore v. Int'l Paint, L.L.C.*,
    547 F. App'x 513 (5th Cir. 2013) ......................................................................13

*Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*,
    321 B.R. 388 (Bankr. D. Del. 2005) ...................................................................3

*Opioid Master Disbursement Trust II v. Covidien Unlimited Company (In re
    Mallinckrodt plc)*,
    2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024) ..............................................6

*Resol. Tr. Corp. v. Aetna Cas. & Sur. Co. of Illinois*,
    25 F.3d 570 (7th Cir. 1994) ................................................................................7

*Trustees of the IBEW Local 351 Pension Fund v. GLNetwork, Inc.*,
    2021 WL 5567820 (D.N.J. Nov. 29, 2021) ........................................................5

*Warner v. Zent*,
    997 F.2d 116 (6th Cir. 1993) ..............................................................................7

*Westchester Cnty. Sav. & Loan Ass'n v. Legel Braswell Gov't Sec. Corp. (In re
    Legel, Braswell Gov't Sec. Corp.)*,
    648 F.2d 321 (5th Cir. 1981) ..............................................................................7

**STATUTES**

11 U.S.C. § 101 ..............................................................................................7, 8, 9, 10, 14

11 U.S.C. § 546 .............................................................................................................1, 5, 15

11 U.S.C. § 550 .............................................................................................................1

11 U.S.C. § 741 .............................................................................................................8, 10

**RULES**

Fed. R. Civ. P. 12 ..........................................................................................................2

Fed. R. Evid. 702 ..........................................................................................................13

**OTHER AUTHORITIES**

Adam Hayes, *Off-Balance Sheet (OBS) Activities: Types and Examples*,
    Investopedia (Nov. 12, 2023), https://www.investopedia.com/terms/o/off-
    balance-sheet-obs.asp ........................................................................................11

Oppenheimer Holdings Inc., Annual Report (Form 10-K) (Mar. 7, 2014),
    https://www.sec.gov/Archives/edgar/data/791963/000119312514089419/d
    666451d10k.htm .................................................................................................11

The Tower Defendants[1] submit this reply in support of their Protocol Motion and in response to the Opposition filed by the Trust [D.I. 350] (the "Opposition" or "Opp.").

Like the Protocol-Based Motions filed by Citadel Securities, Susquehanna Securities, the TRP Defendants, and the Renaissance Defendants, this Protocol Motion presents a straightforward application of Sections 550 and 546(e) of the Bankruptcy Code. Tower Research should be dismissed pursuant to Section 550 because it is a "Non-Transferee." It is a manager that never received proceeds of the Share Repurchases and did not have the right to use any such proceeds for its own benefit.

Spire X and Latour did receive the proceeds of the alleged trades. But they, too, should be dismissed, in each of their cases pursuant to Section 546(e). As explained in the CS/SSLLC Motion and CS/SSLLC Reply Brief,[2] the Share Repurchases are quintessential "settlement payments" and transfers made "in connection with a securities contract," and thus are "qualifying transactions." As to the "qualifying participant" prong, the Trust concedes that Latour is a financial participant, disputing only Spire X's status. But like Latour, Spire X also had securities contracts exceeding the statutory threshold for "financial participant" status, and thus is a "qualifying participant" as well. The Court should grant the Protocol Motion.

**I.  Tower Research Is A Non-Transferee**

1.      Like its opposition to the TRP Motion [D.I. 271], the Trust's Opposition does not (and cannot) dispute the dispositive law. The Trust does not contest that Section 550 of the Bankruptcy Code allows it to recover an avoided transfer only from a "transferee." Opp. ¶ 5. It also does not dispute that an entity is a "transferee" only where it both (1) is the "*recipient* of the

---

[1] Unless otherwise defined, terms have the meanings provided in the Tower Defendants' motion [D.I. 286] (the "Protocol Motion" or "Mot.").

[2] [D.I. 346] (the "CS/SSLLC Reply Brief").

property" to be avoided and (2) has the "right to put the money *to [the recipient's] own purposes*." *Id.* ¶¶ 5-6 (quoting *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (emphasis added)).

2. As Tower Research showed with a sworn declaration, it did not receive the proceeds of the Share Repurchases at all, let alone for its own purposes. Firsenbaum Decl., Ex. 2 ¶¶ 4-6. The Trust neither submits nor points to any contrary evidence, nor does the Trust suggest any basis on which to question Tower Research's sworn declaration. Because one cannot be a transferee if one did not receive the transfer to be avoided—again, a legal proposition the Trust does not, and cannot, dispute—these facts are dispositive on the transferee issue and should be the end of the matter.

3. The Trust (Opp. ¶¶ 7-8 & n.7) resists this conclusion, however, asserting that its mere *allegations* in its Amended Complaint that Tower Research received the Share Repurchase proceeds should be sufficient to carry the day. But that contention simply ignores the Protocol Order. Tower Research has brought a "Protocol-Based Motion" pursuant to the Protocol Order, not a Rule 12(b)(6) motion. And under the Protocol Order, which the Trust agreed to and jointly submitted to the Court with Defendants, the Court may on this motion consider the evidence exchanged between the Parties pursuant to the Protocol process. *See* D.I. 185-1 ¶ 11(b); *see also* Mot. ¶¶ 26, 53; CS/SSLLC Reply Br. ¶ 15.

4. In those exchanges, Tower Research provided the Trust with a sworn declaration that Tower Research never received the proceeds of the alleged sales of Mallinckrodt stock identified in Exhibit B to the Amended Complaint. Firsenbaum Decl., Ex. 2 ¶¶ 4-6. That is the end of the matter. Tower Research cannot be a transferee if it never received the payments that

the Trust seeks to avoid. *See supra* ¶ 2.[3]

5.   Even evaluated under the pleading standard that the Trust seeks to have this Court apply, the Trust's case still fails. As explained in the TRP Reply Brief [D.I. 348] and the Protocol Motion, the Trust has the burden of pleading that Tower Research was a transferee, which requires the Trust to plead that Tower Research had dominion and control over the proceeds of the Share Repurchases. TRP Reply Br. ¶ 3 & n.3 (citing cases); *see also* Mot. ¶¶ 23-25, 27. The Trust undisputedly has not made any such allegations in its Amended Complaint. And though it tries, the law does not permit the Trust to shift the burden to Tower Research. *See* TRP Reply Br. ¶ 3; *see also* Mot. ¶¶ 23, 27.

6.   Rather than engage with these points, the Trust rehashes the same arguments it made in response to the TRP Motion—that Tower's status as a fiduciary to and agent of Spire X is irrelevant; that Tower's discretionary authority over Spire X's securities trading renders it liable as a "transferee"; and that two irrelevant cases, *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1 (S.D.N.Y. 2007), and *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388 (Bankr. D. Del. 2005), support that position. *See* Opp. ¶¶ 10-27. All of these arguments are without merit and contrary to settled law—for the reasons explained in Tower Research's motion (¶¶ 27-35), as well as TRP's Motion and TRP's Reply Brief. Tower Research incorporates the TRP arguments here. *See* TRP Mot.

---

[3] The Trust's treatment of *Iannacone v. IRS (In re Bauer)*, 318 B.R. 697 (Bankr. D. Minn. 2005), proves the point. The Trust tries (Opp. ¶ 8 n.7) to distinguish *Iannacone* based on the explanation that the defendant there "merely directed the flow of funds *but was not a recipient of the funds*," and "[h]ere, the Amended Complaint alleges that Tower [Research] received [proceeds] from Mallinckrodt." (emphasis added). But again, on this Protocol Motion, the Trust cannot rely on conclusory allegations in its Amended Complaint; the uncontroverted evidence shows that Tower Research, like the defendant in *Iannacone*, never received the proceeds. The holding of *Iannacone* thus further supports Tower Research's dismissal.

3

¶¶ 35-44; TRP Reply Br. ¶¶ 5-14.

7. As to Tower Research specifically, the Trust points (Opp. ¶¶ 11-12) to certain provisions of Spire X's LLC Agreement and the Grant of Authority showing that Tower Research had the authority, as manager, to trade securities or otherwise make management decisions for Spire X. But the Trust misses the point. As to the LLC Agreement, the Trust either ignores that the relevant provisions require Tower Research to act in the name of or on behalf of Spire X, *see, e.g.*, Firsenbaum Decl., Ex. 9 at Ex. A at 3 ("affecting the business and affairs *of [Spire X]*"); *id.* at 4 ("the authority to bind *[Spire X]*"), or it selectively deemphasizes portions of those provisions that allocate all of Spire X's profits and losses, not to the "Manager," but entirely to the "Member"[4] *see id.* at 4 ("profits and losses shall be allocated *entirely to the Member*" (emphasis added)); *id.* at 5 (profits "to be distributed *to the Member*" (emphasis added)).[5] The same goes for the Grant of Authority. The Trust in particular (Opp. ¶ 12) seizes on the provision authorizing Tower Research to trade Spire X securities "in any manner." But the Trust ignores the universally applicable, dispositive provision of that document: that Tower Research only has the authority to "perform the following functions *in the name and on behalf of the Company [Spire X]*."[6] Firsenbaum Decl., Ex. 9 at Ex. B at 1. Thus, at all times, Tower Research acted—and only had authority to act—*as Spire X's agent* and on *Spire X's behalf*,

---

[4] Contrary to the Trust's characterizations (*e.g.*, Opp. ¶¶ 10, 14), Tower Research was the "Manager," not "Managing *Member*," of Spire X. *See* Firsenbaum Decl., Ex. 9 at Ex. A.

[5] The remaining provisions of the LLC Agreement cited by the Trust (Opp. ¶ 11) are equally irrelevant. The provisions show only that Spire X granted Tower Research, its *manager*, the unsurprising authority to *manage* Spire X's day-to-day operations. Those provisions do not say, or in any way show, that Tower Research could use Spire X assets or securities for Tower Research's own purposes or that it could hold any Spire X accounts for its own purposes. *See* Opp. ¶ 11 (citing provisions granting authority to appoint officers and to issue Spire X shares).

[6] Indeed, as Tower Research has explained, it was Spire X's fiduciary and was required *by law* to act in the best interests of Spire X. *See* Mot. ¶ 30 n.6 (citing cases).

4

including when trading securities. *See* Mot. ¶¶ 34-35; *see also* TRP Reply Br. ¶¶ 10-11. Under the case law, that is what matters. *See* Mot. ¶¶ 34-35 (citing cases); *see also* TRP Reply Br. ¶¶ 10-11. Nothing cited by the Trust shows that Tower Research had any authority to use Spire X's proceeds to trade *for Tower Research's own benefit*, or otherwise to put Spire X's proceeds to *Tower Research's* own benefit.

8. The Trust's final contention is a half-hearted "suggest[ion]" (Opp. ¶ 17) that Tower Research is the alter ego of Spire X and, for that reason, constitutes the transferee of the Share Repurchase proceeds. For authority, the Trust cites only *Trustees of the IBEW Local 351 Pension Fund v. GLNetwork, Inc.*, 2021 WL 5567820 (D.N.J. Nov. 29, 2021), but that case did not concern any question of transferee status under the Bankruptcy Code. Rather, the court applied the alter ego doctrine to an employment dispute, to "prevent employers from evading their obligations under labor laws." *Id.* at *3. The defendant, an individual, was the sole shareholder, owner, and supervisor of two separate entities and thoroughly disrespected corporate formalities. *See id.* Here, Tower Research has shown the opposite. Tower Research was Spire X's manager and, as the corporate documents show, was required at all times to manage Spire X to serve Spire X's interests. Firsenbaum Decl., Ex. 9 at Exs. A-C, E-G.[7]

## II. Latour And Spire X Are Protected By The Section 546(e) Safe Harbor

### A. The Share Repurchases Are "Qualifying Transactions"

9. The Tower Defendants incorporate by reference paragraphs 31-52 of the CS/SSLLC Motion and 1-13 of the CS/SSLLC Reply Brief, which demonstrate that the Share

---

[7] Moreover, the alter ego issue was before the *GLNetwork* court on the plaintiff's unopposed motion for a default judgment, which required the Court to accept as true the allegations in the plaintiff's complaint. 2021 WL 5567820, at *3. Here, Tower's Protocol-Based Motion relies on sworn evidence demonstrating that it was Spire X's agent and fiduciary.

Repurchases—payments of cash for stock—are quintessential "settlement payments" as well as transfers "in connection with a securities contract," and thus are "qualifying transactions" (and why the Trust waived any argument to the contrary). *See* CS/SSLLC Motion ¶¶ 31-52; *see also* CS/SSLLC Reply Br. ¶¶ 1-15.

10. The only new point made by the Trust in the Opposition (¶ 31) is flatly wrong. This Court's decision in *Opioid Master Disbursement Trust II v. Covidien Unlimited Company (In re Mallinckrodt plc)*, 2024 WL 206682 (Bankr. D. Del. Jan. 18, 2024), did not turn on New York law. Rather, *Covidien* relied on the Third Circuit's holding in *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999), that, under the Bankruptcy Code, a "settlement payment" is "the transfer of cash or securities made to complete a securities transaction." *Id.* at *15.

B. Latour And Spire X Are Qualifying Participants

11. Latour demonstrated that it is a financial participant. Mot. ¶ 40. The Trust does not dispute this. Opp. at 2 n.3 & ¶ 46 n.57. Latour therefore should be dismissed.

12. Spire X, too, has demonstrated that it is a financial participant. Mot. ¶¶ 41-42. Spire X provided audited financial statements, corroborating trading data, three sworn declarations, and other financial records demonstrating that, on statutorily relevant dates, it (1) had mark-to-market positions in repurchase and reverse repurchase agreements of over $300 million, and (2) received an extension of credit with a mark-to-market position of over $300 million. *Id.*; *see also* Firsenbaum Decl., Ex. 2 ¶ 7 & Ex. A at 26; *id.*, Ex. 9 at Exs. D-G. Both showings exceed the relevant $100 million statutory threshold. *Id*.

13. The Trust makes six arguments in response, none of which has merit.

14. The Trust's *first*, and primary, argument (*see* Opp. ¶¶ 34-43) is that Spire X's repurchase and reverse repurchase agreements should be considered "loans" and, as such, the

6

agreements can support "financial participant" status only if their "principal amount outstanding" exceeded the $1 billion threshold under the first prong of the financial participant definition in 11 U.S.C. § 101(22A). That argument is wrong for multiple reasons.

15. To start, repurchase and reverse repurchase agreements are *not* loans; they are contracts under which parties agree to sell, and later repurchase, securities.[8] Even the Trust's own authorities recognize this self-evident proposition. *See, e.g.*, *Cohen v. Sav. Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 896 F.2d 54, 55 (3d Cir. 1990) ("From one point of view, repurchase agreements *are nothing more than contracts for purchase and sale of securities*. Repurchase agreements have been so characterized for purposes of determining the rights of creditors vis-a-vis the Trustee in these proceedings." (emphasis added)). All that the Trust's authorities and argument establish is that repurchase and reverse repurchase agreements mimic loans "[a]s a matter of economic substance." Opp. ¶ 34; *see id.* (citing *Cohen*, 896 F.2d at 55 (repurchase agreements "*closely resemble* secured loans") (emphasis added); *id.* ¶ 34 n.28 (citing *Resol. Tr. Corp. v. Aetna Cas. & Sur. Co. of Illinois*, 25 F.3d 570, 579 (7th Cir. 1994) ("repurchase agreements are '*in the nature of*'" a loan) (emphasis added)).[9]

---

[8] The Trust's own asserted expert recognizes the same, offering authority that a repurchase agreement "is structured *legally* as a sale and repurchase of securities." Opp., Ex. A ¶ 18 (emphasis added).

[9] *See also id.* ¶ 34 n.28 (citing *Warner v. Zent*, 997 F.2d 116, 120 & n.1 (6th Cir. 1993) (repos are "*similar to* [] collateralized loan[s]" and were "*in effect*" a loan)) (emphasis added); *id.* (citing *Westchester Cnty. Sav. & Loan Ass'n v. Legel Braswell Gov't Sec. Corp. (In re Legel, Braswell Gov't Sec. Corp.)*, 648 F.2d 321, 324 n.5 (5th Cir. 1981) (a repo is "*essentially*" a loan)) (emphasis added); *id.* (citing *CarVal Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*, 506 B.R. 346, 355 n.6 (S.D.N.Y. 2014) (repos are "more *akin to* secured loans")) (emphasis added).

7

16.     This matters because the only reason the Trust seeks to recharacterize repurchase and reverse repurchase agreements as loans is so that it can argue that Spire X must satisfy the $1 billion threshold of "principal amount outstanding" for financial participant status under the first prong of § 101(22A). But being economically "akin to" a loan is not the same as being a loan as a matter of law.

17.     The Trust's argument is also wrong as a matter of statutory interpretation. The Bankruptcy Code's definition of "securities contract" distinguishes between, on the one hand, "repurchase or reverse repurchase transaction[s] on any such security," and, on the other hand, "loans," such as "mortgage loan[s]," "margin loan[s]" and "any loan transaction coupled with a securities collar transaction." 11 U.S.C. § 741(7)(A). The definition of "repurchase agreement" also refutes the Trust's argument; it defines "repurchase agreement" *not* as a loan, but rather, as relevant here, as any "agreement, including related terms, which provides for the transfer of one or more . . . securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States against the transfer of funds by the transferee of such . . . securities." *Id.* § 101(47)(A)(i).

18.     And, if those definitions were not enough, the statutory language at issue here also refutes the Trust's argument. The Trust contends (Opp. ¶ 38) that an entity relying on a repurchase agreement must demonstrate $1 billion in "principal amount outstanding" under § 101(22A)'s first prong. But that is not what the Bankruptcy Code says. Rather, § 101(22A) states that an entity can establish its "financial participant" status based on the entity's "mark-to-market positions" in "repurchase agreement[s]." That explicit textual reference flatly rejects the Trust's convoluted, atextual attempt to limit "financial participant" status in this context to only the "notional or actual principal amount" prong ostensibly applicable to loans. *See Hartford*

8

*Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (construing the Bankruptcy Code and holding "when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (internal citations and quotations omitted)).

19. In its *second* argument (Opp. ¶ 40) the Trust disputes Spire X's status as a financial participant by seeking to overlay the Bankruptcy Code's definition of "financial participant" with a claimed, narrow accounting principle nowhere found in the statute. Citing a few accounting materials and one case—*Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 666 (S.D.N.Y. 2011)—the Trust argues that only one party to a repurchase agreement records *on its balance sheet* its position in securities transacted in a repurchase agreement. *Id.* As the Trust and its supposed expert tell it (Opp. ¶ 40 & Ex. A), while the seller of the securities (in the Trust's telling, the party akin to the borrower) records its securities position on its balance sheet, the purchaser (in the Trust's telling, the party akin to the lender) does not. To quote the Trust's asserted expert: "In its Motion to Dismiss, Spire X *correctly claimed* that the securities underlying a repo agreement are marked-to-market on the balance sheet of the *repo seller*." *Id.*, Ex. A ¶ 33 (first emphasis added); *see also id.* ¶ 24 (same). But, he continues, this would not be the case when "Spire X was not a 'repo seller' but was instead a 'repo buyer.'" *Id.* ¶ 33. The reason this is relevant, the Trust argues (Opp. ¶ 41 & n.45), is that only Tower's mark-to-market positions as a "repo seller" (i.e., repurchase agreements) can count towards the "financial participant" threshold—not its positions as a "repo buyer" (i.e., reverse repurchase agreements).

20. The Trust's argument has no merit. The simple reason is that the principle on which the Trust relies, even if correct as a matter of *balance-sheet accounting*, is wholly irrelevant to the legal question here. Nothing in § 101(22A) defines "financial participant"—or

9

purports to limit "financial participant" status—by reference to balance-sheet accounting rules. *See* 11 U.S.C. § 101(22A). To the contrary, under the prong applicable here (i.e., "gross mark-to-market positions of not less than $100,000,000"), the statute focuses on the *magnitude* of the party's positions in securities contracts, repurchase agreements, and other contracts. *Id.* The Bankruptcy Code deems entities with large positions, measured by the $100 million threshold of § 101(22A), "financial participants" because of the *significance* of their participation in the financial markets. *Id.* Appropriately, with that focus, it matters not whether the entity is the "repo seller" or the "repo buyer."

21. Yet again, the words of the statute are fatal to the Trust's position. What is a repurchase agreement to one side (the repo seller) is a reverse repurchase agreement to the other (the repo buyer). Under the Trust's position, then, only securities positions in repurchase agreements would count towards the financial participant threshold. In defining "securities contract" and "repurchase agreement," however, the Code makes clear that the term covers *both* "repurchase" *and* "reverse repurchase transaction[s]." 11 U.S.C. § 741(7)(A)(i); *id.* § 101(47). In doing so, the Code makes clear that *both* "repo sellers" and "repo buyers" may use the mark-to-market value of their securities positions to establish their financial participant status.

22. Even as an accounting matter, the Trust's view (Opp. ¶ 40) is too narrow. As Spire X explained in its opening brief, and as financial regulators recognize, reverse repurchase agreements *are* recorded as "assets" in audited financial statements, albeit as "off-balance sheet items." *See* Mot. ¶ 49 & n.10 (citing FINRA and CFTC authorities). Contrary to the Trust's assertion (Opp. ¶ 41 n.44), it does not matter whether these regulators, the CFTC and FINRA, regulate Spire X; their guidance demonstrates that accepted accounting standards support the position that "repo buyers" also record the mark-to-market positions of such agreements as off-

balance sheet items.[10] Spire X did just that. And Spire X is not alone. Other companies likewise disclose the fair value of their repurchase and reverse repurchase agreements by describing—in their securities disclosures—the values of their securities positions in those agreements. *See, e.g.*, Oppenheimer Holdings Inc., Annual Report (Form 10-K), at 44 (Mar. 7, 2014).[11] Thus, even if accounting rules did govern over the statutory text (they do not), they confirm that the Trust's "repo seller" versus "repo buyer" distinction is irrelevant.

23. *Third*, apparently recognizing that Spire X's audited financial statement *does* record its positions in *both* its repurchase *and* reverse repurchase agreements, the Trust ultimately resorts (Opp. ¶ 39) simply to recharacterizing the facts set forth in the financial statement, offering (for the first time in this entire process) an expert declaration, in which the purported expert disagrees with the characterization of the amounts as mark-to-market positions. The argument should be rejected for several reasons.

24. To begin, Dr. Shaked's opinion should be disregarded entirely as procedurally improper. The Protocol Order prohibits the Trust from relying on additional grounds not provided in its letter refusing to dismiss the Tower Defendants. *See* Protocol Order ¶ 11(b). And while the Protocol Order (¶ 11(c)) reserves the Trust's right to assert arguments regarding the

---

[10] The Trust's own cited authorities say the same thing. For example, the *Investopedia* article the Trust cites explains that, while "[o]ff-balance sheet (OBS) items are assets or liabilities that do not appear on a company's balance sheet," such items "are *still assets and liabilities of the company*." Adam Hayes, *Off-Balance Sheet (OBS) Activities: Types and Examples*, Investopedia (Nov. 12, 2023), https://www.investopedia.com/terms/o/off-balance-sheet-obs.asp (emphasis added).

[11] In its Form 10-K, Oppenheimer explained that it was providing the value of its repurchase and reverse repurchase agreements by "elect[ing] [to use] the fair value option for those securities sold under agreements to repurchase ('repurchase agreements') and securities purchased under agreements to resell ('reverse repurchase agreements')." *Id.* at 44; *see also id.* (setting forth the "fair value of the reverse repurchase agreements and repurchase agreements"). The cited 10-K can be found at https://www.sec.gov/Archives/edgar/data/791963/000119312514089419/d666451d10k.htm.

sufficiency of the Defendant's showing—*e.g.*, asserting an "objection … to the admissibility into evidence or the taking of judicial notice" of any supporting documentation—the Protocol Order does *not* allow the Trust to submit evidence for the first time in opposition to a Protocol Motion, as it has done here. The Trust neither submitted Dr. Shaked's opinions to the Tower Defendants nor notified them of an intent to present them. Allowing the Trust to do so now would make a mockery of the Protocol Order, which allowed the parties either to resolve issues or hone any dispute through the pre-court process and present *that dispute* to this Court.[12] *See id.* ¶¶ 9, 11(b).

25. Moreover, Dr. Shaked's opinion (Opp. Ex. A ¶¶ 25, 34) on this point is also wrong, as demonstrated by the very evidence he fails to acknowledge or discuss anywhere in his opinion. When Spire X provided the excerpt of its audited financial statement recording its positions in repurchase and reverse repurchase agreements, the Trust asked for corroborating evidence. *See* Firsenbaum Decl., Ex. 4. Spire X provided it—corroborating internal positional data underlying the audited financial statements. *Id.*, Ex. 9 at Ex. D. That positional data showed that the "money" (i.e., mark-to-market) positions of the securities sold and purchased pursuant to the repurchase and reverse repurchase agreements were the same positions disclosed in the audited financial statements. *Id.*, Ex. 9 ¶ 7 & Ex. D.[13] Screenshots of the relevant positional data are provided here for ease of reference; they show that the values of the

---

[12] At minimum, Dr. Shaked's attempt to offer legal testimony in his opinion—such as his numerous applications of the statute to the facts as he opines on them (e.g., Opp. Ex. A ¶¶ 4-5, 34-36)—must be excluded. *See M.S. v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 129 (3d Cir. 2020) (holding that "an expert cannot testify to the legal conclusion"); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("[A]n expert witness is prohibited from rendering a legal opinion.").

[13] As Tower Research's Chief Investment Officer explained, "Column Q of the spreadsheet, titled 'MONEY,' represents the mark-to-market values of the reverse repurchase and repurchase agreements, which . . . were calculated using the market value of the securities purchased and sold by Spire X under the reverse repurchase and repurchase agreements as of December 31, 2019." Firsenbaum Decl., Ex. 9 ¶ 7.

repurchase and reverse repurchase agreements in the audited financial statements are the mark-to-market positions in those agreements (i.e., the "MONEY" column, *see supra* n.13), and not a contractual price or otherwise "principal plus interest agreed to be paid," as Dr. Shaked opines. *See* Opp., Ex. A ¶¶ 25, 34.



26. That the actual evidence—evidence Dr. Shaked simply ignored—contradicts his opinion is yet one more reason to ignore his opinion. Dr. Shaked's failure to address the record evidence means that his opinion falls short of Federal Rule of Evidence 702, which requires any expert opinion to be "based on sufficient facts." *See* Fed. R. Evid. 702(b); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[W]hen indisputable *record facts contradict or otherwise render the opinion unreasonable*, it cannot support a jury's verdict . . . . Expert testimony is useful as a guide to interpreting [] facts, but *it is not a substitute for them*." (emphasis added)); *Doherty v. Allstate Indem. Co.*, 734 F. App'x 817, 823 (3d Cir. 2018) (affirming rejection of expert's opinion in favor of "clear" record evidence); *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515-16 (5th Cir. 2013) (affirming rejection of plaintiff's expert when testimony was "flatly contradicted by all the available evidence").

27. *Fourth*, the Trust's arguments about Spire X's credit and margin loan are equally unpersuasive. The Trust—and its expert—offer no case law or other authority to support their argument that securities purchased pursuant to an extension of credit are not "mark-to-market" positions. *See* Opp. ¶¶ 44-46; *id.*, Ex. A ¶¶ 25, 34. As explained above, the plain language of

13

the statute says otherwise; any "securities contract," including any "extension of credit" and "margin loan" can have mark-to-market positions under 11 U.S.C. § 101(22A). *Supra* ¶¶ 17-18.

28.     *Fifth*, in a seeming after-the-fact aside, the Trust also seeks to justify its refusal to dismiss Spire X with the assertion (Opp. ¶¶ 47-54) that it lacks the evidentiary basis to "verify" the information provided by Spire X pursuant to the Protocol Order. That argument blinks reality.

29.     Indeed, having been supplied with internal positional data used by Spire X that "verifies" Spire X's submission, the Trust and its supposed expert did not even consider it, let alone address it in the Opposition. *See supra* ¶ 25-26. Actions speak louder than words—and these actions confirm that the Trust's demands for documents were never intended to "verify" positions, but rather simply to throw up obstacles to the dismissal of defendants with threshold defenses to the Trust's claims.

30.     As to other information the Trust requests (Opp. ¶ 48), it offers no "good faith" explanation whatsoever as to what use that information would have. *Cf.* Protocol Order ¶ 9. For example, the Trust (Opp. ¶ 49) seeks copies of the repurchase and/or reverse repurchase agreements between Spire X and Cantor Fitzgerald, claiming that Spire X's "internally generated spreadsheet is no substitute for the actual repurchase and reverse repurchase agreements that Spire X entered into with counterparties." But this argument demonstrates the Trust's basic misunderstanding of these instruments. As other Defendants have explained, internal trading data is the primary source for these electronic trades. *See* CS/SSLLC Reply Br. ¶ 18 n.10. Master agreements, like those covering Spire X's repurchase and reverse repurchase agreements, show instead the counterparty and bare financing terms; they do not show the mark-to-market positions of securities purchased and sold pursuant to those agreements (which depend on the

14

market value of those securities on the days in question). *See* Renaissance Reply Br. ¶¶ 11. In any event, the counterparties, repo rates, and market values were provided to the Trust in the backup data it conveniently ignores. Firsenbaum Decl., Ex. 9 at Ex. D.

31. The Trust's argument that none of this evidence can be trusted (Opp. ¶ 51) is equally wrong. The Trust, similar to what it has done for any defendant seeking dismissal under the Protocol Order, points to irrelevant enforcement actions brought against Tower Research and Latour (and notably not Spire X) to claim that Spire X's audited financial statements and internal trading records are somehow untrustworthy. Not only are the enforcement actions entirely irrelevant to the issues here, but Spire X has already provided all the corroboration the Trust needs—*sworn declarations* attesting that the financial statements, *audited by a public auditing firm*, and internal trading data are accurate. *See* Firsenbaum Decl., Exs. 2, 6, 9. The Trust's claims cannot survive based solely on the Trust's "unsubstantiated doubt as to the veracity of [an] opposing [declaration]." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969).

32. *Sixth* and *finally*, the Trust's last arguments—that Section 546(e) defenses require discovery and are purportedly not appropriate for motions to dismiss; that the Trust is a fiduciary with an obligation to verify information; and that the Court cannot take judicial notice of the documents (which the Tower Defendants never argued it should)—have all already been refuted by other defendants who have filed Protocol motions. *See* CS/SSLLC Reply Br. ¶¶ 14-25; Renaissance Reply Br. ¶¶ 5-13. The arguments, as applied to the Tower Defendants, are no different, so the Tower Defendants incorporate those responses here.

33. For these reasons, and those set forth in the Protocol Motion, the Tower Defendants respectfully request that the Court enter the proposed order submitted as Exhibit A to the Protocol Motion dismissing them from the Adversary Proceeding.

Dated: February 28, 2024
Wilmington, Delaware

/s/ Jeremy W. Ryan
Jeremy W. Ryan (No. 4057)
Andrew L. Brown (No. 6766)
**POTTER ANDERSON CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Email: jryan@potteranderson.com
abrown@potteranderson.com

*-and-*

Philip D. Anker *(admitted pro hac vice)*
Noah A. Levine *(admitted pro hac vice)*
Ross E. Firsenbaum *(admitted pro hac vice)*
Michael McGuinness *(admitted pro hac vice)*
Austin M. Chavez *(admitted pro hac vice)*
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8000
Email: philip.anker@wilmerhale.com
noah.levine@wilmerhale.com
ross.firsenbaum@wilmerhale.com
mike.mcguinness@wilmerhale.com
austin.chavez@wilmerhale.com

*Counsel to Defendants Tower Research Capital LLC, Spire X Trading LLC, and Latour Trading LLC.*