**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALLINCKRODT PLC, *et al.*, | ) | Case No. 20-12522 (JTD) |
| | ) | (Jointly Administered) |
| _____Reorganized Debtors._____ | ) | |
| | ) | |
| OPIOID MASTER DISBURSEMENT | ) | |
| TRUST II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 22-50435 (JTD) |
| | ) | |
| ARGOS CAPITAL APPRECIATION | ) | |
| MASTER FUND LP, *et al.*, | ) | |
| | ) | |
| _____Defendants._____ | ) | **Re: D.I. Nos. 215, 217, 242, and 286** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Opioid Master Disbursement Trust II (the "**Trust**") commenced this action

seeking to avoid more than $1 billion in allegedly fraudulent pre-petition transfers made by

debtor Mallinckrodt plc ("**Mallinckrodt**").

The Trust alleges that between 2015 and 2018, Mallinckrodt implemented a program to

repurchase its own shares on the open market (the "**Share Repurchase Program**") in an attempt

to artificially inflate its stock price during a period of decline in Mallinckrodt's value due to its

opioid business.[1]  Altogether, Mallinckrodt repurchased approximately 36 million shares, for

close to $1.6 billion (the "**Share Repurchase Transfers**" or "**Transfers**").

To effectuate the Share Repurchase Transfers, Mallinckrodt entered into a series of

contracts (the "**Purchase Agreements**") with two brokers:  Goldman Sachs & Co. and Morgan

---

[1] Adv. D.I. 1, Complaint; Adv. D.I. 205 Amended Complaint.

Stanley (the "**Brokers**").  Under the Purchase Agreements, Mallinckrodt authorized the Brokers to repurchase shares in the open market or through privately negotiated transactions in accordance with certain price, quantity, and timing terms set forth in the Purchase Agreements.

At the first hearing in this case, in December 2022, counsel for the Trust stated that the Trust was working to identify the proper shareholder defendants and, to that end, had issued more than 350 subpoenas.  The Trust sought, and was granted, multiple extensions of the deadline to serve its complaint to allow for this investigation.

Due to the ever-growing number of defendants in this case, many of whom stated that they intended to assert affirmative defenses that would, if successful, require their dismissal, I entered an order outlining a process for the streamlining of early motions on these issues (the "**Protocol Order**") on May 15, 2023.[2]  Before me now are four motions, filed by (1) Citadel Securities LLC ("**Citadel**") and Susquehanna Securities, LLC ("**Susquehanna**") (the "**Citadel Motion**"); (2) Rock Creek MB, LLC ("**Rock Creek**"), GF Trading LLC ("**GF Trading**"), RIEF Trading LLC ("**RIEF Trading**"), and RIEF RMP LLC ("**RIEF RMP**") (together the "**Renaissance Defendants**") (the "**Renaissance Motion**"); (3) T. Rowe Price Associates, Inc. ("**TRP**") and the T. Rowe Price funds (the "**TRP Funds**")[3] (the "**TRP Motion**"); and (4) Tower

---

[2] Order Approving Protocol for the Dismissal of Conduits, Non-Transferees, "Financial Participants," "Financial Institutions," "Stockbrokers," and Dissolved Entities, Adv. D.I. 185.

[3] The TRP Funds include (1) T. Rowe Price All-Cap Opportunities Fund, Inc.; (2) T. Rowe Balanced Fund, Inc.; (3) T. Rowe Price All-Cap Opportunities Portfolio, a Series of T. Rowe Price Equity Series, Inc.; (4) T. Rowe Price Health Sciences Portfolio, a Series of T. Rowe Price Equity Series, Inc.; (5) T. Rowe Price Equity Index 500 Portfolio, a Series of T. Rowe Price Equity Series, Inc.; (6) T. Rowe Price Moderate Allocation Portfolio, a Series of T. Rowe Price Equity Series, Inc.; (7) T. Rowe Price Global Allocation Fund, Inc.; (8) T. Rowe Price Health Sciences Fund, Inc.; (9) T. Rowe Price Spectrum Conservative Allocation Fund, a Series of T. Rowe Price Spectrum Funds II, Inc.; (10) T. Rowe Price Spectrum Moderate Allocation Fund, a Series of T. Rowe Price Spectrum Funds II, Inc.; (11) T. Rowe Price Spectrum Moderate Growth Allocation Fund, a Series of T. Rowe Price Spectrum Funds II, Inc.; and (12) and T. Rowe Price Value Fund, Inc.

Research Capital LLC ("**Tower**"), Spire X Trading LLC ("**Spire X**"), and LaTour Trading LLC ("**LaTour**") (together the "**Tower Defendants**") (the "**Tower Motion**").[4]

For the reasons detailed below, the Motions are granted.

## LEGAL STANDARD

While the Protocol Order was intended to simplify the process of getting certain questions of law decided quickly, it has instead been the source of another point of contention among the parties. Specifically, the parties' differing views regarding the standard applicable to motions filed pursuant to the Protocol Order has caused confusion about each party's burden with respect to the Motions and the degree to which evidence outside the pleadings can be considered.

The Trust argues that because Movants titled the Motions as "motions to dismiss," the standards applicable to a motion made pursuant to Federal Rule of Civil Procedure 12(b)(6) apply. Under this standard, the Court must accept the truth of all well-pled factual allegations and may only consider a limited universe of documents. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). Movants disagree, arguing that the Motions are not motions made pursuant to Rule 12(b)(6), but are "Protocol Motions," made pursuant to the terms of the Protocol Order. Because the Protocol Order expressly permits the Court to consider the evidence exchanged by the parties in full, Movants contend, the Court is not limited to taking only judicial notice of the Movants' submissions as it would on a motion to dismiss but can consider them for their truth.

---

[4] Citadel Motion, Adv. D.I. 215; Renaissance Motion, Adv. D.I. 242; TRP Motion, Adv. D.I. 217; and Tower Motion, Adv. D.I. 286 (collectively, the "**Motions**").

Having considered both the terms and purpose of the Protocol Order and the substance of the Motions before me, I have determined that it is appropriate to treat the Motions as ones for summary judgment.  The purpose of the Protocol Order was to enable the swift and efficient resolution of certain statutory defenses likely to be asserted by many of the defendants.  As such, the Protocol Order sets forth a process for the parties to exchange information and, if necessary, obtain a prompt ruling from the Court without the need for full discovery on all issues in the case.  The Order provides that if the parties are unable to reach agreement regarding dismissal following the exchange of information under the Protocol, then the defendant may file "a single motion under [the] Protocol to dismiss or for judgment based on the asserted Defense(s)" which motion may include for consideration by the Court the documentation exchanged by the parties during the negotiation process.[5]

The Motions before me, though titled "Motions to Dismiss," do not specify the legal standard that Movants believe applies.  They do, however, rely on voluminous documents that were not integral or otherwise incorporated into the Trust's complaint.  For this reason, the Motions are more appropriately treated as ones for summary judgment under Federal Rule of Civil Procedure 56, than motions to dismiss pursuant to Rule 12(b)(6).  See *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016) ("If other 'matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.'") (quoting Fed. R. Civ. P. 12(d)).  5C Charles Alan Wright et al., *Fed. Prac. & Proc. Civ.* § 1366 (3d ed.) ("The element that triggers the conversion [from a Rule

---

[5] Protocol Order, D.I. 185, ¶ 11.

12(b)(6) dismissal motion into a Rule 56 motion for summary judgment] is a challenge to the

sufficiency of the pleader's claim supported by extra-pleading material.").[6]

Pursuant to Rule 56, a movant is entitled to summary judgment if it shows "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56.  Summary judgment is thus proper "where the facts are undisputed and

only one conclusion may reasonably be drawn from them." *Gans v. Mundy*, 762 F.2d 338, 341

(3d Cir. 1985). "[A]t the summary judgment stage[,] the judge's function is not . . . to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## <u>ANALYSIS</u>

### I.   <u>Section 550</u>

Two of the Movants, TRP and Tower, argue that the claims against them must be

dismissed because they are not "transferees," as required by Section 550 of the Bankruptcy Code

(the "**Code**").  Section 550 provides that a trustee may only recover an avoided fraudulent

transfer from: "(1) the initial transferee of such transfer or the entity for whose benefit such

transfer was made; or (2) any immediate or mediate transferee of such initial transferee."  11

U.S.C. § 550(a).

---

[6] Counsel for the Trust acknowledged that they were aware of the possibility that the Motions would be treated as summary judgment motions and responded accordingly.  *See* Transcript of May 14, 2024, Hearing, Adv. D.I. 416 at 52 ("[G]iven the ambiguity of the pertinent legal standards upon which the defendants were purporting to move, Your Honor, we, of course, attached our declaration out of an abundance of caution in case this was a summary judgment motion.").  Additionally, the parties were provided with notice of my intent to treat the Motions as ones for summary judgment at oral argument. *Id.* at 131.  *See also In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287-88 (3d Cir. 1999) ("When a District Court decides to convert a motion to dismiss into a motion for summary judgment, it must provide the parties 'reasonable opportunity' to present all material relevant to a summary judgment motion.") (quoting Fed. R. Civ. P. 12(b)).

Both TRP and Tower contend that as investment managers, they never received the proceeds from the Share Repurchase Transfers, which went instead to the funds that TRP and Tower oversee (the TRP Funds and Spire X, respectively). The Trust, in response, does not dispute that TRP and Tower never received the proceeds but argues that they are nonetheless transferees because they possessed the ability to control the proceeds by virtue of their positions as investment managers of the funds. I disagree.

The Trust contends that to determine whether someone is an initial transferee under Section 550(a), the Court should apply the "dominion and control" test, which examines whether a recipient of a transfer has dominion over the money or other asset and the right to put the money to one's own purposes. *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988). But in all the cases cited by the Trust in which the dominion and control test was applied, the defendants had, at some point, been in physical possession of the proceeds. That is not the case here. While the Amended Complaint alleges that transfers were made to TRP and Tower, both defendants submitted evidence in support of their motions that demonstrate that they never received any proceeds.[7] The Trust has not cited to any case in which a defendant was held to be an initial transferee on the basis of the dominion and control test where the transfer in question was never in its possession. Accordingly, there is no reason to apply the dominion and control test here. *See Leonard v. First Commer. Mortg. Co. (In re Circuit All., Inc.)*, 228 B.R. 225, 234 (Bankr. D. Minn. 1998) (observing "the conundrum of how a party outside the formal chain of title and possession can be deemed the recipient of a

---

[7] As noted above, while the briefing makes clear that the Trust believed it was responding to a motion to dismiss, and thus argued that its pleading satisfied its burden in opposing the motion, I made clear at argument that I intended to treat the Motions as one for summary judgment. Adv. D.I. 416. The Trust made no objection or otherwise requested to supplement its opposition to submit additional evidence. As such, I have relied on the evidence submitted. Adv. D.I. 218, Declaration of Ross E. Firsenbaum in Support of TRP Motion ("**TRP Declaration**"), at PDF pg 10; Adv. D.I. 287, Declaration of Ross E. Firsenbaum in Support of Tower Motion ("**Tower Declaration**"), at PDF pg 9.

'transfer,' given the requirement of 11 U.S.C. Section 101(54) that 'property or . . . an interest in property' pass to the transferee).

Even if I were to interpret the Trust's argument as suggesting that TRP and Tower are entities "for whose benefit the transfer was made" – as referenced in the second half of Section 550(a)(1) -- the applicable test is not whether or not the defendant possesses dominion and control over the transfer, but is instead whether it received an "actual, quantifiable, and accessible benefit." *In re Samson Res. Corp.,* No. 15-11934 (BLS), 2022 WL 3135288, at *7 (Bankr. D. Del. Aug. 4, 2022) ("To recover from a transfer beneficiary under § 550(a)(1), a trustee must show that the benefit: (i) must actually have been received by the beneficiary; (ii) must be quantifiable; and (iii) must be accessible to the beneficiary."). *See also Leonard*, 228 B.R. at 234 (noting that the concepts of "entity for whose benefit" and "transferee" are mutually exclusive and "given that mutual exclusivity, it is difficult to conceive how a participating entity outside the chain could be anything under the statutory scheme other than an 'entity for whose benefit.'"). However, this is a distinction without a difference here, as application of either test leads to the same result.

The only evidence on which the Trust relies in support of its position that TRP and Tower are transferees are the documents that govern the relationship between the investment managers and the funds, *i.e.*, the investment management agreements, fund prospectuses, limited liability company agreement, grant of authority, and officer's certificate.[8] These documents, the Trust argues, give TRP and Tower the authority to supervise and direct the investments of the funds, act as agent, and execute the share repurchase trades, among other grants of authority. But that does nothing to establish that TRP or Tower either received an "actual, quantifiable, and

---

[8] Opposition to Tower Motion, Adv. D.I. 344, at 7-8 (citing Tower Declaration, Adv. D.I. 287, at PDF pg 97); Opposition to TRP Motion, Adv. D.I. 264 at 12-14 (citing TRP Declaration, Adv. D.I. 218, at PDF pg 3918).

accessible benefit" from the Share Repurchase Transfers or that they had dominion and control over the Share Repurchase Transfers. The documents relied on by the Trust fail to connect the allegedly broad powers of authority possessed by TRP and Tower to the proceeds of the Transfers at issue in this case.

Because the Trust has not presented any evidence that raises a genuine issue of material fact regarding TRP or Tower's status as a transferee, summary judgment in favor of TRP and Tower is granted.

**II.    <u>Section 546(e)</u>**

Section 546(e) of the Code provides a "safe harbor" against certain fraudulent transfer claims arising out of securities transactions. As relevant here, Section 546 provides, in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) . . . , the trustee may not avoid a transfer that is a margin payment . . . , or settlement payment, as defined in section 101 or 741 of this title [11 USCS § 101 or 741], made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7) [11 USCS § 741(7)], commodity contract . . . , or forward contract, that is made before the commencement of the case [.]

11 U.S.C. § 546(e). "Put simply, the safe harbor applies where two requirements are met: (1) there is a <u>qualifying</u> <u>transaction</u> (i.e., there is a 'settlement payment' or a 'transfer payment' . . . made in connection with a securities contract) and (2) there is a <u>qualifying participant</u> (i.e., the transfer was 'made by or to (or for the benefit of) a . . . financial institution'). *In re Nine W. LBO Sec. Litig.,* 482 F. Supp. 3d 187, 197 (S.D.N.Y. 2020), *aff'd in part, vacated in part, remanded sub nom. In Re: Nine W. LBO Sec. Litig.,* 87 F.4th 130 (2d Cir. 2023).

A.  Qualifying Transaction

Moving Defendants argue that the first prong of Section 546(e) is met because the Transfers constitute "settlement payments."  The Code defines the term "settlement payment" to mean ". . . a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. § 741(8).  "While some courts have concluded that this self-referring definition is ambiguous and does not lend itself to a plain meaning interpretation, *see generally Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Intern., Inc.)*, 195 B.R. 971, 983 (Bankr. D. Mass. 1996) (noting that definition is 'as opaque as it is circular'), other courts consider that the statute is clear when read in the context of the securities industry."  *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 865 (Bankr. S.D.N.Y. 2005).  Among the latter, the Third Circuit has interpreted the term to be "extremely broad," explaining that "[i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,* 583 U.S. 366 (2018).  Movants argue that the Transfers at issue here constitute settlement payments because they were payments to complete the open market purchases of Mallinckrodt's publicly traded shares.[9]

The Trust counters that Movants cannot establish that the Transfers qualify as "settlement payments" because they were void *ab initio* under applicable law.  Specifically, the Trust argues

---

[9] Amended Complaint ¶ 7.

that under Irish law, which governs pursuant to the internal affairs doctrine,[10] Mallinckrodt could only purchase or redeem its shares if, *inter alia*, the purchases were funded out of profits available for distribution.[11]   The Trust has alleged that Mallinckrodt did not have profits available for distribution and that the Share Repurchase Transfers are therefore void. Consequently, the Trust argues, there can be no "settlement payment" covered by Section 546(e). I disagree.

In support of its argument, the Trust relies primarily on *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857 (Bankr. S.D.N.Y. 2005) ("***Enron I***").  There, debtor Enron sought to avoid its prepetition purchase of 323,000 shares of its stock from defendant Bear Stearns.  Bear Stearns moved to dismiss asserting a Section 546 defense.

Enron opposed the motion by arguing that the transfer was not eligible for protection under Section 546's safe harbor because the underlying transaction was void under Oregon state law.  Specifically, Enron argued that, pursuant to Oregon law, the transfers to Bear Stearns were illegal distributions to a shareholder of an insolvent company and, accordingly, did not qualify as "settlement payments 'commonly used' in the securities and forward contract trade as required by that section."  *Id.* at 868; 11 U.S.C. § 741(8) ("'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade").  In other words, Enron argued, "no common trade usage would consider an illegal payment to constitute a bona fide settlement payment."  *Id.* at 870.  The Court agreed, holding that:

---

[10] Under the internal affairs doctrine, the law of the state of incorporation governs affairs involving a corporation's relationship to its shareholders.  See *In re PHP Healthcare Corp.*, 128 F. App'x 839, 843-44 (3d Cir. 2005).

[11] Adv. D.I. 265, Opposition to Citadel Motion at 11 (citing Section 105(2) of the Companies Act 2014 of Ireland).

> A settlement payment is a payment made to discharge a settlement obligation. If the Oregon law was violated, the payment cannot be a settlement payment because the transaction is void and there is no settlement obligation to discharge nor any securities transaction to complete.

*Id.* at 876.   I am not persuaded that *Enron I* is applicable here for two reasons.

First, the validity of the holding in *Enron I* is questionable in light of the Second Circuit's decision in *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011) ("***Enron II***").   There, the Court held that it disagreed with the notion that the phrase "commonly used in the securities trade" in Section 546(e) modifies all preceding terms in that subsection, thereby excluding from the definition of "settlement payment" all uncommon payments.  *Id.* at 335.  As the Second Circuit explained:

> Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." . . . . Under the "rule of the last antecedent, . . . a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003); *see also Stepnowski v. Comm'r*, 456 F.3d 320, 324 n.7 (3d Cir. 2006) ("Under the last-antecedent rule of construction, . . . the series 'A or B with respect to C' contains two items: (1) 'A' and (2) 'B with respect to C.'"). Enron seizes on a corollary rule of construction under which "a modifier . . . set off from a series of antecedents by a comma . . . should be read to apply to each of those antecedents." *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,* 186 F.3d 210, 215 (2d Cir. 1999), *abrogated on other grounds as recognized by Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 660 n.2 (2d Cir. 2005). For example, in the phrase "no person shall be deprived of life, liberty, or the pursuit of happiness, without due process of law," the phrase "without due process of law" modifies all three terms. This rule, however, does not apply to the series in § 741(8) because the modifier is not set off from its antecedents by a comma. Because both the modifier and its immediate antecedent are set off from the preceding terms in the series, the last-antecedent rule applies. ***The phrase "commonly used in the securities industry" thus is properly read as modifying only the term "any other similar payment." The phrase is not a limitation on the definition of settlement payment, but rather, as our sister circuits have held, it is "a catchall phrase intended to underscore the <u>breadth</u> of the § 546(e) exemption."*** *In re QSI Holdings, Inc.,* 571 F.3d at 550 (*quoting Contemporary Indus. Corp.,* 564 F.3d at 986 (underlining in original)).

*Enron II*, 651 F.3d at 335-36 (emphasis added).

As the holding in *Enron I* was premised on that Court's conclusion that "in order to qualify as a settlement payment that is protected by the safe harbors, the settlement payment must be 'commonly used' within the industry[,]" 323 B.R. at 870, the Second Circuit's denunciation of that conclusion calls the legitimacy of *Enron I* into question. *See also Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Inv'rs Fund, L.P.)*, 467 B.R. 643, 653 (Bankr. N.D. Ill. 2012) (stating that the [*Enron I*] ruling "may not be strong precedent given the Second Circuit's recent broad interpretation of the safe harbor provision in [*Enron II*].").

But even if *Enron I* remains good law, it is distinguishable on its facts. The transaction at issue in *Enron I* was a single transfer made to a single defendant pursuant to a single contract. Here, on the other hand, the Trust seeks to unwind a widespread series of transactions made over the span of three years which involved the repurchase of more than 36 million shares on the open market from more than 75 defendants. This difference is crucial in light of the underlying purpose of Section 546(e). As the Second Circuit explained:

> The narrowest purpose of Section 546(e) was to protect other commodities and securities firms from avoidance claims seeking to unwind a bankrupt commodities or securities firm's transactions that consummated transfers between customers. See H.R. Rep. No. 97-420, at 1 (1982) ("The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market.").

*Deutsche Bank Tr. Co. Ams. v. Large Private Ben. Owners (In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 91 (2d Cir. 2019). The narrow facts in *Enron I* did not implicate these concerns. The same cannot be said here.

The Trust also relies on *Cooper v. Centar Invs. (Asia) Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855, 866 (Bankr. C.D. Cal. 2010) as supporting its position.  But *TriGem* is also distinguishable on its facts.  The Court in *TriGem* did not refuse to apply the safe harbor because the transaction violated applicable law, but rather held that the fact that the purported "swap" was, among other things, designed for the purpose of evading Korean law, made the safe harbor inapplicable.  *Cooper v. Centar Invs. (Asia) Ltd. (In re TriGem Am. Corp.)*, 431 B.R. 855, 866 (Bankr. C.D. Cal. 2010) ("Almost everything about this transaction smells of an *ad hoc* attempt to evade the Korean authorities, which, combined with its manifestly one-sided structure and the fact that it was foisted upon TGA by TGI, brings it outside of the protection of the statute because it was not the same or similar to anything commonly used in the securities trade.").  Accordingly, *TriGem* simply stands for the proposition that in order to take advantage of the provision of Section 546 that applies to swap agreements, the transaction must actually be a swap agreement.  *Id.*  ("Nor is it any reasonable argument that the Court should merely accept the parties' designation of the transaction as a "swap agreement" because an International Swaps and Derivatives Association form was used; it is an ancient precept that equity will disregard labels and inquire into the substance of a transaction.").  This holding simply does not apply here.

As the Third Circuit has made clear, the Code's definition of "settlement payment" is "extremely broad."  *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savings & Loan Ass'n*, 878 F.2d 742, 752 (3d Cir. 1989).  I see no valid reason to exclude the Share Repurchase Transfers that took place here from that definition.  I find that the Share Repurchase Transfers constitute "settlement payments" as that term is used in Section 546(e) and that the "qualifying transaction" prong of Section 546(e) is therefore satisfied.[12]

---

[12] Movants also argue that the Share Repurchase Transfers are qualifying transactions for the additional reason that they are transfers made "in connection with a securities contract."  11 U.S.C. § 546(e).

B. <u>Qualifying Participant</u>

Having established that the Transfers are qualifying transactions, I must now determine if the Movants were qualifying participants, *i.e.* a financial institution, financial participant, or other entity set forth in Section 546(e).  11 U.S.C. §546(e) (referring to transfers made by or to (or for the benefit of) a "commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7) [11 USCS § 741(7)], commodity contract, as defined in section 761(4) [11 USCS § 761(4)], or forward contract . . . .").

1. <u>TRP Funds</u>

The TRP Funds argue that they qualify as "financial institutions" because they are investment companies registered under the Investment Company Act of 1940 (the "**40 Act**").[13] *See* 11 U.S.C. §101 (22) (defining "financial institution" to include "in connection with a securities contract (as defined in section 741 [11 USCS § 741]) an investment company registered under the Investment Company Act of 1940 [15 USCS §§ 80a-1 et seq.]").  The Trust does not dispute the TRP Funds' status as '40 Act companies but argues that the TRP Funds have not established that they are financial institutions because they have not sufficiently established that they were acting "in connection with a securities contract."  Specifically, the Trust argues that the TRP Funds cannot rely on the Purchase Agreements, which govern the Share Repurchase Transfers, because (1) the agreements make no reference to any specific repurchase trades that the TRP Funds were involved with or received proceeds from; and (2) the TRP Funds were not parties to the Purchase Agreements.  I am not persuaded by either argument.

---

However, given that I have concluded that the Share Repurchase Transfers constitute settlement payments, I need not address that argument.

[13] TRP Declaration, Adv. D.I. 218 at PDF pg 13.

First, the Trust's own allegations preclude any argument that the Transfers were not sufficiently related to, or made "in connection with," the Purchase Agreements. *See* Amended Complaint ¶ 274 ("Mallinckrodt entered into . . [the Purchase Agreements] . . . *in connection with the share repurchases*.") (emphasis added). Second, the Trust cites to nothing in support of its position that the phrase "a securities contract" as used in Section 101(22) should be read to mean "a securities contract *to which the transferee is a party*." If Congress meant to restrict the definition of financial participant in such a way, it easily could have included such a modifier. That it chose not to do so is significant. *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600 (2020) (Courts "may not narrow a provision's reach by inserting words Congress chose to omit.").

Additionally, Courts that have considered the question as it pertains to the identical language in Section 546(e) have reached a conclusion contrary to what the Trust suggests. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 12 MC 115 JSR, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("The issue, then, is whether Section 546(e) requires that the securities contract that the transfer is made "in connection with" must be a securities contract with the debtor. Nowhere in the language of Section 546(e) is such a relationship explicitly required."). *See also In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 203 (S.D.N.Y. 2020), *aff'd in part, vacated in part, remanded sub nom. In Re: Nine W. LBO Sec. Litig.,* 87 F.4th 130 (2d Cir. 2023) (finding defendants who received payments that were part of a qualifying transaction constituted financial institutions because their SEC filings indicated that they were registered under the '40 Act). I agree with the reasoning of these cases and similarly hold that the TRP Funds qualify as financial institutions under Section 546(e).[14]

---

[14] The Trust argues that the *Nine West* Court was interpreting the language of Section 546(e) and not 101(22). This is incorrect. *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 203 (S.D.N.Y. 2020) (finding that defendants whose SEC filings indicate that they are '40 Act companies qualify as "financial institutions" under Section 101(22)(B)). But it would not matter in any event, as it is a cardinal rule of

As both the "qualifying transaction" and "qualifying participant" prongs of Section 546(e) are satisfied, summary judgment is granted in favor of the TRP Funds.

    2.  <u>Spire X</u>[15]

Defendant Spire X argues that it qualifies as a financial participant on two independent grounds. Specifically, Spire X contends that as of the relevant dates, it had: (1) a credit extension to support daily trading activities in the amount of $308 million; and (2) repurchase agreements with mark-to-market positions of over $302 million. Because I can resolve this motion on the first ground, I need not reach the second.

In support of its position that it has an extension of credit of the requisite amount, Spire X submitted into evidence a Securities Account Agreement between Spire X and ABN AMRO Clearing Chicago LLC, the Haircut Report associated with this agreement, and the declaration of John Cogman, Chief Investment Officer of Tower Research.[16] In his declaration, Mr. Cogman states that "the Haircut Report shows that as of October 12, 2020, Spire X's credit utilization was $308,151,944. This value represents the mark to market value of the margin loan ABN AMRO extended to Spire X to support its trading activities on that day, which was calculated by reference to the market value of the securities Spire X sold short on October 12, 2020."[17] The Trust counters that this evidence is insufficient to establish Spire X's status as financial

---

statutory construction that "a term appearing in several places in statutory text is generally read the same way each time it appears." *Ratzlaf* v. *United States*, 510 U.S. 135, 143 (1994).

[15] The Tower Motion also includes a motion on behalf of defendant Latour. The Trust acknowledges that Latour has demonstrated that it qualifies as a financial participant, but states that it declined to dismiss Latour because the Trust did not believe it (like the other movants) had established the existence of a qualifying transaction. See Opposition to Tower Motion, Adv. D.I. 344 at 27 n. 57. As I have ruled that the Movants have established that the Share Repurchase Transfer was a qualifying transaction, summary judgment is granted in favor of Latour.

[16] Tower Declaration, Adv. D.I. 287 at PDF pg 97.

[17] *Id.* at PDF pg 99.

participant because the documents produced merely show that, in both form and substance, the

arrangement between ABN AMRO and Spire X was a loan, not a mark-to market position.

The Code defines the term "financial participant" to include:

> **an entity that**, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, **has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a)** [11 USCS § 561(a)] with the debtor or any other entity (other than an affiliate) **of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding** (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, <u>or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements</u> or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition . . . .

11 U.S.C. § 101(22A) (emphasis added).  The "agreements or transactions" referenced within

this definition, as described in Section 561(a), include "securities contracts," 11 U.S.C. § 561(a),

which are defined in Section 741(7) of the Code as including "any extension of credit for the

clearance or settlement of securities transactions." 11 U.S.C. § 741(7)(A)(v).

The evidence submitted by Spire X is sufficient to establish that it had, as of the relevant

date, an extension of credit for the clearance or settlement of securities transactions with a mark-

to-market position of in excess of $100 million, and therefore qualifies as a financial participant.

Accordingly, the burden then shifted to the Trust, as non-movant, to submit contrary evidence

sufficient to demonstrate the existence of an issue of material fact.  *In re Bamboo Abbott, Inc.*,

Nos. (Chapter 7) (MBK), 09-28689, 11-02139, 2012 Bankr. LEXIS 3097, at *5-6 (Bankr. D.N.J.

July 5, 2012) ("Once the moving party establishes the absence of a genuine issue of material fact,

. . . the burden shifts to the non-moving party to do more than simply show that there is some

metaphysical doubt as to the material facts.  A party may not defeat a motion for summary

judgment unless it sets forth specific facts, in a form that 'would be admissible in evidence,' establishing the existence of a genuine issue of material fact for trial.") (internal citations omitted); *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) ("Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions."). The Trust has not met this burden.

The only evidence submitted by the Trust in response to Spire X's motion was the testimony of its expert, Israel Shaked, in which he opines that it is inconsistent with generally accepted financial principles to value a loan by reference to a mark-to-market position.[18] Most of Dr. Shaked's report discussed Spire X's repurchase agreements. The entirety of Dr. Shaked's testimony regarding Spire X's credit agreement is the following:

> I have reviewed the ABN AMRO documents provided by the Defendants. What was presented in these documents is a credit facility and not a mark-to-market position. Furthermore, defendants describe that ABN AMRO extended credit to Spire X, acknowledging that this was a loan. Thus, the $100 million threshold is not relevant to ABN AMRO's loan to Spire X. Instead, the applicable threshold is the $1 billion in notional or actual principal amount outstanding. Spire X's $308 million loan balance falls short of that threshold.[19]

While Dr. Shaked states, in conclusory fashion, that the amount Spire X reports as a mark-to-mark position is not one, he fails to explain the basis for that conclusion beyond the passing implication that a loan is not properly thought of as having a mark-to-market position. He does not challenge that accuracy of the calculations or methodology performed by Spire X or provide any other reason for questioning the validity of Spire X's submissions. This does not create a genuine issue of material fact.

The Trust's argument is essentially that as a matter of generally accepted accounting principles a loan cannot have a mark-to-market position and, thus, a party relying on a loan to

---

[18] Opposition to Tower Motion, Adv. D.I. 344 at PDF pg 56.
[19] *Id.*

establish that it meets the threshold must use the $1 billion notional or actual principal amount

and not the $100 million mark-to-market amount.  But even if I accept the underlying

proposition as true as, I cannot simply ignore that the statute expressly includes extensions of

credit as the type of agreement whose value could be determined by reference to mark-to-market

position.[20]  The credit agreement on which Spire X relies meets the requirements set forth in

Section 101(22A) and Spire X therefore qualifies as a financial participant.  *Golden v. Cmty.*

*Health Sys. (In re Quorum Health Corp.)*, 2023 Bankr. LEXIS 698, at *20 (Bankr. D. Del. Mar.

16, 2023).

As both the "qualifying transaction" and "qualifying participant" prongs of Section

546(e) are satisfied, summary judgment is granted in favor of Spire X.

### 3.  Citadel

Citadel argues that it qualifies as a financial participant on two independent grounds: (1)

it has outstanding repurchase and reverse repurchase agreements in gross notional amounts of

$10.4 billion and $4.4 billion, respectively; and (2) it has outstanding option positions with a

notional amount of over $65 billion.  Each of these, Citadel argues, far exceeds the $1 billion

notional or actual principal amount outstanding threshold required by the statute.  In support of

its position, Citadel points to its 2019 audited financial statements and its SEC-filed Form 13F.[21]

As the Trust acknowledges, the notional or actual principal amount of a contract is often

readily discoverable.  See Opposition to Citadel Motion at 26 ("Unlike the notional or actual

---

[20] In pertinent part, Section 101(22) provides that a financial participant is "an entity that. . . at the time of
the date of the filing of the petition . . . has [agreements, including a securities contract, which is defined
as including "any extension of credit for the clearance or settlement of securities transactions"] with the
debtor or any other entity . . . of a total gross dollar value of not less than $1,000,000,000 in notional or
actual principal amount outstanding .. . . **or** has gross mark-to-market positions of not less than
$100,000,000 . . . in one or more such agreements. . . ."  11 U.S.C. § 101(22A).
[21] See Declaration of Ross E. Firsenbaum in Support of Citadel Motion ("**Citadel Declaration**"), Adv.
D.I. 216 at PDF pgs 23, 36-37, and 45.

principal amounts outstanding, which may be ascertainable from the face of an instrument, an entity's 'gross mark-to-market position' cannot be determined by simply reviewing the terms of an instrument.").  Nevertheless, the Trust disputes that Citadel can satisfy its summary judgment burden and establish that it meets the threshold requirements by reference to only its financial statements, an internally prepared spreadsheet detailing the data underlying the financials, and a declaration of its principal.  The Trust argues it is not required to accept this evidence at face value, particularly in light of the fact that Citadel was fined by the SEC in 2023 for incorrectly marking millions of orders.  Instead, it insists that it is entitled to the historical documents that substantiate the spreadsheet data, such as underlying trade documentation and relevant agreements themselves, including the repurchase and reverse repurchase agreements and the relevant options contracts, which Citadel refused to provide.  I disagree.

Citadel met its initial burden of producing evidence that establishes that it is a financial participant by producing its financial statements along with sworn declarations of its officers. The burden then shifted to the Trust to present evidence that raises a genuine issue of material fact.  *In re Bamboo Abbott, Inc.*, Nos. (Chapter 7) (MBK), 09-28689, 11-02139, 2012 Bankr. LEXIS 3097, at *5-6 (Bankr. D.N.J. July 5, 2012); Fed. R. Civ. P. 56(e) ("Once the moving party establishes the absence of a genuine issue of material fact, however, the burden shifts to the non-moving party to do more than simply show that there is some metaphysical doubt as to the material facts. A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that would be admissible in evidence, establishing the existence of a genuine issue of material fact for trial.") (internal quotations and citations omitted).  It has not done so.

The only evidence submitted by the Trust in opposition to Citadel's motion related to the issue of whether there was a qualifying transaction.  The Trust did not submit evidence that would raise any questions about Citadel's calculations of its notional or actual value or the validity of its SEC filings.  While the Trust included in its argument reference to a press release discussing the fact that Citadel was fined $7 million in 2023 for marking errors, this does not advance the Trust's position.  The existence of an unrelated problem with certain Citadel SEC filings does nothing to create an issue of triable fact as to the filings before me now.  There is nothing in the press release or the underlying SEC order attached thereto that would support the conclusion that the mis-marking errors that are the subject of the order impacted the accuracy of the SEC filings on which Citadel relies here.[22]  Accordingly, it does not suffice in creating an issue of fact that would preclude summary judgment.  *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969) ("[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient.") (internal citations omitted).

While the Trust argues that it has not yet had the opportunity to take full discovery and should be entitled to test the veracity of Citadel's conclusions, such generalized arguments are insufficient to oppose a summary judgment motion.  To the extent the Trust believed it required information that Citadel (or any other Movant) objected to providing during negotiations pursuant to the Protocol Order, there is nothing in that Order that precluded the Trust from seeking the assistance of the Court in resolving that issue in a timely matter prior to the filing of any motions.  Alternatively, the Trust could have opposed Citadel's motion with a declaration

---

[22] See Press Release, SEC, *SEC Charges Citadel Securities for Violating Order Marking Requirements of Short Sale Regulations* (Sept. 22, 2023), https://www.sec.gov/news/press-release/2023-192 (describing the problem as originating from a coding error in Citadel's trading system, which Citadel eventually discovered upon its own internal audit and remedied).

that specified exactly what it needed to respond to the motion and explain why it could not

obtain it until now.  But the Trust did neither.  Accordingly, the fact that formal discovery has

not yet occurred does not preclude the entry of summary judgment in Citadel's favor now, nearly

two years after this action was commenced and nearly one year after the Trust received Citadel's

response to its request for additional information.[23]  *See Shelton v. Bledsoe*, 775 F.3d 554, 568

(3d Cir. 2015) ("Summary judgment may [ ] be granted if the Rule 56(d) declaration is

inadequate. An adequate affidavit or declaration specifies what particular information that is

sought; how, if disclosed, it would preclude summary judgment; and why it has not been

previously obtained.") (citing *See Koplove v. Ford Motor Co*., 795 F.2d 15, 18 (3d Cir. 1986)

(finding the affidavit insufficient because it did not specify what discovery was needed or why it

had not previously been secured) and *Dowling v. Philadelphia*, 855 F.2d 136, 140 (3d Cir.

1988)) (internal citations omitted).  Speculation alone does not satisfy Rule 56(d).  *FDIC v.

Arciero*, 741 F.3d 1111, 1116 (10th Cir. 2013) ("Speculation cannot support a Rule 56(d)

motion.").[24]

　　　For these reasons, I find that Citadel has established that it meets the requirements set

forth in Section 101(22A) and therefore qualifies as a financial participant. As both the

"qualifying transaction" and "qualifying participant" prongs of Section 546(e) are satisfied,

summary judgment is granted in favor of Citadel.

---

[23] Adv. D.I. 265, Declaration of Serafina Concannon (noting Citadel responded to Trust's request for additional information on September 14, 2023).

[24] The Trust included argument in its brief and during the hearing about the discovery needed, but arguments by counsel do not constitute evidence.  *Jersey Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.").

4. <u>Susquehanna Securities</u>

Susquehanna argues that it is a financial participant because it has outstanding mark-to-market options contract positions in excess of $100 million.  In support of its position, Susquehanna submitted its 2019 Audited Financial Statement, along with the declaration of its Treasurer, Robert Sack, which it contends demonstrates that as of the relevant date it had outstanding options and options on futures with an aggregate mark-to-market value of over $38.5 billion.[25]

The Trust did not submit any evidence on the question of whether Susquehanna qualifies as a financial participant, but instead simply argues that the Trust is not obligated to accept Susquehanna's evidence at face value, particularly in light of Susquehanna's refusal to provide any of the supporting information requested by the Trust.  I disagree.

As discussed above, to the extent the Trust believed it required information that Susquehanna objected to providing during negotiations, there is nothing in the Protocol Order that precluded the Trust from seeking the Court's assistance in reaching a resolution on that dispute in a timely matter.  Alternatively, the Trust could have opposed Susquehanna's motion with a declaration that specified exactly what it needed to respond to the motion and explain why it could not obtain it until now.  But the Trust did neither.

For these reasons, I find that Susquehanna has established that it meets the requirements set forth in Section 101(22A) and qualifies as a financial participant. As both the "qualifying transaction" and "qualifying participant" prongs of Section 546(e) are satisfied, summary judgment is granted in favor of Susquehanna.

---

[25] Citadel Declaration, Adv. D.I. 216 at PDF pg 342.

5.  Renaissance Defendants

The Renaissance Defendants consist of several individual funds – Rock Creek, RIEF Trading, and GF Trading[26] – which are all managed by Renaissance Technologies LLC ("**Renaissance**"), a non-party to this proceeding.[27]  The Renaissance Defendants argue that they qualify as financial participants on the following bases: (1) Rock Creek had outstanding equity and equity index swap agreements with an aggregate gross notional value of approximately $1.2 billion; (2) RIEF Trading had outstanding equity swap agreements with an aggregate gross notional value of approximately $2.54 billion; and (3) GF Trading had outstanding equity swap agreements with an aggregate gross notional value of approximately $26 billion.  In support of this position, the Renaissance Defendants point to their audited financial statements, along with declarations from Renaissance's Chief Financial Officer, Brian Felczak.[28]

As it did with the other Movants, the Trust argues that the information provided by the Renaissance Defendants is insufficient to establish that they are financial participants.  Specifically, the Trust argues that it need not accept defendants' summary documentation at face value, particularly where defendants have a "history of engaging in controversial practices, as evidenced by Renaissance Technologies' payment of a staggering $7 billion to the IRS to settle a dispute over how Renaissance Technologies (Movants' investment manager) taxed its options trades."[29]

---

[26] Renaissance Motion, D.I. 242, at 4.

[27] The fourth fund is RIEF RMP.  The Trust has indicated that it is not challenging RIEF RMP's status as a qualifying participant.  Trust Opposition to Renaissance Motion, Adv. D.I. 314 at 8, n. 7.  Accordingly, as I have already ruled that there is a qualifying transaction, RIEF RMP meets the requirements for Section 546(e) and its motion is granted.

[28] Declaration of Ross E. Firsenbaum in Support of Renaissance Motion, Adv. D.I. 243.

[29] Opposition to Renaissance Motion, Adv. D.I. 314 at 10-11 (citing generally a 2021 article in the New York Times).

But again, as with the Trust's opposition to the previous motions, the Trust's opposition here falls short of meeting its burden.  The Trust has offered nothing that raises a triable issue of fact regarding any aspect of the evidence on which the Renaissance Defendants rely.  Accordingly, and for the reasons set forth in detail above, the summary judgment in favor of the Renaissance Defendants is also granted.

For the foregoing reasons, the Motions are **GRANTED**.  A judgment consistent with this Opinion will be entered separately.

**SO ORDERED.**

Dated:  September 5, 2024

_____
JOHN T. DORSEY, U.S.B.J.